# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| VICTOR CAGARA ORTIGUERRA, DONATO MANALILI AGUSTIN, AMADO TRANATE YUZON, CHRISTOPHER ESCALANTE RAYOS, ARVIN BANZON SAN PEDRO, WILFREDO BATONG SATUROS, ROSEL NUFABLE HERNANDEZ, SIEGFRIED TAPIA CARLOS, RENATO ARBOLIDA DECENA, and ISAIAS SANTIAGO DINGLASAN,<br><br>     *Plaintiffs*<br><br>v.<br><br>GRAND ISLE SHIPYARD, LLC., and GIS, LLC,<br><br>     *Defendants* | **CIVIL ACTION NO.**<br>**2:22-cv-00309-CJB-KWR**<br><br>**COLLECTIVE ACTION PURSUANT TO 29 U.S.C. § 216(b)**<br><br>**CLASS ACTION PURSUANT TO FED. RR. CIV. P. 23(a), 23(b)(2), & 23(b)(3)**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

**NOW INTO COURT,** through undersigned counsel, come Plaintiffs Victor Cagara Ortiguerra, Donato Manalili Agustin, Amado Tranate Yuzon, Chistopher Escalante Rayos, Arvin Banzon San Pedro, Wilfredo Batong Saturos, Rosel Nufable Hernandez, Siegfried Tapia Carlos, Renato Arbolida Decena, and Isais Santiago Dinglasan (collectively, "Plaintiffs"), on their own behalf and on behalf of those similarly situated and allege as follows:

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs are skilled welders and/or fitters from the Philippines who worked for Grand Isle Shipyard LLC and GIS, LLC (collectively, "Defendants") in and around Galliano, Louisiana at various times from 2006 until 2022.

2.    Defendants housed Plaintiffs and dozens of other Filipino workers in a former bowling alley Defendants had converted into a bunkhouse. When the Plaintiffs and other Filipino workers were in between offshore jobs—lulls that often lasted for a week or longer—Defendants did not allow them to leave the bunkhouse, except in a GIS van that took them on brief trips to the local Walmart (or, at the end of their stint, to purchase goods for their family in a larger town). The Filipino workers were prohibited from getting rides with non-Filipino workers, using taxi services, or walking away from the bunkhouse.  Supervisors threatened to fire and deport Filipino workers who attempted to leave the bunkhouse.

3.    During the COVID-19 pandemic, Plaintiffs and other Filipino workers who were infected with the virus were required to quarantine in cramped quarters on moored tugs and supply ships.  Defendants did not provide the quarantined workers with sufficient food, and the only medical treatment they initially received was Vitamin C and white pills the Plaintiffs believe was Percocet.  Later in the pandemic, the quarantined workers were not provided with any medication. The misery on the quarantine vessels was compounded by the very weak cellular data signal. Therefore, though sick and isolated, it often was not possible for the quarantined workers to communicate with their families.

4.    Defendants were so adamant that the Filipino workers not leave the bunkhouse or the quarantine vessels, they were abandoned as Category 4 Hurricane Ida made landfall on top of Galliano.  Plaintiffs Rosel N. Hernandez, Siegfried Carlos, Renato Decena, and Isais Dinglasan had to shelter in the bunkhouse and feared for their lives as the hurricane shredded the building.

Upon information and belief, other Filipino workers weathered the storm on the quarantine vessels as they were blown and tossed in the wind and storm surge.  The non-Filipino workers were evacuated before the storm.

5.      This conduct constituted forced labor and trafficking for forced labor, in violation of the Trafficking Victims Protection Act ("TVPA"), as well as attempt and conspiracy to commit forced labor and trafficking for forced labor.

6.      This conduct and other rules of occupancy applying to the bunkhouse and the quarantine vessels applied only to the Filipino workers.  Therefore, it constituted housing discrimination in violation of the Fair Housing Act.

7.      Plaintiffs and Filipino workers routinely worked or were on call upwards of ninety hours per week, but Defendants did not pay them the minimum wage and overtime wage required by the Fair Labor Standards Act ("FLSA").

8.      Finally, Defendants claim that Plaintiffs and other Filipino workers should be forced to arbitrate these claims in the Philippines, effectively stripping these workers of access to a United States forum to seek remedies available under federal law for injuries suffered in the United States.  Plaintiffs and other Filipino workers seek a declaratory judgment on issues of arbitrability.

## II.      JURISDICTION AND VENUE

9.       The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1337; 29 U.S.C. § 201 *et seq.* (the Fair Labor Standards Act); 18 U.S.C. § 1595(a) (TVPA); and 42 U.S.C. § 3613 (Fair Housing Act).  The Court also has jurisdiction over the declaratory judgment claim in this action pursuant to 28 U.S.C. § 2201.

10.     The Court has personal jurisdiction over Defendants since they regularly conduct business in the State of Louisiana and therefore have minimum contacts with the State of Louisiana.

11.     Venue lies in this Court over these claims pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Louisiana.

### III.   PARTIES

12.     Plaintiff Victor Cagara Ortiguerra ("Ortiguerra") is a resident of Florida who Defendants employed as a welder from 2019 until 2021. While Ortiguerra worked for Defendants, he was a resident of the State of Louisiana.

13.     Ortiguerra's written consent to join this FLSA collective action is attached hereto as Exhibit A and was attached as Exhibit A to Plaintiffs' initial Complaint. ECF No. 1.

14.     Plaintiff Donato Manalili Agustin ("Agustin") is a resident of Florida who Defendants employed as a fitter in 2008 and again from 2018 until 2021. While Agustin worked for Defendants, he was a resident of the State of Louisiana.

15.     Agustin's written consent to join this FLSA collective action is attached hereto as Exhibit B and was attached as Exhibit B to Plaintiffs' initial Complaint. ECF No. 1.

16.     Plaintiff Amado Tranate Yuzon ("Yuzon") is a resident of Florida who Defendants employed as a welder from 2006 until 2021.  While Yuzon worked for Defendants, he was a resident of the State of Louisiana.

17.     Yuzon's written consent to join this FLSA collective action is attached hereto as Exhibit C and was attached as Exhibit C to Plaintiffs' initial Complaint. ECF No. 1.

18.     Christopher Escalante Rayos ("Rayos") is a resident of Florida who Defendants employed as a welder from 2019 until 2021.  While Rayos worked for Defendants, he was a resident of the State of Louisiana.

19.     Rayos's written consent to join this FLSA collective action is attached hereto as Exhibit D and was attached as Exhibit D to Plaintiffs' initial Complaint. ECF No. 1.

20.     Arvin Banzon San Pedro ("San Pedro") is a resident of Florida who Defendants employed as a fitter from 2007 until 2021.  While San Pedro worked for Defendants, he was a resident of the State of Louisiana.

21.     San Pedro's written consent to join this FLSA collective action is attached hereto as Exhibit E and was attached as Exhibit E to Plaintiffs' initial Complaint. ECF No. 1.

22.     Wilfredo Baton Saturos ("Saturos") is a resident of Florida who Defendants employed as a welder from 2018 until 2021.  While Saturos worked for Defendants, he was a resident of the State of Louisiana.

23.     Saturos's written consent to join this FLSA collective action is attached hereto as Exhibit F and was attached as Exhibit F to Plaintiffs' initial Complaint. ECF No. 1.

24.     Isaias Santiago Dinglasan ("Dinglasan") is a resident of Florida who Defendants employed as a fitter and welder from 2007 until 2022.  While Dinglasan worked for Defendants, he was a resident of the State of Louisiana.

25.     Dinglasan's written consent to join this FLSA collective action was docketed on May 11, 2022.  ECF No. 11.

26.     Renato Arbolida Decena ("Decena") is a resident of Florida who Defendants employed as a welder from 2018 until 2022.  While Decena worked for Defendants, he was a resident of the State of Louisiana.

27.     Decena's written consent to join this FLSA collective action was docketed on May 11, 2022.  ECF No. 9.

28.     Rosel Nufable Hernandez ("Hernandez") is a resident of Florida who Defendants employed as a welder from 2007 until 2022.  While Hernandez worked for Defendants, he was a resident of the State of Louisiana.

29.     Hernandez's written consent to join this FLSA collective action was docketed on May 11, 2022.  ECF No. 9.

30.     Siegfried Tapia Carlos ("Carlos") is a resident of Florida who Defendants employed as a welder from 2018 until 2022.  While Carlos worked for Defendants, he was a resident of the State of Louisiana.

31.     Carlos's written consent to join this FLSA collective action was docketed on May 11, 2022.  ECF No. 9.

32.     Plaintiffs are among over 100 nationals of the Philippines who worked for the Defendants with B-1 visas as welders, fitters, painters/riggers/blasters, cooks, mechanics, and housekeepers/laundrymen in the Eastern District of Louisiana (collectively, "B-1 workers").

33.     Like Plaintiffs, the other B-1 workers resided at Defendants' Lafourche Parish, Louisiana bunkhouse and at various times also worked offshore under the same or similar wage payment scheme, which resulted in minimum wage and overtime underpayments.

34.     Plaintiffs and other B-1 workers are Filipino, of Philippine national origin, and Asian Pacific Islanders.

35.     Pursuant to 29 U.S.C. § 216(b), and as set forth in detail below, Plaintiffs seek to assert their FLSA claims individually and on behalf of all similarly situated individuals.

36.     Pursuant to Fed. RR. Civ. P. 23(a) and 23(b)(3), and as set forth below, Plaintiffs assert their TVPA and Fair Housing Act claims individually and on behalf of all similarly situated individuals.

37.     Pursuant to Fed RR. Civ. P. 23(a) and 23(b)(2), and as set forth below, Plaintiffs assert their claims for a declaratory judgment on the question of arbitrability individually and on behalf of all similarly situated individuals.

38.     Defendant Grand Isle Shipyard, LLC. ("GI Shipyard") is a Louisiana Limited Liability Company domiciled in Galliano, Louisiana and headquartered at 18838 Highway 3235, Galliano, LA 70354, in the Eastern District of Louisiana.

39.     Upon information and belief, GI Shipyard maintains and repairs oil rigs in the Gulf of Mexico, housing many of its 200-plus employees, when onshore, in a converted bowling alley in Lafourche Parish, Louisiana.

40.     According to Louisiana Secretary of State records, Daniel St. Germaine is the Registered Agent for GI Shipyard, with the same address as the GI Shipyard headquarters.

41.     Defendant GIS, LLC ("GIS") is a Washington Limited Liability Company registered with the Louisiana Secretary of State as a Foreign Limited Liability Company. GIS's principal business office is 18838 Highway 3235, Galliano, LA 70354, in the Eastern District of Louisiana.

42.     According to Louisiana Secretary of State records, Daniel St. Germaine is the Registered Agent for GIS, with the same address as the GIS business office.

43.     Upon information and belief, GIS maintains and repairs oil rigs in the Gulf of Mexico, housing some of the 2,000-plus in purports to employ, when onshore, in a converted bowling alley in Lafourche Parish, Louisiana and on quarantine vessels.

44.     Upon information and belief, GI Shipyard and GIS exercised control over Plaintiffs' and other B-1 workers' work, directly or indirectly.

45.     Upon information and belief, GI Shipyard and GIS had the power to establish, and did establish, Plaintiffs' and other B-1 workers' terms of employment.

46.     Upon information and belief, GI Shipyard and GIS had the power to hire and fire Plaintiffs and other B-1 workers.

47.     At all relevant times, Defendants were "employers" of Plaintiffs and other B-1 workers within the meaning of the FLSA.

48.     At all relevant times, Plaintiff and other B-1 workers were individual employees engaged in performing activities within the meaning of 29 U.S.C. § 203(r) as required by 29 U.S.C. §§ 206 and 207.

49.     At all relevant times, Defendants "employed" Plaintiffs and other B-1 workers within the meaning of the FLSA.

50.     At all relevant times, Plaintiffs and other B-1 workers were engaged in commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 203(b) and (j).

51.     At all times relevant to this Complaint, Defendants have been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(s), in that Defendants operate an enterprise that has employees engaged in commerce or production of goods for commerce and that has annual gross revenues that exceed $500,000.00. 29 U.S.C. § 203(s)(1)(A).

52.     At all relevant times, each Plaintiff and other B-1 worker was a "person" as defined by the Fair Housing Act, 42 U.S.C. § 3602(d).

53.     At all relevant times, each Plaintiff and other B-1 worker was an "aggrieved person" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i).

54.     At all relevant times, each Defendant was a "person" as defined by the Fair Housing Act, 42 U.S.C. § 3602(d).

## IV.     FACTUAL BACKGROUND

55.     According to Plaintiffs' and other B-1 workers employment contracts,[1] Defendants were to pay them a "Basic Monthly Salary."

56.     For example, the "Basic Monthly Salary" amount in the Plaintiffs' 2021 employment contracts was $1,640.00.

57.     Plaintiffs and other B-1 workers did not receive their "Basic Monthly Salary" amount "free and clear."

58.     According to Plaintiffs' and other B-1 workers' employment contracts, Defendants were to pay them "Vacation Leave with Pay."

59.     For example, the "Vacation Leave with Pay" amount in the Plaintiffs' 2021 employment contracts was $246.00 per month.

60.     Plaintiffs and other B-1 workers did not receive their "Vacation Leave with Pay" amount "free and clear."

61.     According to Plaintiffs' and other B-1 workers' employment contracts, Defendants were to pay an "Overtime" rate to the Plaintiffs and other B-1 workers.

62.     For example, the "Overtime" rate in the Plaintiffs' 2021 employment contract was $15.375 per hour.

---

[1] Plaintiffs use the term "contract" herein as shorthand to refer to the referenced documents. Plaintiffs contend the documents do not constitute enforceable contracts.

63.     Plaintiffs and other B-1 workers did not receive their "Overtime" rate "free and clear."

64.     Defendants did not pay Plaintiffs and other B-1 workers their wages "free and clear" as required by the FLSA.  29 C.F.R. § 531.32.  Rather, Defendants paid Plaintiffs and other B-1 workers only twenty percent of their wages.

65.     Plaintiffs and other B-1 workers regularly worked over 70 hours per week while offshore and were on call all day, every day, while living in Defendants' bunkhouse.

66.     Defendants did not pay Plaintiffs and other B-1 workers full overtime premiums at a rate of time-and-a-half for every hour worked and/or on call over 40 hours in a workweek.

67.     Defendants paid the remainder of Plaintiffs' and other B-1 workers' wages to DNR Offshore and Crewing Services, Inc. ("DNR"), a labor broker based in the Philippines. DNR in turn took substantial deductions out of the Plaintiff's and other B-1 workers' wages and paid the balance to Plaintiffs' and other B-1 workers' family members in the Philippines.

68.     For example, the workweek of December 29, 2020 to January 4, 2021, Plaintiff Agustin's wage statement indicates he worked 46 hours,[2] his regular (non-overtime) pay was $404.60 (40 hours at $10.12 per hour), and his overtime pay was $91.08 (6 hours at $15.18 per hour).  Under Defendants' wage payment scheme, Agustin would have received only 20 percent of these wages "free and clear."  Therefore, his regular pay rate would have been $2.02 per hour, and his overtime pay rate would have been $3.04 per hour; both substantially below the FLSA minimum wage and the FLSA-mandated overtime pay rate based on Agustin's regular rate of pay.

---

[2]  Plaintiffs dispute that their wage statements accurately reflect their work hours.

69.     The pay scheme described above was designed to prevent Plaintiffs and other B-1 workers from having access to sufficient financial resources to leave their employment with Defendants.

70.     When Plaintiffs and other B-1 workers were not working on rigs or getting transported to and from rigs, they were required to stay in the Defendants' bunkhouse or, when quarantined because of a COVID19 infection, on a moored tugboat and supply ship.

71.     The bunkhouse and each quarantine vessel was a "dwelling" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

72.     Plaintiffs and other B-1 workers were not allowed to leave the bunkhouse on their own.

73.     The only time the Plaintiffs and other B-1 workers were allowed to leave the bunkhouse was (a) when Defendants' drivers took them to a local Walmart in a twelve-passenger van about three times per week; and (b) when Defendants' drivers took them to Houma, Louisiana to make purchases shortly before the workers departed to the Philippines.

74.     GIS supervisors threatened to fire and deport B-1 workers who attempted to leave the bunkhouse on their own. For example,

    a.    When Plaintiff Agustin tried to walk from the bunkhouse to a store to buy medicine, a supervisor the workers refer to as "Big E" caught him, yelled at him, made him go back to the bunkhouse, and said he would be fired if he saw him outside the bunkhouse again.

    b.    When Plaintiff Carlos walked to a store, a supervisor met him at the door of the bunkhouse and told him he would be deported to the Philippines if he left on his own again.

75.     The Plaintiffs and other B-1 workers either were directly threatened, as described above, or were aware of such threats directed at other B-1 workers.

76.     Defendants threatened B-1 workers who escaped from the bunkhouse and remained in the United States and threatened individuals who helped them escape. For example,

     a.   When Plaintiff Agustin left his employment at GIS and remained in the United States, a representative of DNR, GIS's manning agent, called Mr. Agustin and told him (1) DNR would report him to law enforcement and immigration authorities in the United States, and (2) Mr. Agustin would be arrested if he returned to the Philippines.

     b.   When Plaintiffs Hernandez, Carlos, Decena, and Dinglasan left their employment at GIS and remained in the United States, counsel for Defendants sent a letter to the individual who Defendants claim helped the group leave threatening legal action against him and a business they claim he operated.  They also made a thinly veiled threat of legal repercussions in the Philippines for the workers who left.

77.     The Plaintiffs and other B-1 workers were not allowed to have visitors at the bunkhouse.

78.     Conditions on the quarantine vessels, which the Plaintiffs and other quarantined B-1 workers also were not allowed to leave, were miserable.  For example, on one of the vessels, the GIS Dylan,

     a.   As many as 28 COVID-infected workers were housed together;

     b.   GIS did not provide the quarantined workers with sufficient food;

c. The only medical treatment the workers received was Vitamin C and white pills they believed were Percocet.  Later in the pandemic, the quarantined workers were not provided any medication.

d. The cellular phone data signal was very weak.  At the bunkhouse, the B-1 workers were able to communicate with their families.  On the GIS Dylan, this often was not possible.

79.   Conditions on the quarantine vessels led to the Plaintiffs' and other B-1 workers' psychological deterioration.

80.   On August 29, 2021, Category 4 Hurricane Ida made landfall just southeast of Galliano, Louisiana, with sustained winds of 145 miles per hour.

81.   Before Hurricane Ida struck Galliano, Defendants evacuated the non-Filipino workers from the bunkhouse to a safer location.

82.   Defendants did not evacuate most of the B-1 workers, including Plaintiffs Hernandez, Carlos, Decena, and Dinglasan, from the bunkhouse.

83.   As Hurricane Ida's eyewall passed over the bunkhouse, the B-1 workers, including Plaintiffs Hernandez, Carlos, Decena, and Dinglasan feared for their lives as the building shook at was pelted by flying debris.  The winds started to rip open part of the roof, water entered the building, and the floor flooded.

84.   After Hurricane Ida passed, there was no water or electricity at the bunkhouse for approximately two weeks.  Defendants still did not provide the B-1 workers, including Plaintiffs Hernandez, Carlos, Decena, and Dinglasan, with alternative housing.  Defendants continued to require that the B-1 workers remain at the bunkhouse, causing them physical and psychological harm.

85.    Upon information and belief, Defendants did not evacuate other B-1 workers who were quarantined on the moored vessels due to COVID-19.  These workers would have faced extraordinary danger due to the combined impacts of storm surge, waves, and fierce winds.

86.    Non-Filipino workers also lived at the bunkhouse.

87.    Unlike the B-1 workers, non-Filipino workers were allowed to leave the bunkhouse on their own.

88.    Unlike the B-1 workers, Defendants evacuated non-Filipino workers from the bunkhouse before Hurricane Ida struck.

89.    Upon information and belief, some non-Filipino workers who were infected with COVID were sent to their homes to quarantine, while Defendants paid for hotel accommodations for other COVID-infected non-Filipino workers.

90.    The Defendants' manager who supervised the Plaintiffs and other B-1 workers at the bunkhouse subjected the Plaintiffs and other B-1 workers to persistent verbal abuse.

91.    The non-Filipino workers were not subjected to persistent verbal abuse at the bunkhouse.

92.    B-1 workers who were on the quarantine barge were not allowed to leave.

93.    Because the Plaintiffs and other similarly situated workers were required to remain on-call on the Defendants' premises during non-work hours (or, when they left, the were required to remain under Defendants' control), Defendants were required to pay Plaintiffs FLSA-required minimum wage and overtime premiums for these hours.

94.    Defendants did not pay Plaintiffs and other similarly situated workers FLSA-required minimum wage or overtime premiums for on-call hours.

## UNENFORCEABLE ARBITRATION PROVISIONS

95.    Though the Migrant Workers and Overseas Filipinos Act of 1995 references arbitration, it applies only to Filipino migrant workers who *opt to* file a complaint with the National Philippine Labor Relations Commission ("NLRC").  It does not *mandate* arbitration.

96.    Defendants contend that, as a condition of employment at Defendants' operations, Plaintiffs and other B-1 workers are required to sign a "Contract of Employment."

97.    Each alleged "Contract of Employment" covered a limited period of time—generally three months—during which a B-1 worker was to be employed by a foreign employer.

98.    Defendants have not met their burden of showing a "Contract of Employment" existed for each period of employment during which the Plaintiffs and other B-1 workers allege they suffered the injuries set forth in this amended complaint.

99.    Each "Contract of Employment" is written in English.

100.    The Plaintiffs' native language is Tagalog.

101.    The Plaintiffs' English language skills are limited to maritime English, which is sufficient to communicate in English, as the *lingua franca*, about work assignments, such as receiving work instructions and communicating with supervisors and other workers on spars and platforms about safety issues.

102.    The Plaintiffs' English language skills are not sufficient to read or understand legal documents written in English.

103.    Each "Contract of Employment" specifies an offshore spar or vessel upon which the B-1 worker was to work.

104.     Upon information and belief, Plaintiffs and other B-1 workers worked on spars and platforms other than the spar or platform identified on each "Contract of Employment," during the alleged contract period.

105.     Each "Contract of Employment" does not itself contain any language referencing arbitration.

106.     Each "Contract of Employment" does not incorporate the "Seafarer Standard Terms," which Defendants contend contain language mandating arbitration.

107.     Defendants have not met their burden to show Plaintiffs and the other B-1 workers agreed to be bound by the "Seafarer Standard Terms."

108.     Even if the "Seafarer Standard Terms" were to apply, Plaintiffs' and other B-1 workers' Fair Housing Act claims do not arise from their employment, but rather arise out of their relationship with Defendants as tenants in the housing.

109.     Even if the "Seafarer Standard Terms" were to apply, Plaintiffs and other B-1 workers were not "seafarers," as spars and platforms are not "ships" as defined by the law of the Philippines.

110.     Defendants' manning agent threatened Plaintiff Agustin would be subject to arrest if he returned to the Philippines.

111.     Upon information and belief, Defendants' counsel have reported or intend to report Plaintiffs to Philippine government authorities for what Defendants claim is "abscond[ing]," but which Plaintiffs would characterize as escaping.

112.     As set forth in paragraphs 110 and 111, Plaintiffs face arrest and/or other adverse legal action if they are forced to return to the Philippines to arbitrate their claims.

113.     The NLRC in the Philippines will not enforce U.S. statutory remedies.

114.    Corruption in NLRC arbitration is widespread.

115.    Strong public interest factors weigh against forced arbitration in the Philippines. The United States has a strong interest in ensuring its remedial employment and anti-discrimination laws are given full force and effect when violations of these laws occur in the United States.

<u>FLSA COLLECTIVE ACTION ALLEGATIONS</u>

116.    Plaintiffs brings their FLSA claims on behalf of themselves and those other B-1 workers who may opt into this action pursuant to 29 U.S.C. § 216(b) and who were not paid required wages at the Defendants' operations between February 9, 2019 and the date of preliminary approval of the opt-in class.

117.    Plaintiffs and other B-1 workers were subject to the same policies and practices of the Defendants.

118.    Plaintiffs and other B-1 workers worked offshore and, while onshore, resided at Defendants' bunkhouse in Lafourche Parrish, Louisiana.

119.    Plaintiffs and other B-1 workers were nationals of the Philippines employed at Defendants' operations with B-1 visas having an "OCS" (outer continental shelf) designation.

120.    Common proof applicable to Plaintiffs and the other B-1 workers will show that Defendants failed to properly pay wages to Plaintiffs and other B-1 workers.

121.    Plaintiffs are currently unaware of the identities of all the B-1 workers who would be members of the FLSA opt-in class, but this information is readily ascertainable from Defendants' records.  Defendants therefore should be required to provide Plaintiffs with a list—including last known addresses, telephone numbers, and email addresses—of all individuals who, at any time between February 9, 2019 and the present, (1) were employed at GI Shipyard and/or

GIS; (2) lived at the bunkhouse and/or on the quarantine vessels; (3) were nationals of the

Philippines; and (4) were B-1 visa holders.

RULE 23 CLASS ALLEGATIONS

122.    Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs brings their TVPA claims—Count

2—on behalf of themselves and a class of persons ("the TVPA Class") consisting of:

> All individuals who, at any time between June 28, 2012 and the present, (1) were
> employed at GI Shipyard and/or GIS; (2) lived at the bunkhouse and/or on the
> quarantine vessels; (3) were nationals of the Philippines; and (4) were B-1 visa
> holders.

123.    Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs bring their Fair Housing Act

claims—Count 3—on behalf of themselves and a class of persons ("the FHA Class") consisting

of:

> All individuals who, at any time between June 28, 2020 and the present, (1) lived
> at the bunkhouse and/or on the quarantine vessels; (2) were Filipinos, of Philippine
> national origin, and Asian Pacific Islanders; and (3) were B-1 visa holders.

124.    Pursuant to Fed. R. Civ. P. 23(b)(2), Plaintiffs bring their claim for a declaratory

judgment on issues of arbitrability—Count 4—on behalf of themselves and a class of persons ("the

Declaratory Judgement Class") consisting of:

> All individuals who, between June 28, 2012 and the present, (1) were employed at
> GI Shipyard and/or GIS; (2) lived at the bunkhouse and/or on the quarantine
> vessels; (3) were nationals of the Philippines; and (4) were B-1 visa holders.

125.    Excluded from the Classes are the legal representatives, officers, directors, assigns,

and successors of Defendants; any individual who at any time during the class period has had a

controlling interest in any Defendant; and all persons who submit timely and otherwise proper

requests for exclusion from the Classes.

<u>*Numerosity*</u>

126.    There are over 100 B-1 workers who would be members of the Classes in this action.

127.    The members of the Classes are sufficiently numerous that joinder of all members is impracticable.

<u>*Existence and Predominance of Common Questions*</u>

128.    Common questions of law and fact exist as to Plaintiffs and all members of the Classes. These common questions include

a.   Whether Defendants knowingly recruited and/or obtained Plaintiffs' and other B-1 workers' labor or services by means of (i) physical restraint; (ii) threats of physical restraint; (iii) serious harm; (iv) threats of serious harm; (v) abuse of legal process; (vi) threatened abuse of legal process; and/or (vii) a scheme, plan, or pattern intended to cause Plaintiffs and the other B-1 workers to believe that, if they did not perform such labor or services, they or another person would suffer serious harm or physical restraint;

b.   Whether Defendants knowingly recruited, transported, harbored, provided, and/or obtained the Plaintiffs and the B-1 workers so as to obtain their labor and services by the means described herein;

c.   Whether Defendants conspired and/or attempted to commit the acts described herein;

d.   Whether Defendants discriminated against Plaintiffs and other B-1 workers in the terms, conditions, and privileges of rental of the bunkhouse and quarantine vessels,

and in the provision of services or facilities in connection therewith, because of Plaintiffs' and other B-1 workers' race, color, and national origin;

e.   The nature and extent of class-wide injury and the measure of damages for those injuries;

f.   Whether the nature and location of Plaintiffs' and other B-1 workers' work, the nature of their claims related to the occupancy of the bunkhouse and quarantine vessels, and the public interest preclude forced arbitration of Plaintiffs' and other B-1 workers' claims in the Philippines.

129.   With respect to the TVPA Class and the FHA Class, the common questions set forth in paragraph 128(a)-(e) predominate over questions affecting only individual Class members.

## *Typicality*

130.   Plaintiffs and proposed members of the Classes have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

131.   Defendants subjected Plaintiffs and the proposed members of the Classes to the same coercive rules and practices that constituted violations of the TVPA.

132.   Defendants subjected Plaintiffs and the proposed members of the Classes to the same discrimination that constituted violations of the Fair Housing Act.

133.   Plaintiffs and proposed Class members suffered similar types of damages.

134.   Plaintiffs' interests are co-extensive with the interests of the members of the Classes; Plaintiffs have no interest adverse to the members of the Classes.

135.   Plaintiffs and the proposed Class members have the same statutory rights under the TVPA and the Fair Housing Act, and they have the same right to a declaratory judgment on issues of arbitrability.

*Adequacy*

136.    Plaintiffs will fairly and adequately represent the interests of the members of the Classes.   Their interests do not conflict with the interests of the members of the Classes they seek to represent.

137.    Plaintiffs understand that, as class representatives, they assume responsibilities to the Classes to represent their interests fairly and adequately.

138.    Plaintiffs have retained counsel experienced in prosecuting class actions.  There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

*Superiority*

139.    With respect to the TVPA Class and the FHA Class, a class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein because:

    a.  The damages suffered by each individual member of the Classes may not be sufficient to justify the burden and expense of individual prosecution of the litigation necessitated by Defendants' conduct;

    b.  It would be difficult for members of the Classes to obtain individual redress effectively for the wrongs done to them;

    c.  If individual actions were to be brought by each member of the Classes, the result would be a multiplicity of actions, creating hardships for members of the Classes, the Court, and the Defendants;

    d.  The members of the Classes are indigent foreign nationals and workers who lack the means and resources to secure individual legal assistance, have limited command of the English language or familiarity with the United States legal

system, and are particularly unlikely to be aware of their rights to prosecute these claims.

e.  Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system;

f.  The class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court; and

g.  This case does not present individualized factual or legal issues which would render a class action difficult.

140.  In the alternative, the TVPA Class and the FHA Class may be certified because:

a.  The prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants;

b.  The prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.  Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

*Claim for Declaratory Relief*

141.   Defendants have acted or refused to act on grounds generally applicable to the Declaratory Judgment Class, thereby making final declaratory relief applicable to the Class appropriate under Fed. R. Civ. P. 23(b)(2).   Defendants claim all members of the Declaratory Judgement Class are subject to forced arbitration in the Philippines.

## V.      CAUSE OF ACTION

### COUNT 1
### VIOLATIONS OF THE FLSA

142.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

143.   Defendants willfully and intentionally failed to pay the minimum wage to Plaintiffs, and to other B-1 workers who opt into this action, for every hour they worked and were on call between February 9, 2019 and the present.

144.   Defendants' failure to pay the minimum wage violates the Fair Labor Standards Act, 29 U.S.C. § 206(a) and its implementing regulations.

145.   Defendants also willfully and intentionally failed to pay Plaintiffs and other B-1 workers who opt into this action overtime at a rate of at least one-and-a-half times the legally required wage for every hour they worked above 40 hours in a workweek between February 9, 2019 and the present.

146.   Defendants' failure to pay overtime premiums violates the FLSA, 29 U.S.C. § 207(a), and its implementing regulations.

147.   Further, Section 211 of the FLSA requires employers to keep accurate records of data related to their employees' "wages, hours, and other conditions and practice of employment." 29 U.S.C. § 211(a), (c).

148.   Upon information and belief, Defendants failed and/or refused to document the total hours Plaintiffs and other B-1 workers worked and/or were on call each workweek, their total overtime earnings for the work week, and all additions to or deductions from their wages.

149.   Plaintiffs and other B-1 workers who opt into this action are therefore entitled to their unpaid minimum wages and overtime premiums, plus an equal amount in liquidated damages, as a consequence of Defendants' unlawful acts and omissions, in accordance with 29 U.S.C. § 216(b).

## COUNT 2
### VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION ACT

150.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

151.   This Cause of Action sets forth claims by Plaintiffs and other B-1 workers against all Defendants under the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595.

152.   Plaintiffs and other B-1 workers are victims of violations of the following provisions of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589, 1590, and 1594(b);

153.   Defendants were perpetrators of the foregoing violations.

154.   Defendants knowingly benefited, financially or by receiving anything of value from participation in a venture Defendants knew or should have known engaged in the foregoing violations.

155.   Defendants, directly or through their agents, knowingly recruited and obtained Plaintiffs' and other B-1 workers' labor or services.

24

156.     Defendants, directly or through their agents, attempted to and did subject Plaintiffs and other B-1 workers to forced labor in violation of 18 U.S.C. § 1589.

157.     In violation of 18 U.S.C. § 1589(1)-(4), Defendants, directly or through their agents, knowingly recruited and obtained the labor or services of Plaintiffs and other B-1 workers by means of:

    a.  Physical restraint;

    b.  Serious harm, including financial harm, psychological harm, and reputational harm;

    c.  Threats of physical restraint;

    d.  Threats of serious harm, including financial harm, psychological harm, and reputational harm;

    e.  Abuse of legal process;

    f.  Threatened abuse of legal process; and

    g.  A scheme, plan, or pattern intended to cause Plaintiffs and other B-1 workers to believe that, if they did not perform such labor or services, they or another person would suffer serious harm, including financial, psychological, and reputational harm, as well as physical restraint.

158.     Defendants' scheme to, *inter alia*,

    a.  force Plaintiffs and other B-1 workers to live at a bunkhouse they were not allowed to leave except for work or with a GIS driver, and where they were not allowed to have visitors;

    b.  force Plaintiffs and other B-1 workers, when infected with COVID-19, to live in overcrowded, dangerous, and isolated conditions causing psychological deterioration and harm; and

    c.   threaten B-1 workers with deportation, blacklisting, civil action, and criminal prosecution to prevent Plaintiffs and other B-1 workers from leaving their employment with Defendants;

    d.   threaten civil and criminal action against individuals who Defendants believed helped some B-1 workers leave their employment with Defendants;

    e.   Prevent Plaintiffs and other B-1 workers from receiving 80 percent of their wages while they were employed at Defendants' operations, thereby preventing Plaintiffs and other B-1 workers form having the financial means to leave;

was designed to convince Plaintiffs and other B-1 workers that they would suffer serious harm if they were to leave his employment with Defendants.

159.    Defendants' threats of deportation, civil action, and criminal prosecution constituted abuse or threatened abuse of legal process designed to obtain Plaintiffs' and other B-1 workers' labor.

160.    In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants, directly or through their agents, knowingly recruited, transported, harbored and/or obtained Plaintiffs and other B-1 workers for labor or services in furtherance of the Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

    a.   forced labor, violating 18 U.S.C. § 1589;

    b.   attempting to violate 18 U.S.C. § 1589, thereby violating 18 U.S.C. § 1594(a); and

    c.   conspiring to violate 18 U.S.C. § 1589, thereby violating 18 U.S.C. § 1594(b).

161.    In violation of 18 U.S.C. § 1594(b), Defendants, directly or through their agents, attempted, and conspired with each other, to violate 18 U.S.C. § 1589.

162.    Defendants knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs and other B-1 workers of their rights under the TVPA.

163.    As a proximate result of the conduct of Defendants, Plaintiffs and other B-1 workers suffered financial and other damages.

164.    Under the TVPA, Plaintiffs and other B-1 workers are entitled to recover compensatory and punitive damages in an amount to be proven at trial, and attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

**COUNT 3**
**FAIR HOUSING ACT VIOLATIONS**

165.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

166.    As set forth herein, Defendants discriminated against Plaintiffs and other B-1 workers in the terms, conditions, or privileges of rental of the bunkhouse and quarantine vessels, and in the provision of services or facilities in connection therewith, because of Plaintiffs' and other B-1 workers' race, color, and/or national origin.

167.    The discrimination included imposing adverse rules on the Plaintiffs and other B-1 workers, including not permitting them to leave Defendants' bunkhouse without a GIS escort, forcing them to quarantine in poor conditions on vessels, and subjecting them to pervasive verbal abuse—to which workers of different race, color, and/or national origin were not similarly subjected.

168.    Plaintiffs and other B-1 workers were injured by these discriminatory housing practices.

169.     Defendants knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs and other B-1 workers of their rights under the Fair Housing Act.

170.     Under the Fair Housing Act, Plaintiffs and other B-1 workers are entitled to recover compensatory and punitive damages in an amount to be proven at trial, and attorneys' and experts' fees and costs as authorized by 42 U.S.C. § 3613(c).

**COUNT 4**
**DECLARATORY JUDGMENT WITH RESPECT TO ARBITRABILITY**

171.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

172.     No valid and enforceable agreement to arbitrate was formed, entered into, or agreed to between Defendants and Plaintiffs and other B-1 workers.

173.     No valid and enforceable agreement to arbitrate applies to Plaintiffs and other B-1 workers' legal claims set forth herein.

174.     Strong public interest factors weigh against arbitration.

175.     Plaintiffs and other B-1 workers therefore seek a declaratory judgment finding that (1) an agreement to arbitrate was not formed, otherwise is not enforceable, and/or does not apply to their claims, and (2) that the claims in law and equity set forth in this amended complaint should proceed before this Court.

176.     Plaintiffs and other B-1 workers demand a trial by jury on all questions of fact necessary to determine whether they have an obligation to arbitrate their claims.

**VI.     DEMAND FOR TRIAL BY JURY**

177.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all questions of fact raised by this Complaint.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and other B-1 workers pray that this Court enter an Order:

a.   assuming jurisdiction over this action;

b.   declaring this action to be maintainable as a FLSA collective action pursuant to 29 U.S.C. § 216, allowing Plaintiffs to provide notice of this action to potential opt-in plaintiffs, and allowing those eligible similarly situated workers who choose to do so to opt-in to this action;

c.   certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

d.   declaring that the Defendants violated the FLSA, the TVPA, and the Fair Housing Act;

e.   declaring that Plaintiffs' and other B-1 workers' claims are not subject to arbitration in the Philippines;

f.   permanently enjoining Defendants from further violations of the FLSA, the TVPA, and the Fair Housing Act;

g.   granting judgment to Plaintiffs, and to otherB-1 workers who opt in pursuant to 29 U.S.C. § 216(b), on their FLSA claims and awarding each of them their unpaid minimum wages and overtime premiums plus an equal amount in liquidated damages;

h.   granting judgment to Plaintiffs and the other B-1 workers on their TVPA and Fair Housing Act claims and awarding them compensatory and punitive damages;

i.   awarding prejudgment and postjudgment interest as allowed by law;

j.   awarding Plaintiffs and other similarly situated workers their costs and reasonable attorneys' fees; and

k.   granting such further relief as this Court finds just.

Respectfully submitted this day: June 28, 2022,

           /s/ Daniel Werner
**Daniel Werner (GA Bar #422070)**
**Radford & Keebaugh, LLC**
315 W. Ponce de Leon Ave., Suite 1080.
Decatur, GA 30030
P: 678-271-0300
F: 678-271-0304
E: dan@decaturlegal.com
*(admitted pro hac vice)*


**Kenneth C. Bordes (Bar #35668)**
**Kenneth C. Bordes,**
**Attorney at Law, LLC**
4224 Canal St.
New Orleans, LA 70119
P: 504-588-2700
F: 504-708-1717
E: kcb@kennethbordes.com

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 28, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF electronic filing system which will send notification to counsel for Defendants.

/s/ Daniel Werner



PLAINTIFF'S
EXHIBIT

**A**

ENGLISH:

CONSENT TO SUE UNDER THE FAIR LABOR STANDARDS ACT

I am a current or former employee of Grand Isle Shipyard, Inc. and/or GIS, LLC in Galliano, Louisiana. I consent to be a party Plaintiff in an action under the Fair Labor Standards Act ("FLSA") against Grand Isle Shipyard, Inc., GIS, LLC and/or related entitles and individuals to recover my unpaid minimum wage and overtime pay and all other damages as allowed by the FLSA.

Signature: _____

Victor Ortiguerra (Feb 9, 2022 17:07 EST)

Full Name: _____Victor Cagara Ortiguerra_____

Date: _____Feb 9, 2022_____


TAGALOG:

KONSENTO NA MAG-SUE SA ILALIM NG FAIR LABOR STANDARDS ACT

Ako ay kasalukuyan o dating empleyado ng Grand Isle Shipyard, Inc. at/o GIS, LLC. sa Galliano, Louisiana. Sumasang-ayon ako na maging isang partido ng Plaintiff sa isang aksyon sa ilalim ng Fair Labor Standards Act ("FLSA") laban sa Grand Isle Shipyard, Inc., GIS, LLC. at / o mga nauugnay na kumpanya at indibidwal upang makuha ang aking hindi nabayarang minimum na sahod at dagdag na bayad sa obertaym at lahat ng iba pang mga pinsalang pinahintulutan ng FLSA.

Lagda: _____

Victor Ortiguerra (Feb 9, 2022 17:07 EST)

Buong Pangalan: _____Victor Cagara Ortiguerra_____

Petsa: _____Feb 9, 2022_____



ENGLISH:

CONSENT TO SUE UNDER THE FAIR LABOR STANDARDS ACT

I am a current or former employee of Grand Isle Shipyard, Inc. and/or GIS, LLC in Galliano, Louisiana. I consent to be a party Plaintiff in an action under the Fair Labor Standards Act ("FLSA") against Grand Isle Shipyard, Inc., GIS, LLC and/or related entitles and individuals to recover my unpaid minimum wage and overtime pay and all other damages as allowed by the FLSA.

Signature: Donato Agustin (Jan 21, 2022 20:36 EST)

Full Name: Donato Agustin

Date: Jan 21, 2022


TAGALOG:

KONSENTO NA MAG-SUE SA ILALIM NG FAIR LABOR STANDARDS ACT

Ako ay kasalukuyan o dating empleyado ng Grand Isle Shipyard, Inc. at/o GIS, LLC. sa Galliano, Louisiana. Sumasang-ayon ako na maging isang partido ng Plaintiff sa isang aksyon sa ilalim ng Fair Labor Standards Act ("FLSA") laban sa Grand Isle Shipyard, Inc., GIS, LLC. at / o mga nauugnay na kumpanya at indibidwal upang makuha ang aking hindi nabayarang minimum na sahod at dagdag na bayad sa obertaym at lahat ng iba pang mga pinsalang pinahintulutan ng FLSA.

Lagda: Donato Agustin (Jan 21, 2022 20:36 EST)

Buong Pangalan: dhoyagustin24@gmail.com

Petsa: Jan 21, 2022



PLAINTIFF'S
EXHIBIT

C

ENGLISH:

CONSENT TO SUE UNDER THE FAIR LABOR STANDARDS ACT

I am a current or former employee of Grand Isle Shipyard, Inc. and/or GIS, LLC in Galliano, Louisiana. I consent to be a party Plaintiff in an action under the Fair Labor Standards Act ("FLSA") against Grand Isle Shipyard, Inc., GIS, LLC and/or related entitles and individuals to recover my unpaid minimum wage and overtime pay and all other damages as allowed by the FLSA.

Signature: _____ Amado T. Yuzon (Jan 24, 2022 17:26 EST) _____

Full Name: Amado T. Yuzon

Date: Jan 24, 2022


TAGALOG:

KONSENTO NA MAG-SUE SA ILALIM NG FAIR LABOR STANDARDS ACT

Ako ay kasalukuyan o dating empleyado ng Grand Isle Shipyard, Inc. at/o GIS, LLC. sa Galliano, Louisiana. Sumasang-ayon ako na maging isang partido ng Plaintiff sa isang aksyon sa ilalim ng Fair Labor Standards Act ("FLSA") laban sa Grand Isle Shipyard, Inc., GIS, LLC. at / o mga nauugnay na kumpanya at indibidwal upang makuha ang aking hindi nabayarang minimum na sahod at dagdag na bayad sa obertaym at lahat ng iba pang mga pinsalang pinahintulutan ng FLSA.

Lagda: _____ Amado T. Yuzon (Jan 24, 2022 17:26 EST) _____

Buong Pangalan: Amado T. Yuzon

Petsa: Jan 24, 2022



ENGLISH:

CONSENT TO SUE UNDER THE FAIR LABOR STANDARDS ACT

I am a current or former employee of Grand Isle Shipyard, Inc. and/or GIS, LLC in Galliano, Louisiana. I consent to be a party Plaintiff in an action under the Fair Labor Standards Act ("FLSA") against Grand Isle Shipyard, Inc., GIS, LLC and/or related entitles and individuals to recover my unpaid minimum wage and overtime pay and all other damages as allowed by the FLSA.

Signature: _____
Christopher escalante raros (Jan 24, 2022 16:39 EST)

Full Name: Christopher escalante raros
_____

Date: Jan 24, 2022
_____

TAGALOG:

KONSENTO NA MAG-SUE SA ILALIM NG FAIR LABOR STANDARDS ACT

Ako ay kasalukuyan o dating empleyado ng Grand Isle Shipyard, Inc. at/o GIS, LLC. sa Galliano, Louisiana. Sumasang-ayon ako na maging isang partido ng Plaintiff sa isang aksyon sa ilalim ng Fair Labor Standards Act ("FLSA") laban sa Grand Isle Shipyard, Inc., GIS, LLC. at / o mga nauugnay na kumpanya at indibidwal upang makuha ang aking hindi nabayarang minimum na sahod at dagdag na bayad sa obertaym at lahat ng iba pang mga pinsalang pinahintulutan ng FLSA.

Lagda: _____
Christopher escalante raros (Jan 24, 2022 16:39 EST)

Buong Pangalan: Christopher escalante raros
_____

Petsa: Jan 24, 2022
_____



PLAINTIFF'S
EXHIBIT

E

ENGLISH:

CONSENT TO SUE UNDER THE FAIR LABOR STANDARDS ACT

I am a current or former employee of Grand Isle Shipyard, Inc. and/or GIS, LLC in Galliano, Louisiana. I consent to be a party Plaintiff in an action under the Fair Labor Standards Act ("FLSA") against Grand Isle Shipyard, Inc., GIS, LLC and/or related entitles and individuals to recover my unpaid minimum wage and overtime pay and all other damages as allowed by the FLSA.

Signature: _Arvin B.San Pedro_
Arvin B.San Pedro (Jan 24, 2022 14:31 EST)

Full Name: Arvin B.San Pedro

Date: Jan 24, 2022

TAGALOG:

KONSENTO NA MAG-SUE SA ILALIM NG FAIR LABOR STANDARDS ACT

Ako ay kasalukuyan o dating empleyado ng Grand Isle Shipyard, Inc. at/o GIS, LLC. sa Galliano, Louisiana. Sumasang-ayon ako na maging isang partido ng Plaintiff sa isang aksyon sa ilalim ng Fair Labor Standards Act ("FLSA") laban sa Grand Isle Shipyard, Inc., GIS, LLC. at / o mga nauugnay na kumpanya at indibidwal upang makuha ang aking hindi nabayarang minimum na sahod at dagdag na bayad sa obertaym at lahat ng iba pang mga pinsalang pinahintulutan ng FLSA.

Lagda: _Arvin B.San Pedro_
Arvin B.San Pedro (Jan 24, 2022 14:31 EST)

Buong Pangalan: Arvin B.San Pedro

Petsa: Jan 24, 2022



PLAINTIFF'S
EXHIBIT

F

ENGLISH:

CONSENT TO SUE UNDER THE FAIR LABOR STANDARDS ACT

I am a current or former employee of Grand Isle Shipyard, Inc. and/or GIS, LLC in Galliano, Louisiana. I consent to be a party Plaintiff in an action under the Fair Labor Standards Act ("FLSA") against Grand Isle Shipyard, Inc., GIS, LLC and/or related entitles and individuals to recover my unpaid minimum wage and overtime pay and all other damages as allowed by the FLSA.

Signature: _____
Wilfredo b. Saturos (Jan 21, 2022 20:38 EST)

Full Name: Wilfredo b. Saturos

Date: Jan 21, 2022


TAGALOG:

KONSENTO NA MAG-SUE SA ILALIM NG FAIR LABOR STANDARDS ACT

Ako ay kasalukuyan o dating empleyado ng Grand Isle Shipyard, Inc. at/o GIS, LLC. sa Galliano, Louisiana. Sumasang-ayon ako na maging isang partido ng Plaintiff sa isang aksyon sa ilalim ng Fair Labor Standards Act ("FLSA") laban sa Grand Isle Shipyard, Inc., GIS, LLC. at / o mga nauugnay na kumpanya at indibidwal upang makuha ang aking hindi nabayarang minimum na sahod at dagdag na bayad sa obertaym at lahat ng iba pang mga pinsalang pinahintulutan ng FLSA.

Lagda: _____
Wilfredo b. Saturos (Jan 21, 2022 20:38 EST)

Buong Pangalan: Wilfredo b. Saturos

Petsa: Jan 21, 2022