

(1)

**June 7, 1995**

## REPUBLIC ACT NO. 8042 ⚠*

**AN ACT TO INSTITUTE THE POLICIES OF OVERSEAS EMPLOYMENT AND ESTABLISH A HIGHER STANDARD OF PROTECTION AND PROMOTION OF THE WELFARE OF MIGRANT WORKERS, THEIR FAMILIES AND OVERSEAS FILIPINOS IN DISTRESS, AND FOR OTHER PURPOSES**

SECTION 1.    *Short Title*. — This Act shall be known and cited as the "Migrant Workers and Overseas Filipinos Act of 1995."

SECTION 2.    *Declaration of Policies.* ⚠[1] —

(a)    In the pursuit of an independent foreign policy and while considering national sovereignty, territorial integrity, national interest and the right to self-determination paramount in its relations with other states, the State shall, at all times, uphold the dignity of its citizens whether in country or overseas, in general, and Filipino migrant workers, in particular, continuously monitor international conventions, adopt/be signatory to and ratify those that guarantee protection to our migrant workers, and endeavor to enter into bilateral agreements with countries hosting overseas Filipino workers. ⚠[1-a]

(b)    The State shall afford full protection to labor, local and overseas, organized and unorganized, and promote full employment and equality of employment opportunities for all. Towards this end, the State shall provide adequate and timely social, economic and legal services to Filipino migrant workers, **especially for workers who are vulnerable to physical, emotional, and psychological stress or abuse**. ⚠[2] cdtai

Copyright 2021    CD Technologies Asia, Inc. and Accesslaw, Inc.    Philippine Law Encyclopedia Second Release 2021    1



(c)     While recognizing the significant contribution of Filipino migrant workers to the national economy through their foreign exchange remittances, the State does not promote overseas employment as a means to sustain economic growth and achieve national development. The existence of the overseas employment program rests solely on the assurance that the dignity and fundamental human rights and freedoms of the Filipino citizen shall not, at any time, be compromised or violated. ⬦[3] The State, therefore, shall continuously create local employment opportunities and promote the equitable distribution of wealth and the benefits of development.

(d)     The State affirms the fundamental equality before the law of women and men and the significant role of women in nation-building. Recognizing the contribution of overseas migrant women workers and their particular vulnerabilities, the State shall apply gender sensitive criteria in the formulation and implementation of policies and programs affecting migrant workers and the composition of bodies tasked for the welfare of migrant workers.

(e)     Free access to the courts and quasi-judicial bodies and adequate legal assistance shall not be denied to any person by reason of poverty. In this regard, it is imperative that an effective mechanism be instituted to ensure that the rights and interest of distressed overseas Filipinos, in general, and Filipino migrant workers, in particular, whether regular/documented or irregular/undocumented, are adequately protected and safeguarded.

(f)     The right of Filipino migrant workers and all overseas Filipinos to participate in the democratic decision-making processes of the State and to be represented in institutions relevant to overseas employment is recognized and guaranteed.

(g)     The State recognizes that the most effective tool for empowerment is the possession of skills by migrant workers. The government shall provide them free and accessible skills development and enhancement programs. Pursuant to this and as soon as practicable, the government shall deploy and/or allow the deployment only of skilled Filipino workers.

h)   The State recognizes non-governmental organizations, trade unions, workers associations, stakeholders and other similar entities duly recognized as legitimate, are partners of the State in the protection of Filipino migrant workers and in the promotion of their welfare. The State shall cooperate with them in a spirit of trust and mutual respect. The significant contribution of recruitment and manning agencies shall form part of this partnership.

(i)   Government fees and other administrative costs of recruitment, introduction, placement and assistance to migrant workers shall be rendered free without prejudice to the provision of Section 36 hereof.

Nonetheless, the deployment of Filipino overseas workers, whether land-based or sea-based, by local service contractors and manning agencies employing them shall be encouraged. Appropriate incentives may be extended to them. △[3-a]

SECTION 3.      *Definitions.* — For purposes of this Act:

(a)   **"Overseas Filipino** worker" refers to a person who is to be engaged, is engaged or has been engaged in a remunerated activity in a state of which he or she is not a **citizen or on board a vessel navigating the foreign seas other than a government ship used for military or non-commercial purposes or on an installation located offshore or on the high seas**; to be used interchangeably with migrant worker. △[4]

(b)   "*Gender-sensitivity*" shall mean cognizance of the inequalities and inequities prevalent in society between women and men and a commitment to address issues with concern for the respective interests of the sexes.

(c)   "*Overseas Filipinos*" refers to dependents of migrant workers and other Filipino nationals abroad who are in distress as mentioned in Sections 24 and 26 of this Act. △[4-a]

I. *Deployment*

SECTION 4.      *Deployment of Migrant Workers.* — The State shall allow **the deployment of** overseas Filipino workers only in countries where the rights of

Filipino migrant workers are protected. The government recognizes any of the following as a guarantee on the part of the receiving country for the protection of the rights of overseas Filipino workers:

    (a)    It has existing labor and social laws protecting the rights of **workers, including** migrant workers;

    (b)    It is a signatory to **and/or a ratifier of** multilateral conventions, declarations or resolutions relating to the protection of **workers, including** migrant workers; **and**

    (c)    It has concluded a bilateral agreement or arrangement with the government **on the protection of** the rights of overseas Filipino Workers:

*Provided,* **That the receiving country is taking positive, concrete measures to protect the rights of migrant workers in furtherance of any of the guarantees under subparagraphs (a), (b) and (c) hereof.**

**In the absence of a clear showing that any of the aforementioned guarantees exists in the country of destination of the migrant workers, no permit for deployment shall be issued by the Philippine Overseas Employment Administration (POEA).**

**The members of the POEA Governing Board who actually voted in favor of an order allowing the deployment of migrant workers without any of the aforementioned guarantees shall suffer the penalties of removal or dismissal from service with disqualification to hold any appointive public office for five (5) years. Further, the government official or employee responsible for the issuance of the permit or for allowing the deployment of migrant workers in violation of this section and in direct contravention of an order by the POEA Governing Board prohibiting deployment shall be meted the same penalties in this section.**

**For this purpose, the Department of Foreign Affairs, through its foreign posts, shall issue a certification to the POEA, specifying therein the pertinent provisions of the receiving country's labor/social law, or the convention/declaration/resolution, or the bilateral agreement/arrangement which protect the rights of migrant workers.**

**The State shall also allow the deployment of overseas Filipino workers to vessels navigating the foreign seas or to installations located offshore or on high**

seas whose owners/employers are compliant with international laws and standards that protect the rights of migrant workers.

The State shall likewise allow the deployment of overseas Filipino workers to companies and contractors with international operations: *Provided,* That they are compliant with standards, conditions and requirements, as embodied in the employment contracts prescribed by the POEA and in accordance with internationally-accepted standards. ⟁⁴⁻ᵇ

SECTION 5.     *Termination or Ban on Deployment.* — Notwithstanding the provisions of Section 4 hereof, in pursuit of the national interest or when public welfare so requires, the POEA Governing Board, after consultation with the Department of Foreign Affairs, may, at any time, terminate or impose a ban on the deployment of migrant workers. ⟁⁴⁻ᶜ

## II. *Illegal Recruitment* ⟁⁵

SECTION 6.     *Definition.* — For purposes of this Act, illegal recruitment shall mean any act of canvassing, enlisting, contracting, transporting, utilizing, hiring, or procuring workers and includes referring, contract services, promising or advertising for employment abroad, whether for profit or not, when undertaken by a non-licensee or non-holder of authority contemplated under Article 13(f) of Presidential Decree No. 442, as amended, otherwise known as the Labor Code of the Philippines: *Provided,* That any such non-licensee or non-holder who, in any manner, offers or promises for a fee employment abroad to two or more persons shall be deemed so engaged. It shall likewise include the following acts, whether committed by any person, whether a non-licensee, non-holder, licensee or holder of authority:

(a)     To charge or accept directly or indirectly any amount greater than that specified in the schedule of allowable fees prescribed by the Secretary of Labor and Employment, or to make a worker pay **or acknowledge** any amount greater than that actually received by him as a loan or advance;

(b)     To furnish or publish any false notice or information or document in relation to recruitment or employment;

(c)     To give any false notice, testimony, information or document or commit any act of misrepresentation for the purpose of securing a license or authority under the Labor Code, **or for the purpose of documenting hired workers with the POEA, which include the**

**act of reprocessing workers through a job order that pertains to nonexistent work, work different from the actual overseas work, or work with a different employer whether registered or not with the POEA**;

(d)  To induce or attempt to induce a worker already employed to quit his employment in order to offer him another unless the transfer is designed to liberate a worker from oppressive terms and conditions of employment;

(e)  To influence or attempt to influence any person or entity not to employ any worker who has not applied for employment through his agency **or who has formed, joined or supported, or has contacted or is supported by any union or workers' organization**;

(f)  To engage in the recruitment or placement of workers in jobs harmful to public health or morality or to the dignity of the Republic of the Philippines;

(g)  To obstruct or attempt to obstruct inspection by the Secretary of Labor and Employment or by his duly authorized representative;

(h)  To fail to submit reports on the status of employment, placement vacancies, remittance of foreign exchange earnings, separation from jobs, departures and such other matters or information as may be required by the Secretary of Labor and Employment;

(i)  To substitute or alter to the prejudice of the worker, employment contracts approved and verified by the Department of Labor and Employment from the time of actual signing thereof by the parties up to and including the period of the expiration of the same without the approval of the Department of Labor and Employment; [6]

(j)  For an officer or agent of a recruitment or placement agency to become an officer or member of the Board of any corporation engaged in travel agency or to be engaged directly or indirectly in the management of a travel agency;

(k)  To withhold or deny travel documents from applicant workers before departure for monetary or financial considerations other

than those authorized under the Labor Code and its implementing rules and regulations;

(l)     Failure to actually deploy **a contracted worker** without valid reason as determined by the Department of Labor and Employment;

(m)     Failure to reimburse expenses incurred by the worker in connection with his documentation and processing for purposes of deployment, in cases where the deployment does not actually take place without the worker's fault. Illegal recruitment when committed by a syndicate or in large scale shall be considered an offense involving economic sabotage.

**(n)     To allow a non-Filipino citizen to head or manage a licensed recruitment/manning agency.**

Illegal recruitment is deemed committed by a syndicate if carried out by a group of three (3) or more persons conspiring or confederating with one another. It is deemed committed in large scale if committed against three (3) or more persons individually or as a group.

**In addition to the acts enumerated above, it shall also be unlawful for any person or entity to commit the following prohibited acts:**

**(1)     Grant a loan to an overseas Filipino worker with interest exceeding eight percent (8%) per annum, which will be used for payment of legal and allowable placement fees and make the migrant worker issue, either personally or through a guarantor or accommodation party, postdated checks in relation to the said loan;**

**(2)     Impose a compulsory and exclusive arrangement whereby an overseas Filipino worker is required to avail of a loan only from specifically designated institutions, entities or persons;**

**(3)     Refuse to condone or renegotiate a loan incurred by an overseas Filipino worker after the latter's employment contract has been prematurely terminated through no fault of his or her own;**

**(4)     Impose a compulsory and exclusive arrangement whereby an**

overseas Filipino worker is required to undergo health examinations only from specifically designated medical clinics, institutions, entities or persons, except in the case of a seafarer whose medical examination cost is shouldered by the principal/shipowner;

(5)     Impose a compulsory and exclusive arrangement whereby an overseas Filipino worker is required to undergo training, seminar, instruction or schooling of any kind only from specifically designated institutions, entities or persons, except for recommendatory trainings mandated by principals/shipowners where the latter shoulder the cost of such trainings;

(6)     For a suspended recruitment/manning agency to engage in any kind of recruitment activity including the processing of pending workers' applications; and

(7)     For a recruitment/manning agency or a foreign principal/employer to pass on to the overseas Filipino worker or deduct from his or her salary the payment of the cost of insurance fees, premium or other insurance related charges, as provided under the compulsory worker's insurance coverage.

The persons criminally liable for the above offenses are the principals, accomplices and accessories. In case of juridical persons, the officers having ownership, **control,** management or direction of their business **who are responsible for the commission of the offense and the responsible employees/agents thereof** shall be liable.

**In the filing of cases for illegal recruitment or any of the prohibited acts under this section, the Secretary of Labor and Employment, the POEA Administrator or their duly authorized representatives, or any aggrieved person may initiate the corresponding criminal action with the appropriate office. For this purpose, the affidavits and testimonies of operatives or personnel from the Department of Labor and Employment, POEA and other law enforcement agencies who witnessed the acts constituting the offense shall be sufficient to prosecute the accused.**

**In the prosecution of offenses punishable under this section, the public prosecutors of the Department of Justice shall collaborate with the anti-illegal**

recruitment branch of the POEA and, in certain cases, allow the POEA lawyers to take the lead in the prosecution. The POEA lawyers who act as prosecutors in such cases shall be entitled to receive additional allowances as may be determined by the POEA Administrator.

The filing of an offense punishable under this Act shall be without prejudice to the filing of cases punishable under other existing laws, rules or regulations. △[6-a]

SECTION 7.        *Penalties.* —

(a)   Any person found guilty of illegal recruitment shall suffer the penalty of imprisonment of not less than **twelve (12)** years and one (1) day but not more than **twenty (20)** years and a fine of not less than **One million** pesos **(P1,000,000.00)** nor more than **Two million** pesos **(P2,000,000.00)**.

(b)   The penalty of life imprisonment and a fine of not less than **Two million** pesos **(P2,000,000.00)** nor more than **Five** million pesos **(P5,000,000.00)** shall be imposed if illegal recruitment constitutes economic sabotage as defined therein.

*Provided, however,* That the maximum penalty shall be imposed if the person illegally recruited is less than eighteen (18) years of age or committed by a non-licensee or non-holder of authority.

(c)   **Any person found guilty of any of the prohibited acts shall suffer the penalty of imprisonment of not less than six (6) years and one (1) day but not more than twelve (12) years and a fine of not less than Five hundred thousand pesos (P500,000.00) nor more than One million pesos (P1,000,000.00).**

If the offender is an alien, he or she shall, in addition to the penalties herein prescribed, be deported without further proceedings.

In every case, conviction shall cause and carry the automatic revocation of the license or registration of the recruitment/manning agency, lending institution, training school or medical clinic. △[6-b]

SECTION 8.        *Prohibition on Officials and Employees.* — It shall be unlawful for any official or employee of the Department of Labor and Employment,

the Philippine Overseas Employment Administration (POEA), or the Overseas Workers Welfare Administration (OWWA), or the Department of Foreign Affairs, or other government agencies involved in the implementation of this Act, or their relatives within the fourth civil degree of consanguinity or affinity, to engage, directly or indirectly, in the business of recruiting migrant workers as defined in this Act. The penalties provided in the immediate preceding paragraph shall be imposed upon them.

SECTION 9.        *Venue.* — A criminal action arising from illegal recruitment as defined herein shall be filed with the Regional Trial Court of the province or city where the offense was committed or where the offended party actually resides at the time of the commission of the offense: *Provided*, That the court where the criminal action is first filed shall acquire jurisdiction to the exclusion of other courts: *Provided, however*, That the aforestated provisions shall also apply to those criminal actions that have already been filed in court at the time of the effectivity of this Act.

SECTION 10.        *Money Claims.* ⚠ 7 — Notwithstanding any provision of law to the contrary, the Labor Arbiters of the National Labor Relations Commission (NLRC) shall have the original and exclusive jurisdiction to hear and decide, within ninety (90) calendar days after the filing of the complaint, the claims arising out of an employer-employee relationship or by virtue of any law or contract involving Filipino workers for overseas deployment including claims for actual, moral, exemplary and other forms of damages. **Consistent with this mandate, the NLRC shall endeavor to update and keep abreast with the developments in the global services industry.**

The liability of the principal/employer and the recruitment/placement agency for any and all claims under this section shall be joint and several. This provision shall be incorporated in the contract for overseas employment and shall be a condition precedent for its approval. The performance bond to be filed by the recruitment/placement agency, as provided by law, shall be answerable for all money claims or damages that may be awarded to the workers. If the recruitment/placement agency is a juridical being, the corporate officers and directors and partners as the case may be, shall themselves be jointly and solidarily liable with the corporation or partnership for the aforesaid claims and damages.

Such liabilities shall continue during the entire period or duration of the employment contract and shall not be affected by any substitution, amendment or modification made locally or in a foreign country of the said contract.

Any compromise/amicable settlement or voluntary agreement on money

claims inclusive of damages under this section shall be paid within four (4) months from the approval of the settlement by the appropriate authority.

In case of termination of overseas employment without just, valid or authorized cause as defined by law or contract, **or any unauthorized deductions from the migrant worker's salary,** the worker shall be entitled to the full reimbursement of his placement fee **and the deductions made** with interest at twelve percent (12%) *per annum,* plus his salaries for the unexpired portion of his employment contract or for three (3) months for every year of the unexpired term, whichever is less.

**In case of a final and executory judgment against a foreign employer/principal, it shall be automatically disqualified, without further proceedings, from participating in the Philippine Overseas Employment Program and from recruiting and hiring Filipino workers until and unless it fully satisfies the judgment award.**

Noncompliance with the mandatory periods for resolutions of cases provided under this section shall subject the responsible officials to any or all of the following penalties:

    (a)    The salary of any such official who fails to render his decision or resolution within the prescribed period shall be, or caused to be, withheld until the said official complies therewith;

    (b)    Suspension for not more than ninety (90) days; or

    (c)    Dismissal from the service with disqualification to hold any appointive public office for five (5) years.

*Provided, however,* That the penalties herein provided shall be without prejudice to any liability which any such official may have incurred under other existing laws or rules and regulations as a consequence of violating the provisions of this paragraph. ⚠[7-a]

SECTION 11.    *Mandatory Periods for Resolution of Illegal Recruitment Cases.* — The preliminary investigations of cases under this Act shall be terminated within a period of thirty (30) calendar days from the date of their filing. Where the preliminary investigation is conducted by a prosecution officer and a *prima facie* case is established, the corresponding information shall be filed in court within twenty-four (24) hours from the termination of the investigation. If the preliminary investigation is conducted by a judge and a *prima facie* case is found to exist, the

corresponding information shall be filed by the proper prosecution officer within forty-eight (48) hours from the date of receipt of the records of the case.

SECTION 12.      *Prescriptive Periods.* — Illegal recruitment cases under this Act shall prescribe in five (5) years: *Provided, however*, That illegal recruitment cases involving economic sabotage as defined herein shall prescribe in twenty (20) years.

<u>SECTION 13</u>.      *Free Legal Assistance; Preferential Entitlement Under the Witness Protection Program.* △[7-b] — A mechanism for free legal assistance for victims of illegal recruitment shall be established **in the anti-illegal recruitment branch of the POEA** including its regional offices. Such mechanism shall include coordination and cooperation with the Department of Justice, the Integrated Bar of the Philippines, and other non-governmental organizations and volunteer groups.

The provisions of Republic Act No. 6981 to the contrary notwithstanding, any person who is a victim of illegal recruitment shall be entitled to the Witness Protection Program provided thereunder. △[7-c]

III. *Services*

SECTION 14.      *Travel Advisory/Information Dissemination.* — To give utmost priority to the establishment of programs and services to prevent illegal recruitment, fraud and exploitation or abuse of Filipino migrant workers, △[7-d] all embassies and consular offices, through the Philippine Overseas Employment Administration (POEA), shall issue travel advisories or disseminate information on labor and employment conditions, migration realities and other facts; and adherence of particular countries to international standards on human and workers' rights which will adequately prepare individuals into making informed and intelligent decisions about overseas employment. Such advisory or information shall be published in a newspaper of general circulation at least three (3) times in every quarter.

SECTION 15.      *Repatriation of Workers; Emergency Repatriation Fund.* — The repatriation of the worker and the transport of his personal belongings shall be the primary responsibility of the agency which recruited or deployed the worker overseas. All costs attendant to repatriation shall be borne by or charged to the agency concerned and/or its principal. Likewise, the repatriation of remains and transport of the personal belongings of a deceased worker and all costs attendant thereto shall be borne by the principal and/or the local agency. However, in cases where the termination of employment is due solely to the fault of the worker, the principal/employer or agency shall not in any manner be responsible for the repatriation of the former and/or his belongings. (63a)

---

The Overseas Workers Welfare Administration (OWWA), in coordination with appropriate international agencies, shall undertake the repatriation of workers in cases of war, epidemic, disaster or calamities, natural or man-made, and other similar events without prejudice to reimbursement by the responsible principal or agency. However, in cases where the principal or recruitment agency cannot be identified, all costs attendant to repatriation shall be borne by the OWWA.

For this purpose, there is hereby created and established an emergency repatriation fund under the administration, control and supervision of the OWWA, initially to consist of One hundred million pesos (P100,000,000.00), which shall be taken from the existing fund controlled and administered by the OWWA. Thereafter, such fund shall be provided for in the General Appropriations Act from year to year: *Provided*, That the amount appropriated shall in no case be less than One hundred million pesos (P100,000,000.00), inclusive of outstanding balances.

SECTION 16.   *Mandatory Repatriation of Underage Migrant Workers.* — Upon discovery or being informed of the presence of migrant workers whose actual ages fall below the minimum age requirement for overseas deployment, the responsible officers in the foreign service shall without delay repatriate said workers and advise the Department of Foreign Affairs through the fastest means of communication available of such discovery and other relevant information. **The license of a recruitment/manning agency which recruited or deployed an underage migrant worker shall be automatically revoked and shall be imposed a fine of not less than Five hundred thousand pesos (Php500,000.00) but not more than One million pesos (Php1,000,000.00). All fees pertinent to the processing of papers or documents in the recruitment or deployment shall be refunded in full by the responsible recruitment/manning agency, without need of notice, to the underage migrant worker or to his parents or guardian. The refund shall be independent of and in addition to the indemnification for the damages sustained by the underage migrant worker. The refund shall be paid within thirty (30) days from the date of the mandatory repatriation as provided for in this Act.** [7-e]

SECTION 17.   *Establishment of **National Reintegration** Center for Overseas Filipino Workers.* — A **national reintegration** center **for overseas Filipino workers (NRCO)** is hereby created in the Department of Labor and Employment for returning Filipino migrant workers which shall provide a mechanism for their reintegration into the Philippine society, serve as a promotion house for their local employment, and tap their skills and potentials for national development.

The Department of Labor and Employment, the Overseas Workers Welfare Administration (**OWWA**), and the Philippine Overseas Employment Administration (**POEA**) shall, within ninety (90) days from the effectivity of this Act, formulate a program that would motivate migrant workers to plan for productive options such as entry into highly technical jobs or undertakings, livelihood and entrepreneurial development, better wage employment, and investment of savings.

For this purpose, the Technical Education and Skills Development Authority (TESDA), ⚎[8] the Technology Livelihood Resource Center (TLRC), ⚎[9] and other government agencies involved in training and livelihood development shall give priority to returnees who had been employed as domestic helpers and entertainers. ⚎[9-a]

SECTION 18.     *Functions of the **National Reintegration Center for Overseas Filipino Workers**.* — The Center shall provide the following services:

(a)     Develop **and support** programs and projects **for livelihood, entrepreneurship, savings, investments and financial literacy** for returning Filipino migrant workers **and their families** in coordination with **relevant stakeholders, service providers and international organizations**;

(b)     Coordinate with appropriate **stakeholders, service providers and relevant international organizations for** the promotion, development and the full utilization of **overseas Filipino worker returnees and** their potentials;

(c)     Institute, in cooperation with other government agencies concerned, a computer-based information system on **returning** Filipino migrant workers which shall be accessible to all local recruitment agencies and employers, both public and private;

(d)     Provide a periodic study and assessment of job opportunities for returning Filipino migrant workers;

(e)     Develop and implement other appropriate programs to promote the welfare of returning Filipino migrant workers;

(f)     **Maintain an internet-based communication system for on-line registration and interaction with clients, and maintain and upgrade computer-based service capabilities of the NRCO;**

(g)    Develop capacity-building programs for returning overseas Filipino workers and their families, implementers, service providers, and stakeholders; and

(h)    Conduct research for policy recommendations and program development. ⧍[9-b]

SECTION 19.    *Establishment of a Migrant Workers and Other Overseas Filipinos Resource Center.* ⧍[9-c] — Within the premises and under the administrative jurisdiction of the Philippine Embassy in countries where there are large concentrations of Filipino migrant workers, there shall be established a Migrant Workers and Other Overseas Filipinos Resource Center with the following services:

(a)    Counselling and legal services;

(b)    Welfare assistance including the procurement of medical and hospitalization services; ⧍[10]

(c)    Information, advisory and programs to promote social integration such as post-arrival orientation, settlement and community networking services and activities for social interaction;

(d)    Institute a scheme of registration of undocumented workers to bring them within the purview of this Act. For this purpose, the Center is enjoined to compel existing undocumented workers to register with it within six (6) months from the effectivity of this Act, under pain of having his/her passport cancelled;

(e)    Human resource development, such as training and skills upgrading;

(f)    Gender sensitive programs and activities to assist particular needs of women migrant workers;

(g)    Orientation program for returning workers and other migrants; and

(h)    Monitoring of daily situations, circumstances and activities affecting migrant workers and other overseas Filipinos.

The establishment and operations of the Center shall be a joint undertaking of the various government agencies. The Center shall be open for twenty-four (24) hours daily including Saturdays, Sundays and holidays, and shall be staffed by Foreign

Service personnel, service attaches or officers who represent other Philippine government agencies abroad and, if available, individual volunteers and *bona fide* non-government organizations from the host countries. In countries categorized as highly problematic by the Department of Foreign Affairs and the Department of Labor and Employment and where there is a concentration of Filipino migrant workers, the government must provide a *Shari'a* or **human rights** lawyer, **a psychologist** and a social worker for the Center. **In addition to these personnel, the government must also hire within the receiving country, in such number as may be needed by the post, public relation officers or case officers who are conversant, orally and in writing, with the local language, laws, customs and practices.** The Labor Attache shall coordinate the operation of the Center and shall keep the Chief of Mission informed and updated on all matters affecting it. ⚑

The Center shall have a counterpart 24-hour information and assistance center at the Department of Foreign Affairs to ensure a continuous network and coordinative mechanism at the home office. ⚜[10-a]

SECTION 20.    *Establishment of a Shared Government Information System for Migration.* ⚜[11] — An interagency committee composed of the Department of Foreign Affairs and its attached agency, the Commission on Filipinos Overseas, the Department of Labor and Employment **and its attached concerned agencies,** the Department of Tourism, the Department of Justice, the Bureau of Immigration, the National Bureau of Investigation, **the Department of the Interior and Local Government, the National Telecommunications Commission, the Commission on Information and Communications Technology, the National Computer Center, the National Statistical and Coordination Board,** the National Statistics Office **and other government agencies concerned with overseas employment** shall be established to implement a shared government information system for migration. The interagency committee shall initially make available to itself the information contained in existing data bases/files. The second phase shall involve linkaging of computer facilities in order to allow free-flow data exchanges and sharing among concerned agencies.

**The inter-agency committee shall be co-chaired by the Department of Foreign Affairs and the Department of Labor and Employment. The National Computer Center shall provide the necessary technical assistance and shall set the appropriate information and communications technology standards to facilitate the sharing of information among the member agencies.**

**The inter-agency committee shall meet regularly to ensure the immediate and full implementation of this section and shall explore the possibility of setting**

**up a central storage facility for the data on migration. The progress of the implementation of this section shall be included in the report to Congress of the Department of Foreign Affairs and the Department of Labor and Employment under Section 33.**

The inter-agency committee shall convene to identify existing data bases which shall be declassified and shared among member agencies. These shared data bases shall initially include, but not be limited to, the following information:

(a) Masterlists of Filipino migrant workers/overseas Filipinos classified according to occupation/job category, civil status, by country/state of destination including visa classification;

(b) Inventory of pending legal cases involving Filipino migrant workers and other Filipino nationals, including those serving prison terms;

(c) Masterlist of departing/arriving Filipinos;

(d) Statistical profile on Filipino migrant workers/overseas Filipinos/tourists;

(e) Blacklisted foreigners/undesirable aliens;

(f) Basic data on legal systems, immigration policies, marriage laws and civil and criminal codes in receiving countries particularly those with large numbers of Filipinos;

(g) List of labor and other human rights instruments where receiving countries are signatories;

(h) A tracking system of past and present gender disaggregated cases involving male and female migrant workers, **including minors;** and

(i) Listing of overseas posts which may render assistance to overseas Filipinos, in general, and migrant workers, in particular. ⚠[11-a]

SECTION 21.    *Migrant Workers Loan Guarantee Fund.* ⚠[12] — In order to further prevent unscrupulous illegal recruiters from taking advantage of workers seeking employment abroad, the OWWA, in coordination with government financial institutions, shall institute financing schemes that will expand the grant of

pre-departure loan and family assistance loan. For this purpose, a Migrant Workers Loan Guarantee Fund is hereby created and the revolving amount of One hundred million pesos (P100,000,000.00) from the OWWA is set aside as a guarantee fund in favor of participating government financial institutions.

SECTION 22.    *Rights and Enforcement Mechanism Under International and Regional Human Rights Systems.* ⛰[13] — The Department of Foreign Affairs is mandated to undertake the necessary initiative such as promotions, acceptance or adherence of countries receiving Filipino workers to multilateral convention, declaration or resolutions pertaining to the protection of migrant workers' rights. The Department of Foreign Affairs is also mandated to make an assessment of rights and avenues of redress under international and regional human rights systems that are available to Filipino migrant workers who are victims of abuse and violation and, as far as practicable and through the Legal Assistant for Migrant Workers Affairs created under this Act, pursue the same on behalf of the victim if it is legally impossible to file individual complaints. If a complaints machinery is available under international or regional systems, the Department of Foreign Affairs shall fully apprise the Filipino migrant workers of the existence and effectiveness of such legal options. [cdtai]

## IV. *Government Agencies*

SECTION 23.    *Role of Government Agencies.* ⛰[14] — The following government agencies shall perform the following to promote the welfare and protect the rights of migrant workers and, as far as applicable, all overseas Filipinos:

(a)  *Department of Foreign Affairs* — The Department, through its home office or foreign posts, shall take priority action or make representation with the foreign authority concerned to protect the rights of migrant workers and other overseas Filipinos and extend immediate assistance including the repatriation of distressed or beleaguered migrant workers and other overseas Filipinos;

(b)  *Department of Labor and Employment* — The Department of Labor and Employment shall see to it that labor and social welfare laws in the foreign countries are fairly applied to migrant workers and whenever applicable, to other overseas Filipinos including the grant of legal assistance and the referral to proper medical centers or hospitals:

(b.1)  Philippine Overseas Employment Administration. ⛰[15]— The Administration shall regulate private sector participation in the recruitment and overseas placement of workers by setting up a

licensing and registration system. It shall also formulate and implement, in coordination with  appropriate entities concerned, when necessary, a system for promoting and monitoring the overseas employment of Filipino workers taking into consideration their welfare and the domestic manpower requirements. It shall be responsible for the regulation and  management of overseas employment from the pre-employment stage, securing the best possible employment terms and conditions for  overseas Filipino workers, and taking into consideration the needs of vulnerable sectors and the peculiarities of sea-based and  land-based workers. In appropriate cases, the Administration shall allow the lifting of suspension of erring recruitment/manning agencies upon the payment of fine of Fifty thousand pesos (P50,000.00) for every month of suspension.

In addition to its powers and functions, the Administration shall inform migrant workers not only of their rights as workers but also of their rights as human beings, instruct and guide the workers how to assert their rights and provide the available mechanism to redress violation of their rights.

**The Administration is hereby mandated to develop, publish, disseminate and update periodically a Handbook on the rights and responsibilities of migrant workers as provided by Philippine laws and the existing labor and social laws of the countries of destination that will protect and guarantee the rights of migrant workers. The Handbook shall be written in simple words that can be easily understood with translation in local language as may be necessary.**

It shall also be responsible for the implementation, in partnership with other law enforcement agencies, of an intensified program against illegal recruitment activities. For this purpose, the POEA shall provide comprehensive gender-sensitive Pre-employment Orientation Seminars (PEOS) that will discuss topics not only on the prevention of illegal recruitment **but also on the content of the Handbook on the rights** and r**esponsibilities of migrant workers**.

**The Administration shall not engage in the recruitment and placement of overseas workers except on a**

**government-to-government arrangement only.**

In the recruitment and placement of workers to service the requirements for trained and competent Filipino workers of foreign governments and their instrumentalities, and such other employers as public interests may require, the administration shall deploy only to countries where the Philippines has concluded bilateral labor agreements or arrangements. *Provided,* that such countries shall guarantee to protect the rights of Filipino migrant workers; and *Provided further*, That such countries shall observe and/or comply with the international laws and standards for migrant workers. ⚠[16]

(b.2)   Overseas Workers Welfare Administration. ⚠[17] — The Welfare officer or in his absence, the coordinating officer shall provide the Filipino migrant worker and his family all the assistance they may need in the enforcement of contractual obligations by agencies or entities and/or by their principals. In the performance of this function, he shall make representation and may call on the agencies or entities concerned to conferences or conciliation meetings for the purpose of settling the complaints or problems brought to his attention. **The OWWA shall likewise formulate and implement welfare programs for overseas Filipino workers and their families while they are abroad and upon their return. It shall also ensure the awareness by the overseas Filipino workers and their families of these programs and other related governmental programs.**

**In the repatriation of workers to be undertaken by OWWA, the latter shall be authorized to pay repatriation-related expenses, such as fines or penalties, subject to such guidelines as the OWWA Board of Trustees may prescribe.** ⚠[17-a]

**(c)   Department of Health. — The Department of Health (DOH) shall regulate the activities and operations of all clinics which conduct medical, physical, optical, dental, psychological and other similar examinations, hereinafter referred to as health examinations, on Filipino migrant workers as requirement for their overseas employment. Pursuant to this, the DOH shall ensure that:**

**(c.1)   The fees for the health examinations are regulated, regularly**

monitored and duly published to ensure that the said fees are reasonable and not exorbitant;

(c.2)   The Filipino migrant worker shall only be required to undergo health examinations when there is reasonable certainty that he or she will be hired and deployed to the jobsite and only those health examinations which are absolutely necessary for the type of job applied for or those specifically required by the foreign employer shall be conducted;

(c.3)   No group or groups of medical clinics shall have a monopoly of exclusively conducting health examinations on migrant workers for certain receiving countries;

(c.4)   Every Filipino migrant worker shall have the freedom to choose any of the DOH-accredited or DOH-operated clinics that will conduct his/her health examinations and that his or her rights as a patient are respected. The decking practice, which requires an overseas Filipino worker to go first to an office for registration and then farmed out to a medical clinic located elsewhere, shall not be allowed;

(c.5)   Within a period of three (3) years from the effectivity of this Act, all DOH regional and/or provincial hospitals shall establish and operate clinics that can serve the health examination requirements of Filipino migrant workers to provide them easy access to such clinics all over the country and lessen their transportation and lodging expenses; and

(c.6)   All DOH-accredited medical clinics, including the DOH-operated clinics, conducting health examinations for Filipino migrant workers shall observe the same standard operating procedures and shall comply with internationally-accepted standards in their operations to conform with the requirements of receiving countries or of foreign employers/principals.

Any foreign employer who does not honor the results of valid health examinations conducted by a DOH-accredited or DOH-operated clinic shall be temporarily disqualified from participating in the overseas employment program, pursuant to POEA rules and regulations.

In case an overseas Filipino worker is found to be not medically fit upon his/her immediate arrival in the country of destination, the medical clinic that conducted the health examination/s of such overseas Filipino worker shall pay for his or her repatriation back to the Philippines and the cost of deployment of such worker.

Any DOH-accredited clinic which violates any provision of this section shall, in addition to any other liability it may have incurred, suffer the penalty of revocation of its DOH accreditation.

Any government official or employee who violates any provision of this subsection shall be removed or dismissed from service with disqualification to hold any appointive public office for five (5) years. Such penalty is without prejudice to any other liability which he or she may have incurred under existing laws, rules or regulations. ⚠️[17-b]

(d)  Local Government Units. — In the fight against illegal recruitment, the local government units (LGUs), in partnership with the POEA, other concerned government agencies, and non-government organizations advocating the rights and welfare of overseas Filipino workers, shall take a proactive stance by being primarily responsible for the dissemination of information to their constituents on all aspects of overseas employment. To carry out this task, the following shall be undertaken by the LGUs:

(d.1)  Provide a venue for the POEA, other concerned government agencies and non-government organizations to conduct PEOS to their constituents on a regular basis;

(d.2)  Establish overseas Filipino worker help desk or kiosk in their localities with the objective of providing current information to their constituents on all the processes and aspects of overseas employment. Such desk or kiosk shall, as far as practicable, be fully computerized and shall be linked to the database of all concerned government agencies, particularly the POEA for its updated lists of overseas job orders and licensed recruitment agencies in good standing. ⚠️[17-c]

(e)  *Department of Social Welfare and Development.* — The Department of Social Welfare and Development (DSWD) shall deploy Social Welfare Attachés in countries with large concentration of Overseas Filipino Workers (OFWs), as determined in coordination with the Department of Foreign Affairs (DFA) and

the Department of Labor and Employment (DOLE). The Social Welfare Attaché shall possess the minimum qualifications set by the Civil Service Commission and the preferred qualifications prescribed by the DSWD.

The Social Welfare Attaché shall perform the following functions and duties at the overseas post:

(e.1)   Manage cases of OFWs and other overseas Filipinos in distress needing psychosocial services, such as victims of trafficking or illegal recruitment, rape or sexual abuse, maltreatment and other forms of physical or mental abuse, and cases of abandoned or neglected children;

(e.2)   Undertake surveys and prepare official social welfare situationers on the OFWs in the area of assignment;

(e.3)   Establish a network with overseas-based social welfare agencies and/or individuals and groups which may be mobilized to assist in the provision of appropriate social services;

(e.4)   Respond to and monitor the resolution of problems and complaints or queries of OFWs and their families;

(e.5)   Establish and maintain a data bank and documentation of OFWs and their families so that appropriate social welfare services can be more effectively provided;

(e.6)   Submit regular reports to the DSWD and DFA home office on plans and activities undertaken, recommendations, and updates on the situation of OFWs, particularly those encountering difficulties in the host country. Said report shall form part of the semi-annual report to Congress as provided under Section 33 of Republic Act No. 8042, as amended;

(e.7)   Provide information about the DSWD and its attached agencies and services; and

(e.8)   Perform other related functions in the delivery of social services, as may be directed by the head of the Diplomatic Post in the area of assignment. ⟁[17-d]

## V. *The Legal Assistant for Migrant Workers Affairs*

SECTION 24.     *Legal Assistant for Migrant Workers Affairs.* ⚑[18] — There is hereby created the position of Legal Assistant for Migrant Workers Affairs under the Department of Foreign Affairs who shall be primarily responsible for the provision and overall coordination of all legal assistance services to be provided to Filipino migrant workers as well as overseas Filipinos in distress. He shall have the rank, salary and privileges equal to that of an undersecretary of said Department.

The said Legal Assistant for Migrant Workers Affairs, shall be appointed by the President and must be of proven competence in the field of law with at least ten (10) years of experience as a legal practitioner and must not have been a candidate to an elective office in the last local or national elections.

Among the functions and responsibilities of the aforesaid Legal Assistant are:

(a)     To issue the guidelines, procedures and criteria for the provision of legal assistance services to Filipino migrant workers;

(b)     To establish close linkages with the Department of Labor and Employment, the POEA, the OWWA and other government agencies concerned, as well as with non-governmental organizations assisting migrant workers, to ensure effective coordination and cooperation in the provision of legal assistance to migrant workers;

(c)     To tap the assistance of reputable law firms, the Integrated Bar of the Philippines, other bar associations, **and other government legal experts on overseas Filipino worker laws** to complement the government's efforts to provide legal assistance to our migrant workers;

(d)     To administer the legal assistance fund for migrant workers established under Section 25 hereof and to authorize disbursements therefrom in accordance with the purposes for which the fund was set up; and

(e)     To keep and maintain the information system as provided in Section 20.

The Legal Assistant for Migrant Workers Affairs shall have authority to hire

private lawyers, domestic or foreign, in order to assist him in the effective discharge of the above functions. ⚔18-a

SECTION 25.   *Legal Assistance Fund.* — There is hereby established a legal assistance fund for migrant workers, hereinafter referred to as the Legal Assistance Fund, in the amount of One hundred million pesos (P100,000,000.00) to be constituted from the following sources:

Fifty million pesos (P50,000,000.00) from the Contingency Fund of the President;

Thirty million pesos (P30,000,000.00) from the Presidential Social Fund;

Twenty million pesos (P20,000,000.00) from the Welfare Fund for Overseas Workers established under Letter of Instruction No. 537, as amended by Presidential Decree Nos. 1694 and 1809; and

**An amount appropriated in the annual General Appropriations Act (GAA) which shall not be less than Thirty million pesos (P30,000,000.00) per year: *Provided,* That the balance of the Legal Assistance Fund (LAF) including the amount appropriated for the year shall not be less than One hundred million pesos (P100,000,000.00): *Provided, further,* That the Fund shall be treated as a special fund in the National Treasury and its balance, including the amount appropriated in the GAA, which shall form part of the Fund, shall not revert to the General Fund.**

Any balances of existing funds which have been set aside by the government specifically as legal assistance or defense fund to help migrant workers shall, upon effectivity of this Act, be turned over to, and form part of, the Fund created under this Act. ⚔18-b

SECTION 26.   *Uses of the Legal Assistance Fund.* — The Legal Assistance Fund created under the preceding section shall be used exclusively to provide legal services to migrant workers and overseas Filipinos in distress in accordance with the guidelines, criteria and procedures promulgated in accordance with Section 24(a) hereof. The expenditures to be charged against the Fund shall include the fees for the foreign lawyers to be hired by the Legal Assistant for Migrant Workers Affairs to represent migrant workers facing charges **or in filing cases against erring or abusive employers** abroad, bail bonds to secure the temporary release of workers under detention, court fees and charges and other litigation expenses: ***Provided,* That at the end of every year, the Department of Foreign Affairs shall include in its**

**report to Congress, as provided for under Section 33 of this Act, the status of the Legal Assistance Fund, including the expenditures from the said fund duly audited by the Commission on Audit (COA):** *Provided, further,* **That the hiring of foreign legal counsels, when circumstances warrant urgent action, shall be exempt from the coverage of Republic Act No. 9184 or the Government Procurement Act.** ⚠[18-c]

## VI. *Country-Team Approach*

SECTION 27.    *Priority Concerns of Philippine Foreign Service Posts.* — The country-team approach, as enunciated under Executive Order No. 74, series of 1993, shall be the mode under which Philippine embassies or their personnel will operate in the protection of the Filipino migrant workers as well as in the promotion of their welfare. The protection of the Filipino migrant workers and the promotion of their welfare, in particular, and the protection of the dignity and fundamental rights and freedoms of the Filipino citizen abroad, in general, shall be the highest priority concerns of the Secretary of Foreign Affairs and the Philippine Foreign Service Posts.

cdasia

SECTION 28.    *Country-Team Approach.* ⚠[19] — Under the country-team approach, all officers, representatives and personnel of the Philippine government posted abroad regardless of their mother agencies shall, on a per country basis, act as one country-team with a mission under the leadership of the ambassador. In this regard, the ambassador may recommend to the Secretary of the Department of Foreign Affairs the recall of officers, representatives and personnel of the Philippine government posted abroad for acts inimical to the national interest such as, but not limited to, failure to provide the necessary services to protect the rights of overseas Filipinos.

Upon receipt of the recommendation of the ambassador, the Secretary of the Department of Foreign Affairs shall, in the case of officers, representatives and personnel of other departments, endorse such recommendation to the department secretary concerned for appropriate action. Pending investigation by an appropriate body in the Philippines, the person recommended for recall may be placed under preventive suspension by the ambassador.

In host countries where there are Philippine consulates, such consulates shall also constitute part of the country-team under the leadership of the ambassador.

In the implementation of the country-team approach, visiting Philippine delegations shall be provided full support and information. cdi

VII. *Deregulation and Phase-Out*

SECTION 29.          ⚐ [20]

SECTION 30.          ⚐ [21]

VIII. *Professional and Other Highly-Skilled Filipinos Abroad*

SECTION 31.     *Incentives to Professionals and Other Highly-Skilled Filipinos Abroad.* ⚐ [22] — Pursuant to the objective of encouraging professionals and other highly-skilled Filipinos abroad especially in the field of science and technology to participate in, and contribute to national development, the government shall provide proper and adequate incentives and programs so as to secure their services in priority development areas of the public and private sectors.

IX. *Miscellaneous Provisions*

SECTION 32.     *POEA, OWWA and other Boards; Additional Memberships.* — Notwithstanding any provision of law to the contrary, the respective Boards of the POEA and the OWWA shall, in addition to their present composition, have three (3) members each who shall come from the women, sea-based and land-based sectors respectively, to be **selected and nominated openly** by the **general membership of the sector being represented**.

**The selection and nomination of the additional members from the women, sea-based and land-based sectors shall be governed by the following guidelines:**

(a)     **The POEA and the OWWA shall launch a massive information campaign on the selection of nominees and provide for a system of consultative sessions for the certified leaders or representatives of the concerned sectors, at least three (3) times, within ninety (90) days before the boards shall be convened, for purposes of selection. The process shall be open, democratic and transparent;**

(b)     **Only non-government organizations that protect and promote the rights and welfare of overseas Filipino workers, duly registered with the appropriate Philippine government agency and in good standing as such, and in existence for at least three (3) years prior to the nomination shall be qualified to nominate a representative for each sector to the Board;**

(c)     The nominee must be at least twenty-five (25) years of age, able to read and write, and a migrant worker at the time of his or her nomination or was a migrant worker with at least three (3) years experience as such; and

(d)     A final list of all the nominees selected by the OWWA/POEA governing boards, which shall consist of three (3) names for each sector to be represented, shall be submitted to the President and published in a newspaper of general circulation;

Within thirty (30) days from the submission of the list, the President shall select and appoint from the list the representatives to the POEA/OWWA governing boards.

The additional members shall have a term of three (3) years and shall be eligible for reappointment for another three (3) years. In case of vacancy, the President shall, in accordance with the provisions of this Act, appoint a replacement who shall serve the unexpired term of his or her predecessor.

Any executive issuances or orders issued that contravene the provisions of this section shall have no force and effect.

All other government agencies and government-owned or -controlled corporations which require at least one (1) representative from the overseas workers sector to their respective boards shall follow all the applicable provisions of this section. ⚖ [23]

SECTION 33.     *Report to Congress.* — In order to inform the Philippine Congress on the implementation of the policy enunciated in Section 4 hereof, the Department of Foreign Affairs and the Department of Labor and Employment shall submit **separately** to the said body a semi-annual report of Philippine foreign posts located in countries hosting Filipino migrant workers. **The mid-year report covering the period January to June shall be submitted not later than October 31 of the same year while the year-end report covering the period July to December shall be submitted not later than May 31 of the following year.** The report shall include, but shall not be limited to, the following information: [cdasia]

(a)     Masterlist of Filipino migrant workers, and inventory of pending legal cases involving them and other Filipino nationals including those serving prison terms;

(b)     Working conditions of Filipino migrant workers;

(c)     Problems encountered by the migrant workers, specifically violations of their rights;

(d)     Initiatives/actions taken by the Philippine foreign posts to address the problems of Filipino migrant workers;

(e)     Changes in the laws and policies of host countries; and

(f)     Status of negotiations on bilateral labor agreements between the Philippines and the host country.

Any officer of the government who fails to submit the report as stated in **this** section shall be subject to an administrative penalty **of dismissal from the service with disqualification to hold any appointive public office for five (5) ye**ars. ⚎[24]

SECTION 34.     *Representation in Congress.* — Pursuant to Section 5(2), Article VI of the Constitution and in line with the objective of empowering overseas Filipinos to participate in the policy-making process to address Filipino migrant concerns, two (2) sectoral representatives for migrant workers in the House of Representatives shall be appointed by the President from the ranks of migrant workers: *Provided,* That at least one (1) of the two (2) sectoral representatives shall come from the women migrant workers sector: *Provided, further*, That all nominees must have at least two (2) years experience as a migrant worker. ⚎

SECTION 35.     *Exemption from Travel Tax, Documentary Stamp Tax and Airport Fee.* — All laws to the contrary notwithstanding, the migrant worker shall be exempt from the payment of travel tax and airport-fee upon proper showing of proof of entitlement by the POEA.

**The remittances of all overseas Filipino workers, upon showing of the same proof of entitlement by the overseas Filipino worker's beneficiary or recipient, shall be exempt from the payment of documentary stamp tax.** ⚎[25]

SECTION 36.     *Non-increase of Fees; Abolition of Repatriation Bond.* — Upon approval of this Act, all fees being charged by any government office on migrant workers shall remain at their present levels and the repatriation bond shall be abolished.

SECTION 37.     *The Congressional Migrant Workers Scholarship Fund.* — There is hereby created a Congressional Migrant Workers Scholarship Fund which

shall benefit deserving migrant workers and/or their immediate descendants below twenty-one (21) years of age who intend to pursue courses or training primarily in the field of science and technology. The initial seed fund of Two hundred million pesos (P200,000,000.00) shall be constituted from the following sources:

(a)     Fifty million pesos (P50,000,000.00) from the unexpended Countrywide Development Fund for 1995 in equal sharing by all Members of Congress; and

(b)     The remaining One hundred fifty million pesos (P150,000,000.00) shall be funded from the proceeds of Lotto draws.

The Congressional Migrant Workers Scholarship Fund as herein created shall be administered by the DOLE in coordination with the Department of Science and Technology (DOST). To carry out the objectives of this section, the DOLE and the DOST shall formulate the necessary rules and regulations.

**SECTION 37-A.** *Compulsory Insurance Coverage for Agency-Hired Workers.* **— In addition to the performance bond to be filed by the recruitment/manning agency under Section 10, each migrant worker deployed by a recruitment/manning agency shall be covered by a compulsory insurance policy which shall be secured at no cost to the said worker. Such insurance policy shall be effective for the duration of the migrant worker's employment contract and shall cover, at the minimum:**

**(a)   Accidental death, with at least Fifteen thousand United States dollars (US$15,000.00) survivor's benefit payable to the migrant worker's beneficiaries;**

**(b)   Natural death, with at least Ten thousand United States dollars (US$10,000.00) survivor's benefit payable to the migrant worker's beneficiaries;**

**(c)   Permanent total disablement, with at least Seven thousand five hundred United States dollars (US$7,500.00) disability benefit payable to the migrant worker. The following disabilities shall be deemed permanent: total, complete loss of sight of both eyes; loss of two (2) limbs at or above the ankles or wrists; permanent complete paralysis of two (2) limbs; brain injury resulting to incurable imbecility or insanity;**

**(d)   Repatriation cost of the worker when his/her employment is terminated without any valid cause, including the transport of his or her personal belongings. In case of death, the insurance provider shall arrange and**

pay for the repatriation or return of the worker's remains. The insurance provider shall also render any assistance necessary in the transport including, but not limited to, locating a local and licensed funeral home, mortuary or direct disposition facility to prepare the body for transport, completing all documentation, obtaining legal clearances, procuring consular services, providing death certificates, purchasing the minimally necessary casket or air transport container, as well as transporting the remains including retrieval from site of death and delivery to the receiving funeral home;

(e)   Subsistence allowance benefit, with at least One hundred United States dollars (US$100.00) per month for a maximum of six (6) months for a migrant worker who is involved in a case or litigation for the protection of his/her rights in the receiving country;

(f)   Money claims arising from employer's liability which may be awarded or given to the worker in a judgement or settlement of his or her case in the NLRC. The insurance coverage for money claims shall be equivalent to at least three (3) months for every year of the migrant worker's employment contract;

In addition to the above coverage, the insurance policy shall also include:

(g)   Compassionate visit. When a migrant worker is hospitalized and has been confined for at least seven (7) consecutive days, he shall be entitled to a compassionate visit by one (1) family member or a requested individual. The insurance company shall pay for the transportation cost of the family member or requested individual to the major airport closest to the place of hospitalization of the worker. It is, however, the responsibility of the family member or requested individual to meet all visa and travel document requirements;

(h)   Medical evacuation. When an adequate medical facility is not available proximate to the migrant worker, as determined by the insurance company's physician and/or a consulting physician, evacuation under appropriate medical supervision by the mode of transport necessary shall be undertaken by the insurance provider; and

(i)   Medical repatriation. When medically necessary as determined by the attending physician, repatriation under medical supervision to the migrant worker's residence shall be undertaken by the insurance provider at such time that the migrant worker is medically cleared for travel by commercial carrier. If the period to receive medical clearance to travel exceeds fourteen (14) days from

the date of discharge from the hospital, an alternative appropriate mode of transportation, such as air ambulance, may be arranged. Medical and non-medical escorts may be provided when necessary.

Only reputable private insurance companies duly registered with the Insurance Commission (IC), which are in existence and operational for at least five (5) years, with a net worth of at least Five hundred million pesos (P500,000,000.00) to be determined by the IC, and with a current year certificate of authority shall be qualified to provide for the worker's insurance coverage. Insurance companies who have directors, partners, officers, employees or agents with relatives, within the fourth civil degree of consanguinity or affinity, who work or have interest in any of the licensed recruitment/manning agencies or in any of the government agencies involved in the overseas employment program shall be disqualified from providing this workers' insurance coverage.

The recruitment/manning agency shall have the right to choose from any of the qualified insurance providers the company that will insure the migrant worker it will deploy. After procuring such insurance policy, the recruitment/manning agency shall provide an authenticated copy thereof to the migrant worker. It shall then submit the certificate of insurance coverage of the migrant worker to POEA as a requirement for the issuance of an Overseas Employment Certificate (OEC) to the migrant worker. In the case of seafarers who are insured under policies issued by foreign insurance companies, the POEA shall accept certificates or other proofs of cover from recruitment/manning agencies: *Provided,* That the minimum coverage under sub-paragraphs (a) to (i) are included therein.

Any person having a claim upon the policy issued pursuant to subparagraphs (a), (b), (c), (d) and (e) of this section shall present to the insurance company concerned a written notice of claim together with pertinent supporting documents. The insurance company shall forthwith ascertain the truth and extent of the claim and make payment within ten (10) days from the filing of the notice of claim.

Any claim arising from accidental death, natural death or disablement under this section shall be paid by the insurance company without any contest and without the necessity of proving fault or negligence of any kind on the part of the insured migrant worker: *Provided,* That the following documents, duly authenticated by the Philippine foreign posts, shall be sufficient evidence to substantiate the claim:

(1)     Death Certificate — In case of natural or accidental death;

(2)     Police or Accident Report — In case of accidental death; and

(3)     Medical Certificate — In case of permanent disablement;

For repatriation under subparagraph (d) hereof, a certification which states the reason/s for the termination of the migrant worker's employment and the need for his or her repatriation shall be issued by the Philippine foreign post or the Philippine Overseas Labor Office (POLO) located in the receiving country.

For subsistence allowance benefit under subparagraph (e), the concerned labor attache or, in his absence, the embassy or consular official shall issue a certification which states the name of the case, the names of the parties and the nature of the cause of action of the migrant worker.

For the payment of money claims under subparagraph (f), the following rules shall govern:

(1)     After a decision has become final and executory or a settlement/compromise agreement has been reached between the parties at the NLRC, an order shall be released mandating the respondent recruitment/manning agency to pay the amount adjudged or agreed upon within thirty (30) days;

(2)     The recruitment/manning agency shall then immediately file a notice of claim with its insurance provider for the amount of liability insured, attaching therewith a copy of the decision or compromise agreement;

(3)     Within ten (10) days from the filing of notice of claim, the insurance company shall make payment to the recruitment/manning agency the amount adjudged or agreed upon, or the amount of liability insured, whichever is lower. After receiving the insurance payment, the recruitment/manning agency shall immediately pay the migrant worker's claim in full, taking into account that in case the amount of insurance coverage is insufficient to satisfy the amount adjudged or agreed upon, it is liable to pay the balance thereof;

(4)   In case the insurance company fails to make payment within ten (10) days from the filing of the claim, the recruitment/manning agency shall pay the amount adjudged or agreed upon within the remaining days of the thirty (30)-day period, as provided in the first subparagraph hereof;

(5)   If the worker's claim was not settled within the aforesaid thirty (30)-day period, the recruitment/manning agency's performance bond or escrow deposit shall be forthwith garnished to satisfy the migrant worker's claim;

(6)   The provision of compulsory worker's insurance under this section shall not affect the joint and solidary liability of the foreign employer and the recruitment/manning agency under Section 10;

(7)   Lawyers for the insurance companies, unless the latter is impleaded, shall be prohibited to appear before the NLRC in money claims cases under this section.

Any question or dispute in the enforcement of any insurance policy issued under this section shall be brought before the IC for mediation or adjudication.

In case it is shown by substantial evidence before the POEA that the migrant worker who was deployed by a licensed recruitment/manning agency has paid for the premium or the cost of the insurance coverage or that the said insurance coverage was used as basis by the recruitment/manning agency to claim any additional fee from the migrant worker, the said licensed recruitment/manning agency shall lose its license and all its directors, partners, proprietors, officers and employees shall be perpetually disqualified from engaging in the business of recruitment of overseas workers. Such penalty is without prejudice to any other liability which such persons may have incurred under existing laws, rules or regulations.

For migrant workers recruited by the POEA on a government-to-government arrangement, the POEA shall establish a foreign employers guarantee fund which shall be answerable to the workers' monetary claims arising from breach of contractual obligations. For migrant workers classified as rehires, name hires or direct hires, they may opt to be covered by this insurance coverage by requesting their foreign employers to pay for the cost of the insurance coverage or they may pay for the premium themselves. To

protect the rights of these workers, the Department of Labor and Employment and the POEA shall provide them adequate legal assistance, including conciliation and mediation services, whether at home or abroad.

At the end of every year, the Department of Labor and Employment and the IC shall jointly make an assessment of the performance of all insurance providers, based upon the report of the NLRC and the POEA on their respective interactions and experiences with the insurance companies, and they shall have the authority to ban or blacklist such insurance companies which are known to be evasive or not responsive to the legitimate claims of migrant workers. The Department of Labor and Employment shall include such assessment in its year-end report to Congress.

For purposes of this section, the Department of Labor and Employment, IC, NLRC and the POEA, in consultation with the recruitment/manning agencies and legitimate non-government organizations advocating the rights and welfare of overseas Filipino workers, shall formulate the necessary implementing rules and regulations.

The foregoing provisions on compulsory insurance coverage shall be subject to automatic review through the Congressional Oversight Committee immediately after three (3) years from the effectivity of this Act in order to determine its efficacy in favor of the covered overseas Filipino workers and the compliance by recruitment/manning agencies and insurance companies, without prejudice to an earlier review if necessary and warranted for the purpose of modifying, amending and/or repealing these subject provisions. △[26]

SECTION 37-B. *Congressional Oversight Committee.* — There is hereby created a Joint Congressional Oversight Committee composed of five (5) Senators and five (5) Representatives to be appointed by the Senate President and the Speaker of the House of Representatives, respectively. The Oversight Committee shall be co-chaired by the chairpersons of the Senate Committee on Labor and Employment and the House of Representatives Committee on Overseas Workers Affairs. The Oversight Committee shall have the following duties and functions:

(a)     To set the guidelines and overall framework to monitor and ensure the proper implementation of Republic Act No. 8042, as amended, as well as all programs, projects and activities related to overseas employment;

(b)     To ensure transparency and require the submission of reports from concerned government agencies on the conduct of programs, projects and policies relating to the implementation of Republic Act No. 8042, as amended;

(c)     To approve the budget for the programs of the Oversight Committee and all disbursements therefrom, including compensation of all personnel;

(d)     To submit periodic reports to the President of the Philippines and Congress on the implementation of the provisions of Republic Act No. 8042, as amended;

(e)     To determine weaknesses in the law and recommend the necessary remedial legislation or executive measures; and

(f)     To perform such other duties, functions and responsibilities as may be necessary to attain its objectives.

The Oversight Committee shall adopt its internal rules of procedure, conduct hearings and receive testimonies, reports, and technical advice, invite or summon by subpoena *ad testificandum* any public official or private citizen to testify before it, or require any person by subpoena *duces tecum* documents or other materials as it may require consistent with the provisions of Republic Act No. 8042, as amended. ⚠ [27]

The Oversight Committee shall organize its staff and technical panel, and appoint such personnel, whether on secondment from the Senate and the House of Representatives or on temporary, contractual, or on consultancy, and determine their compensation subject to applicable civil service laws, rules and regulations with a view to ensuring a competent and efficient secretariat.

The members of the Oversight Committee shall not receive additional compensation, allowances or emoluments for services rendered thereto except traveling, extraordinary and other necessary expenses to attain its goals and objectives.

The Oversight Committee shall exist for a period of ten (10) years from the effectivity of this Act and may be extended by a joint concurrent resolution. ⚠ [28]

SECTION 38.     *Appropriation and Other Sources of Funding.* — The amount necessary to carry out the provisions of this Act shall be provided for in the General Appropriations Act of the year following its enactment into law and thereafter.

SECTION 39.     *Migrant Workers Day.* — The day of signing by the President of this Act shall be designated as the Migrant Workers Day and shall henceforth be commemorated as such annually.

SECTION 40.     *Implementing Rules and Regulations.* — The departments and agencies charged with carrying out the provisions of this Act shall, within ninety (90) days after the effectivity of this Act, formulate the necessary rules and regulations for its effective implementation.

SECTION 41.     *Repealing Clause.* — All laws, decrees, executive orders, rules and regulations, or parts thereof inconsistent with the provisions of this Act are hereby repealed or modified accordingly.

SECTION 42.     *Separability Clause.* — If, for any reason, any section or provision of this Act is held unconstitutional or invalid, the other sections or provisions hereof shall not be affected thereby.

SECTION 43.     *Effectivity Clause.* — This Act shall take effect after fifteen (15) days from its publication in the *Official Gazette* or in at least two (2) national newspapers of general circulation whichever comes earlier.

Approved: June 7, 1995

# Endnotes

## 1 (Popup - Popup)

The subject clause does not state or imply any definitive governmental purpose; and it is for that precise reason that the clause violates not just petitioner's right to equal protection, but also her right to substantive due process under Section 1, 137 Article III of the Constitution.

The subject clause "or for three months for every year of the unexpired term, whichever is less" in the 5th paragraph of Section 10 of Republic Act No. 8042 is DECLARED UNCONSTITUTIONAL . . .

*Antonio M. Serrano vs. Gallant Maritime Services, Inc., et al., G.R. No. 167614, March 24, 2009*