

**Philippine Overseas Employment Administration**

Republic of the Philippines
Department of Labor and Employment
BFO Building, Ortigas Avenue cor. EDSA, Mandaluyong City 1501

Website: www.poea.gov.ph  E-mail: info@poea.gov.ph
Hotlines: 722-1144, 722-1155

ISO 9001 :2000
Cert. No: CIP/0115/02/04/294

RECEIVED
BY:
DATE OCT 2 7 2010
TIME: 12:00

MEMORANDUM CIRCULAR NO. **10**
(Series of 2010)

| | | |
|---|---|---|
| TO | : | ALL PRINCIPALS/EMPLOYERS, LICENSED MANNING AGENCIES AND FILIPINO SEAFARERS |
| SUBJECT | : | AMENDED STANDARD TERMS AND CONDITIONS GOVERNING THE OVERSEAS EMPLOYMENT OF FILIPINO SEAFARERS ON-BOARD OCEAN-GOING SHIPS |
| DATE | : | 26 October 2010 |

Pursuant to Governing Board Resolution No. 09, series of 2010,  the following guidelines on the implementation of the Amended Standard Terms and Conditions Governing the Overseas Employment of Filipino Seafarers on Board Ocean-Going Ships, which reflect the consensus of all the stakeholders after a series of tripartite consultations, are hereby issued :

1. The terms and conditions provided therein are the minimum requirements acceptable to the POEA for the employment of Filipino seafarers on board ocean-going ships.

2. The parties to the contract may  improve on the minimum terms and    conditions, provided such improvements shall be made in writing and appended to the contract of employment.

3. Manning agencies shall use and submit to the POEA, the full text of the seafarer's employment contract herein attached including improvements, if any, for approval and processing. Such improvements in the contract shall have prospective application.

4. Manning agencies are directed to inform and provide copies of the amended terms and conditions to all its accredited principals/employers.

5. Manning agencies shall ensure that its departing seafarers are given a copy of the processed and approved employment contract, including its improvements if any. Under no circumstances shall seafarers be allowed to leave for their respective vessels without a copy of the processed employment contract.  Such contract shall be randomly checked at the airports.

6. PDOS providers for seafarers are directed  to include in the  Pre-departure Orientation Seminar (PDOS) of its hired seafarers, the provisions of the amended terms and conditions governing  the employment of Filipino seafarers on board ocean- going ships.

CONTROLLED AND DISSEMINATED
BY CRD ON OCT 2 7 2010

**EXHIBIT E**

This Circular shall take effect fifteen (15) days after publication in a newspaper of general circulation.

NORIEL P. DEVANADERA
OIC - Administrator

## STANDARD TERMS AND CONDITIONS GOVERNING THE OVERSEAS EMPLOYMENT OF FILIPINO SEAFARERS ON-BOARD OCEAN-GOING SHIPS

**Definition of Terms:**

For purposes of this contract, the following terms are defined as follows:

1. **Allottee** - refers to any person named or designated by the seafarer as the recipient of his remittance to the Philippines.

2. **Basic Wage** - refers to the salary of the seafarer exclusive of overtime, leave pay and other allowances and benefits.

3. **Beneficiary(ies)** – refers to the person(s) to whom the death compensation and other benefits due under the employment contract are payable in accordance with rules of succession under the Civil Code of the Philippines, as amended.

4. **Compassionate Ground** - refers to incidence of death of an immediate member of the seafarer's family which includes his parents, spouse and children if the seafarer is married or his parents if the seafarer is single

5. **Convenient Port** - any port where it is practicable, economical, safe and convenient to repatriate the seafarer.

6. **Dental Treatment** - covers tooth extraction, or dental surgery if necessary, due to accident

7. **Departure** - refers to the actual departure from the point of hire of the seafarer through air, sea or land travel transport to join his ship at a Philippine or foreign port

8. **Manning Agency** – refers to any person, partnership or corporation duly licensed by the Secretary of Labor and Employment to engage in the recruitment and placement of seafarers for ships plying international waters and for related maritime activities.

9. **Philippine Port** - refers to any Philippine airport or seaport.

10. **Point of Hire** - refers to the place indicated in the contract of employment which shall be the basis for determining commencement and termination of contract.

11. **Pre-existing illness** – an illness shall be considered as pre-existing if prior to the processing of the POEA contract, any of the following conditions are present:

1

a. The advice of a medical doctor on treatment was given for such continuing illness or condition; or

b. The seafarer had been diagnosed and has knowledge of such an illness or condition but failed to disclose the same during pre-employment medical examination (PEME), and such cannot be diagnosed during the PEME

12. **Principal/Employer/Company** - any person, partnership or corporation hiring Filipino seafarers to work onboard ocean-going ships.

13. Regular Working Hours - refers to the seafarer's eight (8) hour working hours within a period of 24 hours.

14. **Seafarer** - refers to any person who is employed or engaged in overseas employment in any capacity on board a ship other than a government ship used for military or non-commercial purposes.

15. Shipwreck - refers to the damage or destruction of a ship at sea caused by collision, storm, grounding or any other marine peril at sea or in port rendering the ship absolutely unable to pursue her voyage.

16. Work-Related Illness - any sickness as a result of an occupational disease listed under Section 32-A of this Contract with the conditions set therein satisfied

17. Work-Related Injury - injury arising out of and in the course of employment.

## SECTION 1. DUTIES

A. Duties of the Principal/Employer/Master/Company:

1. To faithfully comply with the stipulated terms and conditions of this contract, particularly the prompt payment of wages, remittance of allotment and the expeditious settlement of valid claims of the seafarer.

2. To extend coverage to the seafarers under the Philippine Social Security System (SSS), Philippine Health Insurance Corporation (PhilHealth), Employees' Compensation Commission (ECC) and Home Development Mutual Fund (Pag-IBIG Fund), unless otherwise provided in multilateral or bilateral agreements entered into by the Philippine government with other countries.

3. To make operational on board the ship the grievance machinery provided in this contract and ensure its free access at all times by the seafarer.

4. To provide a seaworthy ship for the seafarer and take all reasonable precautions to prevent accident and injury to the crew including provision of safety equipment, fire prevention, safe and proper navigation of the ship and such other precautions necessary to avoid accident, injury or sickness to the seafarer.

2

5. To observe the Code of Ethics for Seafarers and conduct himself in the traditional decorum of a master.

6. **To provide a workplace conducive for the promotion and protection of the health of the seafarers in accordance with the standards and guidelines in Title 4 of the ILO Maritime Labor Convention, 2006.**

B. Duties of the Seafarer:

1. To faithfully comply with and observe the terms and conditions of this contract, violation of which shall be subject to disciplinary action pursuant to Section 33 of this contract.

2. To abide by the Code of Discipline as provided in the POEA rules and regulations governing overseas contract workers and the Code of Ethics for Seafarers.

3. To be obedient to the lawful commands of the Master or any person who shall lawfully succeed him and to comply with the company policy including safety policy and procedures and any instructions given in connection therewith.

4. To be diligent in his duties relating to the **ship**, its stores and cargo, whether on board, in boats or ashore.

5. To conduct himself at all times in an orderly and respectful manner towards shipmates, passengers, shippers, stevedores, port authorities and other persons on official business with the ship.

6. **To take personal responsibility for his health while onboard by practicing a healthy lifestyle which includes taking medications and lifestyle changes as prescribed by the company-designated doctor.**

## SECTION 2. COMMENCEMENT/DURATION OF CONTRACT

A. The employment contract between the employer and the seafarer shall commence upon actual departure of the seafarer from the Philippine airport or seaport in the point of hire and with a POEA approved contract.  It shall be effective until the seafarer's date of arrival at the point of hire upon termination of his employment pursuant to Section 18 of this Contract.

B. **The period of employment shall be for a period mutually agreed upon by the seafarer and the employer but not to exceed 12 months.  Any extension of the contract shall be subject to mutual consent of both parties.**

## SECTION 3.  FREE PASSAGE FROM THE POINT OF HIRE TO THE PORT OF EMBARKATION

The seafarer shall join the **ship** and be available for duty at the date and time specified by the employer.  The seafarer shall travel by air or as otherwise directed at the expense of the employer.

3

## SECTION 4.  BAGGAGE ALLOWANCE

The seafarer traveling by air to join a **ship** or on repatriation shall be entitled to the normal free baggage allowance offered by the airlines.  The cost of the excess baggage shall be for the account of the seafarer.

## SECTION 5.  HYGIENE AND VACCINATION

A. The seafarer shall keep his quarters and other living spaces **such as: mess rooms,** toilets, bathrooms, alleyways and recreation rooms in clean and tidy condition to the satisfaction of the master.  Such work is to be performed outside the seafarer's regular working hours and for which no overtime pay shall be claimed.

B. The seafarer shall submit to the order of the master or to the laws of any country within the territorial jurisdiction of which the **ship** may enter to have such vaccination or inoculation or to undertake measures to safeguard his health **and the entire crew complement.**

C. **The company/employer shall ensure that the seafarer shall be informed on the cause, prevention and consequences of HIV/AIDS.**

## SECTION 6. WAGES

A. **All seafarers shall be paid for their work regularly and in full in accordance with this contract.** They shall be paid monthly wages not later than 15 days of the succeeding month from the date of commencement of the contract until the date of arrival at point of hire upon termination of their employment pursuant to Section 18 of this contract.

B. **Seafarers shall be given a monthly account of the payments due and the amounts paid to them, including wages, additional payments and the rate of exchange used.**

## SECTION 7.  PAYMENT ON BOARD

Payment of shipboard pay in foreign ports shall be subject to the currency control regulations at the port abroad and to the official rate of exchange prevailing at the time of payment.  Advances shall be at the master's/employer's discretion and in accordance with the foregoing conditions.

## SECTION 8. ALLOTMENTS AND REMITTANCES

A. The seafarer is required to make an allotment which shall be payable once a month to his designated allottee in the Philippines through any authorized Philippine bank.  The **principal/employer/master/company** shall provide the seafarer with facilities to do so at no expense to the seafarer.  The allotment shall be at least eighty percent (80%) of the seafarer's monthly basic salary.

B. The **principal/employer/master/company** may also provide facilities for the seafarer to remit any amount earned in excess of his allotment, including backwages, if any, to his designated allottee in the Philippines through any authorized Philippine bank without any charge to him.

C. The allotments shall be paid to the designated allottee in Philippine currency at the rate of exchange indicated in the credit advice of the local authorized Philippine bank.

### SECTION 9.  FINAL WAGE ACCOUNT & CERTIFICATE OF EMPLOYMENT

The seafarer, upon his discharge, shall be given a written account of his **final wages** reflecting all deductions therefrom.  Where a seafarer is landed in an emergency, the written account of his wages shall be given to him **not later than one month from disembarkation.** Upon the seafarer's request, he shall also be provided by his **principal/employer/master/company** his certificate of employment or service record without any charge.

### SECTION 10.  HOURS OF WORK

A. The seafarer shall perform not more than forty-eight (48) hours of regular work a week.   The hours of works shall be determined and prescribed by the master, provided that it conforms with the customary international practices and standards and as prescribed in paragraph B below.

B. Regular working hours for the seafarer shall be eight (8) hours in every 24 hours, midnight to midnight, Monday to Sunday.  The normal practice is as follows:

   1. The day worker shall observe the eight (8) regular working hours during the period from 0600 hours to 1800 hours.

   2. The steward personnel shall observe the eight (8) regular working hours during the period   from 0500 hours to 2000 hours.

   3. The Radio Operator shall observe the eight (8) regular working hours in every twenty-four (24) hours, midnight to midnight, from Monday to Sunday as established by International Telecommunication Conventions and as prescribed by the master.

   4. For those who are on sea watch, their working hours shall be eight (8) hours per day.  Staggering of working hours will be at the master's discretion.

C. **The record of the seafarer's daily hours of work or of his daily hours of rest shall be maintained to allow monitoring of compliance to the above provisions. The seafarer shall be provided a copy of the records pertaining to him which shall be endorsed by the master or a person authorized by the master, and by the seafarer.**

   The seafarer shall be allowed reasonable rest period in accordance with international standards.

5

**SECTION 11.  OVERTIME & HOLIDAYS**

A.  The seafarer shall be compensated for all work performed in excess of the regular eight (8) hours as prescribed above.  Overtime pay may be classified as open, fixed or guaranteed.

In computing overtime, a fraction of the first hour worked shall be considered as one full hour.  After the first hour overtime, any work performed which is less than thirty (30) minutes shall be considered as half an hour and more than thirty (30) minutes shall be considered one full hour.

B. Overtime work may be compensated at the following rates:

1. Open overtime - not less than 125 percent (125%) of the basic hourly rate computed based on two hundred eight (208) regular working hours per month.

2. Guaranteed or fixed overtime - not less than thirty percent (30%) of the basic monthly salary of the seafarer.  This fixed rate overtime shall include overtime work performed on Sundays and holidays but shall not exceed one hundred five (105) hours a month.

3. Overtime work for officers shall be computed based on the fixed overtime rate.

4. For ratings, overtime work shall be based on guaranteed or open overtime rate, as mutually agreed upon by the contracting parties. **For ratings paid on guaranteed overtime, overtime work in excess of 105 hours a month for ratings shall be further compensated by their hourly overtime rate.**

C.  Any hours of work or duty including hours of watchkeeping performed by the seafarer on designated rest days and holidays shall be paid rest day or holiday pay.   The following shall be considered as holidays at sea and in port.

| | | |
|---|---|---|
| New Year's Day | - | January 1 |
| Maundy Thursday | - | movable date |
| Good Friday | - | movable date |
| Araw ng Kagitingan (Bataan& Corregidor Day) | - | April 9 |
| Labor Day | - | May 1 |
| Independence Day | - | June 12 |
| National Heroes Day August | - | Last Sunday of |
| All Saints Day | - | November 1 |
| Bonifacio Day | - | November 30 |
| Christmas Day | - | December 25 |
| Rizal Day | - | December 30 |

D.  Emergency Duty

**Nothing in this Contract shall be deemed to impair the right of the master of a ship to require a seafarer to perform any hours of work necessary for the immediate safety of the ship, persons on board or cargo, for the purpose of**

6

giving assistance to other ships or persons in distress at sea, or to conduct fire, boat, or emergency drill. Accordingly, the master may suspend the schedule of hours of work or hours of rest and require a seafarer to perform any hours of work necessary until the normal situation has been restored or the drill has been completed. As soon as practicable after the normal situation has been restored or the drill has been completed, the master shall ensure that any seafarer who have performed work in a scheduled rest period are provided with an adequate period of rest.

No overtime work and pay shall be considered for such an emergency service or for fire, boat, or emergency drill.

## SECTION 12.  LEAVE PAY

The seafarer's leave pay shall be in accordance with the number of days leave per month as agreed upon.  Days leave shall not be less than **four and a half days (4 ½)** for each month of service and pro-rated.  Leave pay shall be settled onboard or settled within two weeks after arrival of the seafarer at the point of hire.

## SECTION 13.  SHORE LEAVE

The seafarer shall be allowed shore leave when practicable, upon the consent of the master or his deputy, taking into consideration the operations and safety of the ship.

## SECTION 14. SUBSISTENCE, SHIP STORES **AND PROVISIONS**

A.  The seafarer shall be provided by the **principal/employer/master/company** with subsistence consistent with good maritime standards and practices while on board the ship.

B.  All stores and provisions issued to the seafarer are only for use and consumption on board the ship and any unused or unconsumed stores or provisions shall remain the property of the employer.  The   seafarer shall not take ashore, sell, destroy or give away such stores   and provisions.

## SECTION 15.  TRANSFER CLAUSE

The seafarer agrees to be transferred at any port to any ship owned or operated, manned or managed by the same employer, provided it is accredited to the same manning agent and provided further that the position of the seafarer and the rate of his wages and terms of service are in no way inferior and the total period of employment shall not exceed that originally agreed upon.

Any form of transfer shall be documented and made available when necessary.

## SECTION 16.  GRIEVANCE MACHINERY

A.  If the seafarer considers himself aggrieved, he shall make his complaint in accordance with the following procedures:

7

1. The seafarer shall first approach the head of the Department in which he is assigned to explain his grievance.

   a.   In the Deck, Radio and Catering Department, the head is the Chief Mate.

   b.   In the Engine Department, the head is the Chief Engineer.

   c.   In the Catering and/or Hotel Department in a passenger ship, the head is the Chief Steward and/or Purser.

2. The seafarer shall make his grievance in writing and in an orderly manner and shall choose a time when his complaint or grievance can be properly heard.

3. The seafarer may also seek the assistance of the highest-ranking Filipino seafarer on board.

4. The Department head shall deal with the complaint or grievance and where solution is not possible at his level, refer the complaint or grievance to the Master who shall handle the case personally.

5. If no satisfactory result is achieved, the seafarer concerned may appeal to the management of the company or with a Philippine Overseas Labor Office or consular officer overseas. The master shall afford such facilities necessary to enable the seafarer to transmit his appeal.

B.   When availed of by the seafarer, the grievance procedure and all actions or decisions agreed upon shall be properly documented for the protection and interest of both parties.

C.   The aggrieved seafarer whose employment is covered by an existing CBA shall elevate any unsatisfactory resolution of his grievance to voluntary arbitration as agreed upon under the CBA. The aggrieved party whose employment is not covered by an existing CBA may elevate his complaint to the Maritime Industry Labor Arbitration Council (MILA) prior to any other forum.

D.   The foregoing procedures shall be without prejudice to other modes of voluntary settlement of disputes and to the jurisdiction of the Philippine Overseas Employment Administration (POEA) or the National Labor Relations Commission (NLRC) over any unresolved complaints arising out of shipboard employment that shall be brought before it by the seafarer.

## SECTION 17.  DISCIPLINARY PROCEDURES

The Master shall comply with the following disciplinary procedures against an erring seafarer:

A. The Master shall furnish the seafarer with a written notice containing the following:

   1. Grounds for the charges as listed in Section 33 of this Contract or analogous act constituting   the same.

8

    2. Date, time and place for a formal investigation of the charges against the seafarer concerned.

B. The Master or his authorized representative shall conduct the investigation or hearing, giving the seafarer the opportunity to explain or defend himself against the charges. These procedures must be duly documented and entered into the ship's logbook.

C. If after the investigation or hearing, the Master is convinced that imposition or a penalty is justified, the Master shall issue a written notice of penalty and the reasons for it to the seafarer, with copies furnished to the Philippine agent.

D. Dismissal for just cause may be effected by the Master without furnishing the seafarer with a notice of dismissal if there is a clear and existing danger to the safety of the crew or the ship. The Master shall send a complete report to the manning agency substantiated by witnesses, testimonies and any other documents in support thereof.

## SECTION 18.  TERMINATION OF EMPLOYMENT

A. The employment of the seafarer shall cease when the seafarer completes his period of contractual service aboard the ship, signs-off from the ship and arrives at the point of hire.

B. The employment of the seafarer is also terminated effective upon arrival at the point of hire for any of the following reasons:

    1. When the seafarer signs-off and is disembarked for medical reasons pursuant to Section 20 (A)[5] of this Contract.

    2. When the seafarer signs-off due to shipwreck, ship's sale, lay-up of ship, discontinuance of voyage or change of ship principal in accordance with Sections 22, 23 and 26 of this Contract.

    3. When the seafarer, in writing, voluntarily resigns and signs off prior to expiration of contract pursuant to Section 19 (G) of this Contract.

    4. When the seafarer is discharged for just cause as provided for in Section 33 of this Contract.

## SECTION 19.  REPATRIATION

A. If the ship is outside the Philippines upon the expiration of the contract, the seafarer shall continue his service on board until the ship's arrival at a convenient port and/or after arrival of the replacement crew provided that, in any case, the continuance of such service shall not exceed three months. The seafarer shall be entitled to earned wages and benefits as provided in his contract.

B. If the ship arrives at a convenient port before the expiration of the contract, the **principal/employer/master/company** may repatriate the seafarer from such port, provided the unserved portion of his contract is not more than one (1) month. The

seafarer shall be entitled only to his earned wages and earned leave pay and to his basic wages corresponding to the unserved portion of the contract, unless within 60 days from disembarkation, the seafarer is rehired at the same rate and position, in which case the seafarer shall be entitled only to his earned wages and earned leave pay.

C.  If the ship arrives at a convenient port within a period of three (3) months before the expiration of his contract, the **principal/employer/master/company** may repatriate the seafarer from such port provided that the seafarer shall be paid all his earned wages. In addition, the seafarer shall also be paid his leave pay for the entire contract period plus a termination pay equivalent to one (1) month of his basic pay, provided, however, that this mode of termination may only be exercised by the **principal/employer/master/company** if the original contract period of the seafarer is at least nine **(9) months**; provided, further, that the conditions for this mode of **repatriation** shall not apply to dismissal for cause.

D.  **The seafarer, if discharged at a port abroad for any reason shall be repatriated to the Philippines via sea or air or as may otherwise be directed by the principal/employer/company. He shall be provided with accommodation and food, allowances and medical treatment, if necessary, until he arrives at the point of hire.**

E.  When the seafarer is discharged for any just cause, the employer shall have the right to recover the costs of his replacement and repatriation from the seafarer's wages and other earnings.

F.  The seafarer, when discharged and repatriated as directed by the **principal/employer/master/company** shall be entitled to basic wages from date of signing off until arrival at the point of hire except when the discharge is in accordance with the above or for disciplinary reasons.

If the seafarer delays or makes a detour or proceeds to a destination other than **through the travel itinerary arranged by the employer to the point of hire, the employment of the seafarer will be considered terminated at the time the seafarer signs off the ship and all additional expenses shall be to the seafarer's account. The seafarer shall be entitled to earned wages and basic wage calculated based on the original scheduled date of arrival at the point of hire. All other liabilities of the company in this event shall cease at the time the seafarer is terminated. Any illness, injury or death sustained by the seafarer, due to the above shall be considered non-work related and shall not be compensated.**

G.  A seafarer who requests for early termination of his contract shall be liable for his repatriation cost as well as the transportation cost of his replacement. The employer may, in case of compassionate grounds, assume the transportation cost of the seafarer's replacement.

H.  **The seafarer shall report to the manning agency within 72 hours upon arrival at point of hire.**

**SECTION 20.  COMPENSATION AND BENEFITS**

A.  COMPENSATION AND BENEFITS FOR INJURY OR ILLNESS

The liabilities of the employer when the seafarer suffers work-related injury or illness during the term of his contract are as follows:

1. The employer shall continue to pay the seafarer his wages during the time he is on board the ship;

2. If the injury or illness requires medical and/or dental treatment in a foreign port, the employer shall be liable for the full cost of such medical, serious dental, surgical and hospital treatment as well as board and lodging until the seafarer is declared fit to work or to be repatriated. However, if after repatriation, the seafarer still requires medical attention arising from said injury or illness, he shall be so provided at cost to the employer until such time he is declared fit or the degree of his disability has been established by the company-designated physician.

3. In addition to the above obligation of the employer to provide medical attention, the seafarer shall also receive sickness allowance from his employer in an amount equivalent to his basic wage computed from the time he signed off until he is declared fit to work or the degree of disability has been assessed by the company-designated physician. The period within which the seafarer shall be entitled to his sickness allowance shall not exceed 120 days. Payment of the sickness allowance shall be made on a regular basis, but not less than once a month.

   The seafarer shall be entitled to reimbursement of the cost of medicines prescribed by the company-designated physician. In case treatment of the seafarer is on an out-patient basis as determined by the company-designated physician, the company shall approve the appropriate mode of transportation and accommodation. The reasonable cost of actual traveling expenses and/or accommodation shall be paid subject to liquidation and submission of official receipts and/or proof of expenses.

   For this purpose, the seafarer shall submit himself to a post-employment medical examination by a company-designated physician within three working days upon his return except when he is physically incapacitated to do so, in which case, a written notice to the agency within the same period is deemed as compliance. In the course of the treatment, the seafarer shall also report regularly to the company-designated physician specifically on the dates as prescribed by the company-designated physician and agreed to by the seafarer. Failure of the seafarer to comply with the mandatory reporting requirement shall result in his forfeiture of the right to claim the above benefits.

   If a doctor appointed by the seafarer disagrees with the assessment, a third doctor may be agreed jointly between the Employer and the seafarer.  The third doctor's decision shall be final and binding on both parties.

4. Those illnesses not listed in Section 32 of this Contract are disputably presumed as work-related.

11

5. In case a seafarer is disembarked from the ship for medical reasons, the employer shall bear the full cost of repatriation in the event the seafarer is declared (1) fit for repatriation; or (2) fit to work but the employer is unable to find employment for the seafarer on board his former ship or another ship of the employer.

6. In case of permanent total or partial disability of the seafarer caused by either injury or illness the seafarer shall be compensated in accordance with the schedule of benefits enumerated in Section 32 of his Contract.   Computation of his benefits arising from an illness or disease shall be governed by the rates and the rules of compensation applicable at the time the illness or disease was contracted.

   **The disability shall be based solely on the disability gradings provided under Section 32 of this Contract, and shall not be measured or determined by the number of days a seafarer is under treatment or the number of days in which sickness allowance is paid.**

7. **It is understood and agreed that the benefits mentioned above shall be separate and distinct from, and will be in addition to whatever benefits which the seafarer is entitled to under Philippine laws such as from the Social Security System, Overseas Workers Welfare Administration, Employees' Compensation Commission, Philippine Health Insurance Corporation and Home Development Mutual Fund (Pag-IBIG Fund).**

## B. COMPENSATION AND BENEFITS FOR DEATH

1. In case of work-related death of the seafarer, during the term of his contract, the employer shall pay his beneficiaries the Philippine currency equivalent to the amount of Fifty Thousand US dollars (US$50,000) and an additional amount of Seven Thousand US dollars (US$7,000) to each child under the age of twenty-one (21) but not exceeding four (4) children, at the exchange rate prevailing during the time of payment.

2. Where death is caused by warlike activity while sailing within a declared war zone or war risk area, the compensation payable shall be doubled.  The employer shall undertake appropriate war zone insurance coverage for this purpose.

3. It is understood and agreed that the benefits mentioned above shall be separate and distinct from, and will be in addition to whatever benefits which the seafarer is entitled to under Philippine laws from the Social Security System, Overseas Workers Welfare Administration, Employee's Compensation Commission, Philippine Health Insurance Corporation and **Home Development Mutual Fund (Pag-IBIG Fund).**

4. The other liabilities of the employer when the seafarer dies as a result of work-related injury or illness during the term of employment are as follows:

   a. The employer shall pay the deceased's beneficiary all outstanding obligations due the seafarer under this Contract.

b.   The employer shall transport the remains and personal effects of the seafarer to the Philippines at employer's expense except if the death occurred in a port where local government laws or regulations do not permit the transport of such remains.  In case death occurs at sea, the disposition of the remains shall be handled or dealt with in accordance with the master's best judgment.  In all cases, the employer/master shall communicate with the manning agency to advise for disposition of seafarer's remains.

c.   The employer shall pay the beneficiaries of the seafarer the Philippine currency equivalent to the amount of One Thousand US dollars (US$1,000) for burial expenses at the exchange rate prevailing during the time of payment.

C.   It is understood that computation of the total permanent or partial disability of the seafarer caused by the injury sustained resulting from warlike activities within the warzone area shall be based on the compensation rate payable within the warzone area as prescribed in this Contract.

D.   No compensation and benefits shall be payable in respect of any injury, incapacity, disability or death of the seafarer resulting from his willful or criminal act or intentional breach of his duties, provided however, that the employer can prove that such injury, incapacity, disability or death is directly attributable to the seafarer.

E.   **A seafarer who knowingly conceals** a pre-existing illness or condition in the Pre-Employment Medical Examination (PEME) shall be liable for misrepresentation and shall be disqualified from any compensation and benefits. This is likewise a just cause for termination of employment and imposition of appropriate administrative sanctions.

F.   When requested, the seafarer shall be furnished a copy of all pertinent medical reports or any records at no cost to the seafarer.

G.   **The amounts paid to the seafarer due to accidental or natural death, or permanent total disablement by virtue of the provisions of RA 8042 as amended by RA 10022 and its implementing rules and regulations shall form part of and shall be deducted from the total amount that the seafarer is determined to be finally entitled to under this Contract.**

H.   Subsistence allowance benefit as provided in RA 8042, as amended by RA 10022.   The principal/employer/company shall grant to the seafarer who is involved in a case or litigation for the protection of his rights in a foreign country, a subsistence allowance of at least  One Hundred United States Dollars (US$100) per month for a maximum of six (6) months.

I.   Compassionate Visit as provided in RA 8042, as amended by RA 10022.   When a seafarer is hospitalized and has been confined for at least seven (7) consecutive days, he shall be entitled to a compassionate visit by one (1) family member or a requested individual.   The employer shall pay for the transportation cost of the family member or requested individual to the major airport closest to the place of hospitalization of the seafarer. It is, however, the

responsibility of the family member or requested individual to meet all visa and travel document requirements;

J.    The seafarer or his successor in interest acknowledges that payment for injury, illness, incapacity, disability or death **and other benefits** of the seafarer under this contract **and under RA 8042, as amended by RA 10022,** shall cover all claims in relation with or in the course of the seafarer's employment, including but not limited to damages arising from the contract, tort, fault or negligence under the laws of the Philippines or any other country.

## SECTION 21. WAR AND WARLIKE OPERATIONS ALLOWANCE

A.    **The POEA shall be the sole authority to determine whether the ship is within a war risk trading area. It shall also determine the amount of premium pay to which the seafarer shall be entitled to when sailing in that war-risk trading area.**

B.    **The seafarer when sailing within a war-risk trading area shall be entitled to such premium pay as the POEA may determine through appropriate periodic issuances.**

C.    **If at the time of the signing of the contract, an area is declared a war or war-risk trading area and the seafarer binds himself in writing to sail into that area, the agreement shall be properly appended to the Contract for verification and approval by the Philippine Overseas Employment Administration (POEA). The seafarer shall comply with the agreement or shall bear his cost of repatriation when he opts not to sail into a war or war-risk trading area.**

D.    **If a war or warlike operations should arise during the term of this Contract in any country within the ship's trading area, the seafarer may sail with the ship within and out of the trading area if required by the Master.**

## SECTION 22.  TERMINATION DUE TO SHIPWRECK AND SHIP'S FOUNDERING

Where the ship is wrecked necessitating the termination of employment before the date indicated in the contract, the seafarer shall be entitled to earned wages, medical examination at employer's expense to determine his fitness to work, repatriation at employer's cost and one month basic wage as termination pay.

In case of termination of employment of the seafarer before the expiration of the term of his contract due to shipwreck, actual or constructive total loss or foundering of the ship, the seafarer shall be entitled to earned wages, medical examination at employer's expense to determine his fitness to work, repatriation at employer's cost and one month basic wage as termination pay.

## SECTION   23.      TERMINATION   DUE   TO   SALE   OF   SHIP,   LAY-UP   OR DISCONTINUANCE OF VOYAGE

Where the ship is sold, laid up, or the voyage is discontinued necessitating the termination of employment before the date indicated in the Contract, the seafarer shall be

entitled to earned wages, repatriation at employer's cost and one (1) month basic wage as termination pay, unless arrangements have been made for the seafarer to join another ship belonging to the same principal to complete his contract in which case the seafarer shall be entitled to basic wages until the date of joining the other ship.

## SECTION 24.  TERMINATION DUE TO UNSEAWORTHINESS

A.  If the ship is declared unseaworthy by a classification society, port state or flag state, the seafarer shall not be forced to sail with the ship.

B.  If the ship's unseaworthiness necessitates the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at cost to the employer and termination pay equivalent to one (1) month basic wage.

## SECTION 25.  TERMINATION DUE TO REGULATION ¼, CONTROL PROCEDURES OF THE 1978 STCW CONVENTION, AS AMENDED

If the seafarer is terminated and/or repatriated as a result of port state control procedures/actions in compliance with Regulation ¼ of the 1978 STCW Convention, as amended, his termination shall be considered valid.  However, he shall be entitled to repatriation and earned wages and benefits only.

## SECTION 26.  CHANGE OF PRINCIPAL

A.  Where there is a change of Principal of the ship necessitating the pre-termination of employment of the seafarer; the seafarer should be entitled to earned wages and repatriation at employer's expense. He shall also be entitled to one (1) month basic pay as termination pay.

B.  In case arrangements have been made for the seafarer to directly join another ship of the same Principal to complete his contract, he shall only be entitled to basic wage from the date of his disembarkation from his former ship until the date of his joining the new ship.

## SECTION 27.  LOSS OF OR DAMAGE TO CREW'S EFFECTS BY MARINE PERIL

A.  The seafarer shall be reimbursed by the employer the full amount of loss or damage to his personal effects but in no case shall the amount exceed the Philippine currency equivalent to the amount of Two Thousand US dollars (US$2,000) if his personal effects are lost or damaged as a result of the wreck or loss or stranding or abandonment of the ship or as a result of fire, flooding, collision or piracy.

B.  In case of partial loss, the amount shall be determined by mutual agreement of both parties but in no case to exceed the Philippine currency equivalent to the amount of Two Thousand US dollars (US$2,000).

15

C.  Reimbursement for loss or damage to the seafarer's personal effects shall not apply if such loss or damage is due to (a) the seafarer's own fault; (b) larceny or theft or (c) robbery.

D.  Payment of any reimbursement shall be computed at the rate of exchange prevailing at the time of payment.

## SECTION 28.  GENERAL SAFETY

A.  The seafarer shall observe and follow any regulation or restriction that the master may impose concerning safety, drug and alcohol and environmental protection.

B.  The seafarer shall make use of all appropriate safety equipment provided him and must ensure that he is suitably dressed from the safety point of view for the job at hand.

## SECTION 29.  DISPUTE SETTLEMENT PROCEDURES

In cases of claims and disputes arising from this employment, the parties covered by a collective bargaining agreement shall submit the claim or dispute to the original and exclusive jurisdiction of the voluntary arbitrator or panel of voluntary arbitrators.  If the parties are not covered by a collective bargaining agreement, the parties may at their option submit the claim or dispute to either the original and exclusive jurisdiction of the National Labor Relations Commission (NLRC), pursuant to Republic Act (RA) 8042 otherwise known as the Migrant Workers and Overseas Filipinos Act of 1995, as amended, or to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators.  If there is no provision as to the voluntary arbitrators to be appointed by the parties, the same shall be appointed from the accredited voluntary arbitrators of the National Conciliation and Mediation Board of the Department of Labor and Employment.

The Philippine Overseas Employment Administration (POEA) shall exercise original and exclusive jurisdiction to hear and decide disciplinary action on cases, which are administrative in character, involving or arising out of violations of recruitment laws, rules and regulations involving employers, principals, contracting partners and Filipino seafarers.

## SECTION 30.  PRESCRIPTION OF ACTION

All claims arising from this contract shall be made within three (3) years from the date the cause of action arises, otherwise the same shall be barred.

## SECTION 31.  APPLICABLE LAW

Any unresolved dispute, claim or grievance arising out of or in connection with this contract including the annexes thereof, shall be governed by the laws of the Republic of the Philippines, international conventions, treaties and covenants to which the Philippines is a signatory.

**SECTION 32.   SCHEDULE OF DISABILITY OR IMPEDIMENT FOR INJURIES SUFFERED AND DISEASES INCLUDING OCCUPATIONAL DISEASES OR ILLNESS CONTRACTED.**

## HEAD

Traumatic head injuries that result to:

1. Apperture unfilled with bone not over three (3) inches without brain injury ------ Gr. 9
2. Unfilled with bone over three (3) inches without brain injury ----------------------- Gr. 3
3. Severe paralysis of both upper or lower extremities or one upper and one lower extremity ------------------------------------------------------------------------ Gr. 1
4. Moderate paralysis of two (2) extremities producing moderate difficulty in movements with self-care activities -------------------------------------------------- Gr. 10
5. Slight paralysis affecting one extremity producing slight difficulty with self-care activities ---------------------------------------------------------------------------------- Gr. 10
6. Severe mental disorder or Severe Complex Cerebral function disturbance or post-traumatic psychoneurosis which require regular aid and attendance as to render worker permanently unable to perform any work ------------------------------ Gr. 1
7. Moderate mental disorder or moderate brain functional disturbance which limits worker to the activities of daily living with some directed care or attendance ----------------------------------------------------------------------------------- Gr. 6
8. Slight mental disorder or disturbance that requires little attendance or aid and which interferes to a slight degree with the working capacity of the claimant --- Gr. 10
9. Incurable imbecility ---------------------------------------------------------------------------- Gr. 1

## FACE

1. Severe disfigurement of the face or head as to make the worker so repulsive as to greatly handicap him in securing or retaining ----------------------------------- Gr. 2
2. Moderate facial disfigurement involving partial ablation of the nose with big scars on face or head ----------------------------------------------------------------------- Gr. 5
3. Partial ablation of the nose or partial avulsion of the scalp ------------------------- Gr. 9
4. Complete loss of the power of mastication and speech function ------------------- Gr. 1
5. Moderate constriction of the jaw resulting in moderate degree of difficulty in chewing and moderate loss of the power or the expression of speech ----------- Gr. 6
6. Slight disorder of mastication and speech function due to traumatic injuries to jaw or cheek bone ----------------------------------------------------------------------------- Gr. 12

## EYES

1. Blindness or total and permanent loss of vision of both eyes ----------------------- Gr. 1
2. Total blindness of one (1) eye and fifty percent (50%) loss of vision of the other eye ------------------------------------------------------------------------------------------ Gr. 5
3. Loss of one eye or total blindness of one eye ------------------------------------------- Gr. 7
4. Fifty percent (50%) loss of vision of one eye -------------------------------------------- Gr. 10
5. Lagopthalmos, one eye ----------------------------------------------------------------------- Gr. 12
6. Ectropion, one eye ------------------------------------------------------------------------------ Gr. 12
7. Ephiphora, one eye ---------------------------------------------------------------------------- Gr. 12
8. Ptosis, one eye --------------------------------------------------------------------------------- Gr. 12

Note: (Smeller's Chart – used to grade for near and distant vision).

### NOSE AND MOUTH

1. Considerable stricture of the nose (both sides) hindering breathing -------------- Gr. 11
2. Loss of the sense of hearing in one ear ---------------------------------------------- Gr. 11
3. Injuries to the tongue (partial amputation or adhesion) or palate-causing Gr. 10
   defective speech -------------------------------------------------------------------------
4. Loss of the three (3) teeth restored by prosthesis -------------------------------- Gr. 14

### EARS

1. For the complete loss of the sense of hearing on both ears ------------------------ Gr. 3
2. Loss of two (2) external ears -------------------------------------------------------- Gr. 8
3. Complete loss of the sense of hearing in one ear -------------------------------- Gr. 11
4. Loss of one external ear -------------------------------------------------------------- Gr. 12
5. Loss of one half (1/2) of an external ear -------------------------------------------- Gr. 14

### NECK

1. Such injury to the throat as necessitates the wearing of a tracheal tube --------- Gr. 6
2. Loss of speech due to injury to the vocal cord ------------------------------------- Gr. 9
3. Total stiffness of neck due to fracture or dislocation of the cervical pines ------- Gr. 8
4. Moderate stiffness or two thirds (2/3) loss of motion of the neck ------------------- Gr. 10
5. Slight stiffness of the neck or one third (1/3) loss of motion ------------------------ Gr. 12

### CHEST-TRUNK-SPINE

1. Fracture of four (4) or more ribs resulting to severe limitation of chest ----------- Gr. 6
2. Fracture of four (4) or more ribs with intercostal neuralgia resulting in Gr. 9
   moderate limitation of chest expansion ----------------------------------------------
3. Slight limitation of chest expansion due to simple rib functional without Gr. 12
   myositis or intercostal neuralgia -------------------------------------------------------
4. Fracture of the dorsal or lumber spines resulting severe or total rigidity of the
   trunk or total loss of lifting power of heavy objects ------------------------------------ Gr. 6
5. Moderate rigidity or two thirds (2/3) loss of motion or lifting power of the trunk Gr. 8
6. Slight rigidity or one third (1/3) loss of motion or lifting power of the trunk ------- Gr. 11
7. Injury to the spinal cord as to make walking impossible without the aid of a Gr. 4
   pair of crutches --------------------------------------------------------------------------
8. Injury to the spinal cord as to make walking impossible even with the aid of a Gr. 1
   pair of crutches --------------------------------------------------------------------------
9. Injury to the spinal cord resulting to incontinence of urine and feces ------------- Gr. 1

### ABDOMEN

1. Loss of the spleen ----------------------------------------------------------------------- Gr. 8
2. Loss of one kidney ---------------------------------------------------------------------- Gr. 7
3. Severe residuals of impairment of intra-abdominal organs which requires
   regular aid and attendance that will unable worker to seek any gainful Gr. 1
   employment --------------------------------------------------------------------------------
4. Moderate residuals of disorder of the intra-abdominal organs secondary to
   trauma resulting to impairment of nutrition, moderate tenderness, nausea, Gr. 7
   vomiting, constipation or diarrhea ------------------------------------------------------
5. Slight residuals or disorder of the intra-abdominal organs resulting in
   impairment of nutrition, slight tenderness and/or constipation or diarrhea------- Gr. 12
6. Inguinal hernia secondary to trauma or strain ------------------------------------- Gr. 12

18

## PELVIS

1. Fracture of the pelvic rings as to totally incapacitate worker to work -------------- Gr. 1
2. Fracture of the pelvic ring resulting to deformity and lameness -------------------- Gr. 6

## URINARY AND GENERATIVE ORGANS

1. Total loss of penis ------------------------------------------------------------------- Gr. 7
2. Total loss of both testicles --------------------------------------------------------- Gr. 7
3. Total loss of one testicle ----------------------------------------------------------- Gr. 11
4. Scars on the penis or destruction of the parts of the cavernous body or urethra interfering with erection or markedly affecting coitus ----------------------- Gr. 9
5. Loss of one breast ------------------------------------------------------------------- Gr.11
6. Prolapse of the uterus --------------------------------------------------------------- Gr. 13
7. Great difficulty in urinating -------------------------------------------------------- Gr. 13
8. Incontinence of urine ---------------------------------------------------------------- Gr. 10

## THUMBS AND FINGERS

1. Total loss of one thumb including metacarpal bone --------------------------------- Gr. 9
2. Total loss of one thumb -------------------------------------------------------------- Gr. 10
3. Total loss of one index finger including metacarpal bone --------------------------- Gr. 10
4. Total loss of one index finger ------------------------------------------------------- Gr. 11
5. Total loss of one middle finger including metacarpal bone ------------------------- Gr. 11
6. Total loss of one middle finger ----------------------------------------------------- Gr. 12
7. Total loss of one ring finger including metacarpal bone ---------------------------- Gr. 12
8. Total loss of one ring finger -------------------------------------------------------- Gr. 13
9. Total loss of one small finger including metacarpal bone -------------------------- Gr. 13
10. Total loss of one small finger ------------------------------------------------------- Gr. 14
11. Loss of two or more fingers. Compensation for the loss of use of two (2) or more fingers or one (1) or more phalanges of two or more digits of a hand must be proportioned to the loss of the hand occasioned thereby but shall not exceed the compensation for the loss of a hand: ---- Gr. 6
    a. Loss of five (5) fingers of one hand --------------------------------------- Gr. 6
    b. Loss of thumb, index fingers and any of 2 or more fingers of the same hand ------------------------------------------------------------------ Gr. 6
    c. Loss of the thumb, index finger and any one of the remaining fingers of the same hand ----------------------------------------------------------- Gr. 7
    d. Loss of thumb and index finger --------------------------------------------- Gr. 8
    e. Loss of three (3) fingers of one hand not including thumb and index finger ----------------------------------------------------------------------- Gr. 9
    f. Loss of the index finger and any one of the other fingers of the same hand excluding thumb ----------------------------------------------------- Gr. 9
    g. Loss of two (2) digits of one hand not including thumb and index finger ----------------------------------------------------------------------- Gr. 10
12. Loss of ten (10) fingers of both hands ------------------------------------------- Gr. 3

## HANDS

1. Total loss of use of both hands or amputation of both hands at wrist joints or above ------------------------------------------------------------------------------ Gr. 1
2. Amputation of a hand at carpo-metacarpal joints ------------------------------------ Gr. 5
3. Amputation between wrist and elbow joint ---------------------------------------- Gr. 5

19

4. Loss of grasping power for small objects between the fold of the finger of one hand ------------------------------------------------------------------- Gr. 10
5. Loss of grasping power for large objects between fingers and palm of one hand ------------------------------------------------------------------- Gr. 10
6. Loss of opposition between the thumb and tips of the fingers of one hand ----- Gr. 9
7. Ankyclosed wrist in normal position ------------------------------------- Gr. 10
8. Ankyclosed wrist in position one third (1/3) flexed or half extended and/or severe limited action of a wrist ------------------------------------------- Gr. 11

## SHOULDER AND ARM

1. Inability to turn forearm (forearm in normal position-supination) ------------------- Gr. 11
2. Inability to turn forearm ( forearm in abnormal position – pronation) -------------- Gr. 10
3. Disturbance of the normal carrying angle or weakness of an arm or a forearm due to deformity of moderate atrophy of muscles ------------------------------------- Gr. 11
4. Stiff elbow  at full flexion or extension (one side) ------------------------------------- Gr. 7
5. Stiff elbow at right angle flexion ------------------------------------------------------- Gr. 8
6. Flail elbow joint ------------------------------------------------------------------------- Gr. 9
7. Pseudoarthrosis of the humerus with musculospiral or radial paralysis ---------- Gr. 6
8. Ankylosis of one (1) shoulder, the shoulder blade remaining mobile ------------- Gr. 9
9. Ankylosis of one shoulder, the shoulder blade remaining rigid --------------------- Gr. 8
10. Unreduced dislocation of one (1) shoulder ------------------------------------------- Gr. 8
11. Ruptured biceps or pseudoarthrosis of the humerus, close (one side) ----------- Gr. 11
12. Inability to raise arm more than halfway from horizontal to perpendicular ------ Gr. 11
13. Ankylosis of the shoulder joint not permitting arm to be raised above a level with a shoulder and/or irreducible fracture or faulty union collar bone ------------ Gr. 10
14. Total paralysis of both upper extremities ----------------------------------------------- Gr. 1
15. Total paralysis of one upper extremity -------------------------------------------------- Gr. 3
16. Amputation of one (1) upper extremity at or above the elbow ----------------------- Gr. 4
17. Scar the size of the palm in one extremity --------------------------------------------- Gr. 14

## LOWER EXTREMITIES

1. Loss of a big toe --------------------------------------------------------------------------- Gr. 12
2. Loss of a toe other than the big one --------------------------------------------------- Gr. 14
3. Loss of ten (10) digits of both feet ------------------------------------------------------ Gr. 5
4. Loss of a great toe of one foot + one toe --------------------------------------------- Gr. 10
5. Loss of two toes not including great toe or next to it ------------------------------- Gr. 12
6. Loss of three (3) toes excluding great toe of a foot --------------------------------- Gr. 10
7. Loss of four (4) excluding great toe of a foot ------------------------------------------ Gr. 9
8. Loss of great toe and two (2) other toes of the same foot -------------------------- Gr. 9
9. Loss of five digits of a foot --------------------------------------------------------------- Gr. 8
10. Loss of both feet at ankle joint or above --------------------------------------------- Gr. 1
11. Loss of one foot at ankle joint or above ----------------------------------------------- Gr. 6
12. Depression of the arch of a foot resulting in weak foot ------------------------------ Gr. 12
13. Loss of one half (1/2) metatarsus of one (1) foot ----------------------------------- Gr. 8
14. Loss of whole metatarsus or forepart of  foot ----------------------------------------- Gr. 7
15. Tearing of achilles tendon resulting in the impairment of active flexion  and extension of a foot ------------------------------------------------------------------------- Gr. 12
16. Malleolar fracture with displacement of the foot inward or outward --------------- Gr. 10
17. Complete immobility of an ankle joint in abnormal position ------------------------- Gr. 10
18. Complete immobility of an ankle joint in normal position --------------------------- Gr. 11
19. Total loss of a leg or amputation at or above the knee ------------------------------- Gr. 3

20

20. Stretching leg of the ligaments of a knee resulting in instability of the joint ------ Gr. 10
21. Ankylosis of a knee in genuvalgum of varum ------------------------------------------- Gr. 10
22. Pseudoarthrosis of a knee cap ------------------------------------------------------------ Gr. 10
23. Complete immobility of a knee joint in full extension ----------------------------------- Gr. 10
24. Complete immobility of a knee joint in strong flexion ----------------------------------- Gr. 7
25. Complete immobility of a hip joint in flexion of the thigh ------------------------------- Gr. 5
26. Complete immobility of a hip joint in full extension of the thigh --------------------- Gr. 9
27. Slight atrophy of calf of leg muscles without apparent shortening or joint lesion or disturbance of weight-bearing line ------------------------------------------------- Gr. 13
28.  Shortening of a lower extremity from one to three centimeters with either joint lesion or disturbance of weight-bearing joint ------------------------------------------------- Gr. 13
29. Shortening of 3 to 6 cm with slight atrophy of calf or thigh muscles -------------- Gr. 12
30. Shortening of 3 to 6 cm with either joint lesion or disturbance of weight-bearing joint ------------------------------------------------------------------------------------------------- Gr. 11
31. Irregular union of fracture with joint stiffness and with shortening of 6 to 9 cm producing permanent lameness ----------------------------------------------------------------- Gr. 9
32. Irregular union of fracture in a thigh or leg with shortening of 6 to 9 cms -------- Gr. 10
33. Failure of fracture of both hips to unite ----------------------------------------------------- Gr. 1
34. Failure of fracture of a hip to unite ---------------------------------------------------------- Gr. 3
35. Paralysis of both lower extremities ----------------------------------------------------------- Gr. 1
36. Paralysis of one lower extremity -------------------------------------------------------------- Gr. 3
37. Scar the size of a palm or larger left on an extremity --------------------------------- Gr. 14

NOTE: Any item in the schedule classified under Grade 1 shall be considered or shall constitute total and permanent disability.

## SCHEDULE OF DISBILITY ALLOWANCES

| IMPEDIMENT GRAD | | IMPEDIMENT | |
|---|---|---|---|
| 1 | US$ 50,000 | x | 120.00% |
| 2 | " | x | 88.81% |
| 3 | " | x | 78.36% |
| 4 | " | x | 68.66% |
| 5 | " | x | 58.96% |
| 6 | " | x | 50.00% |
| 7 | " | x | 41.80% |
| 8 | " | x | 33.59% |
| 9 | " | x | 26.12% |
| 10 | " | x | 20.15% |
| 11 | " | x | 14.93% |
| 12 | " | x | 10.45% |
| 13 | " | x | 6.72% |
| 14 | " | x | 3.74% |

To be paid in Philippine Currency equivalent at the exchange rate prevailing during the time of paymer

21

**SECTION 32 – A.  OCCUPATIONAL DISEASES**

For an occupational disease and the resulting disability or death to be compensable, all of the following conditions must be satisfied:

1. The seafarer's work must involve the risks described herein;
2. The disease was  contracted as a result of the seafarer's exposure to the described risks;
3. The disease was contracted within a period of exposure and under such other factors necessary to contract it; and
4. There was no notorious negligence on the part of the seafarer.

The following diseases are considered as occupational when contracted under working conditions involving the risks described herein:

| OCCUPATIONAL DISEASE | NATURE OF EMPLOYMENT |
|---|---|
| 1. Cancer of the epithelial of the bladder (Papilloma of the  bladder) | Work involving exposure to alphanapthyylamine, beta-naphathylamin, or benzidine of any part of the salts; and auramine or magenta |
| 2.  Cancer, epithellomatous or ulceration of the skin or of the corneal surface of the eye due to tar, pitch, bitumen, mineral oil or paraffin, or compound product or residue of these substances | The use or handling of,  exposure to tar, pitch, bitumen, mineral oil (including paraffin) soot or any compound product or residue of any of these substances |
| 3. Deafness – severe profound hearing loss in an occupation where employee is exposed to prolonged, significant noise and   vibration in his line of work | Any   industrial   operation   having excessive   noise   particularly   in   the higher frequencies |
| 4. Decompression sickness<br>   a. Caissons disease<br><br>   b. Aeroembolism | Any process carried on in compressed or rarefied air.<br><br>Any process carried on in rarefied air |
| 5.   Dermatitis   due   to   irritants   and sensitizers | The use or handling of chemical agents which are skin irritants and sensitizers |
| 6. Infections<br>Pneumonia<br>Bronchitis<br>Sinusitis<br>Pulmonary TB<br>Anthrax<br>Cellulitis<br>Conjunctivitis (Bacterial and Viral)<br>Norwalk Virus<br>Salmonella | Work   in   connection   with   animals infected   with   anthrax,   handling   of animal   carcasses   or   parts   of   such carcasses, including hides, hoofs, and horns<br><br><br>Hepatitis A*, Norwalk, Salmonella |

Leptospirosis
Malaria
Otitis Media
Tetanus
Viral Encephalitis

Including other infections resulting in complications necessitating repatriation.

| | |
|---|---|
| **7.   Ionizing radiation disease, inflammation, ulceration or malignant disease of the skin or subcutaneous tissues of the bones or leukemia, or anemia of the aplastic type   due to x-rays, ionizing particle, radium or other radioactive substances** | **Exposure to x-rays, ionizing particles of radium or other radioactive substances or other forms of radiant energy** |
| a.  Acute radiation syndrome | Short duration of exposure to large doses of x-rays, gamma rays, alpha rays and beta rays |
| b.  Chronic radiation syndrome | Chronic over-exposure to x-rays with a long latent period affecting the skin, blood and reproductive organ |
| c.   Glass Blower's cataract | Among furnace men, glass blowers, baker, blacksmith, foundry workers. These are workers exposed to infrared rays. |
| 8.   Poisoning and its sequelae<br>     caused by:<br>a.  Ammonia | All work involving exposure to the risk concerned |
| b.  Arsenic or its toxic compound | All work involving exposure to the risk concerned |
| c.  Benzene or its toxic homologues; nitro and aminotoxic derivatives | All work involving exposure to the risk concerned |
| d.  Beryllium or its toxic compounds | All work involving exposure to the risk concerned |
| e.  Brass, zinc or nickel | All work involving exposure to the risk concerned |
| f.  Carbon dioxide | All work involving exposure to the risk concerned |
| g.  Carbon bisulfide | All work involving exposure to the risk concerned |

23

| | |
|---|---|
| h.  Carbon monoxide | All work involving exposure to the risk concerned |
| i.  Chlorine | All work involving exposure to the risk concerned |
| j.  Chrome or its toxic compounds | All work involving exposure to the risk concerned |
| k.  Dinitrophenol or its homologue | All work involving exposure to the risk concerned |
| l.  Halogen       derivatives     of hydrocarbon  of  the  aliphatic series | All work involving exposure to the risk concerned |
| m. Lead or its toxic compounds | All work involving exposure to the risk concerned |
| n.  Manganese    or      its    toxic compounds | All work involving exposure to the risk concerned |
| o.  Mercury or its toxic compounds | All work involving exposure to the risk concerned |
| p.  Nitrous fumes | All work involving exposure to the risk concerned |
| q.  Phosgene | All work involving exposure to the risk concerned |
| r.  Phosphorous   or     its    toxic compounds | All work involving exposure to the risk concerned |
| s.  Sulfur dioxide | All work involving exposure to the risk concerned |
| 9.   Vascular disturbance in the upper extremities due to continuous vibration from pneumatic tools or power drills, riveting machines or hammers | Any occupation causing repeated motions, vibrations and pressure of upper extremities |
| 10. Vascular disturbance in the lower extremities – varicocoele causing pain, varicose     veins     resulting     in discoloration and ulceration. | This is due to heavy straining upon the lifting of heavy loads and prolonged standing Any occupation requiring prolonged standing and lifting of heavy loads |
| 11. Cardio-vascular events – to include heart attack, chest pain (angina), heart failure or sudden death.   Any of the following conditions must be met: | |

| | |
|---|---|
| a. If the heart disease was known to have been present during employment, there must be proof that an acute exacerbation was clearly precipitated by an unusual strain by reasons of the nature of his work | a. if a person who was apparently asymptomatic before working showed signs and symptoms of cardiac injury during the performance of his/her work and such symptoms and signs persisted, it is reasonable to claim a causal relationship |
| b. the strain of work that brings about an acute attack must be sufficient severity and must be followed within 24 hours by the clinical signs of a cardiac insult to constitute causal relationship | b. if a person is a known hypertensive or diabetic, he should show compliance with prescribed maintenance medications and doctor-recommended lifestyle changes. The employer shall provide a workplace conducive for such compliance in accordance with Section 1(A) paragraph 6. |
| c. If a person who was apparently asymptomatic before being subjected to strain at work showed signs and symptoms of cardiac injury during the performance of his work and such symptoms and signs persisted, it is reasonable to claim a causal relationship | c. in a patient not known to have hypertension or diabetes as indicated on his last PEME |
| d. if a person is a known hypertensive or diabetic, he should show compliance with prescribed maintenance medications and doctor-recommended lifestyle changes. The employer shall provide a workplace conducive for such compliance in accordance with Section 1(A) paragraph 5. | |
| e. in a patient not known to have hypertension or diabetes, as indicated on his last PEME | |
| 12. Cerebro-vascular events<br>All of the following conditions must be met:<br><br>a. If the heart disease was known to have been present during employment, there must be proof that an acute exacerbation was clearly precipitated by an unusual strain by reasons of the nature of his work | a. if a person who was apparently asymptomatic before working showed signs and symptoms of cardiac injury during the performance of his/her work and such symptoms and signs persisted, it is reasonable to claim a causal relationship |
| b. the strain of work that brings about | b. if a person is a known hypertensive |

25

| | |
|---|---|
| an acute attack must be sufficient severity and must be followed within 24 hours by the clinical signs of a cardiac insult to constitute causal relationship | or diabetic, he should show compliance with prescribed maintenance medications and doctor-recommended lifestyle changes. The employer shall provide a workplace conducive for such compliance in accordance with Section 1(A) paragraph 5. |
| c. If a person who was apparently asymptomatic before being subjected to strain at work showed signs and symptoms of cardiac injury during the performance of his work and such symptoms and signs persisted, it is reasonable to claim a causal relationship | c. in a patient not known to have hypertension or diabetes as indicated on his last PEME |
| d. if a person is a known hypertensive or diabetic, he should show compliance with prescribed maintenance medications and doctor-recommended lifestyle changes. The employer shall provide a workplace conducive for such compliance in accordance with Section 1(A) paragraph 5. | |
| e. in a patient not known to have hypertension or diabetes, as indicated on his last PEME | |
| 13. END ORGAN DAMAGE RESULTING FROM UNCONTROLLED HYPERTENSION<br><br>Impairment of function of the organs such as kidneys, heart, eyes and brain under the following conditions considered compensable:<br><br>a. if a person is a known hypertensive or diabetic, he should show compliance with prescribed maintenance medications and doctor-recommended lifestyle changes. The employer shall provide a workplace conducive for such compliance in accordance with Section 1(A) paragraph<br><br>b. In a patient not known to have hypertension has the following on his last PEME: normal BP, normal CXR and ECG/treadmill | a. if a person who was apparently asymptomatic before working showed signs and symptoms of cardiac injury during the performance of his/her work and such symptoms and signs persisted, it is reasonable to claim a causal relationship<br><br>b. if a person is a known hypertensive or diabetic, he should show compliance with prescribed maintenance medications and doctor-recommended |

26

| | |
|---|---|
| | lifestyle changes. The employer shall provide a workplace conducive for such compliance in accordance with Section 1(A) paragraph 6. |
| 14.  Cataract and pterygium | Caused by prolonged exposure to UV light or welding, wind abrasion and sea breeze |
| 15.  Poisoning by cadmium | Among workers in battery factories, who are exposed to cadmium fumes |
| 16.  Acute myeloid leukemia | Secondary to prolonged benzene exposure |
| 17. Chronic lymphocytic leukemia | Secondary to prolonged benzene exposure |
| 18.    Vitreal  hemorrhage  and  retinal detachment | Caused by the strain upon lifting of heavy loads |

19. Hernia. All of the following conditions must be met:

a.  The hernia should be of recent origin;

b.  Its appearance was accompanied by pain, discoloration and evidence of a tearing of the tissues;

c.  The disease was immediately preceded by undue or severe strain arising out of and in the course of employment; a protrusion of mass should appear in the area immediately following the alleged strain.

20. Bronchial Asthma – all of the following conditions must be met:

   a. there is no evidence or history of  asthma before employment

   b. the allergen is present in the working conditions

   c. sensitivity test to allergens in the working environment should yield  positive results

27

| |
|---|
| d. a provocative test should show positive results |

**21. Osteoarthritis. Any occupation involving:**

a.  Joint strain from carrying heavy loads, or unduly heavy physical labor, as among laborers and mechanics;

b.  Minor or major injuries to the joint;

c.  Excessive use or constant strenuous usage of a particular joint, as among sportsmen, particularly those who have engaged in the more active sports activities;

d.  Extreme temperature changes (humidity, heat and cold exposures) and;

e.  Faulty work posture or use of vibratory tools

**22. Peptic Ulcer**

Any occupation involving prolonged emotional or physical stress, as among professional people, transport workers and the like.

**23.  Viral hepatitis**

In addition to working conditions already listed under Philippine Decree No. 626, as amended, any occupation involving exposure to a source of infection through ingestion of water, milk or other foods contaminated with hepatitis virus; provided that the physician determining the causal relationship between the employment and the illness should be able to indicate whether the disease of the afflicted worker manifested itself while he was so employed, knowing the incubation period thereof.

**24. Asbestosis.   All of the following conditions must be met:**

a.  The seafarer must have been exposed to Asbestos dust in the work place, as duly certified to by the employer, or by a medical institution, or competent medical practitioner acceptable to or accredited by the System;

b.  The chest X-ray report  of the employee must show findings of asbestos or asbestos-related disease, e.g. pleural plaques, pleural thickening, effusion, neoplasm and interstitial fibrosis; and

c.  In case of ailment is discovered after the seafarer's retirement/separation from the company, the
claim must be filed with the System within three (3) years from discovery.

NOTE: Death or disability which is directly caused by sexually transmitted disease or arose from complications thereof shall not be compensable nor shall be entitled to the benefits provided in this Contract.

**SECTION 33.   TABLE OF OFFENSES AND CORRESPONDING ADMINISTRATIVE PENALTIES**

A. Pursuant to Section 17 and 18 of the Contract, the disciplinary grounds listed in the Table of Offenses and Administrative Penalties hereunder or analogous acts thereto shall be penalized according to its gravity and frequency of commission, imposed by the Master of the ship.  Such offenses shall be penalized as indicated.

B. Commission of a seafarer of any of the offenses enumerated in the Table of Offenses and Administrative Penalties hereunder or of similar offenses shall be ground for disciplinary administrative action at the POEA where the following corresponding penalty shall be imposed.

C. The penalties for administrative actions by the Master and/or the POEA provided herein shall be separate and distinct from whatever appropriate criminal action that may be filed against the seafarer.

| OFFENSES | AGREED ADMINISTRATIVE PENALTIES (IMPOSED BY THE MASTER) | AGREED ADMINISTRATIVE PENALTIES (IMPOSED BY POEA AFTER DUE INVESTIGATION) |
|---|---|---|
| **1.** Smuggling or violation of any custom rules and regulations of the Philippines and of foreign ports | | |
| a. smuggling any taxable item | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense One (1) year to two (2) years suspension 2nd Offense Two (2) years and one (1) day suspension to delisting |
| b. possession or use of prohibited drugs, narcotics and other contraband | Dismissal and to pay of repatriation and  cost of his replacement | 1st Offense:  Delisting |
| c. gun-running or possession of explosives and the like | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  Delisting |
| d. abetting or conniving with others to commit smuggling | Dismissal and to pay cost of repatriation and  cost of his replacement | 1st Offense:  Two (2) years to three (3) years suspension 2nd Offense:  Three (3) years and one  (1) day suspension to delisting |
| e. misdeclaration of or failing to declare articles leading to their seizure and fine to **ship** | Dismissal and to pay  cost of repatriation and  cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years and one (1) day suspension |

29

| | | to delisting |
|---|---|---|
| f. misdeclaration of or failing to declare articles leading to their seizure but ship not implicated | 1st Offense: Reprimand and warning<br>2nd Offense: Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: One (1) year to two (2) years suspension<br>2nd Offense: Two (2) years and one (1) day to three (3) years suspension<br>3rd Offense: Three (3) years and one (1) day suspension to delisting |
| g. possession of pornographic materials leading to its seizure and fine to ship | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: One (1) year to two (2) years suspension<br>2nd Offense: Two (2) years and one (1) day suspension to delisting |
| h. possession of child pornography materials leading to its seizure and fine to ship | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: One (1) year to two (2) years suspension<br>2nd Offense: Two (2) years and one (1) day suspension to delisting |
| i. Any other violation which will not implicate ship | 1st Offense: Reprimand and warning<br>2nd Offense: Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: One (1) year to two (2) years suspension<br>2nd Offense: Two (2) years and one (1) day suspension to delisting |
| j. Any other violation which will implicate the ship | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: (3)Three years suspension to delisting |
| 2. Desertion | | |
| a. deserting or attempting to desert | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: Delisting |
| b. advising, assisting or persuading another to desert | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: Five (5) years suspension to delisting |
| 3. Absence without leave | | |
| a. abandoning post or duty without being properly relieved | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: One (1) year to two (2) years suspension<br>2nd Offense: Two years (2) and one (1) day suspension to delisting |

30

| | | |
|---|---|---|
| b.  leaving the **ship** without permission from responsible officers during working hours | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension<br>2nd Offense:  Two years (2) and one (1) day suspension to delisting |
| c.  Entrusting to others assigned duties without authority of department head | Master's discretion (grave or less grave, depending on circumstances) | 1st Offense:  Six (6) months to one (1) year suspension from participation in the overseas employment program<br>2nd Offense: One (1)year and one (1) day to two (2) years suspension<br>3rd Offense:  Two (2) years and one (1) day suspension to delisting |
| d.  Leaving the ship without permission | Master's discretion (grave or less grave, depending on circumstances) | 1st Offense:  Six (6) months to one (1) year suspension from participation in the overseas employment program<br>2nd Offense: One (1)year and one (1) day to two (2) years suspension<br>3rd Offense:  Two (2) years and one (1) day suspension to delisting |
| 4. Sleeping on post while on duty | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension<br>2nd Offense:  Two (2) years and one day suspension to delisting |
| 5. Insubordination | | |
| a.  any act of disobedience to lawful orders of a superior officer | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension<br>2nd Offense:  Two (2) years and one day suspension to delisting |
| b.  attempting to assault a superior officer | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  Six (6) months to one (1) year suspension from participation in the overseas employment program<br>2nd Offense:  One (1) year and one (1) day to two (2) years suspension<br>3rd Offense:  Two (2) years |

31

| | | |
|---|---|---|
| | | and one (1) day suspension to delisting from the POEA Registry |
| c. assaulting a superior officer/other persons on business with the **ship** without the use of deadly weapon | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| d. assaulting a superior officer/other persons on business with the **ship** with the use of deadly weapon | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  Delisting |
| e. behaving with disrespect towards a superior officer | Dismissal and to   pay cost of repatriation and cost of his replacement | 1st Offense:  Six (6) months to one (1) year suspension 2nd Offense:  One (1) year and one (1) day to three  (3) years suspension 3rd Offense:  Three (3) years and one (1) day suspension to delisting |
| f.  insulting a superior officer by words or deed | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  Six (6) months to one (1) year suspension 2nd Offense:  One (1) year and one (1) day to three  (3) years suspension 3rd Offense:  Three (3) years and one (1) day suspension to delisting |
| g. inciting another to commit insubordination | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  Six (6) months to one (1) year suspension 2nd Offense:  One (1) year and one (1) day to three  (3) years suspension 3rd Offense:  Three (3) years and one (1) day suspension to delisting |
| 6. Drunkenness | | |
| a. drunk while on duty | Dismissal and to  pay cost of repatriation and cost of his replacement | 1st Offense:  Two (2) years to three (3) years suspension 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| b. creating trouble on | 1st Offense:  Reprimand | 1st Offense:  Six (6) months to |

| | | |
|---|---|---|
| board due to intoxication | and warning<br>2nd Offense: Dismissal and to pay cost of repatriation and cost of his replacement | one (1) year suspension<br>2nd Offense: One (1) year and one (1) day to three years suspension<br>3rd Offense: Three (3) years and one (1) day suspension to delisting |
| c. failure to perform assigned jobs due to intoxication | 1st Offense: Reprimand and warning<br>2nd Offense: Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: Six (6) months to one (1) year suspension<br>2nd Offense: One (1) year and one (1) day to three years suspension<br>3rd Offense: Three (3) years and one (1) day suspension to delisting |
| 7. Creating trouble outside the ship's premises | 1st Offense: Reprimand and warning<br>2nd Offense: Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: Six (6) months to one (1) year suspension<br>2nd Offense: One (1) year and one (1) day to three years suspension<br>3rd Offense: Three (3) years and one (1) day suspension to delisting |
| 8. Gambling | | |
| a. which results in fighting or any incident as to upset the harmonious relationship on board the ship | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: One (1) year to two (2) years suspension<br>2nd Offense: Two (2) years and one (1) day suspension to delisting |
| b. any other form of gambling which is not purely recreational | Master's discretion (grave or less grave, depending on circumstances) | 1st Offense: Six (6) months to one (1) year suspension<br>2nd Offense: One (1) year and one (1) day to three years suspension<br>3rd Offense: Three (3) years and one (1) day suspension to delisting |
| 9. Violation of company policies and regulations for: | | |
| a. pilferage or theft of ship's store or cargo | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: One (1) year to two (2) years suspension<br><br>2nd Offense: Two (2) years and one (1) day suspension to delisting |
| b. pilferage or theft of | Dismissal and to pay cost | |

33

| | | |
|---|---|---|
| ships property, of crews or passengers or other persons with business at the ship. | of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension

2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| c.  embezzlement  of company funds | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension

2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| **d. unauthorized disposal of company ship's properties for personal gain** | Dismissal  and  to  pay cost  of  repatriation  and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension

2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| e. any act of dishonesty with intention to defraud the company | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension

2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| f. gross negligence and failure to observe proper storage and cargo handling procedures resulting in delay of ships and/or damage to cargoes | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension

2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| g. failure to observe and comply with regulation and non-baggage shipment and acceptance of parcels on board | Master's discretion (grave or less grave, depending on circumstances) | 1st Offense:  Six (6) months to one (1) year suspension from participation in the overseas employment program

2nd Offense:  One (1) year and one (1) day to two (2) years suspension

3rd Offense:  Two(2) years and one (1) day suspension to delisting |
| h.  failure to observe regulations on expiration of shore liberty | 1st Offense: Reprimand and warning
2nd Offense:  Dismissal and to pay cost of | 1st Offense:  Six (6) months to one (1) year suspension from participation in the overseas |

| | repatriation and cost of his replacement | employment program |
|---|---|---|
| | | 2nd Offense:  One (1) year and one (1) day to two (2) years suspension |
| | | 3rd Offense:  Two(2) years and one (1) day suspension to delisting |
| i.  being left behind by ship in foreign port without justifiable reason | Dismissal and to pay cost of repatriation and cost of replacement | 1st Offense:  Six (6) months to one (1) year suspension from participation in the overseas employment program |
| | | 2nd Offense:  One (1) year and one (1) day to two (2) years suspension |
| | | 3rd Offense:  Two(2) years and one (1) day suspension to delisting |
| j. disorderly conduct and/or disrespect towards passengers or other persons | Dismissal and to pay cost of repatriation and cost of replacement | 1st Offense:  One (1) year to two (2) years suspension |
| | | 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| k. for immorality so as to cast aspersion on the good name of the ship and company | Dismissal and to pay cost of repatriation and cost of replacement | 1st Offense:  One (1) year to two (2) years suspension |
| | | 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| l. inflicting harm or injury to others | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension |
| | | 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| 10. Incompetence and inefficiency | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  Two (2) years to three (3) years suspension 2nd Offense:  Three (3) years and one (2) day suspension to delisting |
| 11. Inciting mutiny, malicious destruction of ship's property at any | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  Two (2) years to three (3) years suspension 2nd Offense:  Three (3) years |

35

| | | |
|---|---|---|
| activity which will hamper the efficient operation of the ship | | and one (2) day suspension to delisting |
| 12. Concerted action to breach approved contracts | Dismissal and to pay cost of repatriation and cost of his replacement | 1ST Offense:  Two (2) years to three (3) years suspension 2nd Offense:  Three (3) years and one (2) day suspension to delisting |
| 13.  Any activity which tends to destroy harmonious relationship of the company | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| 14. Grave abuse of authority<br><br>   a.  grave abuse of authority (with the use of deadly weapon) resulting in harm or injury to subordinate | Dismissal and to pay cost of repatriation and cost of his replacement | Delisting from POEA registry |
| b.  grave abuse of authority (without the use of deadly weapon) resulting in harm or injury to subordinate | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense: Two 92) years to three (3) years suspension 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| d.  any other case of abuse of authority | Master's discretion (grave or less grave, depending on circumstances) | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years and one (1) day to three (3) years suspension 3rd Offense:  Three (3) years and one (1) day suspension to delisting |
| 15. For gross misbehavior prejudicial    to good order and discipline | 1st offense: Reprimand and warning 2nd offense: Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| 16.  Causing through neglect, damage loss, spoilage or deterioration of ship's stocks and property | Master's discretion (grave or less grave, depending on circumstances) | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| 17. Connivance with or cuddling of stowaway | Dismissal and to pay cost of repatriation and cost of his replacement    . | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years |

36

| | | and one (1) day suspension to delisting |
|---|---|---|
| 18.  Willfully making false statement, reports, certification or documents for  personal gain or with intent to mislead or defraud the company or authorities | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| 19.  Any other case as to cast aspersion on the good name of the company and ship | Master's discretion (grave or less grave, depending on circumstances) | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:  Two (2) years and one (1) day suspension to delisting |
| 20. Violation to observe safety and environmental rules/ regulations | Master's discretion  (grave or less grave, depending on circumstances) | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:   Two (2) years and one (1) day suspension to delisting |
| 21. Failure to observe the drug and alcohol policy of the company | Dismissal and to pay cost of repatriation and cost of his replacement | 1st Offense:  One (1) year to two (2) years suspension 2nd Offense:    Two (2) years and one (1) day suspension to delisting |

This contract is pursuant to Governing Board Resolution No. 09 and  POEA Memorandum Circular No. **10**, both series of 2010.