🚩 KeyCite Blue Flag – Appeal Notification
Appeal Filed by CALICDAN v. M D NIGERIA, 5th Cir., July 11, 2022

2022 WL 2162645
Only the Westlaw citation is currently available.
United States District Court, W.D. Louisiana, Lafayette Division.

Servando Paraon CALICDAN
v.
M D NIGERIA LLC et al.

CASE NO. 6:21-CV-03283
|
Signed 06/15/2022

**Attorneys and Law Firms**

Kenneth Charles Bordes, Law Office of Kenneth C. Bordes, New Orleans, LA, Daniel Werner, Pro Hac Vice, Radford & Keebaugh, Decatur, GA, for Servando Paraon Calicdan.

Jennifer Faroldi Kogos, Jason Arthur Culotta, Patrick J. Veters, Jones Walker, New Orleans, LA, for MD Nigeria LLC, Megadrill Services Ltd., Anjalex Investments LLC, M & D Management LLC, Michael A. Topham, Wendy Dunn, Dan Topham, Ian Dunn, Judy M. Dunn, Robert P. Dunn Estate.

**JUDGMENT**

TERRY A. DOUGHTY, UNITED STATES DISTRICT JUDGE

**\*1** The Report and Recommendation of the Magistrate Judge [Doc. No. 52] having been considered, together with the Objection [Doc. No. 55] filed by Plaintiff, and finding that same is supported by the law and the record in this matter,

**IT IS ORDERED, ADJUDGED, AND DECREED** that Defendant M D Nigeria, LLC's Renewed Motion to Dismiss and Compel Arbitration [Doc. No. 27] is **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Plaintiff Servando Paraon Calicdan's Motion to Take Limited Early Discovery on Issues of Arbitrability [Doc. No. 42] is **DENIED,** and Defendant M.D. Nigeria LLC's Motion to Strike Improper Surreply [Doc. No. 45] is **DENIED.**

**All Citations**

Slip Copy, 2022 WL 2162645

End of Document   © 2022 Thomson Reuters. No claim to original U.S. Government Works.



2022 WL 2165638
Only the Westlaw citation is currently available.
United States District Court, W.D. Louisiana,
Lafayette Division.

Servando Paraon CALICDAN
v.
MD NIGERIA LLC et al.

CASE NO. 6:21-CV-03283
|
Signed 05/17/2022

**Attorneys and Law Firms**

Kenneth Charles Bordes, Law Office of Kenneth C. Bordes, New Orleans, LA, Daniel Werner, Pro Hac Vice, Radford & Keebaugh, Decatur, GA, for Servando Paraon Calicdan.

Jennifer Faroldi Kogos, Jason Arthur Culotta, Patrick J. Veters, Jones Walker, New Orleans, LA, for MD Nigeria LLC, Megadrill Services Ltd., Anjalex Investments LLC, M&D Management LLC, Michael A. Topham, Wendy Dunn, Dan Topham, Ian Dunn, Judy M. Dunn, Robert P. Dunn Estate.

### REPORT AND RECOMMENDATION

CAROL B. WHITEHURST, UNITED STATES MAGISTRATE JUDGE

*1 Before the Court is Defendants' Renewed Motion to Dismiss and Compel Arbitration. (Rec. Doc. 27). Plaintiff opposed the Motion (Rec. Doc. 33), and Defendants replied (Rec. Doc. 39). Thereafter, Plaintiff filed a Motion to Take Limited Early Discovery on Issues of Arbitrability. (Rec. Doc. 42). Defendants opposed (Rec. Doc. 44; Plaintiff's Reply at Rec. Doc. 50) and moved to strike Plaintiff's Motion for Early Discovery (Rec. Doc. 45), which Plaintiff, in turn, opposed (Rec. Doc. 51).

The Motions were referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this Court. Considering the evidence, the law, and the arguments of the parties, and for the reasons explained below, the Court recommends that Defendants' Motion to Compel Arbitration be granted and that Plaintiff's Motion for Early Discovery be denied, thereby obviating consideration of Defendants' Motion to Strike.

### I. Procedural History and Plaintiff's Allegations

Plaintiff, individually and on behalf of others similarly situated, filed this putative class action in September 2021 against his employers, Defendants herein [1], for alleged violations of the Fair Labor Standards Act (FLSA). (Rec. Doc. 1). In response to Defendants' initial Motion to Dismiss, Plaintiff filed an Amended Complaint asserting additional claims for violations of the Trafficking Victims Protection Act, the Racketeer Influenced and Corrupt Organizations Act, and predicate acts. (Rec. Doc. 11). Defendants now seek to dismiss the Amended Complaint in a renewed Motion to Dismiss and Compel Arbitration. [2]

Plaintiff, a Philippine national, alleges that he worked as a skilled welder for Defendants from April 2019 to February 2020. (Rec. Doc. 11, ¶1). He alleges that he lived and worked in a fenced, gated, and locked compound in Cameron Parish. He alleges the housing was severely overcrowded and the living and working conditions were unsafe and hostile. He alleges that Defendants violated the Trafficking Victims Protection Act due to these conditions, that Defendants knowingly misclassified him and coworkers as offshore seafarers in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), and that Defendants' "scheme" violated the Louisiana Wage Payment Act and Louisiana Unfair Trade Practices and constituted false imprisonment. (Rec. Doc. 11, ¶3-6).

Defendants filed the instant motion to dismiss for lack of jurisdiction on the grounds that Plaintiff's claims are governed by a legally mandated employment contract which requires arbitration of such claims. Plaintiff disputes the applicability of the contract, and alternatively urges the Court to allow early limited discovery on the issue of arbitrability. Resolution requires a deep dive into the foreign legal scheme governing Filipino workers on overseas vessels.

### II. Legal Standard

*2 The Fifth Circuit has not "definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 472, fn. 3 (5th Cir. 2010). Because Plaintiff did not challenge Defendants' use of Rule 12(b)

(3) and the Fifth Circuit has accepted Rule 12(b)(3) as an appropriate mechanism for dismissal, the Court shall consider Defendants' Motion under Rule 12(b)(3) standards. *Id.* See also *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 902 (5th Cir. 2005).

> [Under] Rule 12(b)(3), the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments. The court may find a plausible set of facts by considering any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 237–38 (5th Cir. 2009)(cleaned up).

The court must view all facts in a light most favorable to the plaintiff. *Id.*

### III. Applicable Philippines Labor Law

The Philippines has established a comprehensive framework governing the employment of Filipinos overseas. The Philippines Labor Code mandates that hiring of Filipino workers be done through the Overseas Employment Development Board. (Rec. Doc. 27-2, p. 3-4). Employers are prohibited from hiring workers directly. (*Id.*) The Labor Code establishes the National Seamen Board, which has original and exclusive jurisdiction over all matters or cases including money claims, involving employer-employee relations, arising out of or by virtue of any law or contracts involving Filipino seamen for overseas employment. The Board's decisions are appealable to the National Labor Relations Commission (NLRC). (*Id.* at p. 5). The Labor Code requires employment contracts between employers and Filipino workers and that these contracts be approved by the Department of Labor. Unauthorized substitution or alteration of employment contracts is prohibited. (*Id.* at p. 8).

As part of the Philippines' labor law, the Migrant Workers and Overseas Filipinos Act of 1995 ("the Migrant Workers Act") establishes the Philippine Overseas Employment Administration (POEA) as the administrative arm of the overseas employment system. (Rec. Doc. 27-3, p. 18-19). Its duties include promoting and monitoring overseas employment of Filipino workers from the pre-employment stage and securing best employment terms and conditions for the workers. (*Id.*)

In October 2010, the POEA promulgated Memorandum Circular No. 10. (Rec. Doc. 27-4). Circular No. 10 appended the Amended Standard Terms and Conditions Governing the Overseas Employment of Filipino Seafarers On-Board Ocean-Going Ships ("Standard Terms"), which set forth the minimum requirements for employment of Filipino seafarers. (*Id.*, p. 3-39).

Circular No. 10 requires manning agencies (entities who contract with employers to facilitate employment of Filipino workers) to submit seafarers' contracts to the POEA for approval and processing. (Rec. Doc. 27-4, p. 1). Seafarers are required to attend a Pre-Departure Orientation Seminar (PDOS) within two weeks prior to their departure, during which they must discuss the Standard Terms. (*Id.* See also Rec. Doc. 27-5). Circular No. 10 further requires that Filipino seafarers be given a copy of their employment contracts as well as a copy of the Standard Terms.

*3 The Standard Terms include a grievance procedure and the following arbitration provisions:

> C. The aggrieved party whose employment is not covered by an existing CBA [collective bargaining agreement [3]] may elevate his complaint to the Maritime Industry Labor Arbitration Council (MILA) prior to any other forum.

> D. The foregoing procedures shall be without prejudice to the other modes of voluntary settlement of disputes and to the jurisdiction of the [POEA] of the [NLRC] over any unresolved complaints arising out of shipboard employment that shall be brought before it by the seafarer.

> (Rec. Doc. 27-4, p. 10).

The Migrant Workers Act contains a corresponding arbitration provision:

> SECTION 10. *Money Claims.* — Notwithstanding any provision of law to the contrary, the Labor Arbiters of the National Labor Relations Commission (NLRC) shall have the original and exclusive jurisdiction to hear and decide, within ninety (90) calendar days after the filing of the complaint, the claims arising out of an employer-employee relationship or by virtue of any law or contract involving Filipino workers for overseas deployment including claims for actual, moral, exemplary and other forms of damages.

**Consistent with this mandate, the NLRC shall endeavor to update and keep abreast with the developments in the global services industry.**

(Rec. Doc. 27-3, p. 11) (emphasis in original).

The Philippines legal framework must be construed "in light of the Supreme Court's recognition generally of 'the strong federal policy in favor of enforcing arbitration agreements.' " *Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 275 (5th Cir. 2002), *holding modified on other grounds by Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327 (5th Cir. 2004), citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). The Supreme Court has also recognized that "[t]he goal of the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards], and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries.' " *Francisco*, 293 F.3d at 75, quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520 n. 15, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974). "[T]he federal policy favoring arbitration 'applies with special force in the field of international commerce.' " *Id.*, quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

### IV. Whether the Court should compel arbitration in this case.

Pursuant to the Philippines overseas employment legal framework, in March 2014, Megadrill entered into a Manning Agreement with Jebsens Marine, Inc. for the employment of Filipino workers. (Rec. Doc. 27-7). The Manning Agreement required crew members to work in accordance with the Standard Terms and POEA Standard Contract of Employment, both of which were annexed to the Agreement. (Rec. Doc. 27-7 [4] ).

 **\*4** The Manning Agreement indicates that Jebsens was to provide Filipino seaman to serve as crew members aboard the vessel "MONARCH (ex Noble Lester Pettus)," a fact which Plaintiff argues renders the contract inapplicable. Therefore, Plaintiff contends, there is no Manning Agreement applicable to his work on the vessel Sovereign, such that the Standard Terms and POEA Contract incorporated into the Manning Agreement are irrelevant. The Court need not decide whether the 2014 Manning Agreement controls Plaintiff's work on the Sovereign, because the evidence shows that Plaintiff executed POEA Contracts of Employment in 2019 wherein the manning agent was identified as Jebsens, the principal/shipowner was identified as Megadrill, and the vessel was identified as Sovereign. (Rec. Doc. 27-9). These contracts control: March 19, 2019 POEA Contract of Employment (for a five-month term), August 13, 2019 POEA Contract of Employment (a one-month extension of the previous contract), and September 30, 2019 POEA Contract of Employment (for a five-month term). (Rec. Doc. 27-9). Plaintiff disputes signing the August 13, 2019 contract extension.

Plaintiff's opposition consists of three principal positions: 1) The POEA arbitration provisions do not apply to him, because he was not a "seafarer." 2) The arbitration provisions are unenforceable against him, because the contracts are invalid for lack of signature and/or a correct ship identification number. 3) Equity considerations justify ignoring the POEA arbitration requirements. Alternatively, Plaintiff seeks to take limited discovery on factual issues to resolve the arbitrability dispute.

### A. Whether the POEA arbitration provisions apply to Plaintiff as a "seafarer."

POEA Circular No. 10 states that the Standard Terms apply to "the employment of Filipino seafarers on board ocean-going ships." (Rec. Doc. 27-4). The Standard Terms define "seafarer" as "any person who is employed or engaged in overseas employment in any capacity on board a ship other than a government ship used for military or non-commercial purposes." (Rec. Doc. 27-4, p. 4). A "ship" is defined as "a ship other than one which navigates exclusively in inland waters or waters within, or closely adjacent to, sheltered waters or areas where port regulations apply." (*Id.* at p. 6).

Plaintiff attests that the vessel Sovereign upon which he was working in Cameron Parish, Louisiana was in deplorable condition, that it at was at times resting in mud, and that he often spent time on land. (Rec. Doc. 33-1, p. 4, ¶10-15). Defendants do not dispute that the Sovereign was moored at Megadrill's dock for outfitting in Cameron at the time of Plaintiff's employment or that Plaintiff was at times working

in the shipyard on land. (Rec. Doc. 27-14, ¶11-13; 35-40). Defendants attest, through Megadrill welding foreman, Andy Pineda, that but for the Covid-19 pandemic and decline in the oil and gas industry, the Sovereign, with Plaintiff and crew aboard, would have travelled to offshore Nigeria. (Rec. Doc. 27-14, ¶41-43).

Plaintiff asks the Court to find that he does not qualify as a "seafarer," because the vessel upon which he worked was not actually at sea and/or was not a "ship." That Plaintiff was initially hired and signed a contract as a "seafarer" is undisputable. (Rec. Doc. 27-9; 27-15). Indeed, Plaintiff attests that he understood he would be working offshore onboard a vessel at sea. (Rec. Doc. 33-1, p. 3, ¶8). The question is whether the grounding of the vessel invalidates the contract and arbitration provisions therein. The Court finds that it does not. The Standard Terms appear to contemplate continued employment even when a ship is at port. For instance, Section 15, Transfer Clause, states:

> The seafarer agrees to be transferred at any port to any ship owned or operated, manned or managed by the same employer, provided it is accredited to the same manning agent and provided further that the position of the seafarer and the rate of his wages and terms of service are in no way inferior and the total period of employment shall not exceed that originally agreed upon.
>
> (Rec. Doc. 27-5, p. 2).

The Standard Terms further include provisions regarding a seafarer's contract's termination:

> **\*5** Section 18. Termination of Employment
>
> The employment of the seafarer shall cease when the seafarer completes his period of contractual service aboard the ship, signs-off from the ship and arrives at the point of hire.
>
> The employment of the seafarer is also terminated effective upon arrival at the point of hire for any of the following reasons:
>
>> 2. When the seafarer signs-off due to shipwreck, ship's sale, lay-up of ship, discontinuance of voyage or change of ship principal in accordance with Sections 22, 23 and 26.
>
> Section 22, Termination Due to Shipwreck and Ship's Foundering
>
> Where the ship is wrecked necessitating the termination of the employment before the date indicated in the contract, the seafarer shall be entitled to earned wages, medical examination at the employer's expense to determine his fitness to work, repatriation at the employer's cost and one month basic wage as termination pay.
>
> In case of termination of employment of the seafarer before the expiration of the term of his contract due to shipwreck, actual or constructive total loss or foundering of the ship, the seafarer shall be entitled to earned wages, medical examination at employer's expense to determine his fitness to work, repatriation at the employer's cost and one month basic wage as termination pay.
>
> Section 23, Termination Due to Sale of Ship, Lay-Up or Discontinuance of Voyage
>
> Where the ship is sold, laid up, or the voyage is discontinued necessitating the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at employer's cost and one (1) month basic wage as termination pay, unless arrangements have been made for the seafarer to join another ship belonging to the same principal to complete his contract in which case the seafarer shall be entitled to basic wages until the date of joining the other ship.
>
> Section 24, Termination Due to Unseaworthiness
>
>> A. If the ship is declared unseaworthy ... the seafarer shall not be forced to sail with the ship.
>>
>> B. If the ship's unseaworthiness necessitates the termination of employment before the date indicated in the Contract, the seafarer shall be entitled to earned wages, repatriation at cost to the employer and termination pay equivalent to one (1) month basic wage.
>
> (Rec. Doc. 27-15, p. 3).

The foregoing provisions protect the employee by ensuring he is paid wages and is able to get home or to another job at the employer's expense. The Standard Terms thereby manifest the goal of the POEA to secure the best possible employment terms and conditions for overseas Filipino workers. (The Migrant Workers Act at Rec. Doc. 27-3, p. 18-19). The record evidence shows that Plaintiff remained in Defendants'

employ during the period of April 2019 through February 2020. Though the ship may have been laid up and the voyage discontinued, the circumstances did not necessitate termination of employment, as contemplated by Section 23. Neither was Plaintiff forced to sail with the apparently unseaworthy Sovereign, as contemplated by Section 24.

**\*6** Plaintiff's argument that Defendants fraudulently obtained his B-1 OCS visa, which shows that he was *supposed to be* working offshore, is unavailing. Defendants do not dispute that Plaintiff was *supposed to be* working offshore. (Rec. Doc. 27-14, ¶41-43). Rather, the circumstances of the pandemic economy and the ship's condition necessitated onshore work. In any event, Plaintiff has shown no evidence Defendants fraudulently obtained his visa in 2015 (i.e. years before the pandemic and before the contracts at issue). Plaintiff's fraud allegations are further undermined by the fact that he signed on as a seafarer (thereby binding himself to the POEA's rules) for a second stint in September 2019, with full knowledge of the ship's condition and location.

Plaintiff should not be permitted to escape his obligations under his employment contracts while also seeking to enforce his employer's obligations. See further and compare *Llagas*, 18 WL 5305366 at *5 ("Because plaintiff seeks to recover unpaid wages from defendants arising out of his employment on their vessels, he cannot at the same time avoid his contractual obligations due to their status as non-signatories.") He signed on to work as a seafarer and was therefore bound by the rules governing seafarers. These considerations, together with the strong federal policy in favor of arbitration of foreign labor disputes, dictate that the Standard Terms apply to Plaintiff as a "seafarer," despite the Sovereign's condition and location.

### B. *Enforceability of the POEA arbitration provisions.*

Defendants submitted three POEA Contracts of Employment which Plaintiff purportedly signed on March 19, 2019 (for a five-month term) ("Contract 1"), August 13, 2019 (a one-month extension of the previous contract) ("Contract 2"), and September 30, 2019 (for a five-month term) ("Contract 3"). (Rec. Doc. 27-9). Plaintiff admits to executing Contracts 1 and 3; however, he states his belief that the signature on Contract 2 (the extension contract) was forged, because it indicates that he signed it in Manila, Philippines, while he was actually working in United States.[5] (Rec. Doc. 33-1, p. 6, ¶28-30). Nonetheless, he admits to having worked for Defendants from April 2019 until February 2020. (Rec. Doc. 11, ¶11).

The POEA Standard Contracts state:

> 2. The herein terms and conditions in accordance with Governing Board Resolution No. 9 and Memorandum Circular NO. 10, both series of 2010 shall be strictly and faithfully observed.
>
> 3. Any alterations or changes, in any part of this Contract shall be evaluated, verified, processed and approved by the [POEA]. Upon approval, the same shall be deemed an integral part of the [Standard Terms].

(Rec. Doc. 27-9).

In 2005, the Fifth Circuit considered whether Filipino seamen were required to arbitrate their Fair Labor Standards Act (FLSA) claims under similar provisions. *Lim*, 404 F.3d 898. In *Lim*, the Filipino workers challenged the arbitration provisions within their POEA contracts as in contravention of Louisiana public policy and as otherwise inapplicable to the workers' wage claims. In enforcing the arbitration provisions, the court reasoned that "strong federal policy in favor of international arbitration agreements in general, and the application of the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards] to seamen's employment contracts in particular, [dictated that] the overall balance of public policy concerns favors enforcing the arbitration agreements." *Id.* at 906.

**\*7** The Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention") "contemplates a very limited inquiry by courts when considering a motion to compel arbitration." *Francisco v. STOLT ACHIEVEMENT MT*, 293 F.3d 270, 272–73 (5th Cir. 2002), (holding modified on other grounds by *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327 (5th Cir. 2004)), citing *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.*, 767 F.2d 1140, 1144–45 (5th Cir. 1985). "[T]he court should compel arbitration if (1) there is an agreement in writing to arbitrate the dispute, (2) the agreement provides for arbitration in the territory of a Convention signatory, (3) the agreement arises out of a commercial legal relationship, and (4) a party to the agreement is not an American citizen." *Id.* "If these requirements are met, the Convention requires district courts to order arbitration." *Id.*

More recently, another division of this court enforced the same arbitration provisions incorporated into the same POEA contracts as those before the Court in this case by virtue of the contracts' reference to POEA Circular 10 and the Standard Terms. *Llagas v. Sealift Holdings, Inc.*, No. 17-CV-00472, 2018 WL 5305366, at *2 (W.D. La. July 27, 2018), *report and recommendation adopted sub nom.* Gonzales Llagas v. Sealift Holdings, Inc., No. CV 17-472, 2019 WL 2413305 (W.D. La. Mar. 20, 2019), *on reconsideration in part sub nom. Llagas v. Sealift Holdings, Inc.*, No. CV 17-0472, 2019 WL 3526844 (W.D. La. June 7, 2019). Other courts have likewise found standard POEA contracts incorporated the Standard Terms arbitration provisions by reference: *Pagaduan v. Carnival Corp.*, 709 F. App'x 713, 716 (2d Cir. 2017), and Bautista v. Star Cruises, 396 F.3d 1289, 1300 (11th Cir. 2005), cited with approval by *Lim*, 404 F.3d at 906. This Court agrees that the POEA Standard Contracts incorporate by reference Circular 10 and the Standard Terms which mandate arbitration.[6]

Plaintiff's claims arise from his employment from April 2019 through February 2020. He admits signing Contract 1 (March 2019 contract covering an employment period of April 2019 through August 2019) and Contract 3 (September 2019 contract covering an employment period of October 2019 through February 2020). He only disputes signing Contract 2 (August 2019 contract, which appears to be an extension of Contract 1 and covers the employment period of September 2019). Thus, regarding Plaintiff's claims arising from his employment during the periods of April 2019 through August 2019 (governed by Contract 1) and October 2019 through February 2020 (governed by Contract 3), Plaintiff must proceed to arbitration. Applying the Convention analysis: 1) The arbitration agreement is in writing, through the contracts' incorporation of Circular 10 and the Standard Terms. See *Llagas*, 18 WL 5305366 at *3-4; *Pagaduan*, and *Bautista, supra.* 2) The agreement provides for arbitration in the Philippines, a Convention signatory. See *Lim*, 404 F.3d at 900-901. 3) The agreement arises out of a commercial legal relationship. *Francisco*, 293 F.3d at 274; *Gavino v. Eurochem Italia*, No. CIV. A. 01-1314, 2001 WL 845456, at *2 (E.D. La. July 24, 2001). Lastly, 4) Plaintiff is not an American citizen. (Rec. Doc. 11, ¶13).

**\*8** Regarding Plaintiff's claims arising from his employment for the one-month period of September 2019, Plaintiff's argument that he did not sign Contract 2 challenges the enforceability of the contract as a written agreement (the Convention's first requirement). The Court is not persuaded this is sufficient grounds to disregard the arbitration requirement, given Plaintiff's consent in the preceding and later contracts and the policy in favor of enforcing international arbitration agreements.

The Court first notes that, without the contracts, the basis for Plaintiff's wage claims is uncertain. The Migrant Workers Act and POEA regulations require employment contracts and Plaintiff has not sufficiently alleged Defendants fraudulently employed him. Plaintiff's conclusory allegations and his declared beliefs that his signature on Contract 2 was forged and that he was rushed to sign the Standard Terms without the opportunity to look at all the pages or have it translated are insufficient to satisfy the strict requirements for pleading fraud under F.R.C.P. Rule 9(b). *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). ("Pleading fraud with particularity in this circuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.' ").

Further, the Standard Terms state:

> A. The employment contract between the employer and the seafarer shall commence upon actual departure of the seafarer from the Philippine airport or seaport in the point of hire and with a POEA approved contract. It shall be effective until the seafarer's date of arrival at the point of hire upon termination of his employment pursuant to Section 18 of this Contract.
>
> B. The period of employment shall be for a period mutually agreed upon by the seafarer and the employer but not to exceed 12 months. Any extension of the contract shall be subject to mutual consent of both parties.

(Rec. Doc. 27-4, p. 5).

It is undisputed that Plaintiff continued in Defendants' employ during September 2019, the period covered by Contract 2. Per POEA regulations, the employment contract remained in effect until Plaintiff returned to the Philippines. Thus, Plaintiff's contention that the arbitration provisions of

the Standard Terms should not apply to claims arising during the period covered by Contract 2 is unpersuasive.

The Court is further bound by the Migrant Workers Act, which grants original and exclusive jurisdiction to the Labor Arbiters of the NLRC to hear and decide "claims arising out of an employer-employee relationship or by virtue of *any law* or contract involving Filipino workers for overseas deployment including claims for actual, moral, exemplary and other forms of damages." (Rec. Doc. 27-3) (emphasis added); *Francisco*, 293 F.3d at 271, fn. 1; *Lim*, 404 F.3d at 908. Likewise, the Standard Terms state that "the parties may at their option submit the claim or dispute to either the original and exclusive jurisdiction of the [NLRC] ... or to the original and exclusive jurisdiction of the voluntary arbitrator or panel of arbitrators." (Rec. Doc. 27-4, p. 9-10). Regardless of the validity of Contract 2, Plaintiff's relationship with Defendants was that of employee-employer. (See generally Rec. Doc. 11). Thus, by the Migrant Workers Act's explicit terms, jurisdiction lies with the NLRC or a voluntary arbitrator or panel of arbitrators.[7]

**\*9** For the same reasons, the Court is not persuaded by Plaintiff's suggestion that the POEA contracts are invalid for want of a correct identification number. Plaintiff shows that the employment contracts identify the Sovereign as IMO Number 8751174 (Rec. Doc. 27-9), but that Plaintiff's counsel's research did not corroborate that identification number with the vessel Sovereign (Rec. Doc. 33-2 and 33-3). The Court finds that Defendants provided evidence reasonably explaining the discrepancy between the identification number noted on the contracts and Plaintiff's counsel's attestation. (Rec. Doc. 41-6). Moreover, other courts have found that less-than-accurate information on the POEA contract did not invalidate the arbitration requirements of the Standard Terms incorporated therein. See e.g. *Llagas, supra*, and *Gavino*, 01 WL 845456, at \*2 (Defendants, who were neither contract signatories nor plaintiff's employers, were entitled to enforce arbitration based on the contracts.); *Pagaduan v. Carnival Corp.*, 709 F. App'x 713, 717 (2d Cir. 2017). In short, nuances of the POEA contracts in this case are insufficient to overcome the strong federal policy in favor of enforcing international arbitration agreements, especially where Philippines' law requires contracts between employers and Filipino employees to include the challenged arbitration provisions.

Plaintiff further suggests his purported inability to understand English and the fact that he was not provided a copy of the Standard Terms' arbitration provisions preclude the Court from finding a written arbitration agreement. However, undisputed record evidence shows that Plaintiff successfully completed the Maritime English course (Rec. Doc. 27-11) and that Plaintiff's supervisor communicated with him and other crew members in English as the only common language among a crew of several nationalities (Rec. Doc. 27-14, ¶22-24).

Factual issues notwithstanding, Plaintiff's argument is essentially an ineffective notice defense. The Eleventh Circuit rejected a similar opposition in *Bautista*, finding that the Convention did not require the party seeking arbitration to demonstrate notice or knowledgeable consent. The court reasoned:

> To require such an evidentiary showing in every case would be to make an unfounded inference from the terms of the Convention and would be squarely at odds with a court's limited jurisdictional inquiry, an inquiry colored by a strong preference for arbitration. It is no better to style Plaintiffs' defective notice claim as an affirmative defense, as virtually every case would be susceptible to a dispute over whether the party resisting arbitration was aware of the arbitration provision when the party signed the agreement. In the limited jurisdictional inquiry prescribed by the Convention Act, we find it especially appropriate to abide by the general principle that "[o]ne who has executed a written contract and is ignorant of its contents cannot set up that ignorance to avoid the obligation absent fraud and misrepresentation."

*Bautista*, 396 F.3d at 1300–01 (citations omitted)

This Court agrees and adopts the foregoing reasoning. Similar to the Filipino plaintiff in *Bautista*, Plaintiff attests that the Standard Terms document he signed was folded back to page 6, which he signed, was not translated into his native language, that he was rushed to sign it, and that he never received a copy. (Rec. Doc. 33-1, p. 5, ¶18-19). Such facts do not constitute fraud or misrepresentation. Rather, these facts, disputed though they may be, are issues akin to affirmative defenses for the arbitrator's consideration. Therefore, the Court finds Plaintiff cannot overcome compelled arbitration on these grounds.

**C. *Plaintiff's equity arguments and private interest factors.***

Plaintiff contends that compelled arbitration would deprive him of rights under U.S. law and due process. He relies principally on an affidavit from Dr. Antonio Gabriel La Viña, a Filipino lawyer with multiple advanced degrees, presented as "an expert on due process and rule of law, on how the Philippine judiciary and Philippine administrative agencies such as the NLRC deliver and fail to deliver justice, on comparative legal-cultural analysis, and on legal and other issues [ ] face in their work both abroad and domestically in the Philippines." (Rec. Doc. 33-4, p. 5, ¶13).

**\*10** Plaintiff first argues that the Standard Terms mandate that any unresolved disputes or claims arising from the contract shall be governed by Philippines law, such that an arbitrator would not consider Plaintiff's claims grounded in U.S. law. Dr. La Viña states that the NLRC would not apply U.S. law, which he attests is far more just than Philippines law. (Rec. Doc. 33-4, p. 6-7).

Plaintiff also relies upon *Aggarao v. MOL Ship Mgmt. Co.*, wherein the District Court of Maryland reversed an arbitration award, because the arbitrator did not allow recovery under U.S. law. *Aggarao v. MOL Ship Mgmt. Co.*, No. CIV. CCB-09-3106, 2014 WL 3894079, at \*14 (D. Md. Aug. 7, 2014). *Aggarao* is unpersuasive at this stage of the proceedings where the issue concerns compelled arbitration under the POEA Standard Terms contracts. *Aggarao* considered enforceability of an arbitration award rendered pursuant to the POEA mandated arbitration provisions; whereas, in the instant case, the issue is one of arbitrability—not enforcement. The Court will not entertain ex-ante challenges to a future arbitration ruling. The Court cannot predict whether a future arbitration ruling in this case would violate U.S. public policy, an inquiry pertinent to *enforcement* of an arbitration award under the Convention. See *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1015 (5th Cir. 2015). Dr. La Viña's general statements are insufficient to prove how an NLRC arbitrator might rule in this case on these facts and whether that ruling would violate U.S. public policy.

The Court is not convinced the Fifth Circuit would have reached the same result as the District Court of Maryland in *Aggarao*. In considering a similar case in which a Filipino worker was severely injured (severe burns to 35% of his body, problems with his body-heat control mechanism, skin ulcerations and sexual dysfunction), the Fifth Circuit upheld the arbitrator's award of $1,870, finding no evidence that the award was in contravention of public policy, distinguishing it from *Aggarao*. *Asignacion*, 783 F.3d at 1014; 1020. As the court pointed out, *Aggarao* relied in part on the underlying Eastern District of Louisiana's ruling in *Asignacion v. Schiffahrts*, Nos. 13–0607, 13–2409, 2014 WL 632177 (E.D. La. Feb. 10, 2014), which the Fifth Circuit later reversed. *Asignacion*, 783 F.3d 1020.

Plaintiff last argues that NLRC proceedings would deny him due process because of "endemic corruption, extraordinary delay, absence of access to counsel, and strong bias in favor of wealthy parties." (Rec. Doc. 33, p. 27). He further relies upon his own dire financial situation which would prevent him from traveling to the Philippines and hiring an attorney. Defendants counter with facts such as that Plaintiff may seek free legal aid from the Philippine Public Attorney's Office (Rec. Doc. 37-3) and that he nonetheless hired Dr. La Viña at $500/hour. (Rec. Doc. 33-4, p. 6). The Court is also cognizant of the Standard Terms, which obligate employers to pay for Filipino workers' passage from the point of hire to the port of embarkation and for their repatriation. (Rec. Doc. 27-4, p. 5; 11-12).

Disregarding factual disputes regarding Plaintiff's ability to litigate his claims in his home country, the Court is persuaded by Defendants' classification of the arbitration provisions as a mandatory forum selection clause, application of which precludes consideration of private interest factors. "[F]oreign arbitration clauses are deemed a 'subset of foreign forum selection clauses in general.' " *Lim*, 404 F.3d 901, citing *Vimar Seguros y Reaseguros, S.A. v. M/V SKY REEFER*, 515 U.S. 528, 534, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995). "Therefore, analysis of foreign forum selection clauses can be extended to foreign arbitration clauses." *Id.*

**\*11** Valid mandatory forum selection clauses are to be "given controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 59, 134 S. Ct. 568, 579, 187 L. Ed. 2d 487 (2013), citing *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988); *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 767 (5th Cir. 2016). As such, in *Atlantic Marine*, the Supreme Court imposed a restrictive analysis for the enforcement of mandatory forum selection clauses:

> First, the plaintiff's choice of forum "merits no weight"; instead he has the burden of establishing that § 1404(a)

transfer or [*forum non conviens*] dismissal is unwarranted. And second, the court should not consider the private-interest factors: Because the parties have contracted for a specific forum, they "waive the right to challenge their preselected forum as inconvenient...." Instead, the court should consider *only* public-interest factors. "Because those factors will rarely defeat a transfer motion, the practical result is that [FSCs] should control except in unusual cases." Cases in which the public-interest factors are sufficiently strong to outweigh a valid FSC "will not be common."

> *Weber*, 811 F.3d at 767, citing *Atlantic Marine*, 571 U.S. at 63-64.

The foregoing *Atlantic Marine* analysis applies only to forum selection clauses which are mandatory, as opposed to permissive:

> A mandatory FSC [forum selection clause] affirmatively requires that litigation arising from the contract be carried out in a given forum. By contrast, a permissive FSC is only a contractual waiver of personal-jurisdiction and venue objections if litigation is commenced in the specified forum. Only mandatory clauses justify transfer or dismissal.

> *Weber*, 811 F.3d at 768, citing *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127–28 (5th Cir. 1994)

> and *K & V Sci. Co. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*, 314 F.3d 494, 500 (10th Cir. 2002).

The Court finds that the arbitration provisions in the POEA Standard Terms and legal scheme are akin to mandatory forum selection clauses. The Migrant Worker Act and the POEA Standard Terms require employers to hire Filipino workers subject to their mandated provisions, which includes mandatory arbitration of disputes. Jurisprudence is replete with cases illustrating the mandatory nature of the arbitration provisions. See e.g. *Lim, Asignacion, Pagaduan, Bautista*, all *supra, inter alia.*

Considering the mandatory arbitration provisions, private interest factors [(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive (*In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004))], are irrelevant. Thus, Plaintiff's arguments regarding the convenience and affordability of litigating in the U.S. rather his home country are unavailing. It is hardly unfair to require a Filipino national to prosecute his claims in his own country, especially when the POEA Standard Terms requires the employer to repatriate its workers. See also *Gavino v. Eurochem Italia*, No. CIV. A. 01-1314, 2001 WL 845456, at *4 (E.D. La. July 24, 2001), citing *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 516–17 (1974) ("[T]he Court does not find that [the plaintiff's] appeal to equity overcomes the strong policy favoring arbitration in international disputes."). Accordingly, the Court finds Plaintiff must proceed to arbitration as required by the contracts mandated by his home country.

### V. Plaintiff's Motion for Limited Early Discovery

**\*12** The Court's foregoing analyses required no findings to resolve factual disputes. As discussed above, the Court's conclusions were drawn from analyses of legal precedent and undisputed facts, though potential factual discrepancies were noted. Accordingly, the Court needed no additional evidence to resolve the issue of compelled arbitration, thereby justifying denial of Plaintiff's Motion for Early Discovery. Regardless, as the Fifth Circuit has noted, " 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay or a like defense to arbitrability." *Sunkyong Eng'g & Const. Co., LTD. v. Born, Inc.*, 149 F.3d 1174 (5th Cir. 1998). Allegations of fraud and other defenses are "more appropriately presented at arbitration, where the arbitrator can reach the merits of the claims and defenses raised." *Id.*

Of course, any doubt as to the enforceability of the arbitration provisions in Plaintiff's contracts are to be resolved in favor of arbitration, given the overarching federal policy of enforcing international arbitration agreements. Plaintiff's arguments and reliance upon potential factual disputes do not surmount the strength of federal policy favoring arbitration in the context of this case.

Having found that Plaintiff's Motion for Early Discovery should be denied, the Court declines to consider whether the motion should be stricken as an improper surreply as Defendants' request.

### VI. Plaintiff's request to stay litigation pending arbitration.

Plaintiff urges the Court to stay these proceedings rather than dismiss his claims pending arbitration.

> The Convention's implementing legislation incorporates the entire [Federal Arbitration Act, or "FAA"], at least to the extent that the FAA does not conflict with the Convention. For example, the Convention and its implementing legislation do not explicitly authorize staying litigation pending arbitration, and thus parties whose arbitration agreements fall under the Convention have had to seek authority for stays under 9 U.S.C. § 3, a provision of the domestic FAA.

*Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.*, 601 F.3d 329, 332 (5th Cir. 2010) (cleaned up).

Further, § 3 of the FAA, which mandates a stay pending arbitration, "was not intended to limit dismissal of a case in the proper circumstances." *Fedmet Corp. v. M/V BUYALYK*, 194 F.3d 674, 678 (5th Cir. 1999) (quoting *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992)). "If all of the issues raised before the district court are arbitrable, dismissal of the case is not inappropriate." *Id.*

> Although we understand that plaintiff's motion to compel arbitration must be granted, we do not believe the proper course is to stay the action pending arbitration. Given our ruling that all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose. Any post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law.

*Alford*, 975 F.2d at 1164 (quoting *Sea–Land Service, Inc. v. Sea–Land of Puerto Rico, Inc.*, 636 F.Supp. 750, 757 (D. Puerto Rico 1986)).

Having found Plaintiff must proceed to arbitration on all claims arising out of his employment with Defendants, the Court finds that dismissal without prejudice pending arbitration is appropriate.

### Conclusion

For the reasons discussed herein, the Court recommends that Defendants' Renewed Motion to Dismiss and Compel Arbitration (Rec. Doc. 27) be GRANTED, that Plaintiff's Motion to Take Limited Early Discovery on Issues of Arbitrability (Rec. Doc. 42) be DENIED, and that Defendants' Motion to Strike Improper Surreply (Rec. Doc. 45) be DENIED.

**\*13** Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 17th day of May, 2022.

**All Citations**

Slip Copy, 2022 WL 2165638

**Footnotes**

| | |
|---|---|
| 1 | Defendants are MD Nigeria, LLC, Megadrill Services Ltd., Anjalex Investments, LLC, M&D Management, LLC, Michael Topham, Wendy Dunn, Judy Dunn, Ian Dunn, Dan Topham, and Robert P. Dunn Estate. |
| 2 | All subsequent references to the "Complaint" shall refer to Plaintiff's Amended Complaint. |
| 3 | Plaintiff's employment was not governed by a CBA. See Rec. Doc. 27-9. |
| 4 | The Manning Agreement in the record does not include Annex 4, which, according to the terms of the Agreement, is the POEA Standard Contract of Employment. Plaintiff does not dispute that the POEA Standard Contract was required. Further, the record includes three POEA Contracts of Employment which Plaintiff purportedly signed (a disputed fact discussed below). |
| 5 | The Court notes, but explicitly does not rely upon, the reasonable possibility that the POEA Contracts of Employment are standard form contracts which Filipino workers typically execute at their point of hire in the Philippines, which could explain the discrepancy between the purported place of execution stated in the contract and the actual place of execution. |
| 6 | Plaintiff relies on *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*, 927 F. Supp. 2d 348, 362 (E.D. La. 2013) wherein the Eastern District of Louisiana found that the same incorporating language in a POEA standard contract did not incorporate the arbitration provisions. This Court declines to follow *Baricuatro*, in light of contrary rulings from another division of this Court (*Llagas*), the Second Circuit (*Pagaduan*), and the Eleventh Circuit (*Bautista*), which the Fifth Circuit has cited with approval. See *Lim supra.* |
| 7 | Plaintiff argues in his Motion for Discovery that the Standard Terms contain a permissive forum selection clause, because the parties "may at their option submit the claim or dispute" to either the NLRC or a voluntary arbitrator(s). The Court disagrees with Plaintiff's interpretation of the Standard Terms. The arbitration provision is less a permissive forum selection clause than a legally mandated provision on jurisdiction. If a worker desires to work overseas, his country requires him to agree to the Standard Terms, which requires arbitration, though the pool of potential arbitrators may be at his option. |