# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

VICTOR CAGARA ORTIGUERRA, ET AL.

       *Plaintiffs*

v.

GRAND ISLE SHIPYARD, LLC, ET AL.

       *Defendants*

CIVIL ACTION NO.  2:22-cv-00309

SECTION "J"
JUDGE CARL J. BARBIER

MAG. DIV. (4)
MAGISTRATE JUDGE KAREN WELLS ROBY

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(3) AND TO COMPEL ARBITRATION**

## **TABLE OF CONTENTS**

*Table of Authorities* ............................................................................................ iii

I.    RELEVANT PROCEDURE AND BACKGROUND ....................................................... 1

II.    FACTUAL BACKGROUND .................................................................................. 2

    A.    Plaintiffs' Work and Housing ............................................................... 2

    B.    Defendants' Misrepresentations to the U.S. Government to
           Obtain Plaintiffs' Entry into the United States on Visitor Visas ............ 5

    C.    The Hiring Process and Documents ....................................................... 7

    D.    Inability to Arbitrate Claims in the Philippines. .................................... 8

III.    ARGUMENT .................................................................................................. 10

    A.    Legal Standard ................................................................................... 11

    B.    Defendants Misrepresent the Scope of the Migrant Workers Act ......... 13

    C.    Plaintiffs Were Not "Seafarers" and Therefore Are Not Subject to
           Mandatory Arbitration. ....................................................................... 15

    D.    Plaintiffs' Fair Housing Act and Trafficking Victims Protection Act
           Claims are Not "Arising Out of This Employment," and Therefore
           Would Not Be Subject to Forced Arbitration. ...................................... 20

    E.    Defendants Have Not Provided Evidence that Plaintiffs Agreed to
           Arbitrate their Claims. ........................................................................ 27

    F.    The Prospective Waiver Doctrine and Strong Public Interest Factors
           Weigh Against Foreign Arbitration. ..................................................... 29

    G.    NLRC Proceedings Would Strip Plaintiffs of Their Due Process Rights ............... 32

    H.    The Purported Arbitration Provisions Used Complicated English
           Plaintiffs Do Not Understand; Therefore Plaintiffs Cannot Be Bound to
           Arbitrate their Claims. ........................................................................ 33

IV.    CONCLUSION ............................................................................................... 34

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Aggarao v. MOL Ship Mgmt. Co.*, No. CIV. CCB-09-3106, 2014 WL 3894079
(D. Md. Aug. 7, 2014) ............................................................................... 29, 30

*Almanza v. Baird Tree Serv. Co.*, No. 3:10-CV-311, 2012 WL 4372456
(E.D. Tenn. Sept. 24, 2012) ............................................................................ 14

*Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013) ........................................ 29

*American Heritage Life Ins. Co. v. Lang*, 321 F.3d 533 (5th Cir.2003) ................................. 13, 33

*Asignacion v. Rickmers Genoa Schiffahrts-gesellschaft mbH & Cie KG*, 783 F.3d 1010
(5th Cir. 2015) ............................................................................................. 29

*Axiall Can. Inc. v. MECS Inc.*, 517 F. Supp. 3d 603 (W.D. La. 2021) ........................................ 12

*Bacon v. Avis Budget Grp., Inc.*, 357 F. Supp. 3d 401 (D.N.J. 2018),
*aff'd*, 959 F.3d 590 (3d Cir. 2020) ................................................................... 12

*Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*, 927 F. Supp. 348 (E.D. La. 2013). .......... *passim*

*Belvis v. Colamussi*, No. CV 16-544 (JFB)(ARL), 2018 WL 3151698
(E.D.N.Y. Feb. 20, 2018) .............................................................................. 14

*BW Offshore USA, LLC v. TVT Offshore AS*, 145 F. Supp. 3d 658 (E.D. La. 2015) .................... 17

*Calicdan v. MD Nigeria LLC*, No. 6:21-CV-03283, 2022 WL 2165638
(W.D. La. May 17, 2022), *report and recommendation adopted sub nom.*,
*Calicdan*, 2022 WL 2162645 (W.D. La. June 15, 2022) ................................................. 14, 19

*Camreta v. Greene*, 563 U.S. 692 (2011) ..................................................................... 19

*Casilao v. Hotelmacher LLC*, No. CIV-17-800-SLP, 2021 WL 4487984
(W.D. Okla. Sept. 30, 2021) ............................................................................ 14

*CEH Energy, LLC v. Kean Miller LLP*, No. CV 17-8274, 2018 WL 782956
(E.D. La. Feb. 7, 2018) ................................................................................... 19

*Cunningham v. Offshore Specialty Fabricators, Inc.*, No. 5:04-CV-282,
2010 WL 11627670 (E.D. Tex. Apr. 1, 2010) ........................................................... 6

*David v. Signal Int'l, LLC,* 257 F.R.D. 114 (E.D. La. 2009) .............................................. 31

*Dedon GmbH v. Janus et Cie*, No. 10 CIV. 04541 CM, 2010 WL 4227309
  (S.D.N.Y. Oct. 19, 2010), *aff'd*, 411 F. App'x 361 (2d Cir. 2011) &
  2011 WL 666174 (S.D.N.Y. Feb. 8, 2011) .............................................................. 27

*Doe v. Tonti Mgmt. Co.*, No. CV 20-2466, 2021 WL 5508874 (E.D. La. Mar. 1, 2021) ............ 24

*Elwakin v. Target Media Partners Operating Co. LLC*, 901 F. Supp. 2d 730 (E.D. La. 2012) ... 28

*Enigma Holdings, Inc. v. Gemplus Int'l S.A.*, No. 3:05 CV 1168 B, 2006 WL 2859369
  (N.D. Tex. Oct. 6, 2006) ............................................................................................ 14

*Fields v. Pool Offshore, Inc.*, 182 F.3d 353 (5th Cir.1999), cert. denied,
  528 U.S. 1155 (2000) ................................................................................................. 17

*Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069 (5th Cir.2002) ............................................ 13

*Gonzalez v. Chrysler Corp.*, 301 F.3d 377 (5th Cir. 2002) ......................................................... 32

*Hadnot v. Bay, Ltd.*, 344 F.3d 474 (5th Cir. 2003) ...................................................................... 29

*Henry v. New Orleans Louisiana Saints L.L.C.,* No. CV 15-5971, 2016 WL 2901775
  (E.D. La. May 18, 2016) ............................................................................................. 29

*Hill v. GE Power Systems*, 282 F.3d 343 (5th Cir.2002) ............................................................. 13

*Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109 (11th Cir. 2001) ................................. 22

*Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431 (N.D. Tex. 2019) ......... 12, 27, 28

*Jones v. Halliburton*, 583 F.3d 228 (5th Cir. 2009) .......................................................... 20, 21, 24

*Kothe v. AIMCO*, No. 06-2097-CM, 2007 WL 2725975 (D. Kan. Sept. 17, 2007)) .................... 25

*Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898 (5th Cir. 2005) ................................. 12

*Mendez v. Anadarko Petroleum Corp.*, 466 Fed.Appx. 316 (5th Cir.2012),
  cert. denied, 568 U.S. 1142 (2013) ............................................................................. 17

*Montero v. Carnival Corp.*, 523 F. App'x 623 (11th Cir. 2013) .................................................. 23

*Morgan v. Sundance, Inc.*, 596 U.S. ---, 142 S. Ct. 1708 (May 23, 2022) .................................. 13

*Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393 (5th Cir. 2022) ................................ 12, 13

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134 (C.D. Cal. 2011) .......... 14

*Patel v. Quality Inn South*, 846 F.2d 700 (11th Cir.1988) ............................................ 31

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) ............................................................................................ 13

*Turnipseed v. APMT, LLC*, No. CV 18-5187, 2018 WL 5977889 (E.D. La. Nov. 14, 2018) ...... 25

*Will–Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211 (5th Cir.2003) ................... 13

**Statutes**

9 U.S.C. § 4 ................................................................................................................. 13

9 U.S.C. §§ 201-208 .................................................................................................... 11

18 U.S.C. § 1595 ..................................................................................................... 1, 17

29 U.S.C. § 255 ............................................................................................................. 1

42 U.S.C. § 3613 ........................................................................................................... 2

43 U.S.C. § 1301 ........................................................................................................... 5

43 U.S.C. § 1331 ........................................................................................................... 6

Migrant Workers and Overseas Filipinos Act of 1995 (No. 8042) ....................................... *passim*

**Regulations**

29 C.F.R. § 531.32 ........................................................................................................ 5

33 C.F.R. § 140.10 ........................................................................................................ 5

33 C.F.R. § 141.14 ........................................................................................................ 6

33 C.F.R. § 141.20 ........................................................................................................ 6

**Rules**

11th Cir. R. 26-2 ......................................................................................................... 21

2016 Revised POEA Rules and Regs. Governing the Recruitment and Employment of Seafarers ..................................................................................................... 15, 17, 18

9 F.A.M. § 402.2-5.................................................................................................................. 5

Fed. R. Civ. P. 5.2 ................................................................................................................. 2

Fed. R. Civ. P. 7(b)(1).......................................................................................................... 12

**Treaties, Conventions, and Related Materials**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
    330 UNTS 3, [1975] ATS 25, 4 ILM 532 (1965), UKTS 26 (1976)................................. *passim*

Maritime Labour Convention at Art. II(1)(i), International Labour Organization (2006),
    available at https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:
    0::NO::P12100_ILO_CODE:C186 ............................................................................. 18

Preparatory Technical Maritime Conference, Consolidated Maritime Labour
    Convention: Commentary to the Recommended Draft, ILO Doc PTMC/04/2
    (September 13-24, 2004), available  at https://www.ilo.org/public/english/
    standards/relm/maritime/pdf/cmlc-comment.pdf ................................................... 18

Ratifications of MLC, 2006 - Maritime Labour Convention, 2006, International
    Labour Organization (Aug. 20, 2013), available at https://www.ilo.org/dyn/normlex/en
    /f?p=NORMLEXPUB:11300:0::NO:11300:P11300_INSTRUMENT_ID:312331:NO........... 18

United Nations Convention on the Law of the Sea, arts. 56 & 60(2),
    1833 U.N.T.S. I-31363 (November 16, 1994), available at https://treaties.un.org/doc/
    publication/unts/volume%201833/volume-1833-a-31363-english.pdf.................................... 19

**Articles and Treatises**

Edcel John A. Ibarra, *The Philippine Supreme Court under Duterte: Reshaped,
    Unwilling to Annul, and Unable to Restrain*, Items: Insights from the Social Sciences
    (Social Science Research Council Nov. 10, 2020), available at https://items.ssrc.org/
    democracy-papers/democratic-erosion/the-philippine-supreme-court-under-duterte-
    reshaped-unwilling-to-annul-and-unable-to-restrain/ ................................................. 9

John Isaac Blanck Jr., *Reflections on the Negotiation of the Maritime Labor
    Convention 2006 at the International Labor Organization*,  31 Tul. Mar. L.J. 35 (2006) ....... 18

*Maritime Labour Convention and the Offshore Oil and Gas Industry*, Safety4Sea
    (Nov. 28, 2014), available at https://safety4sea.com/maritime-labour-convention-
    and-the-offshore-oil-and-gas-industry/ .................................................................... 18

Nicole Curato, *Democratic expressions amidst fragile institutions: Possibilities for reform in Duterte's Philippines* (Brookings Institution Jan. 22, 2021), available at https://www.brookings.edu/articles/democratic-expressions-amidst-fragile-institutions-possibilities-for-reform-in-dutertes-philippines/ ............................ 8

Michael A Scodro, *Deterrence and Implied Limits on Arbitral Power*, 55 Duke L.J. 547 (Dec. 2005) ...................................................................................................................... 30

Moira McConnell, Dominick Devlin, Cleopatra Doumbia-Henry. *The Maritime Labour Convention, 2006 : A Legal Primer to an Emerging International Regime* (Brill | Nijhoff 2011), available at https://search.ebscohost.com/login.aspx?direct=true &AuthType=ip,shib&db=e000xna&AN=377260&site=ehost-live&scope=site .................... 18

*The Philippines Corruption Report*, GIS Integrity (May 2020), available at https://www.ganintegrity.com/portal/country-profiles/the-philippines/ ................ 10

## Other Authorities

Brief *Amici Curiae* of Employers and Employer Organizations in Support of the NLRB, *Hoffman Plastic Compounds, Inc v NLRB*, No. 00-1595 (filed Dec 10, 2001) (for 535 U.S 137) (available on Westlaw at 2001 WL 1631729) ............................................ 31

*Outer Continental Shelf*, U.S. Dept. of the Interior, Bureau of Ocean Energy Management, available at https://www.boem.gov/environment/outer-continental-shelf .......... 6

Plaintiffs Victor Cagara Ortiguerra, Donato Manalili Agustin, Amado Tranate Yuzon, Chistopher Escalante Rayos, Arvin Banzon San Pedro, Wilfredo Batong Saturos, Rosel Nufable Hernandez, Siegfried Tapia Carlos, Renato Arbolida Decena, and Isaias Santiago Dinglasan (collectively, "Plaintiffs"), on their own behalf and on behalf of those similarly situated, respectfully submit this memorandum of law in opposition to Defendants' Renewed Motion to Dismiss First Amended Class Action Complaint Pursuant to Fed. R. Civ. P. 12(b)(3) and to Compel Arbitration ("Renewed MTCA").[1] As set forth herein, (1) there is no valid and enforceable agreement to arbitrate; (2) even if there were a valid agreement to arbitrate, it is not enforceable as to Plaintiffs' claims.

## I.    RELEVANT PROCEDURE AND BACKGROUND

On February 9, 2022, Plaintiffs Victor Cagara Ortiguerra, Donato Manalili Agustin, Amado Tranate Yuzon, Chistopher Escalante Rayos, Arvin Banzon San Pedro, Wilfredo Batong Saturos filed their initial Complaint alleging Fair Labor Standards Act ("FLSA") claims against Defendants ("Initial Complaint").[2] Plaintiffs filed the Initial Complaint at that time to toll the relatively short statute of limitations on the FLSA claims,[3] anticipating that they would add comparatively complex class claims by way of an amended complaint.

On June 8, 2022, Defendants filed a Motion to Dismiss and Compel Arbitration ("Initial MTCA") related to the Initial Complaint.[4]

On June 30, 2022, Plaintiffs filed their First Amended Complaint, adding (1) numerous factual allegations and claims, including class claims for violations of the Trafficking Victims Protection Act ("TVPA"), by way of 18 U.S.C. § 1595, and the Fair Housing Act ("FHA"), by

---

[1] Rec. Doc. 26.
[2] Rec. Doc. 1
[3] *See* 29 U.S.C. § 255(a) (two- or three-year statute of limitations).
[4] Rec. Doc. 14.

way of 42 U.S.C. § 3613; (2) four new named Plaintiffs;[5] and (3) a request for a declaratory judgment—including a related jury demand—on the arbitrability issue.[6]

On August 2, 2022, Defendants timely filed a Renewed Rule 12(b)(3) Motion to Dismiss First Amended Class Action Complaint and Compel Arbitration ("Renewed MTCA").[7] The Renewed MTCA made substantively identical arguments to those Defendants made in their Initial MTCA,[8] and then added arguments related to Plaintiffs' TVPA, FHA, and declaratory judgment claims.[9]

On August 2, 2022, the Court issued an order denying Defendants' Initial MTCA as moot.[10] Therefore, Defendants Renewed MTCA is the operative motion before this Court.

## II.   FACTUAL BACKGROUND

### A.  Plaintiffs' Work and Housing.

Plaintiffs are skilled welders and fitters from the Philippines.[11] Defendants Grand Isle Shipyard, LLC and GIS, LLC (collectively, "Defendants" or "GIS") employed Plaintiffs to work on deep-water platforms and spars, which are fixed to the ocean floor, and shallow-water platforms, which are built onto the ocean floor.[12]

---

[5] The Plaintiffs added were Rosel Nufable Hernandez, Siegfried Tapia, Carlos, Renato Arbolida Decena, and Isaias Santiago Dinglasan.

[6] Rec. Doc. 19.

[7] Rec. Doc. 26.  Defendants initially filed their Renewed MTCA on August 1, 2022, Rec. Doc. 25, but they had not redacted Plaintiffs' dates of birth from certain documents as required by Fed. R. Civ. P. 5.2.   Therefore, they refiled the Renewed MTCA on August 2, 2022, with the redactions. Rec. Doc. 26.

[8] *Compare* Initial MTCA at 2-12 *with* Renewed MTCA at 4-15.

[9] Renewed MTCA at 15-19.

[10] Rec. Doc. 27.

[11] First Amended Compl. ("FAC"), Rec. Doc. 19, at ¶ 1.

[12] Decl. of Victor Cagara Ortiguerra ("Ortiguerra Decl.") at ¶¶ 13-15 (Ex. A); Decl. of Donato Manalili Agustin ("Agustin Decl.") at ¶¶ 13-15 (Ex. B.); Decl. of Amado Tranate Yuzon ("Yuzon Decl.") at ¶¶ 13-15 (Ex. C); Decl. of Chistopher Escalante Rayos ("Rayos Decl.") at ¶¶ 13-15 (Ex. D); Decl. of Arvin Banzon San Pedro ("San Pedro Decl.") at ¶¶ 13-15 (Ex. E); Decl.

Between generally weeks-long stints working on the platforms and spars in the Gulf of Mexico,[13] Plaintiffs would spend extended periods—often for a week or longer—living at a former bowling alley in Galliano (Lafourche Parish), Louisiana, which GIS had converted into a bunkhouse.[14] Travel between the bunkhouse and the platforms and spars almost always took several hours.[15] Plaintiffs and other Filipino workers shared the bunkhouse with non-Filipino workers.[16] Defendants subjected the Filipino workers to oppressive and discriminatory rules and verbal abuse at the bunkhouse.[17] The most shocking of the rules effectively converted the bunkhouse into a jail for the Filipino workers: they were not allowed to leave on their own.[18] Workers who tried to leave were threatened with termination and deportation.[19] The only exceptions were when a GIS driver took them in a GIS van for hurried shopping trips to the local Walmart and, once per contract period, to Houma, Louisiana to shop.[20] By contrast, non-Filipino workers were allowed to come and go to and from the bunkhouse as they pleased.[21]

When the COVID-19 pandemic started to impact GIS's workforce, GIS implemented a similarly draconian and discriminatory rule: Filipino workers who became infected with the virus were required to move to small barges and tugs moored to inland docks.[22] On the boats, the

---

of Wilfredo Batong Saturos ("Saturos Decl.") at ¶¶ 13-15 (Ex. F); Decl. of Rosel Nufable Hernandez ("Hernandez Decl.") at ¶¶ 13-15 (Ex. G); Decl. of Siegfried Tapia Carlos ("Carlos Decl.") at ¶¶ 13-15 (Ex. H); Decl. of Renato Arbolida Decena ("Decena Decl.") at ¶¶ 13-15 (Ex. I); Decl. of Isaias Santiago Dinglasan ("Dinglasan Decl.") at ¶¶ 13-15 (Ex. J). The above-listed declarations collectively will be referred to herein as "Decls."

[13] Decls. at ¶ 16 (Exs. A-J).

[14] FAC at ¶¶ 2, 39, 43, 70.

[15] Decls. at ¶ 17 (Exs. A-J).

[16] FAC at ¶ 86.

[17] FAC at ¶¶ 72-76, 90-91.

[18] *Id.*

[19] FAC at ¶ 74.

[20] FAC at ¶ 73.

[21] FAC at ¶ 87.

[22] FAC at ¶¶ 70, 78-79.

Filipino workers[23] lived in cramped quarters, were only provided Vitamin C and Percocet to treat their symptoms, did not receive enough food, and often were not able to communicate with their loved ones.[24] Again, this particular hell was reserved for the Filipino workers. Local non-Filipino workers could go home when they were infected. Non-Filipino workers who were not from the region were allowed to quarantine in hotels.[25]

The forced segregation and isolation of the Filipino workers turned into a crisis in late August 2021, as Hurricane Ida approached Galliano. The non-Filipino workers were evacuated before the storm hit.[26] Many of the Filipino workers, including four of the Plaintiffs, had to remain at the bunkhouse.[27] When Hurricane Ida made landfall just southeast of Galliano with sustained winds of 145 miles per hour, the Filipino workers feared for their lives as the building shook and was pelted by flying debris. The winds ripped open part of the roof, water entered the building, and the floor flooded.[28] Even after Hurricane Ida had passed, the Filipino workers had to remain at the damaged bunkhouse for weeks without clean water or electricity.[29]

While at GIS, Plaintiffs received only 20 percent of the wages they were owed.[30]  Under a scheme devised by the Philippine government, GIS paid the remaining 80 percent to DNR Offshore and Crewing Services, Inc. ("DNR"), GIS's manning agent in the Philippines. DNR in turn took substantial deductions out of the Plaintiffs' wages and paid the balance to Plaintiffs'

---

[23] Only one Plaintiff, Wildredo Saturos, was never infected and therefore did not have to quarantine on the tugs.
[24] FAC at ¶ 78.
[25] FAC at ¶ 89.
[26] FAC at ¶¶ 80-81.
[27] FAC at ¶ 82.
[28] FAC at ¶ 83.
[29] FAC at ¶ 84.
[30] FAC at ¶ 64.

family members in the Philippines.[31] Not only did Plaintiffs not receive their wages "free and clear" as required by the Fair Labor Standards Act,[32] but the low cash-in-hand wages—two dollars per hour or less—meant it would be exceptionally difficult for the Plaintiffs to have the financial wherewithal to leave on their own.[33]

When the Plaintiffs did manage to leave, GIS and DNR resorted to bullying. DNR threatened Plaintiff Agustin with law enforcement action.[34] GIS's attorneys sent a letter to the individual they claim helped four of the Plaintiffs leave threatening legal action against him and a business they claim he operated. GIS's attorneys also made a thinly veiled threat of legal repercussions in the Philippines for the workers who left.[35]

### B. Defendants' Misrepresentations to the U.S. Government to Obtain Plaintiffs' Entry into the United States on Visitor Visas.

Plaintiffs worked for Defendants using B-1 visas with an Outer Continental Shelf ("OCS") designation.[36] The purpose of the B-1 OCS visa is "to transit or travel to the United States to access the U.S. Outer Continental Shelf . . . to join a unit that is engaged in OCS activity . . . ."[37] An "OCS activity" is "'any offshore activity associated with the exploration for, or development or production of, the minerals of the [OCS].'"[38] The "outer Continental Shelf" likewise is defined as "all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301[[39]] of this title, and of which the subsoil and

---

[31] FAC at ¶¶ 67-68.
[32] *See* 29 C.F.R. § 531.32.
[33] FAC at ¶¶ 68-69.
[34] FAC at ¶ 76.
[35] *Id.*
[36] FAC at ¶ 119.
[37] 9 F.A.M. § 402.2-5(C)(9)(a).
[38] 9 F.A.M. § 402.2-5(C)(9)(a) (quoting 33 C.F.R. § 140.10).
[39] 43 U.S.C. § 1301(a) defines "lands beneath navigable waters."

seabed appertain to the United States and are subject to its jurisdiction and control."[40] In summary:

> Generally, the visa category allowing entry for a nonimmigrant alien destined to the OCS is a B1 (OCS) visa. The B1-OCS visa is, in essence a hall pass used to enter the United States on the way to or from the OCS. Thus, the visas are neither issued, nor required, for the performance of construction work on the OCS. In fact . . . , if the alien never enters the United States, no visa is necessary at all.[41]

To obtain Plaintiffs' entry to the United States on a B-1 OCS visa, Defendants would have been required to request a letter from the U.S. Coast Guard indicating, among other things, an exemption from the Outer Continental Shelf Lands Act, which otherwise requires employment of U.S. citizens or lawful permanent residents on the OCS. GIS would have been required to include a copy of the Plaintiffs' work contract with the Coast Guard letter request.[42]

Plaintiffs have not seen Defendants' Coast Guard letter requests (these would be key documents Plaintiffs would seek in discovery). However, Plaintiffs' recent alleged employment contracts, which Defendants submitted with their Renewed MTCA, with one exception either entirely misrepresent the name of the platform or spar where the Plaintiffs would be working or fail to list each spar or platform.[43]  Further, DNR, GIS's manning agent, provided Guarantee Letters to Plaintiffs, which Plaintiffs were to present to the airlines and U.S. Immigration Officers as they traveled to the United States to work for GIS.[44] The Guarantee Letters

---

[40] 43 U.S.C. § 1331(a); *cf. Outer Continental Shelf*, U.S. Dept. of the Interior, Bureau of Ocean Energy Management, available at https://www.boem.gov/environment/outer-continental-shelf (designating the four OCS regions).

[41] *Cunningham v. Offshore Specialty Fabricators, Inc.*, No. 5:04-CV-282, 2010 WL 11627670, at *4 (E.D. Tex. Apr. 1, 2010).

[42] *See* 33 C.F.R. § 141.14 (citizenship requirement) & 33 C.F.R. § 141.20 (requirements for employer to seek exemption).

[43] Decls. at ¶¶ 13-15 (Exs. A-J). Only Plaintiff Arvin San Pedro believes he worked only on the listed vessel during the contract period. San Pedro Decl. at ¶¶ 13-14 (Ex. E).

[44] Ortiguerra Decl. at ¶ 22 & Ex. VO-1 (Ex A); Saturos Decl. at ¶ 22 & Ex. WS-1 (Ex. F); Decena Decl. ¶ 22 & Ex. RD-1 (Ex. I)

misidentify or do not name each platform or spar where Plaintiffs were to work[45] and falsely stated GIS "shall make necessary arrangements to convey them onboard *the* vessel."[46]

### C.  The Hiring Process and Documents.

Defendants filed, as an exhibit to their Renewed MTCA,[47] a single "Contract of Employment" and one Standard Terms document pertaining to each Plaintiff's last or near-last period of employment with GIS.[48] Plaintiffs do not dispute the authenticity of their signatures on these specific documents.[49]   However, both documents are in English. Though the provisions GIS contends mandate arbitration would be perplexing even to native English speakers, Plaintiffs' first language is Tagalog, and their English knowledge is limited to technical terms related to their profession as welders or fitters and very basic language such as greetings.[50] During their pre-employment orientation at DNR, where Plaintiffs signed the alleged agreements,[51] they were rushed, and they did not have time to read the documents before they signed them.[52] Even now, with the benefit of ample time to review Defendants' submission, they still do not know what the provisions mean.[53] Until GIS filed their arbitration motion in this case, Plaintiffs were not aware they had signed a document GIS would claim required arbitration of

---

[45] Ortiguerra Decl. at ¶¶ 13-15, 22 & Ex. VO-1 (Ex A); Saturos Decl. at ¶¶ 13-15, 22 & Ex. WS-1 (Ex. F)

[46] Ortiguerra Decl. at ¶ 22 & Ex. VO-1 (Ex A); Saturos Decl. at ¶ 22 & Ex. WS-1 (Ex. F); Decena Decl. ¶ 22 & Ex. RD-1 (Ex. I) (emphasis added).

[47] Renewed MTCA, Ex. H, Rec. Doc. 26-9; Dates Chart (Ex. L).

[48]  In their Argument, below, Plaintiffs explain why these alleged agreements would not bind them to arbitrate their claims. However, for the purpose of this Factual Background, Plaintiffs describe the problematic and procedurally defective process of hiring Plaintiffs and obtaining their signatures on the alleged agreements.

[49] *See* Renewed MTCA, Ex. H, Rec. Doc. 26-9; Decls. at ¶¶ 5-8 (Exs. A-J)

[50] Decls. at ¶¶ 2-3 (Exs. A-J).

[51] *See* Renewed MTCA, Ex. H, Rec. Doc. 26-9.

[52] Decls. at ¶¶ 8-9 (Exs. A-J)

[53] *Id.* at ¶¶ 10-11 (Exs. A-J)

their claims in the Philippines.[54]

### D.  Inability to Arbitrate Claims in the Philippines.

Plaintiffs would not be able to arbitrate their cases in front of the National Labor Relations Commission ("NLRC") in the Philippines.  Plaintiffs, who currently live in Florida, cannot afford to travel to the Philippines for arbitration.[55] They also will not be able to retain an attorney in the Philippines. They cannot afford to pay one,[56] and private attorneys in the Philippines generally do not represent clients on a contingency basis.[57] Further, the dearth of attorneys in the Philippines—the number of attorneys per citizen is just eleven percent of the internationally-recognized ideal ratio— means Plaintiffs likely would find themselves among the 80 percent of Filipinos who are not able to find legal assistance.[58]

Further, based on GIS's agents' threats once Plaintiffs left GIS,[59] Plaintiffs legitimately fear arrest and other legal consequences if they return to the Philippines.[60]  In a nation that continues to wrestle with a significant deterioration in the rule of law,[61] Plaintiffs have every reason to be

---

[54] *Id.* at ¶ 12 (Exs. A-J).

[55] *Id.* at ¶¶ 18-19 (Exs. A-J).

[56] *Id.* at ¶ 20 (Exs. A-J).

[57] *See* Expert Decl. of Dr. Antonio Gabriel La Viña ("La Viña Decl.") ¶VII(C)(7) (Ex. K). Dr. La Viña is well-qualified as an expert on "due process and rule of law, on how the Philippine judiciary and Philippine administrative agencies such as the NLRC deliver and fail to deliver justice, on comparative legal-cultural analysis, and on legal and other issues OFWs face in their work both abroad and domestically in the Philippines." La Viña Decl. ¶ 13.  *See also* La Viña Decl. ¶¶ (I)(A)(1)-(13) (describing qualifications) & La Viña Decl. Ex. A (Dr. La Viña's *curriculum vitae*).

[58] *Id.*

[59] FAC at ¶ 76.

[60] Decls. at ¶ 21 (Exs. A-J).

[61] *See, e.g.,* Nicole Curato, *Democratic expressions amidst fragile institutions: Possibilities for reform in Duterte's Philippines* (Brookings Institution Jan. 22, 2021), available at https://www.brookings.edu/articles/democratic-expressions-amidst-fragile-institutions-possibilities-for-reform-in-dutertes-philippines/; Edcel John A. Ibarra, *The Philippine Supreme Court under Duterte: Reshaped, Unwilling to Annul, and Unable to Restrain*, Items: Insights from the Social Sciences (Social Science Research Council Nov. 10, 2020), available at

concerned.

Additionally, according to expert Dr. Antonio Gabriel La Viña, the NLRC "does not and will not apply statutory law from outside the Philippines."[62]  Therefore, Plaintiffs' legal claims and the remedies available therein, which are based entirely on U.S. federal law, would not be available in NLRC proceedings.  For this reason, Plaintiffs would not be able to pursue remedies at all comparable to those available under U.S. law.[63]

Finally, even if Plaintiffs were able to bring their claims before the NLRC, the arbitration process is so lacking in fundamental due-process protections and so plagued with corruption that Plaintiffs would not be able to vindicate their federally protected rights.  According to Dr. La Viña, Plaintiffs would not be able to enforce their U.S. statutory rights in front of the NLRC for myriad reasons:

(1) The protracted nature of NLRC proceedings and related appeals, which generally take well over a decade.  "The enormous time, effort, and expense required to pursue one's claim from start to finish is often enough to force workers to succumb to the pressure to accept whatever paltry offer is made by the respondent company."[64]

(2) The difficulty in executing an NLRC order, a process that may extend the case by more than another decade.[65]

(3) The inability to compel the testimony of witnesses or the production of discovery materials from outside the Philippines, an obstacle that would be particularly pronounced in the instant case where the Plaintiffs themselves, the Defendants, the

---

https://items.ssrc.org/democracy-papers/democratic-erosion/the-philippine-supreme-court-under-duterte-reshaped-unwilling-to-annul-and-unable-to-restrain/.

[62] La Viña Decl., ¶VII(C)(7).

[63] *Id.* ¶ VII(C)(9).

[64] La Viña Decl. ¶ VII(C)(2).

[65] *Id.* ¶ VII(C)(3).

documentary evidence, and nearly all of the witnesses are in the United States.[66]

(4) Endemic corruption in the NLRC, where "bribery and influence-peddling are commonplace at every level of the NLRC process, with participants paying decision-makers to guarantee certain outcomes."[67]   Dr. La Viña identifies several reported incidents of corruption, but he also notes that "the problem is insidious, and perpetrators are rarely held accountable.[68]

(5) As discussed above, the NLRC's unwillingness to apply United States law.[69]

In short, Dr. La Viña concludes that "the remedies available to the plaintiff in the Philippines and under Philippine law will not meet United States and international standards of adequacy and sufficiency."[70]

Dr. La Viña is not alone in his analysis.   The well-regarded GAN Integrity Risk & Compliance Portal describes the judicial system in the Philippines as follows:

> Corruption risks are high in the judicial system. Bribes and irregular payments in return for favorable judicial decisions are common. The judiciary is formally independent, but the rich and powerful have frequently influenced proceedings in civil and criminal cases. Procedural fairness and transparency are severely undermined by nepotism, favoritism, and impunity.[71]

### III.   ARGUMENT

There are myriad reasons why arbitration in the Philippines is not a proper forum for Plaintiffs, who reside in the United States, to bring claims under United States remedial civil-rights and employment statutes against Defendants in the United States.

Plaintiffs discuss these reasons in detail below, beginning with a summary of the

---

[66] *Id.* ¶ VII(C)(4).

[67] *Id.* ¶¶ VII(C)(5)-(6).

[68] *Id.* ¶ VII(C)(5).

[69] *Id.* ¶ 7.

[70] *Id.* ¶ VII (Conclusion).

[71] *The Philippines Corruption Report*, GIS Integrity (May 2020), available at https://www.ganintegrity.com/portal/country-profiles/the-philippines/.

applicable legal standard. Next, Plaintiffs dispense with Defendants' incorrect suggestion that the Migrant Workers and Overseas Filipinos Act imposes a statutory arbitration requirement on all claims by Filipinos working abroad. Plaintiffs then review three threshold issues: (1) whether Plaintiffs are "seafarers" bound by the alleged agreements to arbitrate; (2) whether their FHA and TVPA claims would be subject to arbitration even if Defendants' alleged agreement to arbitrate were binding; and (3) whether Defendants have presented sufficient evidence to carry their burden of proving an agreement to arbitrate covering the entire period of Plaintiffs' claims. If Plaintiffs prevail on the first question, the Court need look no further—none of Plaintiffs' claims would be subject to arbitration. Likewise, if the Court rules for Plaintiffs on the second or third question, the Court retains jurisdiction, and the only remaining issue would be which claims may be heard here, and during which time periods.

Following these threshold arguments, Plaintiffs examine three other grounds precluding forced arbitration of their claims: (1) whether the prospective waiver doctrine and strong public interest factors weigh against foreign arbitration; (2) whether the proceedings in the Philippines would strip Plaintiffs of their due process rights; and (3) whether the combination of Plaintiffs' inability to read legal documents in English and the labor brokers' rushing Plaintiffs to sign those documents makes them unenforceable.

### A. Legal Standard

"Chapter Two of the FAA implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), which governs arbitration clauses in international commercial contracts."[72] "The Convention applies to international arbitration clauses when "(1) there is an agreement in writing to arbitrate the dispute, (2) the agreement

---

[72] *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc.*, 927 F. Supp. 348, 358–59 (E.D. La. 2013) (citing 9 U.S.C. §§ 201-208).

provides for arbitration in the territory of a Convention signatory, (3) the agreement arises out of a commercial legal relationship, and (4) a party to the agreement is not an American citizen."[73]

The inquiry in this case regards question one: whether there was an existing and enforceable arbitration agreement between the parties. While the Court, in this inquiry, accepts the allegations in the FAC as true and resolves conflicts in favor of the Plaintiffs, the Court can also look beyond the pleadings to consider additional evidence related to the allegations.[74]

The Fifth Circuit recently reaffirmed that "courts must decide 'at the outset' whether an enforceable arbitration agreement exists at all."[75] The Fifth Circuit has also held that "deciding an arbitration agreement's enforceability between parties remains a question for courts."[76] Defendants, as the party moving to compel arbitration, bear the burden of proving formation of an agreement to arbitrate.[77]

Where material factual disputes regarding arbitrability are present, the Court may order discovery[78] and may proceed to trial "regarding 'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same,' as Section 4 of the FAA envisions."[79]  Here, Plaintiffs have requested a "trial by jury on all questions of fact necessary to determine whether

---

[73] *Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 903 (5th Cir. 2005); *Baricuatro*, 927 F. Supp. at 358–59.

[74] *Axiall Can. Inc. v. MECS Inc.*, 517 F. Supp. 3d 603, 606 (W.D. La. 2021).

[75] *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398 (5th Cir. 2022) (affirming the denial of a motion to compel arbitration in an FLSA matter where the parties dispute the existence and enforcement of arbitration agreement).

[76] *Id.*

[77] *See Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 445 (N.D. Tex. 2019); *Baricuatro*, 927 F. Supp. 2d at 360 (arbitration not compelled under the Convention as to plaintiffs for whom employer did not provide evidence of signed agreement to arbitrate).

[78] Because Plaintiff cannot make a request for affirmative relief embedded in an opposition brief, Fed. R. Civ. P. 7(b)(1), Plaintiff will file a motion to take limited early discovery on issues of arbitrability. Plaintiff currently expects to file the motion after Defendants have filed their reply brief (if any) so Plaintiff may enumerate the fact issues that are in dispute.

[79] *Bacon v. Avis Budget Grp., Inc.*, 357 F. Supp. 3d 401, 414 (D.N.J. 2018), *aff'd*, 959 F.3d 590 (3d Cir. 2020).

they have an obligation to arbitrate their claims."[80]

"[I]t is axiomatic that arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."[81] Federal policy favoring arbitration does not factor into "whether there is a valid agreement to arbitrate between parties," and it does not contemplate "the determination of who is bound" by an arbitration agreement.[82] Indeed,[83] the Supreme Court clarified earlier this year that "[t]he policy [favoring arbitration] is to make 'arbitration agreements as enforceable as other contracts, but not more so.'"[84] Therefore, "a court may not devise novel rules to favor arbitration over litigation."[85] The correct analysis here follows the familiar principles of contract, which "require a 'meeting of the minds' between the parties in order for agreements to be valid."[86]

### B. Defendants Misrepresent the Scope of the Migrant Workers Act.

Defendants incorrectly contend that the Migrant Workers Act of the Philippines ("MWOFA") "mandates that the Labor Arbiters of the NLRC shall have exclusive jurisdiction of

---

[80] FAC at ¶ 176; *see generally Id.* at ¶¶ 171-176 (Count 4: Declaratory Judgment with Respect to Arbitrability). Plaintiffs here affirmatively repeat that demand for a trial by jury on arbitrability. *See* 9 U.S.C. § 4.

[81] *American Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 537 (5th Cir.2003) (quoting *Hill v. GE Power Systems*, 282 F.3d 343, 347 (5th Cir.2002)) (internal quotation omitted); *Will–Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211 (5th Cir.2003) ("arbitration is a matter contract which cannot be forced upon a party").

[82] *American Heritage*, 321 F.3d at 537–38 (citing *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073–74 (5th Cir.2002)); *see also Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) ("[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration.").

[83] 596 U.S. ---, 142 S. Ct. 1708 (May 23, 2022)

[84] *Id.* at 1713 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)).

[85] *Morgan*, 142 S. Ct. at 1708.

[86] *Baricuatro*, 927 F. Supp. at 359 (citing *American Heritage*, 321 F.3d at 537–38); *see also Newman*, 23 F.4th at 401 (citing the Supreme Court's holding that "principles of state contract law" determine who is bound.).

13

**all** claims involving Filipino overseas workers (not just seafarers)."[87]   However, Defendants misrepresent the scope of MWOFA Section 10.

When read in context, it is clear the MWOFA only applies to workers who *opt to* file an NLRC complaint. The expert declaration of Dr. La Viña supports this position. In summary, Dr. La Viña details how and why the MWOFA "governs *criminal* proceedings for illegal recruitment practices," which "a private party, through non-governmental counsel, may initiate . . . ."[88] Notably, this Court has found the application of the MWOFA arbitration provision to be "wholly inapposite" in a similar case.[89] With the exception of *Calicdan*,[90] which is on appeal to the Fifth Circuit,[91] Plaintiffs are aware of no other court that reads the MWOFA as mandating arbitration of non-seafarer disputes, and multiple cases have proceeded in federal courts on behalf of Filipino non-seafarers deployed through POEA.[92]

Defendants have the "burden of proving [the foreign law's] substance to a reasonable

---

[87] Renewed MTCA at 6 (emphasis included).

[88] La Viña Decl. at ¶¶ VII(D)(1)-5 (Ex. K).

[89] *See Baricuatro*, 927 F. Supp. 2d at 355-356, n.37; *see also, id.* at 368 (noting that "the standard form contract for … workers [who are not seafarers] does not require arbitration…. To the contrary it appears to expressly permit workers to settle employment related disputes in the host country 'at the option of the complaining party'" (internal citations omitted))

[90] *Calicdan v. MD Nigeria LLC*, No. 6:21-CV-03283, 2022 WL 2165638, at *1 (W.D. La. May 17, 2022), *report and recommendation adopted sub nom.*, *Calicdan*, 2022 WL 2162645 (W.D. La. June 15, 2022), *appeal filed, Calicdan*, Rec. Doc. 58 (July 7, 2022).

[91] In *Calicdan*, the court did not consider the similar expert declaration the plaintiff submitted when it considered the applicability of the MWOFA to the dispute.  This is one of the bases for the appeal. *Id.*

[92] *See, e.g., Casilao v. Hotelmacher LLC*, No. CIV-17-800-SLP, 2021 WL 4487984 (W.D. Okla. Sept. 30, 2021) (Filipino H-2B visa holders deployed into hospitality jobs); *Belvis v. Colamussi*, No. CV 16-544 (JFB)(ARL), 2018 WL 3151698 (E.D.N.Y. Feb. 20, 2018) (same); *Almanza v. Baird Tree Serv. Co.*, No. 3:10-CV-311, 2012 WL 4372456 (E.D. Tenn. Sept. 24, 2012) (tree service workers); *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1150 (C.D. Cal. 2011) (teachers with H-1B visas).

certainty."[93] However, while Plaintiffs have presented an expert declaration—of a Yale-educated professor of law and former school of government dean—explaining the MWOFA and why it does not independently mandate arbitration, Defendants merely ask this Court to interpret the statute in a vacuum. Not surprisingly, Defendants get it wrong.  The MWOFA has no bearing on the arbitrability questions before this Court.

### C. Plaintiffs Were Not "Seafarers" and Therefore Are Not Subject to Mandatory Arbitration.

Under international law, the law of the Philippines, and the law of the United States, Plaintiffs were not "seafarers." Because the mandatory arbitration provision in the Standard Terms only apply to seafarers,[94] Plaintiffs are not required to arbitrate their claims. On this basis alone, the Court should deny Defendants' motion in its entirety.[95]

When Plaintiffs were not trapped in Defendants' bunkhouse or quarantine barges, they worked exclusively on non-mobile platforms and spars permanently moored to or built on the seabed of the Gulf of Mexico—not vessels that navigate or are even capable of navigation.[96]  As

---

[93] *Enigma Holdings, Inc. v. Gemplus Int'l S.A*., No. 3:05 CV 1168 B, 2006 WL 2859369, at *1 (N.D. Tex. Oct. 6, 2006).

[94] Standard Terms, Renewed MTCA, Ex. H, at 2-7, 9-14, 16-21, 23-28, 30-35, 37-42, 65-70, 58-63, 44-49, 51-56, Rec. Doc. 26-9. The definition of "seafarer" is in the initial Definition of Terms section of the Standard Terms (No. 14). The "Dispute Settlement Procedures" are set forth in Standard Terms Section 29.

[95] Plaintiffs, below, argue as threshold issues that Plaintiffs' FHA and TVPA claims fall outside the scope of the Standard Terms, and that Defendants did not meet their burden to show—for all but one contract period—Plaintiffs signed the documents Defendants contend create an agreement to arbitrate. *See* pp. 20-28, *infra*.  These arguments, however, only address the applicability of the alleged arbitration agreement to certain claims and certain time periods; they would *limit* the scope of arbitration but would not entirely preclude arbitration. On the other hand, the Court need look no further in this Opposition if it determines that Plaintiffs, as non-seafarers, are not covered by the purported arbitration agreement. Therefore, Plaintiffs here present this dispositive question first and before the scope and proof of formation arguments.

[96] Decls. at ¶ 15.

explained below, platforms and spars are not "ships" within the meaning of the POEA Rules,[97] and Plaintiffs therefore are not "seafarers" as defined in the POEA Rules[98] or the Standard Terms.[99]  As non-seafarers, Plaintiffs may opt to arbitrate, but they are not required to do so.[100] Plaintiffs have brought their disputes before this Court.  Therefore, they are not opting to arbitrate.

Each platform and spar where Plaintiffs contracted to work, and where they actually worked, was fixed to the ocean floor.[101]   However, the Standard Terms apply only to "seafarers."[102] The definition of *seafarer* has changed over time, but it has never applied to non-mobile platforms and spars.  When this Court considered the issue in *Baricuatro*, the POEA Rules defined *seafarer* as:

> any person who is employed or engaged in any capacity on board a seagoing ship navigating the foreign seas other than a government ship used for military or non-commercial purposes. The definition shall include fishermen, cruise ship personnel and those serving on foreign maritime mobile offshore and drilling units.[103]

---

[97] *See* 2016 Revised POEA Rules and Regs. Governing the Recruitment and Employment of Seafarers ("POEA Rules"), R. II(44), MTCA Opp. Ex. F, Rec. Doc. 26-7.

[98] *See Id.* R. II(42).

[99] *See* Standard Terms, Definition of Terms (No. 14).

[100] *See Baricuatro*, 927 F. Supp. 2d at 368.

[101] *See* Decls. at ¶¶ 13-15.

[102] As noted above, "the standard form contract for … workers [who are not seafarers] does not require arbitration…. To the contrary it appears to expressly permit workers to settle employment related disputes in the host country 'at the option of the complaining party'". *Baricuatro*, 927 F. Supp. 2d at 368.

[103] *Baricuatro*, 927 F. Supp. 2d at 367. For this reason, the definition of *ship* within this pre-2016 *seafarer* definition is not material.  Plaintiffs address the definition of *ship* as it applies to the post-2016 definition of *seafarer*, below, because navigability effectively is shifted from the *seafarer* definition to the *ship* definition.

This definition is expressly limited to "navigating" and "mobile" vessels. As structures permanently attached to the ocean floor, the spars and platforms do not navigate or move. As this Court noted in *Baricuatro*:

> [f]rom the POEA rules and the Administrator's letter, it appears that, similar to United States jurisprudence, Philippine law distinguishes between "mobile" drilling units and drilling platforms . . . . In the Fifth Circuit, certain 'spars' have been determined to be fixed such that they do not qualify as a vessel for purposes of the Jones Act.[104]

This definition was applicable at least until 2016, when the POEA Rules were revised.[105] Therefore, Plaintiffs' claims prior to the implementation of the 2016 POEA Rules clearly cannot be subject to arbitration.[106]

In 2016, the POEA Rules were revised. The definition of *seafarer* was changed to "any person who is employed or engaged or works in any capacity on board a ship,"[107] with *ship* defined as "a ship other than one which navigates exclusively in inland waters or waters within, or closely adjacent to, sheltered waters or areas where port regulations apply."[108]  Similarly, the Standard Terms filed here define a *seafarer* as "any person who is employed or engaged in

---

[104] *Baricuatro*, 927 F. Supp. 2d at 367, n.42 (citing *Mendez v. Anadarko Petroleum Corp.*, 466 Fed.Appx. 316, 317–19 (5th Cir.2012), cert. denied, 568 U.S. 1142 (2013); *Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 356–59 (5th Cir.1999), cert. denied, 528 U.S. 1155 (2000); *contrast BW Offshore USA, LLC v. TVT Offshore AS*, 145 F. Supp. 3d 658, 663 (E.D. La. 2015) (a "floating, production, storage, and offloading unit (FPSO)," which "can detached from the well and relocate under their own power within six hours" is a vessel; a spar, the relocation of which would "take nearly two months at a cost of $42 million and would require the construction of a new mooring system at the new site" is not a vessel).

[105] *See* 2016 POEA Rules, Renewed MTCA, Ex. 15, Rec. Doc. 27-16.

[106] The TVPA has a ten-year statute of limitations.  *See* 18 U.S.C. § 1595(c)(1). Therefore, Plaintiffs' putative "TVPA Class" consists of "All individuals who, at any *time between June 28, 2012 and the present*, (1) were employed at GI Shipyard and/or GIS; (2) lived at the bunkhouse and/or on the quarantine vessels; (3) were nationals of the Philippines; and (4) were B-1 visa holders." FAC at ¶ 122 (emphasis added). Plaintiffs Yuzon, San Pedro, Dinglasan, and Hernandez were employed at GIS before 2016, but within the TVPA statute of limitations period. *See*, Dates Chart, Ex. L.

[107] 2016 POEA Rules, R. II(42).

[108] *Id.* at R. II(44).

overseas employment in any capacity *on board a ship* other than a government ship used for military or non-commercial purposes."[109]

*Ship* is not defined in the Standard Terms.[110] However, it is defined in the 2016 POEA rules as " a ship other than one which navigates exclusively in inland waters or waters within, or closely adjacent to, sheltered waters or areas where port regulations apply."[111] This definition of *ship* directly matches the 2006 Maritime Labour Convention's ("MLC") definition.[112] The MLC, which the Philippines ratified in 2012,[113] has been determined to apply only to vessels *with navigation capability* (and pipe-laying barges).[114] Fixed site platforms and spars, such as where

---

[109] Standard Terms, Definition No. 14, Renewed MTCA, Ex. H at 2, Rec. Doc. No. 26-9 (emphasis added).

[110] The Standard Terms, if applicable, mandate duties for seafarers and for the "Principal/Employer/Company," which is defined as "any person, partnership or corporation hiring Filipino seafarers to work onboard ocean-going ships." Standard Terms, Definition 12. This again suggests that mobility is a component of whether a worker is a seafarer.

[111] POEA Rules, R. II(44).

[112] *See* MLC at Art. II(1)(i), International Labour Organization (2006), available at https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:0::NO::P12100_ILO_CODE:C186.

[113] *See* Ratifications of MLC, 2006 - Maritime Labour Convention, 2006, International Labour Organization (Aug. 20, 2013), available at https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:11300:0::NO:11300:P11300_INSTRUMENT_ID:312331:NO

[114] *See, e.g,* John Isaac Blanck Jr., *Reflections on the Negotiation of the Maritime Labor Convention 2006 at the International Labor Organization*, 31 Tul. Mar. L.J. 35, 43 (2006); Preparatory Technical Maritime Conference, Consolidated Maritime Labour Convention: Commentary to the Recommended Draft, ILO Doc PTMC/04/2 at 9 (September 13-24, 2004), available at https://www.ilo.org/public/english/standards/relm/maritime/pdf/cmlc-comment.pdf (noting disagreement as to whether *all* oil rigs and drilling platforms are excluded from MLC, or just oil rigs and platforms when they are not under navigation); *cf. Maritime Labour Convention and the Offshore Oil and Gas Industry*, Safety4Sea (Nov. 28, 2014), available at https://safety4sea.com/maritime-labour-convention-and-the-offshore-oil-and-gas-industry/ (noting that the UK Maritime & Coastguard Agency applies only to mobile offshore oil and gas industry infrastructure, and then only when not attached to the seabed); Moira McConnell, Dominick Devlin, Cleopatra Doumbia-Henry. *The Maritime Labour Convention, 2006 : A Legal Primer to an Emerging International Regime* (Brill | Nijhoff 2011) at 195-98, available at https://search.ebscohost.com/login.aspx?direct=true&AuthType=ip,shib&db=e000xna&AN=377260&site=ehost-live&scope=site (noting uncertainty regarding whether *mobile* offshore drilling

the Plaintiffs worked, are therefore excluded from the MLC definition of a *ship*. Likewise, it follows logically that they would be excluded from the POEA Rules' identical definition, as incorporated into the definition of *seafarer*.

Finally, the Western District of Louisiana's recent decision in *Calicdan v. MD Nigeria, LLC*[115] is not the panacea Defendants suggest. Factually, it is distinct.  There, the plaintiff worked on a seagoing vessel that was undergoing repairs while it was temporarily moored the defendants' dock and that, according to the defendants, would have set sail to Nigeria were it not for the COVID-19 pandemic and the decline in the oil and gas industry.[116] The court there determined that, because the Standard Terms contemplated continuing employment while a ship was at port, the plaintiff could not avoid arbitration while the vessel was moored.[117]  Because there was no dispute that the vessel was intended and designed to self-navigate—as opposed to platforms and spars, which do not have independent propulsion and are permanently fixed to the seabed—the question of whether it was a *ship* was entirely different from the case at bar. Further, Plaintiffs would note that (1) "'[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case[,]'"[118] and (2) the *Calicdan* order compelling arbitration has been

---

units are *ships* within the meaning of the MLC); United Nations Convention on the Law of the Sea, arts. 56 & 60(2), 1833 U.N.T.S. I-31363 (November 16, 1994), available at https://treaties.un.org/doc/publication/unts/volume%201833/volume-1833-a-31363-english.pdf (extraction structures anchored in position and not capable of self-propulsion are installations falling under national domestic law, rather than ships, because they become part of the land to which they are attached—fixtures for the duration.)

[115] *Calicdan*, 2022 WL 2165638.

[116] *Calicdan*, 2022 WL 2165638, at *4.

[117] *Id.* at *4-5.

[118] *CEH Energy, LLC v. Kean Miller LLP*, No. CV 17-8274, 2018 WL 782956, at *3 (E.D. La. Feb. 7, 2018) (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011))

appealed to the Fifth Circuit.[119]

In summary, the Plaintiffs, as welders and fitters on spars and platforms that were fixed to the ocean floor, were not seafarers.  Because they were not seafarers, they are not subject to the mandatory arbitration provisions of the Standard Terms.

### D.  Plaintiffs' Fair Housing Act and Trafficking Victims Protection Act Claims are Not "Arising Out of This Employment," and Therefore Would Not Be Subject to Forced Arbitration.

The Standard Terms document, which Defendants contend mandates arbitration in the Philippines, is limited to "claims and disputes arising from this employment."[120] Here, Plaintiffs' FHA and TVPA claims do not arise from their employment. Therefore, even if, *arguendo*, the Standard Terms constituted a binding agreement to arbitrate claims "arising from" Plaintiffs' employment, Plaintiffs' FHA and TVPA claims are not subject to forced arbitration.

Plaintiffs review these claims *seriatim*.

### 1.  The Fair Housing Act Claims

Plaintiffs' Fair Housing Act ("FHA") claims are separate and apart from their employment. The discrimination Plaintiffs suffered in their housing occurred entirely during time periods when they were not performing the work set forth in their alleged employment contracts. Therefore, Plaintiffs  avoid arbitration, at a minimum, on the FHA claims.

The  Fifth  Circuit's  decision  in  *Jones  v.  Halliburton*[121]  is  instructive.   In  *Jones*, Halliburton  and  other  related  entities  (referred  to  herein  and  in  the  Opinion  as "Halliburton/KBR") employed and housed Jamie Leigh Jones, a U.S. citizen, in the "Green Zone" in Baghdad, Iraq. Jones asked to be housed in an area shared with other women but was

---

[119] *Calicdan*, Rec. Doc. 58 (July 7, 2022) (Notice of Appeal).
[120] Standard Terms § 29, Rec. Doc. 26-9 at 4.
[121] 583 F.3d 228 (5th Cir. 2009)

instead placed in Halliburton/KBR's barracks "occupied predominantly by male employees."[122] While there, she was subjected to sexual harassment, which she reported, but for which Halliburton/KBR took no action.  One evening, she was drugged, beaten, and gang-raped in the barracks by Halliburton/KBR employees. Halliburton/KBR's response to the attack was, in summary, horrific, and compounded Jones's injuries. When Jones brought suit, Halliburton/KBR moved to compel arbitration of Jones's claims.

The question the district court, and subsequently the Fifth Circuit, addressed in *Jones v. Halliburton* was similar to that of the case at bar: whether Jones's claims were "related to" her employment, a requirement of the arbitration clause in her employment contract. Upholding the district court's denial of Halliburton/KBR's motion to compel arbitration, the Fifth Circuit did not equivocate, finding that the "[contract] provision's scope <u>certainly</u> stops at Jones' bedroom door."[123]

The Fifth Circuit also examined Halliburton/KBR's contention that a second, broader phrase in the contract ostensibly required arbitration of claims arising "in or about the workplace." Dismissing this argument, the Fifth Circuit noted that "the barracks were some distance from where Jones worked, and there was no indication Jones or anyone else performed any job duties in the barracks."[124] In Plaintiffs' case here, the distance from the workplace was even greater. They worked on platforms and spars far offshore in the Gulf of Mexico that often took hours to reach from the bunkhouse.[125]

Two subsequent Eleventh Circuit decisions, *Doe v. Princess Cruise Lines, Ltd.*[126] and

---

[122] *Id.* at 231.
[123] *Id.* at 239 (emphasis added).
[124] *Id.* at 241.
[125] Decls. at ¶ 17.
[126] 657 F.3d 1204 (11th Cir. 2011).

*Maglana v. Celebrity Cruises, Inc.*,[127] extended the Fifth Circuit's reasoning in *Jones* to cruise ship employees. In both, the Eleventh Circuit found the off-duty injuries, though they took place on the employer's cruise ship, did not arise out of the workers' employment.[128] Of particular importance here, the Eleventh Circuit in *Maglana* two weeks ago extended the thread starting with *Jones* to find workers from the Philippines, hired through the same POEA scheme as Plaintiffs in the case at bar, could not be compelled to arbitrate their claims under the Convention.

*Doe*, like *Jones*, also involved claims for civil damages arising from a rape of an employee, though on a cruise ship, rather than on land. Doe had signed a contract that used language broader than the clause in question here, requiring arbitration of disputes "relating to or in any way arising out of or connected with the Crew Agreement, these terms, or services performed for the Company."[129]  Relying heavily on *Jones*, the Eleventh Circuit found "arising out of" is broad language, but not all encompassing."[130] Rather, "the focus is on 'whether the tort or breach in question was an immediate, foreseeable result of the performance of contractual duties.'"[131] Because someone other than an employee could have brought the same claim if injured in the same way, the Eleventh Circuit concluded the intentional tort, invasion of privacy,

---

[127] -- F. App'x --, No. 20-14206, 2022 WL 3134373 (11th Cir. Aug. 5, 2022). The Eleventh Circuit designated *Maglana* as "not for publication." Though "not considered binding precedent" in the Eleventh Circuit, 11th Cir. R. 26-2, it is nevertheless persuasive.

[128] *Id.*

[129] *Doe,* 657 F.3d at 1218.

[130] The court notes that the employer could have compelled Doe to arbitrate all her claims if it had implemented a broader arbitration provision, such as "any and all disputes, claims, or controversies whatsoever." *Id.* at 1218. Rather, like in the instant case, the employer limited the scope of the agreement. "If the language about employment and services as an employee did not limit the scope of the arbitration provision, it would have no purpose, and that is an interpretative no-no." *Id.*

[131] *Id.* (quoting Telecom *Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001)).

and fraudulent misrepresentation claims were not subject to forced arbitration.[132]

In *Maglana*, the Eleventh Circuit extended this same reasoning to a case brought by two Filipino cruise ship workers, Ryan Maglana and Francis Bugayong, who were falsely imprisoned aboard the vessel during the initial shelter-in-place months of the COVID-19 pandemic.  There, the employer sought to force arbitration in the Philippines under the Convention, claiming the workers were bound to arbitration by the very same provisions Defendants seek to enforce in the case at bar.  Relying on *Doe*, the Eleventh Circuit reversed the district court's order compelling arbitration, finding:

> The cruise line's alleged treatment of Maglana and Bugayong—keeping them onboard for weeks under miserable conditions and "draconian rules"—was unconnected to the plaintiffs' duties as beverage handlers . . . . There were no passengers to serve, and the cruise line was not operating any cruises. Underscoring the distinction between arbitrable claims related to the employment agreements and the intentional tort claims is the relief plaintiffs sought. Whereas back wages and repatriation are available forms of relief under the employment agreements, the tort claims seek instead compensatory damages for Maglana and Bugayong's "mental anguish."[133]

Further, the court distinguished a previous unpublished decision, *Montero v. Carnival Corp.*,[134] affirming compelled arbitration of a claim arising out of a back injury the employee suffered *while working* that "were only available to seamen, so of course the claims were related to the plaintiff's employment as a seaman."[135]

Here, Plaintiffs' FHA claims are analogous to the claims that the Fifth Circuit in *Jones* and the Eleventh Circuit in *Doe* and *Maglana* determined did not arise out of the workers' employment.  Critically, Plaintiffs' alleged employment contracts were for employment on a

---

[132] *Id.* at 1219.
[133] *Maglana*, 2022 WL 3134373, at *5.
[134] 523 F. App'x 623, 627 (11th Cir. 2013).
[135] *Maglana*, 2022 WL 3134373, at *5.

specific platform or spar.[136]  Nowhere in the alleged contracts or the Standard Terms is there a mention of the *onshore housing* where Defendants' employees would live when they were *between the offshore* assignments.[137]   In *Jones*, the employee suffered egregious intentional torts at an employer-provided labor camp that was distant from the place of employment.  In the case at bar, the bunkhouse and quarantine tugs were hours of travel from the platforms and spars where Defendants contend Plaintiffs worked.[138]  In this housing, "Defendants *knowingly, willfully, maliciously, intentionally, and without justification* acted to deprive Plaintiffs and other B-1 workers of their rights under the Fair Housing Act"[139] by prohibiting them from leaving, even during Category 4 Hurricane Ida, and subjecting them to other discriminatory adverse rules at the bunkhouse and on the moored quarantine tugs.  The scope of the alleged arbitration agreements stops at housing door, [140] where Defendants' intentional discrimination took place in that housing.

*Maglana*, which follows *Jones* and *Doe*, is especially on point with respect to the Defendants' quarantine tugs, though it too extends to Plaintiffs' injuries while in the bunkhouse. Like the case at bar, the employer in *Maglana* confined the workers "under miserable conditions and draconian rules" during the COVID-19 pandemic.  In Maglana, the workers were beverage handlers, a line of work "unconnected" to their employer's prohibitions on their travel. As such, they were not required to submit to arbitration their claims related to their confinement.  Here, the Plaintiffs were welders and fitters, and the analysis is just the same--confinement to their quarters, especially when they were between assignments, is completely unconnected from their

---

[136] *See* Renewed MTCA, Ex. H, at 1, 8, 15, 22, 29, 36, 43, 50 57 & 64.
[137] *See generally, Id. in toto.*
[138] Decls. at ¶ 17.
[139] FAC at ¶ 169 (emphasis added).
[140] *Jones*, 583 F.3d at 239.

job duties.

Moreover, the cases Defendants rely on to suggest Plaintiffs' FHA claims must be arbitrated are not on point. All conclude, unremarkably, that FHA claims *generally* may be subject to forced arbitration.[141]  However, they do not address the specific question before the Court: whether an alleged agreement to arbitrate claims "arising from this employment" itself would subject housing discrimination claims to mandatory arbitration.  For the reasons set forth above, the alleged agreement does not extend to *these* FHA claims.

### 2. *The Trafficking Victims Protection Act Claims.*

Though Plaintiffs' Trafficking Victims Protection Act ("TVPA") claims at first glance may appear to be more closely tied to their employment, the crux of their TVPA claims is, like the FHA claims, Plaintiffs' confinement in the bunkhouse and on the quarantine tugs and the threats directed at the Plaintiffs and other workers if, and eventually when, they left the housing.

To be clear, when Plaintiffs were doing welding and fitting jobs for Defendants on platforms and spars, they were in the Gulf of Mexico.  While there, though they had myriad concerns about their wages and working conditions, they had no Diana Nyad-like ambition[142] to jump off the rigs and swim the long distance to shore. Offshore workers, whether U.S. citizens or nationals of the Philippines, have an expectation that, absent injury or illness, they will remain on the rigs for what is generally several weeks of grueling work (they also expect to be treated and paid as the law mandates). Where the expectation of isolation from the outside world ends—or

---

[141] Renewed MTCA at 3-4 & n.10 (citing *Doe v. Tonti Mgmt. Co.*, No. CV 20-2466, 2021 WL 5508874, at *16 (E.D. La. Mar. 1, 2021); *Turnipseed v. APMT, LLC*, No. CV 18-5187, 2018 WL 5977889, at *3 (E.D. La. Nov. 14, 2018); *Kothe v. AIMCO*, No. 06-2097-CM, 2007 WL 2725975, at *2 (D. Kan. Sept. 17, 2007)).

[142] Daniel Hajek, *From Cuba to Florida: Diana Nyad's Final Attempt at a Record-Breaking Swim*, NPR (May 31, 2015), available at https://www.npr.org/2015/05/31/410855681/from-cuba-to-florida-diana-nyads-final-attempt-at-a-record-breaking-swim.

should have ended—was after an offshore stint was done and the workers were helicoptered back to land.  At that point, the Plaintiffs and other Filipino B-1 workers should have been able to what any other offshore worker does during their onshore time: enjoy themselves, travel, look for future work opportunities elsewhere, and accept those opportunities.

Instead, as alleged in the FAC, Defendants implemented a scheme to, *inter alia*,

a.      force Plaintiffs and other B-1 workers to live at a bunkhouse they were not allowed to leave except for work or with a GIS driver, and where they were not allowed to have visitors;

b.      force Plaintiffs and other B-1 workers, when infected with COVID-19, to live in overcrowded, dangerous, and isolated conditions causing psychological deterioration and harm; and

c.      threaten B-1 workers with deportation, blacklisting, civil action, and criminal prosecution to prevent Plaintiffs and other B-1 workers from leaving their employment with Defendants;

d.      threaten civil and criminal action against individuals who Defendants believed helped some B-1 workers leave their employment with Defendants; [and]

e.      Prevent[ed] Plaintiffs and other B-1 workers from receiving 80 percent of their wages while they were employed at Defendants' operations, thereby preventing Plaintiffs and other B-1 workers form having the financial means to leave[.][143]

Each of these elements prevented Plaintiffs and other B-1 workers from leaving the bunkhouse and the horrendous conditions on the quarantine tugs (again, even during Hurricane Ida) while they were not working as seafarers "on a ship" performing *any* welding or fitting work set forth in the alleged contracts—or any work at all. The purpose of the confinement was to trap the Filipino B-1 workers and prevent them from leaving GIS, thus ensuring they would eventually return to the platforms and spars. The claim does not arise out of their alleged contractual employment, but rather their extended period of non-employment when they had no choice but

---

[143] FAC at ¶ 158.

to sit idly and miserably by.

This is a key distinction from *Baricuatro*, where this Court found the workers' TVPA claims did fall under the "arising out of" clause of the Standard Terms (as described below, the Court, for different reasons, did not compel most of the workers to arbitrate their claims). Importantly, the *Baricuatro* court noted that "[o]ne could argue that the false imprisonment claim is based on conduct outside the employment relationship, as it relates to alleged physical restraint in a bunkhouse after work hours. However, this claim is not asserted against the two defendants at issue here."[144]   In contrast, Plaintiffs here base their claim that Defendants "knowingly, willfully, maliciously, intentionally, and without justification" violated the TVPA,[145] based on the time when they were not working.   Therefore, Plaintiffs' TVPA claim is far closer to the situation in *Jones* and *Maglana*, where the intentional harm occurred when the employees were not working; in *Maglana* in particular because the employees, like the Plaintiffs here, were idled by lack of work.

### E. Defendants Have Not Provided Evidence that Plaintiffs Agreed to Arbitrate their Claims.

The only employment documents Defendants have produced that Defendants contend subject Plaintiffs to forced arbitration are the "Contracts of Employment" and Standard Terms covering a single three- or four-month period for each Plaintiff in 2020, 2021, or 2022.[146]   The vast majority of the time for which Plaintiffs seek damages, however, accrued before the dates on the employment documents.[147]  Even after Plaintiffs noted this deficiency in their First

---

[144] *Baricuatro*, 927 F. Supp. 2d at n.52.
[145] FAC at ¶ 162,
[146] *See* Dates Chart, Ex. L; *see also*, Renewed MTCA Ex. H, Rec. Doc. 26-9
[147] *Id.*

Amended Complaint as a basis for a declaratory judgment on arbitrability,[148] Defendants did not correct it when they filed their Renewed MTCA.   Defendants have not met their burden to show the existence of any written agreement for the remainder of the time Plaintiffs worked for GIS[149] and, because Defendants had ample time to gather the documents after Plaintiffs filed their FAC, they should be estopped from now presenting new documents in their Reply submissions.[150]

Plaintiffs' class claims under the Trafficking Victims Protection Act and for a declaratory judgment on arbitrability extend back to June 28, 2012,[151] their Fair Housing Act class claims to June 28, 2020,[152] and their Fair Labor Standards Act collective action claims to February 9, 2019.[153]   Therefore, even if Defendants could show Plaintiffs were bound by an arbitration agreement for a period of three or four months at the end of their employment (they cannot),[154] Defendants have not met their burden of proving the existence of an arbitration agreement for the many prior years of Plaintiffs' employment.

---

[148]  FAC at ¶¶ 96-98.
[149]  *See Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 444-45 (N.D. Tex. 2019); *cf. Dedon GmbH v. Janus et Cie*, No. 10 CIV. 04541 CM, 2010 WL 4227309, at *11-12 (S.D.N.Y. Oct. 19, 2010), aff'd, 411 F. App'x 361 (2d Cir. 2011) & 2011 WL 666174, at *4 (S.D.N.Y. Feb. 8, 2011) (discovery warranted where factual dispute exists as to formation of agreement to arbitrate under New York Convention).
[150]  *See Elwakin v. Target Media Partners Operating Co. LLC*, 901 F. Supp. 2d 730, 745-46 (E.D. La. 2012) (striking new evidence submitted with summary judgment reply where moving party was on notice of claim when initial motion was filed).
[151]  FAC ¶¶ 122 & 124.
[152]  FAC ¶ 123.
[153]  FAC ¶ 116.
[154]  As noted above, the MWOFA does not require arbitration of Plaintiffs' claims. The only provision that would conceivably mandate arbitration is Section 29 of the Standard Terms. The only signed Standard Terms document Defendants produced accompanied a single "Employment Contract" covering the last stint of Plaintiffs' employment at Defendants' operations.

Therefore, at a minimum, this court retains jurisdiction over Plaintiffs' class claims for the periods not covered by the employment documents Defendants produced.[155]

### F. The Prospective Waiver Doctrine and Strong Public Interest Factors Weigh Against Foreign Arbitration.

Because the Standard Terms (if they were deemed applicable to the case at bar) limit remedies to those found under the law of the Philippines—as opposed to United States statutory rights—any agreement to arbitrate would be void as a violation of public policy.

The Standard Terms provide that

[a]ny unresolved dispute, claim or grievance arising out of or in connection with this contract, including the annexes thereof, shall be governed by the laws of the Republic of the Philippines, international conventions, treaties, and covenants to which the Philippines is a signatory.[156]

This provision precludes enforcement of foreign law.[157]

It is well established that the prospective-waiver doctrine prohibits a purported agreement to arbitrate from waiving an aggrieved party's statutory rights and remedies.[158] Even if Plaintiffs were seafarers—which they were not—the Fifth Circuit has expressly distinguished between U.S. statutory claims and "general maritime law" in the context of seamen's claims.[159]  Notably, other courts have struck down foreign arbitration awards in employment cases where the foreign

---

[155] *See Jackson*, 389 F. Supp. 3d at 445; *Baricuatro*, 927 F. Supp. 2d at 360.

[156] Standard Terms, § 31.

[157] The Convention has no such mandate, and the Philippines is not a signatory to any treaty international convention, treaty, or covenant that would have it apply U.S. statutory law to domestic administrative proceedings.

[158] *See, e.g., Henry v. New Orleans Louisiana Saints L.L.C.,* No. CV 15-5971, 2016 WL 2901775, at *8 (E.D. La. May 18, 2016) (unlawful waiver of statutory rights "must be severed.") (citing *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 (5th Cir. 2003)).

[159] *See, e.g., Asignacion v. Rickmers Genoa Schiffahrts-gesellschaft mbH & Cie KG*, 783 F.3d 1010, 1021 (5th Cir. 2015) (noting that the Supreme Court "has not extended the prospective-waiver doctrine beyond statutory rights and remedies.") (citing *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013)).

arbiter refused to give force to U.S. statutory claims.[160]

In the instant case, Plaintiffs' claims are brought under U.S. statutory law.[161] As set forth in Dr. La Viña's declaration, the NLRC "does not and will not apply statutory law from outside the Philippines."[162] Plaintiffs' U.S. statutory rights would not just be weakened if they were required to bring these claims in front of the NLRC.  They would be eviscerated.

Notably, Dr. La Viña's conclusion is bolstered by the single (to Plaintiffs' knowledge) case retrospectively addressing the NLRC's willingness to apply U.S. statutory law. In *Aggarao*, a Filipino seafarer filed a motion in federal court seeking to vacate an NLRC arbiter's decision.[163]  The NLRC arbiter had refused to apply U.S. law even where the worker's own counsel submitted an affidavit showing the applicability of U.S. law to the claims, instead insisting only Philippine law could govern the proceedings.[164] The *Aggarao* court concluded that the arbiter's refusal to apply U.S. law violated public policy because it "transgressed this country's strong and longstanding policy of protecting injured seafarers and providing them special solicitude."[165]

The public policy concern with respect to the absence of U.S. statutory remedies is particularly pronounced in the instant case, where (1) the violations of fundamental remedial

---

[160] *See, e.g., Aggarao v. MOL Ship Mgmt. Co.*, No. CIV. CCB-09-3106, 2014 WL 3894079 (D. Md. Aug. 7, 2014). Plaintiffs recognize the procedural posture of *Aggarao* was different: it was in the award-enforcement phase, rather than the arbitration-enforcement stage. However, it would make no sense to force Plaintiffs to exhaust their NLRC remedies considering (1) Plaintiffs' lack of resources to arbitrate his case in the Philippines, Decls. ¶¶ 17-20; (2) the likelihood that NLRC proceedings would take upwards of ten years, not including the potentially decade-long process of executing an order, La Viña Decl. ¶ VII(C)(2); and (3) the foregone conclusion that the NLRC would not apply U.S. law. *Id.* ¶ VII(C)(7).

[161] *See, generally*, 1st Am. Compl. at ¶¶ 142-170.

[162] La Viña Decl.¶VII(C)(7).

[163] 2014 WL 3894079, *1

[164] *Id.* at *6 & n.12.

[165] *Id.* at *14.

employment statutes, including protections against forced labor, occurred on U.S. soil and in U.S. waters; (2) the Defendants appear to have committed fraud on the U.S. government when they misidentified, on the employment contracts provided to the U.S. Coast Guard and the Guarantee Letters, the platforms or spars where Plaintiffs would work and falsely stated GIS "shall make necessary arrangements to convey them onboard the vessel";[166] and (3) disallowing enforcement of U.S. laws when such fraud occurs would have the perverse effect of incentivizing the fraud.[167]

The public policy risk, therefore, impacts the foreign workers as well as U.S. workers and U.S. markets. It is axiomatic that foreign workers employed in the U.S., regardless of visa status, have the same protections under remedial employment statutes as U.S. workers for work performed.[168] The alternative, which courts have recognized as contrary to public policy: U.S. workers would be displaced if employers could run roughshod over U.S. employment laws by fraudulently hiring foreign workers and subjecting them to terms and conditions of employment that violate U.S. law.[169]   Further, U.S. markets would be impacted because law-abiding businesses would be forced to compete against businesses with unscrupulous—and less expensive—employment practices.[170]

---

[166]   Ortiguerra Decl. at ¶¶ 13-15, 22 & Ex. VO-1 (Ex A); Saturos Decl. at ¶¶ 13-15, 22 & Ex. WS-1 (Ex. F)

[167]   *cf.* Michael A Scodro, *Deterrence and Implied Limits on Arbitral Power*, 55 Duke L.J. 547, 591 (Dec. 2005) ("The deterrent effect of nonwaivable rights is of the utmost importance, not solely to the individual who may become the victim of misconduct, but also to third parties and to society generally.").

[168]   *See, e.g., David v. Signal Int'l, LLC,* 257 F.R.D. 114, 123 (E.D. La. 2009) (citing *Patel v. Quality Inn South*, 846 F.2d 700, 704 (11th Cir.1988)).

[169]   *Id.* (coverage of undocumented workers under minimum wage laws supported the IRCA policy of reducing illegal immigration because such laws offset the most 'attractive feature' of such workers—their willingness to work for less than the minimum wage.").

[170]   *Cf.* Brief *Amici Curiae* of Employers and Employer Organizations in Support of the NLRB, *Hoffman Plastic Compounds, Inc v NLRB*, No. 00-1595, *7-9 (filed Dec 10, 2001) (for 535 U.S

For these reasons, and particularly in light of the Defendants' apparent procurement of Plaintiffs' labor through fraud, public policy requires that Plaintiffs be permitted to pursue their claims in a forum that would be able to enforce our remedial employment statutes. The only such forum is this Court.

### G. NLRC Proceedings Would Strip Plaintiffs of Their Due Process Rights.

As described above, even if the NLRC could and would consider Plaintiff's U.S. statutory claims, endemic corruption, extraordinary delay, absence of access to counsel, and strong bias in favor of wealthy parties are so pervasive in Philippine legal proceedings—and particularly the NLRC arbitration process—that Plaintiffs' due process rights would be denied.[171] Similarly, the NLRC's inability to compel production of evidence and witnesses from outside the Philippines; the Plaintiffs' own  financial situation, which would prevent them from traveling to the Philippines and hiring an attorney; and the Plaintiffs' fear that they would face arrest or legal claims against them if they were to return to the Philippines would make adjudication of their claims in front of the NLRC impossible, even if the other due process concerns were not present.

Here, Plaintiffs should not be compelled to arbitrate their claims in the Philippines. A forum is adequate when "the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they may receive in an American court."[172] Because all the parties are in the United States, Plaintiffs would not be able to bring their arbitration in the Philippines, and the NLRC proceedings would deprive them of remedies and treat them unfairly, they should not be compelled to bring their claims there. Requiring all the

---

137) (available on Westlaw at 2001 WL 1631729) (demonstrating that outlaw businesses prefer to hire and exploit undocumented immigrants so as to obtain unfair competitive advantage over law-abiding employers).

[171] *See* La Viña Decl. at ¶¶ VII(C)(1)-(9) & n.61, *supra.*

[172] *Gonzalez v. Chrysler Corp.*, 301 F.3d 377, 379-80 (5th Cir. 2002).

parties to travel to and adjudicate this case in the Philippines would produce an absurd result. The only logical forum is where the parties and the evidence are located.

### H. The Purported Arbitration Provisions Used Complicated English Plaintiffs Do Not Understand; Therefore Plaintiffs Cannot Be Bound to Arbitrate their Claims.

The legal documents presented to native Tagalog-speaking workers in the Philippines were written in complicated English, and the workers were rushed to sign them.[173] To this day, even with the benefit of time to review them, Plaintiffs, who understand only very limited English, still do not understand the terms Defendants contend mandate arbitration.[174] Defendants' agents who presented the documents presumably were aware Plaintiffs, as only rudimentary English speakers, would not understand the particularly dense arbitration language, but nevertheless hurried the signing process. Plaintiffs therefore legitimately claim they were defrauded in the inducement to sign the documents.[175]

Defendants do not address this issue in their Renewed MTCA, though Plaintiffs had raised it in their FAC as a basis for a declaratory judgment on arbitrability.[176]  As this Court has noted, Plaintiffs' confusion about the terminology in the alleged contracts is warranted.[177] Further, as to the Standard Terms document, Plaintiffs have specifically stated in their

---

[173] Decls. at ¶¶ 2-3 & 9-12.

[174] *Id.*

[175] *See Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 538 (5th Cir. 2003).

[176] FAC at ¶¶ 99-102.

[177] *Baricuatro*, 927 F. Supp. 2d at 360 ("No straightforward reading of this clause would yield an understanding, even to a proficient reader of English, that the parties were thereby incorporating another body of terms…") & 364 ("Even if both parties to the contracts were sophisticated in business and proficient in reading English, there is simply nothing in the plain language of the contracts that discloses an intent to arbitrate or to incorporate such terms from outside the four corners of the contract. The fact that the plaintiffs are workers who are not proficient in English only reinforces this finding.")

declarations that they were not aware of the purported arbitration clause.[178]  Therefore, Plaintiffs

should not be bound by their terms.[179]

## IV.   CONCLUSION

For the reasons set forth herein, Plaintiffs respectfully request that the Court deny

Defendants' Renewed MTCA.

Respectfully submitted this day: August 23, 2022,


    /s/ Daniel Werner
**Daniel Werner (GA Bar #422070)**
**Radford & Keebaugh, LLC**
315 W. Ponce de Leon Ave., Suite 1080.
Decatur, GA 30030
P: 678-271-0300
F: 678-271-0304
E: dan@decaturlegal.com
*(admitted pro hac vice)*


    /s/ Kenneth C. Bordes
**Kenneth C. Bordes (Bar #35668)**
**Kenneth C. Bordes,**
**Attorney at Law, LLC**
4224 Canal St.
New Orleans, LA 70119
P: 504-588-2700
F: 504-708-1717
E: kcb@kennethbordes.com

***Attorneys for Plaintiffs***

---

[178] Decls. at ¶¶ 9-12.
[179] *Contra Baricuatro*, 927 F. Supp. 2d at 369 (plaintiffs who had signed Standard Terms did not state they "were ignorant of the arbitration clause…  Indeed, the declarations of these two plaintiffs do not mention the Seafarer Standard Terms or the arbitration clause in any way.").

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF electronic filing system, which will send notification of such filing to all counsel of record.

/s/ Daniel Werner