# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**VICTOR CAGARA ORTIGUERRA, DONATO MANALILI AGUSTIN, AMADO TRANATE YUZON, CHRISTOPHER ESCALANTE RAYOS, ARVIN BANZON SAN PEDRO, WILFREDO BATONG SATUROS, ROSEL NUFABLE HERNANDEZ, SIEGFRIED TAPIA CARLOS, RENATO ARBOLIDA DECENA, and ISAIAS SANTIAGO DIGLASAN**

**VERSUS**

**GRAND ISLE SHIPYARD, LLC and GIS, LLC**

**CIVIL ACTION NO. 22-cv-00309**

**SECTION "J"**
**JUDGE CARL J. BARBIER**

**MAG. DIV. (4)**
**MAGISTRATE JUDGE KAREN WELLS ROBY**

---

## REPLY MEMORANDUM IN SUPPORT OF RENEWED RULE 12(b)(3) MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT AND COMPEL ARBITRATION

Defendants, Grand Isle Shipyard, LLC[1] and GIS, LLC ("GIS" or "Defendants"), respectfully submit this Reply Memorandum in Support of Their Renewed Motion to Dismiss the First Amended Class Action Complaint filed by Plaintiffs[2] and to Compel Arbitration pursuant to Fed. R. Civ. P. 12(b)(3).

## I.    INTRODUCTION

In their Opposition, Plaintiffs admit signing the POEA-approved Seafarer contracts of employment as well as the Standard Terms and Conditions, which includes a mandatory arbitration clause. Under the established law of this Circuit and the Convention on the Recognition and

---

[1] GIS, LLC owns Grand Isle Shipyard, LLC. Grand Isle Shipyard, LLC is the actual employer of the Plaintiffs in this matter.

[2] Victor Cagara Ortiguerra, Donato Manalili Agustin, Amado Tranate Yuzon, Christopher Escalante Rayos, Arvin Banzon San Pedro, Wilfredo Batong Saturos, Rosel Nufable Hernandez, Siegfried Tapia Carlos, Renato Arbolida Decena, and Isaias Santiago Dinglasan (collectively "Plaintiffs").

Enforcement of Foreign Arbitral Awards (the "Convention"), this is all that is required to compel Plaintiffs to submit their claims to mandatory arbitration in the Philippines.

In an attempt to avoid the obligations to which they voluntarily submitted, Plaintiffs contend they were "rushed" into signing employment contracts in a foreign language they did not understand. Like their myriad other factual assertions supported by nothing more than Plaintiffs' own dubious and unverified allegations, Plaintiffs fail to mention that, prior to their departure from the Philippines, they attended not one, but *two* trainings offered in Filipino (Tagalog), during which the terms and conditions of their employment contracts were explained to them, including the POEA-approved Seafarer contracts' **mandatory** arbitration provisions.[3]

Indeed, after their second orientation session, Plaintiffs each signed a document before two witnesses verifying that the terms and conditions of their employment contract had been explained to them in a language they understood.[4] In this same document, Plaintiffs all confirmed their understanding that, pursuant to their employment contracts, they could be transferred to any ship *or platform* owned or operated, manned or managed by GIS during their employment with GIS.[5] Not only did each Plaintiff attest specifically to the fact that they had all the terms of their employment contracts explained to them in a language they understood, each Plaintiffs' English language proficiency was also tested and verified prior to their departure for overseas employment with GIS.[6]

Next, Plaintiffs argue that, because they allegedly worked on fixed platforms, they should not be considered "Seafarers" under Filipino law or for purposes of the POEA.[7] But whether Filipino law

---

[3] Declaration of Ulyses G. Bautista attached hereto as **Exhibit J** (Bautista Decl.), at ¶¶ 4–6.

[4] **Exhibit J** (Bautista Decl.), at ¶ 7; *see also* Plaintiffs' Executed Acknowledgment Forms, attached as **Exhibit C** (Plaintiffs' Attestations) to **Exhibit J** (Bautista Decl.) ("**Exhibit J-C**")..

[5] **Exhibit J** (Bautista Decl.), at ¶ 7; **Exhibit J-C** (Plaintiffs' Attestations).

[6] **Exhibit J** (Bautista Decl.), at ¶ 8.

[7] Plaintiffs liken their status as "seafarers" to an analysis of whether they are akin to Jones Act Seaman or Longshoremen under the Longshore and Harbor Workers Compensation Act ("LHWCA"). But this analogy is misplaced, as "it is clear that a Jones Act seaman and a longshore worker under the LHWCA are [both] seafarers." *Trinh ex rel. Tran v. Dufrene Boats, Inc.*, 6 So. 3d 830, 840 (La. App. 1 Cir. 2009); *see also In re Oil Spill by the Oil*

2

allows for overseas workers performing work on a fixed platform to be considered "seafarers" under the POEA is not outcome determinative of GIS' Motion to Compel, particularly in light of Plaintiffs' *all* having agreed that the seafarer contracts they voluntarily executed allowed GIS to assign them to any ship *or platform* owned operated, manned or managed by GIS during the duration of their contracts.[8]  Plaintiffs agreed to work under the terms and conditions of these contracts.  That includes an agreement to arbitrate their claims against GIS.

Moreover, contrary to Plaintiffs' claims, Plaintiffs are Seafarers as the POEA contemplates the term in light of their work on offshore oil platforms.  The 2016 Revised POEA Rules and Regulations Governing the Recruitment and Employment of Seafarers (the "2016 Revised POEA Rules") **specifically** provide for the deployment of Seafarers to "installations located offshore or on high seas."   Further, POEA Memorandum Circular No. 163 defines "Seafarer" to include "Offshore Workers," which includes personnel deployed in oil rigs or production platforms, as Plaintiffs contend they were.  Thus, even assuming Plaintiffs' performed work on fixed platforms, they would nevertheless be considered "Seafarers" under the POEA.

Plaintiffs next attempt to convince the Court through their purported expert that the arbitration provisions promulgated under the POEA framework are somehow not mandatory but are instead voluntary and at the Plaintiffs' option.   Since this expert "opinion" completely contradicts the established law of this Circuit, it is properly disregarded pursuant TO FED. R. CIV. P. 44.1.[9]  It also bears mention that Plaintiffs' expert Declaration in this case is simply recycled from the recent case of *Calicdan v. M D Nigeria, LLC*, where that court rightfully discounted Dr.

---

*Rig Deepwater Horizon*, 808 F. Supp. 2d 943, 955 (E.D. La. 2011) (stating that "seafarers . . . generally speaking [include] seaman and longshoremen") (Barbier, J.).
    [8] **Exhibit J** (Bautista Decl.), at ¶ 7.
    [9] *United States v. One Afghan Urial Ovis Orientalis Blanfordi Fully Mounted Sheep*, 964 F.2d 474, 477 (5th Cir. 1992) ("Federal courts are competent to make determinations of foreign law.").

La Viña's opinions and compelled the plaintiff in that case to submit his claims to mandatory arbitration in the Philippians.[10]

Finally, although they admit these claims appear to arise out of their employment with GIS, Plaintiffs argue that, even if their FLSA claims are submitted to arbitration, their Fair Housing Act ("FHA") and Victims of Trafficking and Violence Protection Act ("TVPA") claims should nevertheless remain pending before this Court.  In support of their position, Plaintiffs rely on a single Fifth Circuit case in which the court concluded that the plaintiff's intentional tort claims arising out of an alleged gang rape did not arise out of the plaintiff's employment with the defendant and, therefore, were not subject to the parties' agreement to arbitrate.  Here, Plaintiffs' FHA and TVPA claims stem from their claimed dissatisfaction with the alleged conditions of their employer-provided housing and from Defendants' allegedly subjecting them to forced labor— claims that plainly arise out of their employment with GIS.

Tacitly acknowledging the obvious weakness of their position, Plaintiffs resort to accusing GIS of committing "fraud on the U.S. Government," and go so far as to insinuate that GIS will somehow have Plaintiffs arrested should they return to the Philippines to arbitrate their claims. These outrageous accusations, made without any evidence whatsoever, should not sway the Court into breaking with established Fifth Circuit and U.S. Supreme Court precedent. Plaintiffs' claims should be submitted to arbitration, as Plaintiffs each agreed they would be when they accepted their positions of employment with GIS.

---

[10] *See* Judgment, *Calicdan v. M D Nigeria, LLC*, No. 21-3283, 2022 WL 2162645 (W.D. La. June 15, 2022); Report and Recommendation, *Calicdan v. M D Nigeria, LLC*, No. 21-3283, 2022 WL 2165638 (W.D. La. May, 17, 2022).  In Dr. La Viña's Declaration, he acknowledges his Declaration was originally drafted for use in *Calicdan*.

4

For the reasons discussed herein and in GIS' principle Memorandum, GIS respectfully submits that this Court should grant Defendants' Motion, dismiss this action, and order Plaintiffs to submit their claims to an arbitration tribunal in the Philippines.

## II.      LAW AND ARGUMENT

### A.  The POEA-Approved Employment Contracts Mandate Arbitration

While not going so far as to argue that they never executed any contracts other than those attached to Defendants' original motion, Plaintiffs suggest that Defendants should be estopped from providing the Court with Plaintiffs' previously entered-into contracts of employment now that they have put them at issue in their Opposition briefing. But Plaintiffs having raised the argument that they should not be compelled to arbitrate claims related to their prior employment with GIS simply because GIS did not attach every iteration of their *identical* employment contracts, GIS must be permitted to respond in kind.  Accordingly, Defendants now attach each of Plaintiffs' prior contracts of employment with GIS, all of which contain the same mandatory arbitration clause placed at issue in Defendants' opening memorandum.[11]  Other than to demand proof of the prior contracts they also voluntarily entered into, Plaintiffs now acknowledge that they signed the POEA-approved contracts of employment as well as the Standard Terms and Conditions that contain a mandatory arbitration clause.[12]  Thus, Plaintiffs' claims should be submitted to arbitration pursuant to their agreement.

The U.S. Supreme Court has consistently emphasized that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," and "any doubts

---

[11] *See* Plaintiffs' Prior Employment Contracts, attached as **Exhibit E** to **Exhibit J** (Bautista Decl.), at ¶ 9 ("**Exhibit J-E**").
[12] *See* Plaintiffs' Opposition at 7; *see also* **Exhibit J-E** (Plaintiffs' Prior Employment Contracts).

concerning the scope of arbitrable issues should be resolved in favor of arbitration."[13]  This federal policy favoring arbitration "applies with special force in the field of international commerce."[14]

Consistent with this policy favoring arbitration, under the Fifth Circuit's limited inquiry test, district courts in this Circuit **must** compel arbitration if: (1) there is an agreement in writing to arbitrate the dispute, (2) the agreement provides for arbitration in the territory of a Convention signatory, (3) the agreement arises out of a commercial legal relationship, and (4) a party to the agreement is not an American citizen.[15]  Plaintiffs have admitted to executing the written agreements specifically incorporating the provisions of POEA Memorandum Circular No. 10, which provides for mandatory arbitration in the Philippines.[16]  It is uncontested that the agreement arose out of a commercial legal relationship and that Plaintiffs are all citizens of the Philippines. Thus, Plaintiffs' claims are subject to the mandatory arbitration clause to which they agreed to be bound.[17]

Despite this straight-forward application of Fifth Circuit precedent, Plaintiffs now argue that the mandatory arbitration they agreed to should not be enforced because, allegedly, they: (1) knew little English when they signed their employment contracts, (2) were rushed into signing them, and (3) did not have time to review the documents before signing them.[18]  In reality, Plaintiffs went through *two* extensive orientations in the Philippines prior to their departure and each Plaintiff signed an acknowledgment, before two witnesses, attesting to the fact that they had the terms of their employment contracts explained to them in a language they understood.[19]  And

---

[13] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25 (1983).

[14] *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.,* 473 U.S. 614, 631 (1985).

[15] *Francisco v. STOLT ACHIEVEMENT* MT, 293 F.3d 270, 273 (5th Cir. 2002).

[16] *See Bautista v. Star Cruises,* 396 F.3d 1289, 1300 (11th Cir. 2005) (where plaintiffs confirmed veracity of their signatures on POEA contract, jurisdictional prerequisite is met for arbitration).  Indeed, the standard POEA-approved contracts of employment in the instant matter are essentially identical to those in *Calicdan,* in which the U.S. District Court for the Western District of Louisiana compelled arbitration in the Philippines.

[17] *See* R. Doc. 19, at 2 ¶ 1.

[18] *See* Plaintiffs' Opposition at 7.

[19] **Exhibit J** (Bautista Decl.), at ¶¶ 4–7.

what makes Plaintiffs' baseless allegations even more astounding is that each Plaintiffs' English proficiency was tested and verified prior to their arrival in the United States.[20] Like their unmoored allegations of fraud and corruption, Plaintiffs' assertions are legally and factually baseless.

Plaintiffs' assertions that they did not understand the contracts they were signing also have absolutely no bearing on the enforcement of the mandatory arbitration provisions they agreed to, since "[s]uch facts do not constitute fraud or misrepresentation.  Rather, these facts, disputed though they may [be], are issues akin to affirmative defenses for the arbitrator's consideration . . . Plaintiff[s] cannot overcome compelled arbitration on these grounds."[21]  Indeed, rejecting a near-identical argument, the Court in *Calicdan* relied on the Eleventh Circuit's ruling in *Bautista v. Star Cruises*,[22] which also dealt with a party's attempt to evade arbitration in the Philippines.

In compelling arbitration, the *Bautista* Court aptly held that "[i]n the limited jurisdictional inquiry prescribed by the Convention Act, we find it especially appropriate to abide by the general principle that '[one] who has executed a written contract and is ignorant of its contents cannot set up that ignorance to avoid the obligation absent fraud and misrepresentation.'"[23]  This principal should apply with equal force in this case, in which Plaintiffs **do not dispute** the fact that the employment contracts they admit to signing contain a valid arbitration clause.  Plaintiffs' *ex post facto* argument that the arbitration agreement, while valid, should not apply to them based on their feigned ignorance should be rejected out of hand.

### B.  Arbitration of Claims in the Philippines is Mandatory.

Through the Declaration of their retained Philippine legal expert, Dr. Antonio La Viña, Plaintiffs appear to suggest that arbitration of their claims under the POEA-approved contracts

---

[20] **Exhibit J** (Bautista Decl.), at ¶ 8.

[21] *Calicdan v. M D Nigeria, LLC*, No. 21-3283, 2022 WL 2165638 at ¶ 9 (W.D. La. May, 17, 2022).

[22] 396 F.3d 1289 (11th Cir. 2005).

[23] *Bautista v. Star Cruises*, 396 F.3d 1289, 1301 (11th Cir. 2005).

of employment is not mandatory, but is instead, voluntary and at the Plaintiffs' option.  Plaintiffs are wrong.

As an initial point, in matters determining foreign law, FED. R. CIV. P. 44.1 provides that the Court "*may*" consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  However, the Court is also free to disregard such material, particularly where, as here, the testimony at issue directly contradicts established and settled legal findings of a U.S. Court.[24]

In this instance, as previously detailed in GIS's Principal Memorandum, courts within the Fifth Circuit have resoundingly held that, where POEA contracts incorporate the terms of Section 29 of Memorandum Circular 10, as is the case with Plaintiffs, arbitration in the Philippines is *mandatory*.[25]  Other jurisdictions are in accord.[26]  Plaintiffs seek to avoid the mandatory arbitration provisions of their contracts, while simultaneously attempting to enforce other, select provisions of the very same contract.  This position is both untenable and plainly inconsistent with the established law of this Circuit.

---

[24] *United States v. One Afghan Urial Ovis Orientalis Blanfordi Fully Mounted Sheep*, 964 F.2d 474, 477 (5th Cir. 1992) ("Federal courts are competent to make determinations of foreign law.").

[25] *See Lim v. Offshore Specialty Fabricators, Inc.*, 404 F.3d 898, 908 (5th Cir. 2005) ("The National Labor Relations Commission," a Filipino entity unrelated to the U.S. National Labor Relations Board, has "'original and exclusive jurisdiction to hear and decide . . . the claims arising out of an employer-employee relationship or by virtue of *any law* or contract involving Filipino workers for overseas deployment including claims for actual, moral, exemplary and other forms of damages." (quoting the Migrant Workers and Overseas Filipino Act of 1995, Republic Act 8042, § 10 (2004) (Phil.)); *Llagas v. Sealift Holdings, Inc.*, No. 17-472, 2018 WL 5305366, at *5–7 (W.D. La. July 27, 2018) (plaintiff bound to arbitrate his claims where POEA contract incorporated Memorandum Circular No. 10); *Calicdan v. MD Nigeria LLC*, No. 21-3283, 2022 WL 2165638, at *11 (W.D. La. May 17, 2022) ("Accordingly, the Court finds Plaintiff must proceed to arbitration as required by the contracts mandated by his home country.").

[26] *See Lucina v. Carnival PLC*, No. 17-6849, 2019 WL 1317471, at *8 (E.D.N.Y. March 22, 2019) ("Because Plaintiffs have failed to establish that the arbitration clause in POEA Memorandum Circular No. 10 was 'null and void' under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Article II, the Court concludes that the clause is enforceable against Plaintiffs."); *Navarette v. Silversea Cruises Ltd.*, No. 14-20593, 2014 WL 11444105, at *2–3 (S.D. Fla. June 24, 2014) (claims properly arbitrated pursuant where POEA contract incorporated Section 29 of Memorandum Circular No. 10).

### C.  Plaintiffs are Seafarers for Purposes of the Mandatory Arbitration Provisions

Next, although they admit to having signed employment contracts related to their employment as seafarers that contain a mandatory arbitration clause, Plaintiffs contend they should not be bound by their contacts' mandatory arbitration provision (all while enforcing others) because, according to Plaintiffs, they were not seafarers by virtue of their alleged work on offshore platforms.  Plaintiffs make this claim despite having acknowledged that the terms of their employment contracts allowed them to be deployed to *either* a vessel *or* an offshore platform.[27]  Like Plaintiffs' other unsustainable assertions, Plaintiffs' arguments regarding the location of their employment should not be countenanced by this Court.

As an initial matter, a determination of Plaintiffs' status as "seafarers" is a factual dispute that lacks any bearing on this Court's "limited inquiry"[28] into whether the arbitration agreements Plaintiffs voluntarily executed are valid and enforceable.  For example, in *Baricuatro*, a section of this Court noted that, although it was "unclear" whether two plaintiffs, both of whom worked on fixed offshore platforms, could be considered "Seafarers" under the POEA,[29] because these plaintiffs, unlike their co-plaintiffs, signed the very same Seafarer Standard Terms at issue herein, their claims were nevertheless subject to mandatory arbitration.[30] As the *Baricuatro* Court explained, because the defendant,

---

[27] **Exhibit J** (Bautista Decl.), at ¶ 7; *see also* Plaintiffs' Executed Acknowledgment Forms, attached as **Exhibit C** to **Exhibit J** (Bautista Decl.) ("**Exhibit J-C**").

[28] *Francisco v. STOLT ACHIEVEMENT* MT, 293 F.3d 270, 273 (5th Cir. 2002).

[29] *Baricuatro v. Indus. Personnel and Mgmt. Servs., Inc.*, 927 F. Supp. 2d 348, 367 & n.42 (E.D. La. 2013) ("Even as to Ranel Lamoste and Eduardo Real (the two plaintiffs who signed the Seafarer Standard Terms), who have submitted declarations attesting that they have worked offshore on various spars and platforms during their tenure with for the defendants, it is not clear from the record that they qualify as 'seafarers' under the POEA rules."). Notably, of the nineteen plaintiffs, only Lamoste and Real signed the Seafarer Standard Terms.  The other seventeen signed employment contracts that did not contain an arbitration clause and likewise did not reference the Seafarer Standard Terms.  In this case, all Plaintiffs signed an employment contract as well as the Standard Terms and Conditions Governing the Overseas Employment of Filipino Seafarers On-Board Ocean-Going Ships at issue in *Baricuartro*.  *See* Plaintiffs' Employment Contracts attached to Exhibit "H" to GIS' Original Motion, R. Doc. 26-9.  *See also* **Exhibit J-E** (Plaintiffs' Prior Employment Contracts).

[30] *See Baricuatro*, 927 F. Supp. 2d at 372 (granting motion to compel as to the plaintiffs who signed the Seafarer Standard Terms).

PD.39491146.1

> presented evidence of an agreement in writing to arbitrate that
> would encompass at least certain of the claims asserted against
> [them] in this litigation, . . . [u]nless such agreements are shown
> to be null and void, the Convention requires that they be enforced.
> . . . Having determined that Lamoste's and Real's claims against
> the movants fall within the arbitration clause and are subject to the
> arbitration, the Court will enter a stay that shall apply only to those
> [plaintiffs'] particular claims.[31]

Thus, notwithstanding the fact that these two plaintiffs performed work on offshore platforms and the defendant failed to offer any evidence as to whether such a distinction would preclude the two workers from being "seafarers" under the POEA, because the plaintiffs signed employment contracts containing an arbitration clause, the court granted the defendants' motion to compel arbitration as to those two plaintiffs. As in and *Baricuatro*, Plaintiffs in this case all signed contracts of employment to work as seafarers that included an arbitration clause, and they should be bound to the rules clearly calling for arbitration of their claims in the Philippines.

Not only does Plaintiffs' position regarding their status as seafarers lack any significance to the issue at bar, as the court in *Baricuatro* concluded, Plaintiffs are also mistaken as to whether the work they performed for GIS was that of a seafarer. In the standardized POEA-approved contracts of employment, Plaintiffs' names are on the line marked "Name of Seafarer," and it bears their signatures, that of the manning agent for GIS, DNR Offshore and Crewing Services, Inc. ("DNR"), as well as the signature of the POEA official approving the contract.[32] Plaintiffs also acknowlededge in the Declarations attached to their Opposition that they attended an orientation DNR provided *to seafarers* prior to their departure from the Philippines to the United States. This is consistent with POEA Memorandum Circular No. 3, which requires all seafarers to attend a Pre-Departure Orientation Seminar within two weeks prior to their departure, during which they must discuss the

---

[31] *Id.* at 369.
[32] *See* Exhibit "H" (Plaintiffs' Contracts of Employment and Standard Terms and Conditions) **[Redacted]**.

Standard Terms.[33]  That's exactly what happened in this case.[34]  And after having attended both a mandatory and second orientation offered by DNR, Plaintiffs' signed an acknowledgment noting that the terms of their employment contracts contemplated work on either a vessel or a platform.[35]

In addition to the fact that Plaintiffs agreed to work on either a vessel *or a platform* in connection with their employment with GIS as seafarers, any work performed on a fixed platform *is* considered the work of a seafarer under Filipino law.  Who counts as a Seafarer must be construed in accordance with the POEA Rules as a whole.  Under Section 114 of the 2016 Revised POEA Rules (Deployment of Seafarer), the POEA "shall allow the deployment of seafarers **only** to the following: ships navigating the foreign seas, **or installations located offshore or on high-seas**, whose owners/employers are compliant with international laws and standards that protect the rights of seafarers."[36]  Further, POEA Memorandum Circular No. 163 defines "Seafarer" as inclusive of "Offshore Workers," including personnel deployed in oil rigs or production platforms.[37]  Thus, whether an employee is stationed on an offshore vessel or fixed platform is immaterial to a determination of their status as a seafarer under the POEA.[38]

Finally, Plaintiffs' recycled attempt to avoid the terms of their valid arbitration agreement by arguing they are not "seafarers" has already been squarely rejected by the Western District in *Calicdan*.  In *Calicdan*, the plaintiff (while represented by the same counsel as Plaintiffs in the instant case) unsuccessfully made a similar argument that he should not be treated as a seafarer for

---

[33] See Exhibit "G" (POEA Memorandum Circular No. 3, Series of 1983).

[34] *See* **Exhibit J** (Bautista Decl.), at ¶¶ 4–6; *see also* Plaintiffs' Certificates of Attendance, attached as **Exhibit A** to **Exhibit J** (Bautista Decl.) ("**Exhibit J-A**"); PDOS Syllabus, attached as **Exhibit B** to **Exhibit J** (Bautista Decl.) ("**Exhibit J-B**").

[35] **Exhibit J** (Bautista Decl.), at ¶ 7; *see also* Plaintiffs' Executed Acknowledgment Forms, attached as **Exhibit C** to **Exhibit J** (Bautista Decl.) ("**Exhibit J-C**").

[36] See Exhibit "F" (2016 Revised POEA Rules and Regulations Governing the Recruitment and Employment of Seafarers, https://www.dmw.gov.ph/archives/laws&rules/laws&rules.html.

[37] https://marina.gov.ph/wp-content/uploads/2018/07/mc163.pdf (POEA  Memorandum Circular No. 163).

[38] Declaration of Saben Loyola, attached hereto as **Exhibit K** (Loyola Decl.), at ¶ 10.

purposes of mandatory arbitration in the Philippines, even though he had signed the same type of standardized POEA contract of employment for seafarers as the Plaintiffs in this case.  In enforcing the mandatory arbitration provision, the District Court relied, in part, on an estoppel theory:

> Plaintiff should not be permitted to escape his obligations under his employment contracts while also seeking to enforce his employer's obligations . . . He signed on to work as a seafarer and was therefore bound by the rules governing seafarers. [39]

As in that case, the same principle applies to this one.  Plaintiffs here attempt to enforce Defendants' obligations under the contracts, while simelteneously seeking to wholly avoid their own.  But both parties are entitled to the benefit of their bargain.

### D. Plaintiffs' FHA and TVPA claims Arise out of Plaintiffs' Employment and are Subject to Mandatory Arbitration.

Plaintiffs next argue that their FHA and TVPA claims do not arise out of their employment with Defendants.  But *none* of the cases to which Plaintiffs point in support of their position actually considered whether an FHA and/or TVPA claim is subject to mandatory arbitration.   Instead, two of the three the cases Plaintiffs cite—*Jones* and *Doe*—considered whether the plaintiff's assault and battery claim predicated on an alleged rape arose out of the victim's employment, while the other case, *Maglana*, considered whether the plaintiffs' false imprisonment claims based on conduct that allegedly took place *after* their employment with the defendant ended arose out of their employment.

Comparatively, in this case, Plaintiffs' FHA and TVPA claims concern their discontent with the alleged conditions of their employer-provided housing—housing that would not be available to them in the absence of their employment relationship with Defendants and to which Plaintiffs voluntarily returned year after year through their employment with GIS.[40]  Most tellingly, Plaintiffs'

---

[39] *Calicdan v. M D Nigeria, LLC*, No. 21-3283, 2022 WL 2165638 at ¶ 6 (W.D. La. May, 17, 2022).
[40] *See* **Exhibit J-E** (Plaintiffs' Prior Employment Contracts).

FHA and TVPA claims track their Title VII claims against Defendants, which are currently pending before the Equal *Employment* Opportunity Commission (the "EEOC"), an entity responsible for enforcing employment laws.[41]  Because Plaintiffs' FHA and TVPA claims plainly arise out of their employment with GIS, they are also subject to mandatory arbitration.

### a.  Plaintiffs' FHA Claims Are Subject to Arbitration

In support of their argument that their FHA claims somehow *do not* arise out of their employment with GIS, Plaintiffs rely primarily on the Fifth Circuit's holding in *Jones v. Halliburton Co.*[42] But the Fifth Circuit's analysis in *Jones* is entirely distinguishable from the case at bar.  In *Jones*, a case that does not deal with any claims arising under the FHA, the plaintiff alleged she had been drugged, beaten, and violently gang raped by several of her male co-workers while working overseas in Iraq.  The Fifth Circuit reasoned that the plaintiff's claims based on her alleged rape did not relate to her employment and were, therefore, not subject to mandatory arbitration after analyzing various cases involving "employees' claims premised on sexual assault."[43]  As the Court explained, "in most circumstances, a sexual assault is independent of an employment relationship."[44] The Court

---

[41] *See* EEOC Charges filed by Plaintiffs, attached hereto as **Exhibit L** (EEOC Charges).  *Compare, e.g.*, R. Doc. 19, at 2 ¶ 2 (alleging that they were confined to the bunk house except for trips to Walmart and claiming Defendant would threaten to deport Filipino employees who attempted to leave the bunkhouse), *with* **Exhibit L** (EEOC Charges), at 1 ¶ 1 (same).  The EEOC has not issued a determination on these claims and, tellingly, Plaintiffs have not requested one despite having filed their Charges in October and November of 2021 through the same counsel representing them in the instant litigation. Defendants adamately dispute Plaintiffs' allegations, both in this Court and before the EEOC.

Notably, the EEOC has jurisdiction to investigate Plaintiffs' charges even if the matter is referred to arbitration. This is because, even if a complaining employee is bound by an arbitration agreement, the EEOC is not a signatory to that agreement and therefore cannot be bound by the employee's commitment to arbitrate.  Accordingly, the mere fact that the EEOC may investigate a claim that has been referred to arbitration does not negate the binding effect of the employee's agreement to arbitrate.  *See EEOC. Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991); *EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002).

[42] 583 F.3d 228 (5th Cir. 2009).

[43] *Id.* at 235.

[44] *Id.*

did not find that, in general, complaints about alleged discrimination in employer-provided housing

do not arise out of an employment relationship, as Plaintiffs imply.[45]

>Contrary to Plaintiffs' contention that *Jones* supports their position, the Fifth Circuit stated:

>The one consensus emerging from this analysis is that it is fact-specific, and concerns an issue about which courts disagree. When deciding whether a claim falls within the scope of an arbitration agreement, courts "focus on factual allegations in the complaint rather than the legal causes of action asserted."[46]

In this case, Plaintiffs allege that their employer discriminated against them in the provision of

housing on the basis of their race and/or national origin, language that tracks Title VII, and treated

non-Filipino employees more favorably than them while at the bunkhouse. These run-of-the-mill,

quintessentially employment-related allegations are a far cry from an alleged gang rape.

>Indeed, the factual underpinnings and legal theories Plaintiffs advance in support of their

FHA claims overlap *almost entirely* with their Title VII claims currently pending before the EEOC,[47]

claims that can **only** be asserted against an employer.[48]  Like they do before the EEOC, Plaintiffs

seek to represent a class *of their co-workers* based on their FHA (and TVPA) claims. Indeed, in their

Amended Complaint, Plaintiffs point to their "commonality" with the putative class as relating to

---

[45] Plaintiffs also focus on the Court's conclusion that the alleged rape did not take place "in or about the workplace," language found in the arbitration agreement in *Jones* that is inapplicable here.  In this case, the relevant consideration is not whether any alleged FHA claims took place "in or about the workplace," but is instead whether Plaintiffs' FHA allegations arise out of their employment with Defendants.  Accordingly, Plaintiffs' emphasis on the fact that their employer-provided housing was located on land while their work took place either at sea or offshore is of no moment.

[46] *Jones*, 583 F.3d at 240 (citing *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 344 (5th Cir. 2004).

[47] *See* **Exhibit L** (EEOC Charges).  *Compare, e.g.*, R. Doc. 19, at 2 ¶ 2 (alleging that they were confined to the bunk house except for trips to Walmart and claiming Defendant would threaten to deport Filipino employees who attempted to leave the bunkhouse), *with* **Exhibit L** (EEOC Charges), at 1 ¶ 1 (same).

[48] *See, e.g.*, *Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 273 (5th Cir. 1988) ("Title VII does prohibit discrimination 'against any individual with respect to his . . . *privileges of employment*." (citing 42 U.S.C. § 2000e–2(a)(1) (emphasis added)).

the means by which Defendants "recruit[ed]" Plaintiffs and other B-1 Visa-holders for "labor and services,"[49] and represent that "This case does not present individualized factual or legal issues."[50]

Plaintiffs' reliance on the Eleventh Circuit's holdings in *Doe* and *Maglana* fair no better. In *Doe v. Princess Cruise Lines, Ltd.*,[51] which contained sexual assault allegations similar to those considered in *Jones*, the Eleventh Circuit concluded that the plaintiff's alleged rape did not arise out of her employment with the defendant, as being the victim or rape was not a foreseeable result of her employment. Comparitively, an employee's dissatisfaction with their employer-provided housing is plainly a foreseeable result of employment. And unlike the type of claims alleged in *Doe*, only Defendants' employees can assert an FHA claim against Defendants based on the housing Defendants provide only for their employees.

Finally, Plaintiffs argue that *Maglana v. Celebrity Cruises, Inc.*, an out-of-circuit, unpublished opinion that considered employees' intentional tort claims against their *former* employer for conduct that allegedly took place *after* the employees' employment had already ended, supports their position.[52] Plaintiffs once again miss the mark. All of Plaintiffs' allegations in this case relate to alleged conduct that took place *during* their employment—not after Plaintiffs had already absconded to Florida prior to the expiration of their B-1 Visas and employment contracts. Plaintiffs' complaints about their employer-provided housing, which was available to them only during their employment with Defendants, plainly arise out of Plaintiffs' employment with Defendants. As a result, Plaintiffs' FHA claims are subject to arbitration.

---

[49] R. Doc. 19, at 19 ¶ 128.

[50] *Id.* at 22, ¶ 139(g). Notably, non-U.S. citizens are only eligible for a B-1 visa through employment.

[51] 657 F.3d 1204 (11th Cir. 2011).

[52] No. 20-14206, 2022 WL 3134373, at *4 (11th Cir. Aug. 5, 2022) (explaining that the plaintiffs in that case "brought intentional tort claims based on the cruise line's actions *after their termination*" (emphasis added)); *see also id.* at *2 ("On March 30, Maglana took an expensive bottle of scotch from the ship's bar and shared it with Bugayong. Celebrity terminated their employment as a result. . . . Maglana, still aboard the ship, filed this action on May 21 in the United States District Court for the Southern District of Florida.").

### b. Plaintiffs' TVPA Claims Are Subject to Arbitration

In support of their TVPA claims, Plaintiffs again rely on the same inapplicable cases they cite to in support of their argument that their FHA claims do not arise out of their employment.  But Plaintiffs cannot avoid the fact that *both* their FHA and TVPA claims plainly arise out of their employment with GIS, unlike claims premised upon an alleged gang rape or conduct that took place after the employment relationship had ended.  As such, like their FHA claims, Plaintiffs' TVPA claims should be submitted to arbitration in the Philippines.

As explained in Defendants' original memorandum, Plaintiffs' position that their TVPA claims do not arise out of their employment has already been rejected by the Western District of Louisiana in *Calcidian*, as well as another section of this Court in *Baricuatro*.  In their Opposition, Plaintiffs make only a passing, but faulty, attempt to distinguish this Court's holding in *Baricuatro*, and they do not even mention the court's reasoning in *Calcidian*.  This is likely because it strains credulity to argue that an employer's allegedly forcing an employee to remain in employer-provided housing during the term of his employment contract and forced them to perform work pursuant to that contract does not relate to that employee's employment.

In *Baricuatro*, this Court also considered whether TVPA claims brought by Filipino workers arose from their employment and were, therefore, subject to arbitration.[53] As in this case, the *Baricuatro* plaintiffs argued that they experienced forced labor in violation of the TVPA.[54]  In rejecting the plaintiffs' argument, the court stated that the plaintiffs' TVPA claims "appear to go to the very nature of the employment relationship," holding that the TVPA claims at issue should

---

[53] 927 F. Supp. 2d at 371.
[54] *Id.*

be arbitrated.[55] Because Plaintiffs' TVPA claims in the instant case arise out of the employer-employee relationship, and indeed "appear to go to the very nature of the employment relationship," these claims, like the others, are subject to mandatory arbitration.

### E. Plaintiffs' Equity Arguments and Private Interest Factors

In their essentially identical Declarations, Plaintiffs all state they currently live in Florida, cannot afford to travel to the Philippines for mandatory arbitration before the National Labor Relations Commission, and cannot afford to hire a lawyer in the Philippines. In addition, Plaintiffs' retained a $500 per hour Filipino lawyer, who opines in his Declaration that the NLRC will not apply U.S. law and predicts that it would also deprive Plaintiffs of their due process rights.

Plaintiffs' argument boils down to the untennable position that the Philippines is an inadequate and unavailable forum and is thus considered pursuant to a *forum non conveniens* analysis.[56] In *Atlantic Marine*, the U.S. Supreme Court ruled that so-called "private interest factors"[57] are irrelevant to enforcing a valid forum-selection clause under the *forum non conveniens* analysis and that the "valid forum-selection clause should be given controlling weight in all but the most exceptional circumstances."[58] "The district court 'should not consider arguments about the parties' private interests. Instead, the court 'must deem the private-interest factors to weigh entirely in favor of the preselected forum.'"[59] As a result, Plaintiffs' arguments about their ability to afford counsel, witnesses, travel, etc. are irrelevant to whether the Philippines is an adequate and available forum and whether the public interest factors "overwhelmingly disfavor" the Philippine forum.

---

[55] *Id.*

[56] *See Layson v. Baffin Invs., Ltd.*, 2015 U.S. Dist. LEXIS 124962, at *16-*17 (M.D. La. Sep. 18, 2015) (relying on *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas, et al.*, 134 S.Ct. 568, 580 (2013) to determine whether the Philippines and NLRC are an adequate and available forum for POEA contract claims).

[57] The private interest factors include the relative ease of access to sources of proof, the availability of compulsory process for attendance of unwilling witnesses, and all other practical problems that make trial of a case easy, expeditious and inexpensive. *In re Air Crash Disaster Near New Orleans, La. On July 9, 1982*, 821 F.2d 1147, 1154 (5th Cir. 1987) (*en banc*), *vacated on other grounds sub nom., Pan Am World Airways v. Lopez*, 490 U.S. 1032 (1989).

[58] *Layson*, 2015 U.S. Dist. LEXIS 124962, at *16–*17 (citing *Atlantic Marine*, 134 S.Ct. at 583).

[59] *Id.* (quoting *Atlantic Marine*, 134 S.Ct. at 583).

PD.39491146.1

Nevertheless, like Plaintiffs' other specious claims, it also bears mention that The Philippine Public Attorney's Office[60] is legally required to provide free legal representation to Filipino workers in NLRC arbitrations,[61] and that under the Standard Terms and Conditions signed by Plaintiffs, Plaintiffs would have been repatriated to the Philippines free of charge had they not absconded to Florida before completing their terms of employment.

Plaintiffs rely on *Aggarao v. MOL Ship Mgmt Co.*,[62] for the proposition that the NLRC would not apply U.S. law in arbitration in the Philippines. However, in *Calicdan*, the Western District of Louisiana discounted such reliance:

> *Aggarao* is unpersuasive at this stage of the proceedings where the issue concerns compelled arbitration under the POEA Standard Terms contracts. *Aggarao* considered enforceability of an arbitration award rendered pursuant to the POEA mandated arbitration provisions; whereas, in the instant case, the issue is one of arbitrability—not enforcement. The Court will not entertain ex-ante challenges to a future arbitration ruling. The Court cannot predict whether a future arbitration ruling in this case would violate U.S. public policy, an inquiry pertinent to *enforcement* of an arbitration award under the Convention.[63]

Even under the cases cited by Plaintiffs, the *potential* failure to apply US law (the prospective-waiver argument) is improper at the motion to compel stage.[64]

The Philippines is an available forum. U.S. Supreme Court and the Fifth Circuit case law makes clear that a foreign forum is available to a plaintiff haling from the forum's country

---

[60] *See* https://pao.gov.ph/.

[61] *See* 2021 Revised PAO Operations Manual, Articles 1, 5, and 6. https://pao.gov.ph/UserFiles/Public_Attorney's_Office/file/2021%20REVISED%20PAO%20OPERATIONS%20MANUAL%20FINAL_compressed.pdf.

[62] No. 09-3106, 2014 WL 3894079 (D. Md. Aug. 7, 2014).

[63] *Calicdan v. M D Nigeria, LLC*, No. 21-3283, 2022 WL 2165638 at ¶ 10 (W.D. La. May, 17, 2022). The Court in *Calicdan* further discounted reliance of *Aggarao* because it relied on the underlying Eastern District of Louisiana's ruling in *Asignacion v. Schiffahrts*, Nos. 13-607 & 13-2409, 2014 WL 632177 (E.D. La. Feb. 10, 2014), which the Fifth Circuit later reversed.

[64] *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 373 (4th Cir. 2012) (holding "Aggarao is not entitled to interpose his public policy defense, on the basis of the prospective waiver, doctrine until the second stage of the arbitration-related court proceedings — the award-enforcement stage.").

if the defendant submits itself to the foreign jurisdiction.[65] Defendants are willing to submit to the jurisdiction of the NLRC, as they agreed to do under the POE-approved contracts. Thus, the Philippines forum is an available forum.

The Philippines is an adequate forum. "A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly, ***even though they may not enjoy all the benefits of an American court***."[66] "The substantive law of the foreign forum ***is presumed to be adequate unless the plaintiff makes some strong showing to the contrary***, or unless conditions in the foreign forum made known to the court, plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there."[67] Critically, the Fifth Circuit has ruled that the determination of adequacy and availability is subject to precedent and district courts can rely on previous rulings on adequacy and availability.[68] "Unless [the plaintiff] can show evidence distinguishing this case from our precedent . . . or ***reliable*** evidence of some subsequent change in [Philippine] law that calls our earlier determinations into serious question, plaintiffs cannot prevail in their [*forum non conveniens*] defense."[69]  The Fifth Circuit and numerous district courts within the Circuit have found the Philippines to be an available and adequate forum.[70] Plaintiff provides no reliable evidence of a subsequent change that justifies a deviation from this precedent.

---

[65] *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981) (the "requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction."); *Quintero v. Klaveness Ship Lines*, 914 F.2d 717, 728 (5th Cir. 1990) (finding the Philippines an available forum); *Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1245 (5th Cir. 1983).

[66] *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 796 (5th Cir. 2007) (emphasis added).

[67] *Id*. (emphasis added).

[68] *In re Ford Motor Co*., 591 F.3d 406, 413 (5th Cir. 2009).

[69] *Id*. (emphasis added).

[70] *See, e.g. Layson*, 2015 U.S. Dist. LEXIS 124962, at *26; *Quintero*, 914 F.2d at 731; *Llagas*, 2018 U.S. Dist. LEXIS 237529, at *12; *Lim*, 404 F.3d at 900; *Francisco v. STOLT Achievement MT*, 293 F.3d 270 (5th Cir. 2002); *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216 (5th Cir. 1998); *Baricuatro*, 927 F. Supp. 2d at 360.

To the extent Plaintiffs base their arguments against arbitration in the Philippines on public policy concerns, the arguments are irrelevant in this context.[71]  The most compelling public policy interest in this case is the Philippine government's interest in protecting overseas workers.[72]  The importance of the POEA Standard Terms to the Philippine economy also weighs in favor of enforcement. "Arbitration of all claims by Filipino overseas seafarers is an integral part of the POEA's mandate to promote and monitor the overseas employment of Filipinos and safeguard their interests."[73]

This compelling public policy interest is not affected by the fact that U.S. law may not apply to Plaintiff's claims in the Philippines. As the Fifth Circuit explained,

> [T]he United States has a public policy strongly favoring arbitration, which applies with special force in the field of international commerce...The Supreme Court has rejected the concept that all disputes must be resolved under our laws and in our courts, even when remedies under foreign law do not comport with American standards of justice. The Supreme Court has stated: To determine that American standards of fairness . . . must [apply] demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United States law over the laws of other countries.[74]

The fact that Plaintiff's potential recovery could be less under Filipino law is simply irrelevant and not justification for avoiding arbitration.[75]

## III.   CONCLUSION

Having signed and entered into POEA-approved Contracts of Employment and agreed to the Standard Terms and Conditions to work as welders and fitters, Plaintiffs cannot now seek to

---

[71] *See, e.g., Brown v. Royal Caribbean Cruises, Ltd.*, 549 F. App'x 861, 863 (11th Cir. 2013) ("A party opposing arbitration pursuant to an international commercial agreement may not seek to avoid arbitration on the basis that it is contrary to public policy.").

[72] *Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1018 (5th Cir. 2015).

[73] *Balen v. Holland America Line, Inc.*, 583 F.3d 647, 651 (9th Cir.2009); *see also Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 221 n. 25 (5th Cir.1998) ("The effect of POEA intervention in employment contracts is to shift the balance of power slightly in favor of the employee in much the same way that a labor union or legislative enactment of minimum work standards increases the level of protection for employees in the United States.").

[74] 783 F.3d at 1017.

[75] *Id.*

PD.39491146.1

enforce those contracts, all while skirting their agreement to arbitrate their claims. The arbitration provision, forum selection clauses, and choice of law rules within their employment contracts and mandated under Philippine law requires that their claims be brought before an arbitrator or panel of arbitrators in the Philippines. For these reasons, this Court should dismiss Plaintiffs' claims on the basis of improper venue, deny their declaratory judgment, and compel them to submit their claims before an arbitrator in the Philippines.

Dated: September 12, 2022.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:      */s/ David M. Korn*

DAVID M. KORN (#21676) [T.A.]
STEPHANIE M. POUCHER (#37263)
MARK FIJMAN (#37680)
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130
Telephone: (504) 566-1311
Telecopier: (504) 568-9130
david.korn@phelps.com
stephanie.poucher@phelps.com
mark.fijman@phelps.com

**ATTORNEYS FOR DEFENDANTS, GRAND ISLE SHIPYARD, LLC AND GIS, LLC**