# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| VICTOR CAGARA ORTIGUERRA, DONATO MANALILI AGUSTIN, AMADO TRANATE YUZON, CHRISTOPHER ESCALANTE RAYOS, ARVIN BANZON SAN PEDRO, WILFREDO BATONG SATUROS, ROSEL NUFABLE HERNANDEZ, SIEGFRIED TAPIA CARLOS, RENATO ARBOLIDA DECENA, and ISAIAS SANTIAGO DINGLASAN, | **CIVIL ACTION NO. 22-cv-00309**<br><br>**COLLECTIVE ACTION PURSUANT TO 29 U.S.C. § 216(b)**<br><br>**CLASS ACTION PURSUANT TO FED. RR. CIV. P. 23(a), 23(b)(2), & 23(b)(3)** |
| *Plaintiffs* | **JURY TRIAL DEMANDED** |
| v. | |
| GRAND ISLE SHIPYARD, LLC., and GIS, LLC, | |
| *Defendants* | |

## SECOND AMENDED CLASS ACTION COMPLAINT

**NOW INTO COURT,** through undersigned counsel, come Plaintiffs Victor Cagara Ortiguerra, Donato Manalili Agustin, Amado Tranate Yuzon, Chistopher Escalante Rayos, Arvin Banzon San Pedro, Wilfredo Batong Saturos, Rosel Nufable Hernandez, Siegfried Tapia Carlos, Renato Arbolida Decena, and Isaias Santiago Dinglasan (collectively, "Plaintiffs"), on their own behalf and on behalf of those similarly situated and allege as follows:

## I.       PRELIMINARY STATEMENT

1.       Plaintiffs are skilled welders and/or fitters from the Philippines who worked for Grand Isle Shipyard LLC and GIS, LLC (collectively, "Defendants") in and around Galliano, Louisiana at various times from 2006 until 2022.

2.       Defendants housed Plaintiffs and dozens of other Filipino workers in a former bowling alley Defendants had converted into a bunkhouse. When the Plaintiffs and other Filipino workers were in between offshore jobs—lulls that often lasted for a week or longer—Defendants did not allow them to leave the bunkhouse, except for exercise (with Defendants' permission) within the immediate vicinity of the bunkhouse, or brief trips in a GIS van that took them to the local Walmart (or, at the end of their stint, to purchase goods for their family in a larger town). The Filipino workers were prohibited from getting rides with non-Filipino workers, using taxi services, or walking away from the vicinity of the bunkhouse.  Supervisors threatened to fire and deport Filipino workers who attempted to leave the bunkhouse for an unauthorized purpose.

3.       During the COVID-19 pandemic, the Plaintiffs and other Filipino workers who were infected with or exposed to the virus were required to quarantine in cramped quarters on moored tugs and supply ships.  Defendants did not provide the quarantined workers with sufficient food, and the only medical treatment they initially received was Vitamin C and white pills the Plaintiffs believe were Percocet.  Later in the pandemic, the quarantined workers were not provided with any medication.  The misery on the quarantine vessels was compounded by the very weak cellular data signal. Therefore, though sick and isolated, it often was not possible for the quarantined Filipino workers to communicate with their families.

4.       Defendants were so adamant that the Filipino workers not leave the bunkhouse or the quarantine vessels, they were abandoned as Category 4 Hurricane Ida made landfall on top of Galliano.  Plaintiffs Rosel Hernandez and Renato Decena had to shelter in the bunkhouse and

feared for their lives as the hurricane shredded the building.  Upon information and belief, other Filipino workers weathered the storm on the quarantine vessels as they were blown and tossed in the wind and storm surge.  All but two of the non-Filipino workers were evacuated before the storm.

5.       This conduct constituted forced labor and trafficking for forced labor, in violation of the Trafficking Victims Protection Act ("TVPA"), as well as attempt and conspiracy to commit forced labor and trafficking for forced labor.

6.       This conduct and other rules of occupancy applying to the bunkhouse and the quarantine vessels applied only to the Filipino workers.   Therefore, it constituted housing discrimination in violation of the Fair Housing Act.

7.       Plaintiffs and Filipino workers routinely worked or were on call upwards of ninety hours per week, but Defendants did not pay them the minimum wage and overtime wage required by the Fair Labor Standards Act ("FLSA").  In its September 23, 2022 Order, the Court stayed and referred to arbitration Plaintiffs' FLSA minimum wage and overtime claims.  Therefore, Plaintiffs will not continue to assert these claims in this pleading, but Plaintiffs reserve all rights to seek equitable tolling of the statute of limitations if the Court lifts the stay of these claims.[1]

8.       Finally, Defendants have presented a frivolous counterclaim against Plaintiffs in retaliation for bringing this suit.  The retaliatory counterclaim violates the FLSA and constitutes obstruction, in violation of the TVPA.

---

[1] *See, e.g., Gutierrez v. Drill Cuttings Disposal Co., L.L.C.*, 319 F. Supp. 3d 856, 859 (W.D. Tex. 2018); *Qualls v. EOG Res., Inc.*, No. CV H-18-666, 2018 WL 2317718, at *3 (S.D. Tex. May 22, 2018).

## II.     JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1337; 29 U.S.C. § 201 *et seq.* (the Fair Labor Standards Act); 18 U.S.C. § 1595(a) (TVPA); and 42 U.S.C. § 3613 (Fair Housing Act).  The Court also has jurisdiction over the declaratory judgment claim in this action pursuant to 28 U.S.C. § 2201.

10.     The Court has personal jurisdiction over Defendants since they regularly conduct business in the State of Louisiana and therefore have minimum contacts with the State of Louisiana.

11.     Venue lies in this Court over these claims pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Louisiana.

## III.    PARTIES

12.     Plaintiff Victor Cagara Ortiguerra ("Ortiguerra") is a resident of Florida who Defendants employed as a welder from 2019 until 2021. While Ortiguerra worked for Defendants, he was a resident of the State of Louisiana.

13.     Ortiguerra's written consent to join this FLSA collective action is attached hereto as Exhibit A and was attached as Exhibit A to Plaintiffs' initial Complaint. ECF No. 1.

14.     Plaintiff Donato Manalili Agustin ("Agustin") is a resident of Florida who Defendants employed as a fitter in 2008 and again from 2018 until 2021. While Agustin worked for Defendants, he was a resident of the State of Louisiana.

15.     Agustin's written consent to join this FLSA collective action is attached hereto as Exhibit B and was attached as Exhibit B to Plaintiffs' initial Complaint. ECF No. 1.

4

16.     Plaintiff Amado Tranate Yuzon ("Yuzon") is a resident of Florida who Defendants employed as a welder from 2006 until 2021.  While Yuzon worked for Defendants, he was a resident of the State of Louisiana.

17.     Yuzon's written consent to join this FLSA collective action is attached hereto as Exhibit C and was attached as Exhibit C to Plaintiffs' initial Complaint. ECF No. 1.

18.     Christopher Escalante Rayos ("Rayos") is a resident of Florida who Defendants employed as a welder from 2019 until 2021.  While Rayos worked for Defendants, he was a resident of the State of Louisiana.

19.     Rayos's written consent to join this FLSA collective action is attached hereto as Exhibit D and was attached as Exhibit D to Plaintiffs' initial Complaint. ECF No. 1.

20.     Arvin Banzon San Pedro ("San Pedro") is a resident of Florida who Defendants employed as a fitter from 2007 until 2021.  While San Pedro worked for Defendants, he was a resident of the State of Louisiana.

21.     San Pedro's written consent to join this FLSA collective action is attached hereto as Exhibit E and was attached as Exhibit E to Plaintiffs' initial Complaint. ECF No. 1.

22.     Wilfredo Baton Saturos ("Saturos") is a resident of Florida who Defendants employed as a welder from 2018 until 2021.  While Saturos worked for Defendants, he was a resident of the State of Louisiana.

23.     Saturos's written consent to join this FLSA collective action is attached hereto as Exhibit F and was attached as Exhibit F to Plaintiffs' initial Complaint. ECF No. 1.

24.     Isaias Santiago Dinglasan ("Dinglasan") is a resident of Florida who Defendants employed as a fitter and welder from approximately 2007 until 2022.  While Dinglasan worked for Defendants, he was a resident of the State of Louisiana.

25.     Dinglasan's written consent to join this FLSA collective action was docketed on May 11, 2022.  ECF No. 11.

26.     Renato Arbolida Decena ("Decena") is a resident of Florida who Defendants employed as a welder from 2018 until 2022.  While Decena worked for Defendants, he was a resident of the State of Louisiana.

27.     Decena's written consent to join this FLSA collective action was docketed on May 11, 2022.  ECF No. 9.

28.     Rosel Nufable Hernandez ("Hernandez") is a resident of Florida who Defendants employed as a welder from approximately 2006 until 2022.  While Hernandez worked for Defendants, he was a resident of the State of Louisiana.

29.     Hernandez's written consent to join this FLSA collective action was docketed on May 11, 2022.  ECF No. 9.

30.     Siegfried Tapia Carlos ("Carlos") is a resident of Florida who Defendants employed as a welder from 2018 until 2022.  While Carlos worked for Defendants, he was a resident of the State of Louisiana.

31.     Carlos's written consent to join this FLSA collective action was docketed on May 11, 2022.  ECF No. 9.

32.     Plaintiffs are among over 100 nationals of the Philippines who worked for the Defendants with B-1 visas as welders, fitters, painters/riggers/blasters, cooks, mechanics, and housekeepers/laundrymen in the Eastern District of Louisiana (collectively, "B-1 workers").

33.     Like Plaintiffs, the other B-1 workers resided at Defendants' Lafourche Parish, Louisiana bunkhouse and at various times also worked offshore under the same or similar wage payment scheme.

34.     Plaintiffs and other B-1 workers are Filipino, of Philippine national origin, and Asian Pacific Islanders.

35.     Pursuant to 29 U.S.C. § 216(b), and as set forth in detail below, Plaintiffs seek to assert their FLSA retaliation claims individually and on behalf of all similarly situated individuals.

36.     Pursuant to Fed. RR. Civ. P. 23(a) and 23(b)(3), and as set forth below, Plaintiffs assert their TVPA and Fair Housing Act claims individually and on behalf of all similarly situated individuals.

37.     Defendant Grand Isle Shipyard, LLC. ("GI Shipyard") is a Louisiana Limited Liability Company domiciled in Galliano, Louisiana and headquartered at 18838 Highway 3235, Galliano, LA 70354, in the Eastern District of Louisiana.

38.     Upon information and belief, GI Shipyard maintains and repairs oil rigs in the Gulf of Mexico, housing many of its 200-plus employees, when onshore, in a converted bowling alley in Lafourche Parish, Louisiana.

39.     According to Louisiana Secretary of State records, Daniel St. Germaine is the Registered Agent for GI Shipyard, with the same address as the GI Shipyard headquarters.

40.     Defendant GIS, LLC ("GIS") is a Washington Limited Liability Company registered with the Louisiana Secretary of State as a Foreign Limited Liability Company. GIS's principal business office is 18838 Highway 3235, Galliano, LA 70354, in the Eastern District of Louisiana.

41.     According to Louisiana Secretary of State records, Daniel St. Germaine is the Registered Agent for GIS, with the same address as the GIS business office.

42.     Upon information and belief, GIS maintains and repairs oil rigs in the Gulf of Mexico, housing some of the 2,000-plus workers it purports to employ, when onshore, in a converted bowling alley in Lafourche Parish, Louisiana and on quarantine vessels.

43.     Each Defendant is a "person" subject to the FLSA's prohibition against retaliation.[2]

44.     At all relevant times, Plaintiff and other B-1 workers were individual employees of Defendants engaged in performing activities within the meaning of 29 U.S.C. § 203(r) as required by 29 U.S.C. §§ 206 and 207.

45.     At all relevant times, Plaintiffs and other B-1 workers were engaged in commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 203(b) and (j).

46.     At all times relevant to this Complaint, Defendants have been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(s), in that Defendants operate an enterprise that has employees engaged in commerce or production of goods for commerce and that has annual gross revenues that exceed $500,000.00. 29 U.S.C. § 203(s)(1)(A).

47.     At all relevant times, each Plaintiff and other B-1 worker was a "person" as defined by the Fair Housing Act, 42 U.S.C. § 3602(d).

48.     At all relevant times, each Plaintiff and other B-1 worker was an "aggrieved person" as defined by the Fair Housing Act, 42 U.S.C. § 3602(i).

49.     At all relevant times, each Defendant was a "person" as defined by the Fair Housing Act, 42 U.S.C. § 3602(d).

---

[2] 29 U.S.C. § 215(a)(3).

## IV.    FACTUAL BACKGROUND

50.    According to Plaintiffs' and other B-1 workers employment contracts,[3] Defendants were to pay them a "Basic Monthly Salary," "Vacation Leave with Pay," and "Overtime."

51.    Defendants did not pay Plaintiffs and other B-1 workers these wages "free and clear."  Rather, Defendants paid Plaintiffs and other B-1 workers only twenty percent of their wages for work on platforms and spars.

52.    Defendants paid the remainder of Plaintiffs' and other B-1 workers' wages to DNR Offshore and Crewing Services, Inc. ("DNR"), a labor broker based in the Philippines. DNR in turn took substantial deductions out of the Plaintiff's and other B-1 workers' wages and paid the balance to Plaintiffs' and other B-1 workers' family members in the Philippines.

53.    For example, the workweek of December 29, 2020 to January 4, 2021, Plaintiff Agustin's wage statement indicates he worked 46 hours,[4] his regular (non-overtime) pay was $404.60 (40 hours at $10.12 per hour), and his overtime pay was $91.08 (6 hours at $15.18 per hour).  Under Defendants' wage payment scheme, Agustin would have received only 20 percent of these wages "free and clear."  Therefore, his regular pay rate would have been $2.02 per hour, and his overtime pay rate would have been $3.04 per hour.

54.    Plaintiffs and other B-1 workers were on call all day and night, every day, while living in Defendants' bunkhouse.

55.    Defendants did not pay Plaintiffs and other B-1 workers at all for most of their "on call" time.  Therefore, Plaintiffs' and other B-1 workers' actual hourly wage rate received free and clear was substantially lower than the amount set forth above.

---

[3] Plaintiffs use the term "contract" herein as shorthand to refer to the referenced documents. Plaintiffs contend the documents do not constitute enforceable contracts.

[4] Plaintiffs dispute that their wage statements accurately reflect their work hours.

56.     The pay scheme described above was designed to prevent Plaintiffs and other B-1 workers from having access to sufficient financial resources to leave the bunkhouse and employment with Defendants.

57.     When Plaintiffs and other B-1 workers were not working on rigs or getting transported to and from rigs, they were required to stay in the Defendants' bunkhouse with limited exceptions or, when quarantined because of a COVID19 infection, on a moored tugboat and supply ship.

58.     The bunkhouse and each quarantine vessel was a "dwelling" within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b).

59.     Plaintiffs and other B-1 workers were not allowed to leave the bunkhouse on their own, except that some B-1 workers were able to exercise in the immediate vicinity of the bunkhouse with Defendants' prior approval.

60.     The only time the Plaintiffs and other B-1 workers were allowed to leave the bunkhouse was (a) when Defendants' drivers took them to a local Walmart in a twelve-passenger van about three times per week;  (b) when Defendants' drivers took them to Houma, Louisiana to make purchases shortly before the workers departed to the Philippines; and (c) when Defendants gave them permission to exercise in the immediate vicinity of the bunkhouse.

61.     GIS supervisors threatened to fire and deport B-1 workers who attempted to leave the bunkhouse on their own. For example,

   a.   When Plaintiff Agustin tried to walk from the bunkhouse to a store to buy medicine, a supervisor the workers refer to as "Big E" caught him, yelled at him, made him go back to the bunkhouse, and said he would be fired if he saw him outside the bunkhouse again.

b.   After a supervisor learned Plaintiff Carlos had walked to a store, the supervisor called a meeting of the Filipino workers and told them they would be deported to the Philippines if they left on their own, as Plaintiff Carlos had done.

62.   The Plaintiffs and other B-1 workers either were directly threatened, as described above, or were aware of such threats directed at other B-1 workers.

63.   Defendants threatened B-1 workers who escaped from the bunkhouse and remained in the United States and threatened individuals who helped them escape. For example,

a.   When Plaintiff Agustin left his employment at GIS and remained in the United States, a representative of DNR, GIS's manning agent, called Mr. Agustin and told him DNR would report him to law enforcement and immigration authorities in the United States so he would be arrested. Mr. Agustin understood from this call that he also would face arrest if he returned to the Philippines.

b.   When Plaintiffs Hernandez, Carlos, Decena, and Dinglasan left their employment at GIS and remained in the United States, counsel for Defendants sent a letter to the individual who Defendants claim helped the group leave threatening legal action against him and a business they claim he operated.  They also made a thinly veiled threat of legal repercussions in the Philippines for the workers who left.

64.   The Plaintiffs and other B-1 workers were not allowed to have visitors at the bunkhouse.

11

65.     Conditions on the quarantine vessels, which the Plaintiffs[5] and other quarantined B-1 workers who were infected with or exposed to COVID19 also were not allowed to leave, were miserable.  For example, on one of the vessels, the GIS Dylan:

      a.  As many as 28 COVID-infected and COVID-exposed workers were housed together.

      b.  GIS did not provide the quarantined workers with sufficient food.

      c.  The only medical treatment the workers received was Vitamin C and white pills they believed were Percocet.  Later in the pandemic, the quarantined workers were not provided any medication.

      d.  The cellular phone data signal was very weak.  At the bunkhouse, the B-1 workers were able to communicate with their families.  On the GIS Dylan, this often was not possible.

66.     Conditions on the quarantine vessels led to the Plaintiffs' and other B-1 workers' psychological deterioration.

67.     On August 29, 2021, Category 4 Hurricane Ida made landfall just southeast of Galliano, Louisiana, with sustained winds of 145 miles per hour.

68.     Before Hurricane Ida struck Galliano, Defendants evacuated all but two of the non-Filipino workers from the bunkhouse to a safer location.

69.     Defendants did not evacuate most of the Filipino workers, including Plaintiffs Hernandez and Decena, from the bunkhouse, though the Filipino workers had asked to be evacuated.

---

[5] Only Plaintiffs Wilfredo Saturos and Renato Decena were never infected with or exposed to (as far as they knew) COVID19 and therefore were not quarantined on the vessels.

70.     As Hurricane Ida's eyewall passed over the bunkhouse, the B-1 workers, including Plaintiffs Hernandez and Decena feared for their lives as the building shook at was pelted by flying debris.  The winds started to rip open part of the roof, water entered the building, and the floor flooded.  There was no electricity or running water.

71.     Defendants retrieved Plaintiffs Hernandez, Decena, and other B-1 workers from the bunkhouse approximately six hours after the wind had died down.  At that point, they had been in the bunkhouse almost three days with dwindling supplies, no electricity, and no running water.

72.     Defendants returned Plaintiffs Hernandez, Decena, and other B-1 workers to live in the bunkhouse approximately one week after Hurricane Ida passed. There still was no electricity at the bunkhouse.  It would be another two weeks before power was restored to the bunkhouse.

73.     Defendants' treatment of Plaintiffs Hernandez, Decena, and other B-1 workers caused them physical and psychological harm.

74.     Upon information and belief, Defendants did not evacuate other B-1 workers who were quarantined on the moored vessels due to COVID-19.  These workers would have faced extraordinary danger due to the combined impacts of storm surge, waves, and fierce winds.

75.     Non-Filipino workers also lived at the bunkhouse.

76.     Unlike the B-1 workers, non-Filipino workers were allowed to leave the bunkhouse on their own for activities other than exercise in the vicinity of the bunkhouse.

77.     Unlike the B-1 workers, Defendants evacuated all but two non-Filipino workers from the bunkhouse before Hurricane Ida struck.

78.     Upon information and belief, some non-Filipino workers who were infected with or exposed to COVID were sent to their homes to quarantine, while Defendants paid for hotel accommodations to quarantine other COVID-infected and COVID-exposed non-Filipino workers.

13

79.    Upon information and belief, Defendants did not pay for hotel accommodations to quarantine COVID-infected or COVID-exposed Filipino workers.

80.    The Defendants' manager who supervised the Plaintiffs and other B-1 workers at the bunkhouse subjected the Plaintiffs and other B-1 workers to persistent verbal abuse.

81.    The non-Filipino workers were not subjected to persistent verbal abuse at the bunkhouse.

82.    B-1 workers who were on the quarantine barge were not allowed to leave.

83.    Plaintiffs Victor Cagara Ortiguerra, Donato Manalili Agustin, Amado Tranate Yuzon, Chistopher Escalante Rayos, Arvin Banzon San Pedro, Wilfredo Batong Saturos filed this lawsuit on February 9, 2022 alleging Defendants violated the minimum wage and overtime provisions of the Fair Labor Standards Act.[6]

84.    Plaintiffs subsequently filed their First Amended Complaint joining Plaintiffs Rosel Nufable Hernandez, Siegfried Tapia Carlos, Renato Arbolida Decena, and Isaias Santiago Dinglasan. The First Amended Complaint continued to allege violations of the FLSA, as well as violations of the TVPA and the FHA.[7]

85.    By filing or joining this lawsuit, Plaintiffs had "filed [a] complaint or instituted or caused to be instituted [a] proceeding under or related to" the FLSA.[8]

86.    Plaintiffs' FLSA claims included allegations that they and other similarly situated workers were not allowed to leave the bunkhouse except under limited circumstances, and

---

[6] Rec. Doc. 1.
[7] Rec. Doc. 19.  Plaintiffs also added a claim for a declaratory judgment on issues or arbitrability.
[8] 29 U.S.C. § 215(a)(3).

therefore they were on call; that by failing to pay Plaintiffs and other similarly situated workers for their "on call" time, Defendants had violated the FLSA.[9]

87.    Plaintiffs TVPA claims included allegations that Defendants had violated 18 U.S.C. § 1590(a).

88.    This lawsuit constitutes enforcement of 18 U.S.C. § 1590(a).

89.    On October 10, 2022, Defendants filed their "Answer and Affirmative Defenses to Plaintiffs' First Amended Class Action Complaint and Counterclaim."[10]

90.    Defendants Counterclaim claimed Plaintiffs had defamed Defendants by alleging, *in Plaintiffs' First Amended Complaint*, that Plaintiffs were not permitted to leave the bunkhouse except under limited circumstances.[11]

91.    If Plaintiffs had not initiated these legal proceedings, including claims under the FLSA and the TVPA, Defendants would not have filed suit against Plaintiffs.

92.    Defendants' counterclaims were filed for a retaliatory motive.

93.    Defendants' counterclaims lack a reasonable basis in fact or law.

94.    Defendants' counterclaims specifically allege Plaintiffs' TVPA claims, including claims under 18 U.S.C. § 1590(a), constitute defamation.

95.    Defendants have brought counterclaims alleging defamation to intimidate Plaintiffs and to interfere with and chill enforcement of the TVPA, including 18 U.S.C. § 1590(a).

96.    Defendants' counterclaims against Plaintiffs have caused Plaintiffs to suffer damages, including mental and emotional injuries.

---

[9] Rec. Doc. 19 at ¶¶ 93-94.
[10] Rec. Doc. 46.
[11] Rec. Doc. 46 at ¶ 45.

RULE 23 CLASS ALLEGATIONS

97.     Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs brings their TVPA claims—Count

2—on behalf of themselves and a class of persons ("the TVPA Class") consisting of:

> All individuals who, at any time between June 28, 2012 and the present, (1) were employed at GI Shipyard and/or GIS; (2) lived at the bunkhouse and/or on the quarantine vessels; (3) were nationals of the Philippines; and (4) were B-1 visa holders.

98.     Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs bring their Fair Housing Act

claims—Count 3—on behalf of themselves and a class of persons ("the FHA Class") consisting

of:

> All individuals who, at any time between June 28, 2020 and the present, (1) lived at the bunkhouse and/or on the quarantine vessels; (2) were Filipinos, of Philippine national origin, and Asian Pacific Islanders; and (3) were B-1 visa holders.

99.     Excluded from the Classes are the legal representatives, officers, directors, assigns,

and successors of Defendants; any individual who at any time during the class period has had a

controlling interest in any Defendant; and all persons who submit timely and otherwise proper

requests for exclusion from the Classes.

*Numerosity*

100.    There are over 100 B-1 workers who would be members of the Classes in this

action.

101.    The members of the Classes are sufficiently numerous that joinder of all members

is impracticable.

*Existence and Predominance of Common Questions*

102.    Common questions of law and fact exist as to Plaintiffs and all members of the

Classes. These common questions include

a.  Whether Defendants knowingly recruited and/or obtained Plaintiffs' and other B-1 workers' labor or services by means of (i) physical restraint; (ii) threats of physical restraint; (iii) serious harm; (iv) threats of serious harm; (v) abuse of legal process; (vi) threatened abuse of legal process; and/or (vii) a scheme, plan, or pattern intended to cause Plaintiffs and the other B-1 workers to believe that, if they did not perform such labor or services, they or another person would suffer serious harm or physical restraint;

b.  Whether Defendants knowingly recruited, transported, harbored, provided, and/or obtained the Plaintiffs and the B-1 workers so as to obtain their labor and services by the means described herein;

c.  Whether Defendants conspired and/or attempted to commit the acts described herein;

d.  Whether Defendants discriminated against Plaintiffs and other B-1 workers in the terms, conditions, and privileges of rental of the bunkhouse and quarantine vessels, and in the provision of services or facilities in connection therewith, because of Plaintiffs' and other B-1 workers' race, color, and national origin;

e.  The nature and extent of class-wide injury and the measure of damages for those injuries;

f.  Whether the nature and location of Plaintiffs' and other B-1 workers' work, the nature of their claims related to the occupancy of the bunkhouse and quarantine vessels, and the public interest preclude forced arbitration of Plaintiffs' and other B-1 workers' claims in the Philippines.

103.     With respect to the TVPA Class and the FHA Class, the common questions set forth in paragraph 102(a)-(e) predominate over questions affecting only individual Class members.

*Typicality*

104.     Plaintiffs and proposed members of the Classes have all been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices.

105.     Defendants subjected Plaintiffs and the proposed members of the Classes to the same coercive rules and practices that constituted violations of the TVPA.

106.     Defendants subjected Plaintiffs and the proposed members of the Classes to the same discrimination that constituted violations of the Fair Housing Act.

107.     Plaintiffs and proposed Class members suffered similar types of damages.

108.     Plaintiffs' interests are co-extensive with the interests of the members of the Classes; Plaintiffs have no interest adverse to the members of the Classes.

109.     Plaintiffs and the proposed Class members have the same statutory rights under the TVPA and the Fair Housing Act, and they have the same right to a declaratory judgment on issues of arbitrability.

*Adequacy*

110.     Plaintiffs will fairly and adequately represent the interests of the members of the Classes.   Their interests do not conflict with the interests of the members of the Classes they seek to represent.

111.     Plaintiffs understand that, as class representatives, they assume responsibilities to the Classes to represent their interests fairly and adequately.

112.     Plaintiffs have retained counsel experienced in prosecuting class actions. There is no reason why Plaintiffs and their counsel will not vigorously pursue this matter.

*Superiority*

113.    With respect to the TVPA Class and the FHA Class, a class action is superior to other available means for the fair and efficient adjudication of the claims at issue herein because:

    a.  The damages suffered by each individual member of the Classes may not be sufficient to justify the burden and expense of individual prosecution of the litigation necessitated by Defendants' conduct;

    b.  It would be difficult for members of the Classes to obtain individual redress effectively for the wrongs done to them;

    c.  If individual actions were to be brought by each member of the Classes, the result would be a multiplicity of actions, creating hardships for members of the Classes, the Court, and the Defendants;

    d.  The members of the Classes are indigent foreign nationals and workers who lack the means and resources to secure individual legal assistance, have limited command of the English language or familiarity with the United States legal system, and are particularly unlikely to be aware of their rights to prosecute these claims;

    e.  Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system;

    f.  The class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court; and

    g.  This case does not present individualized factual or legal issues which would render a class action difficult.

114.   In the alternative, the TVPA Class and the FHA Class may be certified because:

a.   The prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants;

b.   The prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c.   Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

## V.    CAUSE OF ACTION

### COUNT 1
#### VIOLATION OF THE FAIR LABOR STANDARDS ACT (RETALIATION)

115.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

116.   This Cause of Action sets forth claims by Plaintiffs individually for retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3).

117.   As set forth above, Plaintiffs engaged in protected activity when they "filed [a] complaint or instituted or caused to be instituted [a] proceeding under or related to" the FLSA.[12]

---

[12] 29 U.S.C. § 215(a)(3).

118.     By bringing a counterclaim alleging defamation, which Defendants would not have brought if Plaintiffs had not instituted this lawsuit, Defendants engaged in an adverse employment action against Plaintiffs.

119.     Defendants' counterclaims were filed for a retaliatory motive and lack a reasonable basis in fact or law.

120.     By engaging in an adverse employment action, Defendants discriminated against Plaintiffs for engaging in protected activity, in violation of the FLSA, 29 U.S.C. § 215(a)(3).

121.     Plaintiffs are therefore entitled to compensatory damages, including damages for mental and emotional distress, plus an equal amount in liquidated damages, as a consequence of Defendants' unlawful acts and omissions, in accordance with 29 U.S.C. § 216(b).

## COUNT 2
### VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION ACT

122.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

123.     This Cause of Action sets forth claims by Plaintiffs and other B-1 workers against all Defendants under the civil remedies provision of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1595.

124.     Alternatively, this Cause of Action sets forth claims by Plaintiffs and other B-1 workers against all Defendants under the civil remedies provision of the TVPA, 18 U.S.C. § 1595, for TVPA claims other than the 18 U.S.C. § 1590(b) obstruction claim, which Plaintiffs bring as individual (non-class) claims.

125.     Plaintiffs and other B-1 workers are victims of violations of the following provisions of Title 18, Chapter 77 of the United States Code: 18 U.S.C. §§ 1589, 1590, and 1594(b);

126.    Defendants were perpetrators of the foregoing violations.

127.    Defendants knowingly benefited, financially or by receiving anything of value from participation in a venture Defendants knew or should have known engaged in the foregoing violations.

128.    Defendants, directly or through their agents, knowingly recruited and obtained Plaintiffs' and other B-1 workers' labor or services.

129.    Defendants, directly or through their agents, attempted to and did subject Plaintiffs and other B-1 workers to forced labor in violation of 18 U.S.C. § 1589.

130.    In violation of 18 U.S.C. § 1589(1)-(4), Defendants, directly or through their agents, knowingly recruited and obtained the labor or services of Plaintiffs and other B-1 workers by means of:

    a.  Physical restraint;

    b.  Serious harm, including financial harm, psychological harm, and reputational harm;

    c.  Threats of physical restraint;

    d.  Threats of serious harm, including financial harm, psychological harm, and reputational harm;

    e.  Abuse of legal process;

    f.  Threatened abuse of legal process; and

    g.  A scheme, plan, or pattern intended to cause Plaintiffs and other B-1 workers to believe that, if they did not perform such labor or services, they or another person would suffer serious harm, including financial, psychological, and reputational harm, as well as physical restraint.

131.    Defendants' scheme to, *inter alia*,

a.  force Plaintiffs and other B-1 workers to live at a bunkhouse they were not allowed to leave except for work or with a GIS driver, and where they were not allowed to have visitors;

b.  force Plaintiffs and other B-1 workers, when infected with COVID-19, to live in overcrowded, dangerous, and isolated conditions causing psychological deterioration and harm; and

c.  threaten B-1 workers with deportation, blacklisting, civil action, and criminal prosecution to prevent Plaintiffs and other B-1 workers from leaving their employment with Defendants;

d.  threaten civil and criminal action against individuals who Defendants believed helped some B-1 workers leave their employment with Defendants;

e.  Prevent Plaintiffs and other B-1 workers from receiving 80 percent of their wages while they were employed at Defendants' operations, thereby preventing Plaintiffs and other B-1 workers form having the financial means to leave;

was designed to convince Plaintiffs and other B-1 workers that they would suffer serious harm if they were to leave his employment with Defendants.

132.   Defendants' threats of deportation, civil action, and criminal prosecution constituted abuse or threatened abuse of legal process designed to obtain Plaintiffs' and other B-1 workers' labor.

133.   In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants, directly or through their agents, knowingly recruited, transported, harbored and/or obtained Plaintiffs and other B-1 workers for labor or services in

furtherance of the Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

>    a.   forced labor, violating 18 U.S.C. § 1589;
>
>    b.   attempting to violate 18 U.S.C. § 1589, thereby violating 18 U.S.C. § 1594(a); and
>
>    c.   conspiring to violate 18 U.S.C. § 1589, thereby violating 18 U.S.C. § 1594(b).

134.    In violation of 18 U.S.C. § 1594(b), Defendants, directly or through their agents, attempted, and conspired with each other, to violate 18 U.S.C. § 1589.

135.    By bringing a counterclaim alleging defamation, which Defendants would not have brought if Plaintiffs had not instituted this lawsuit, Defendants obstructed, attempted to obstruct, or interfered with the enforcement of 18 U.S.C. § 1590(a), thereby violating 18 U.S.C. § 1590(b).

136.    Defendants knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs and other B-1 workers of their rights under the TVPA.

137.    As a proximate result of the conduct of Defendants, Plaintiffs and other B-1 workers suffered financial and other damages.

138.    Under the TVPA, Plaintiffs and other B-1 workers are entitled to recover compensatory and punitive damages in an amount to be proven at trial, and attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

## COUNT 3
### FAIR HOUSING ACT VIOLATIONS

139.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above as though fully set forth herein.

140.    This Cause of Action sets forth claims by Plaintiffs and other B-1 workers against all Defendants under the civil remedies provision of the Fair Housing Act, 42 U.S.C. § 3613(c).

141.    As set forth herein, Defendants discriminated against Plaintiffs and other B-1 workers in the terms, conditions, or privileges of rental of the bunkhouse and quarantine vessels, and in the provision of services or facilities in connection therewith, because of Plaintiffs' and other B-1 workers' race, color, and/or national origin.

142.    The discrimination included imposing adverse rules on the Plaintiffs and other B-1 workers, including not permitting them to leave Defendants' bunkhouse without a GIS escort, forcing them to quarantine in poor conditions on vessels, and subjecting them to pervasive verbal abuse—to which workers of different race, color, and/or national origin were not similarly subjected.

143.    Plaintiffs and other B-1 workers were injured by these discriminatory housing practices.

144.    Defendants knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs and other B-1 workers of their rights under the Fair Housing Act.

145.    Under the Fair Housing Act, Plaintiffs and other B-1 workers are entitled to recover compensatory and punitive damages in an amount to be proven at trial, and attorneys' and experts' fees and costs as authorized by 42 U.S.C. § 3613(c).

## VI.    DEMAND FOR TRIAL BY JURY

146.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all questions of fact raised by this Complaint.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and other B-1 workers pray that this Court enter an Order:

a.  assuming jurisdiction over this action;

25

b.  certifying this case as a class action under Fed. R. Civ. P. 23, naming Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

c.  declaring that the Defendants violated the FLSA, the TVPA, and the Fair Housing Act;

d.  permanently enjoining Defendants from further violations of the FLSA, the TVPA, and the Fair Housing Act;

e.  granting judgment to Plaintiffs on their FLSA claims and awarding each of them compensatory damages, plus an equal amount in liquidated damages;

f.  granting judgment to Plaintiffs and the other B-1 workers on their TVPA and Fair Housing Act claims and awarding them compensatory and punitive damages;

g.  awarding prejudgment and postjudgment interest as allowed by law;

h.  awarding Plaintiffs and other similarly situated workers their costs and reasonable attorneys' fees; and

i.  granting such further relief as this Court finds just.

Respectfully submitted this day: November 28, 2022,

/s/ Daniel Werner
**Daniel Werner (GA Bar #422070)**
**Radford & Keebaugh, LLC**
315 W. Ponce de Leon Ave., Suite 1080.
Decatur, GA 30030
P: 678-271-0300
F: 678-271-0304
E: dan@decaturlegal.com
*(admitted pro hac vice)*

**Kenneth C. Bordes (Bar #35668)**
**Kenneth C. Bordes,**
**Attorney at Law, LLC**
4224 Canal St.
New Orleans, LA 70119
P: 504-588-2700
F: 504-708-1717
E: kcb@kennethbordes.com

**M. Lucia Blacksher Ranier (Bar # 26605)**
**Samuel T. Brandao (Bar # 34456)**
**Civil Rights and Federal Practice Clinic**
**Tulane Law School**
6329 Freret Street
New Orleans, LA  70118
P: (504) 862-8892
F: (504) 862-8753
E: lblacksh@tulane.edu
E: sbrandao@tulane.edu

*Attorneys for Plaintiffs*