UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

VICTOR CAGARA ORTIGUERRA ET AL.          CIVIL ACTION

VERSUS                                   NO. 22-309

GRAND ISLE SHIPYARD, LLC ET AL.          SECTION: "J"(3)

**ORDER & REASONS**

Before the Court are Plaintiffs' *Motion for Certification of a Class Action* **(Rec. Doc. 129)**, Defendants' opposition thereto (Rec. Doc. 147), and Plaintiffs' reply (Rec. Doc. 168). The Court held oral argument on the motion on June 11, 2025 (Rec. Doc. 215). Following oral argument, Plaintiffs submitted their *Proposed Class Damages Model and Trial Plan* (Rec. Doc. 220). Defendants submitted their response. (Rec. Doc. 227). Plaintiffs submitted their reply. (Rec. Doc. 243). Having considered the motion and memoranda, the record, the parties' oral arguments, and the applicable law, the Court finds that the motion should be **DENIED**.

**FACTS AND PROCEDURAL BACKGROUND**

Plaintiffs are ten Philippine citizens who secured B-1 visas to work in the United States for Defendants Grand Isle Shipyard, LLC and its parent company GIS, LLC, (collectively "GIS"). (Rec. Doc. 74, at 2). Plaintiffs seek to represent two putative classes of an unknown number of Filipino citizens who worked for GIS over several years. *Id.* at 16. Plaintiffs pursue federal class claims against GIS under the Trafficking Victims Protection Act ("TVPA") and the Fair Housing Act ("FHA"). *Id.*

GIS is an oil-field services contractor that, among other things, maintains and repairs oil rigs in the Gulf of Mexico. *Id.* at 8. In the mid-2000s, GIS began employing skilled welders and fitters from the Philippines to work offshore on these oil rigs. *Id.* at 16. As required by Philippine labor law, GIS hires these employees through a Filipino-owned manning agency. (Rec. Doc. 221, at 39).

The Filipinos sign contracts to work for GIS for a limited term, typically three to four months. *Id.* at 42. Unless the Filipinos ask to extend their term, they will return to the Philippines once their contract ends. *Id.* While employed by GIS, the Filipinos stay in one of two locations. (Rec. Doc. 129-13, at 7). The Filipinos are either working offshore on an oil rig, or they are onshore awaiting deployment to another rig. *Id.* While onshore, the Filipinos are housed in the GIS-owned Galliano bunkhouse. *Id.*

The Filipinos may stay at the bunkhouse for anywhere from a few days to a few weeks. (Rec. Doc. 221, at 42). Consequently, as Plaintiffs allege, GIS provides van transportation to Walmart two to three times a week, and occasionally takes the workers to Houma, Louisiana. (Rec. Doc. 129-13, at 8).  When staying at the bunkhouse, GIS pays the Filipinos for forty hours per week of on-call time, wherein the Filipinos must be available to quickly redeploy to a new rig. (Rec. Doc. 221 at 18, 44). Still, the Filipinos have no working duties while staying at the bunkhouse. *Id.* at 41.

Plaintiffs were not happy at the bunkhouse. Plaintiffs allege that GIS treated Filipino workers differently than the non-Filipino workers who stayed there. (Rec.

Doc. 129-13, at 8–15). Plaintiffs each testify about their different experiences at GIS, but their primary claim is that GIS prohibited Filipino employees from leaving the bunkhouse without permission while allowing non-Filipino employees to leave anytime. *Id.* at 8,9. Plaintiffs do not contend that GIS physically prevented them from leaving, but they claim that if they tried to leave on their own, they would be given a hard time or threatened with termination and deportation. *Id.* at 13. So, Plaintiffs claim that GIS had an implicit but enforced policy of not allowing Filipino employees to leave the bunkhouse of their own free will. *Id.* at 8.

Plaintiffs allege additional discrimination occurred at the bunkhouse during Hurricane Ida. *Id.* at 9. Plaintiffs claim that GIS prohibited Filipino workers from evacuating, while evacuating all but a few non-Filipino workers from the bunkhouse before the storm. *Id.* at 10. Plaintiffs allege that Filipinos endured poor conditions at the bunkhouse for several weeks after the storm, including lack of electricity, lack of running water, and a hole in the bunkhouse roof. *Id.*

Lastly, Plaintiffs allege that, beyond the operation of the bunkhouse, Filipinos were quarantined during the COVID-19 Pandemic on filthy, unsafe, cramped vessels that lacked sufficient food, medical treatment, and, at times, electricity. *Id.* at 10–11. Plaintiffs allege that they were not allowed to leave these vessels while quarantined. *Id.* at 11.

Plaintiffs claim that through their actions Defendants unlawfully forced the Filipinos' labor and trafficked them in violation of the TVPA. *Id.* at 7. Plaintiffs also

3

allege that Defendants discriminatorily housed Filipinos in violation of the FHA. *Id.* Plaintiffs seek class certification of their claims under each of these two statutes. *Id.*

Plaintiffs originally moved for class certification on January 24, 2025. (Rec. Doc. 129). During the June 11 hearing on the motion, the Court asked Plaintiffs to submit a proposed class damages model and trial plan to help the Court determine whether class certification was appropriate. *Id.* at 62.

However, before the briefing was completed on Plaintiffs' proposed class damages model and trial plan, Defendants filed a second motion to compel arbitration of all of Plaintiffs' claims on July 22. (Rec. Doc. 223). The briefing on that opposed motion was completed on September 2. (Rec. Doc. 233). On September 19, the Court denied that motion. (Rec. Doc. 237).  Plaintiffs then submitted their final brief on their proposed class damages model and trial plan (Rec. Doc. 243), which the Court accepted on October 31. (Rec. Doc. 245).

## LEGAL STANDARD

Rule 23 governs whether a proposed class falls within the limited exception to "the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "A proposed class suit must meet all of the requirements of Rule 23(a) and fit into one of the categories of Rule 23(b)." William B. Rubernstein, et al., 1 Newberg and Rubenstein on Class Actions § 1:2 (6th ed. 2024). The proposed class must also satisfy Rule 23's implicit requirements.

The Fifth Circuit, like other circuits, has incorporated an additional requirement or an implicit requirement of class certification—that the class be "definite" or "ascertainable." William B. Rubernstein, et al., 1 Newberg and Rubenstein on Class Actions § 3:1 (6th ed. 2024); *see also Braidwood v. Mgmt., Inc. v. Equal Emp't Opportunity Comm'n,* 70 F.4th 914, 933 (5th Cir. 2023) ("The Fifth Circuit has also articulated an 'ascertainability' requirement for Rule 23 class actions."); *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) ("It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."); *John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445, n.3 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23.").

After the implicit requirement is satisfied, four prerequisites must be met by all classes: numerosity, commonality, typicality, and adequacy of representation. Fed.

R. Civ. P. 23(a). The party seeking class certification bears the burden of demonstrating that the requirements of Rule 23 have been satisfied. *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 737–38 (5th Cir. 2003). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." "[A] plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981). But, the Fifth Circuit has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable." *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013) (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999)). Rather, "a number of facts other than the actual or estimated number of purposed class members may be relevant to the 'numerosity' question; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman*, 651 F.2d at 1038.

Pursuant to Rule 23(a)(2), there must be "questions of law or fact common to the class." The Supreme Court has explained that "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury.'" *Dukes*, 564 U.S. at 349 (quoting *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). Dissimilarities among class members should be considered to determine

6

whether a common question is truly presented. *Id.* at 359. Even a single common question of law or fact can suffice to establish commonality, so long as resolution of that question "will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke." *Id.* at 350, 359.

Rule 23(a)(3) provides that "the claims or defenses of the representative parties [must also be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality inquiry rests "less on the relative strengths of the named and unnamed plaintiffs' cases than on the similarity of legal and remedial theories behind their claims." *Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). Moreover, Rule 23(a)(4) requires the party seeking certification to show that "the representative parties will fairly and adequately protect the interests of the class." This standard "requires the class representative to possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation. *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 482–83 (5th Cir. 2001). The adequacy requirement "also factors in competency and conflicts of class counsel." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n. 20 (1997).

Nevertheless, class certification is permitted only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc.*, 521 U.S.

at 623. "In order to 'predominate,' common issues must constitute a significant part of the individual cases." *Mullen*, 189 F.3d at 626 (quoting *Jenkins*, 782 F.2d at 472).

To determine "whether legal issues common to the class predominate over individual issues," a court must consider how the case will be tried. *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 739 (5th Cir. 2023) (quoting *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003)). This inquiry "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Id.*

Generally, individualized damages calculations will not preclude a finding of predominance. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54 (2016) (citation omitted). However, "[w]here the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried. In such cases, class certification is inappropriate." *O'Sullivan*, 319 F.3d at 744–45. Overall, the predominance standard under Rule 23(b)(3) is "far more demanding" than the commonality requirement under Rule 23(a). *Amchem*, 521 U.S. at 623–24.

Finally, a class action must be the superior method for adjudicating the controversy. The district court must compare and "assess the relative advantages of alternative procedures for handling the total controversy." *In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013) (quoting Fed. R. Civ. P. 23(b)(3) Advisory Committee's Note

to 1966 Amendment). The superiority analysis is fact-specific and varies depending

on the circumstances of each case. *Id.* Among the factors for the court to consider are

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23.

## PARTIES' ARGUMENTS AND DISCUSSION

Plaintiffs seek certification of two separate classes of "Filipino B-1 Visa

Workers" to receive damages and injunctive and declaratory relief. (Rec. Doc. 129, at

13). For their TVPA claims, Plaintiffs seek to certify a class consisting of:

> All individuals who, at any time between June 28, 2012 and the present, (1) were employed at Grand Isle Shipyard and/or GIS; (2) lived at the bunkhouse and/or on the quarantine vessels; (3) were nationals of the Philippines; and (4) were B-1 visa holders.

*Id.* For their FHA claims, Plaintiffs seek to certify a class consisting of:

> All individuals who, at any time between June 28, 2020 and the present, (1) lived at the bunkhouse and/or on the quarantine vessels; (2) were Filipinos, of Philippine national origin, and Asian Pacific Islanders; and (3) were B-1 visa holders.

*Id.* Defendants argue that Plaintiffs fail to establish each requirement of Rule

23(b)(3) class certification. (Rec. Doc. 147, at 3). While all of the Rule 23(a)

requirements are important and must be satisfied, the Rule 23(b)(3) requirements,

including predominance, usually present a far more challenging obstacle for class

certification. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)

9

(explaining that the predominance inquiry is "far more demanding" than Rule 23(a)'s commonality requirement). "[T]he issue of predominance has become the battlefield on which most class certifications are fought, and the outcome depends heavily on a court's assessment of what evidence (i.e., whether class-wide or individualized) will be adduced at the trial." *Barasich v. Shell Pipeline Co., LP*, No. 05-4180, 2008 WL 6468611, at *5 (E.D. La. June 19, 2008) Therefore, for Plaintiffs' TVPA and FHA claims, the Court will appropriately begin its analysis by turning its attention to the more "exacting demands" of Rule 23(b)(3), specifically the predominance requirement. *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 325 (5th Cir. 2008). If the predominance requirement is satisfied, then the Court will address Rule 23(b)(3)'s superiority requirement, and, if that is satisfied, Rule 23(a)'s requirements. *Id.* at 326.

## I.    Predominance

For a Rule 23(b)(3) class to be certified, "the question of law or fact common to class members [must] predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Crutchfield v. Sewerage and Water Bd. of New Orleans*, 829 F.3d 370, 376 (5th Cir. 2016) (quoting *Amchem*, 521 U.S. at 623). The predominance inquiry requires the Court to identify the substantive issues that will control the outcome of the litigation, assess which issues will predominate, and then determine whether the issues are common to the class. *O'Sullivan*, 319 F.3d at 738. The Fifth Circuit has explained that

> [A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof. When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members. At bottom, the inquiry requires the trial court to weigh common issues against individual ones and determine which category is likely to be the focus of a trial.

*Crutchfield*, 829 F.3d at 376 (cleaned up and internal citations omitted).

Plaintiffs argue that the common question that predominates in this case is whether GIS had a *de facto* policy preventing Filipino employees from leaving GIS housing, and, if so, to what extent this was different from the leave policy for non-Filipino employees. (Rec. Doc. 168, at 11). Plaintiffs argue that their claims require extensive but identical factual and legal determinations. (Rec. Doc. 129-13, at 28).

Defendants argue that individual factual issues will predominate because they have 25 signed affidavits from members of the proposed class which contradict all of Plaintiffs' claims, including the claim that Filipino employees were not allowed to leave the bunkhouse. (Rec. Doc. 147, at 18). Noting that most of the evidence Plaintiffs rely on is deposition testimony and declarations, Defendants also argue that the evidence established in support of Plaintiffs' claims shows that each of the named Plaintiffs experienced different alleged mistreatment at different times and from different persons. *Id.* at 19.

11

## A. TVPA Claims

Plaintiffs contend that GIS violated the TVPA's forced labor and trafficking provisions because they obtained forced labor from the Filipinos. (Rec. Doc. 129-12, at 7). The Court will consider Plaintiffs' forced labor claims before considering their trafficking claims.

### i.    Forced Labor

The TVPA's forced labor provision provides that:

> Whoever knowingly provides or obtains the labor or services of a person…
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of abuse or threatened abuse of the law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint
> shall be [subject to criminal penalties].

18 U.S.C. § 1589. The statute defines serious harm as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and . . . circumstances to perform or to continue performing labor . . . in order to avoid incurring that harm.

*Id.* § 1589(c)(2). The statute defines "abuse or threatened abuse of the law or legal process" as:

> The use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

12

*Id.* § 1589(c)(1). The TVPA's express purposes are "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 22 U.S.C.A. § 7101 (West 2025).

Plaintiffs argue that for their TVPA claims, Defendants' intent is central to the liability determination. (Rec. Doc. 129-13, at 28). According to Plaintiffs, because the focus is on Defendants' intent with respect to their threats or actions and how a reasonable person would respond to those actions, there need not be an individualized determination as to whether each Filipino felt compelled to work for Defendants. *Id.*

Defendants disagree. (Rec. Doc. 147, at 20). They argue that to succeed on their forced labor claims, Plaintiffs must show that Defendants' conduct caused the Filipinos to continue to work for GIS. *Id.* According to Defendants, this determination cannot be made without looking to the specific employee involved, and whether that specific employee felt compelled to render forced labor. *Id.*

In support of their arguments, each party relies on one competing case. (Rec. Doc. 129-13, at 28; Rec. Doc. 147, at 20). Plaintiffs rely on a case from the central district of California, where the court found that the TVPA does not require an individualized showing. (Rec. Doc. 129-13, at 28 (citing *Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. 10-1172, 2011 WL 7095434, (C.D. Cal. Dec. 12, 2011)). In contrast, Defendants rely on a case from this district, where the court found that there must be an individualized showing that each employee was coerced to work.

13

(Rec. Doc. 147, at 20 (citing *David v. Signal Int'l, LLC*, No. 08-1220, 2012 WL 10759668, (E.D. La. Jan. 4, 2012)).

After reviewing these cases, the Court is far more persuaded by *Signal*'s TVPA interpretation than *Nunag-Tanedo's*. In *Nunag-Tanedo* the court merely relied on the TVPA's text and interpretation of that text from the ninth circuit to find that the forced labor analysis need only focus on the employer's conduct. 2011 WL 7095434, at *7–8. However, in *Signal*, the court conducted an in-depth analysis that considered the legislative history, purpose, and text of the TVPA to find that the forced labor analysis must consider the employer's conduct and the employee's vulnerabilities. *Signal*, 2012 WL 10759668, *19. As the court explained, the TVPA's forced labor provision asks whether the defendants' actions coerced or forced the victim to provide labor, and this question cannot be answered "without looking to the specific victim involved." *Id.* The court explained that these individualized considerations become "extremely important" when the case involves a more subtle type of coercion, such as psychological coercion. *Id.* at *20; *see also*, *Menocal v. GEO Group, Inc.*, 320 F.R.D. 258, 267, *aff'd*, 882 F.3d 905 (10th Cir. 2018) (finding *Signal* "to be persuasive in that the forced labor statute does contain both an objective and a subjective component"). Accordingly, the Court will follow *Signal*'s lead.[1]

---

[1] Plaintiffs argue in a footnote in their reply brief that this case is distinguishable from *Signal* because Plaintiffs also bring "attempt" claims, meaning the Defendants also attempted to obtain the Filipinos' forced labor. (Rec. Doc. 168, at 12 n. 10). Plaintiffs argue that this attempt claim focuses entirely on Defendants' intent rather than each employees' perception of Defendants' actions. Plaintiffs cite two cases in support of this idea in their motion supporting class certification: *Slipchenko v. Brunel Energy, Inc.*, 2013 WL 4677918, at *13 (S.D. Tex. Aug. 30, 2013) and *Menocal*, 320 F.R.D. at 267. However, neither of those non-binding cases held that bringing an attempt claim obviates the need for a subjective inquiry under the TVPA. Further, as the Court explains below, the individualized nature of the evidence in this case also precludes predominance.

Still, *Signal* rejected the argument that TVPA forced labor claims could never be suitable for class certification. *Id.* at 21. The court explained that certification of TVPA forced labor claims could be appropriate when, based on the type of coercion used by the defendant, consent becomes irrelevant. *Id.* But, for that to happen, the victim's choice to work must be "so illegitimate that any decision to work is 'involuntary." *Id.*  (quoting *United States v. Kozminski*, 487 U.S. 931, 959 (1988) (Brennan J. concurring)).

Plaintiffs argue that such a circumstance is present here because Defendants had a policy of not allowing Filipino employees to leave GIS housing. (Rec. Doc. 243, at 5–6). However, the Court does not find that this alleged policy was so restrictive that it rendered the Filipino's decision to work for Defendants involuntary. First, none of the Plaintiffs testified that they could not leave the bunkhouse building, and many of them expressed that they could walk or jog around the property for exercise. (Rec. Doc. 129-13, at 9; Rec. Doc. 129-14, at 56: 16–22; Rec. Doc. 129-17, at 78:13–16;). As for leaving the bunkhouse property, none of the Plaintiffs claim that GIS employees physically prevented them from leaving, and none of them claim that there were gates or barriers that fully enclosed the property. (Rec. Doc. 129-17, at 44–45). This is self-evident because the named Plaintiffs in this suit were able to walk out the bunkhouse, get into a vehicle, and drive to Florida before this suit began. (Rec. Doc. 221, at 45). Further, Plaintiffs admit that they could leave the bunkhouse to travel to Walmart on scheduled trips provided by GIS two to three times per week, and GIS also provided the occasional trip to Houma, Louisiana. (Rec. Doc. 129-13, at

15

8–9). So, Defendants alleged policy did not actually prevent Plaintiffs from leaving the bunkhouse.

Second, GIS paid Plaintiffs, both while working offshore and while staying in the bunkhouse without work duties. (Rec. Doc. 221, at 29–30). Plaintiffs voluntarily renewed their employment contracts with GIS multiple times, and GIS was not exerting any pressure on Plaintiffs to renew these contracts. *Id.* at 42. At the end of every employment term, GIS would pay for Plaintiffs' airfare back to the Philippines. (Rec. Doc. 129-16, at 10; Rec. Doc. 221, at 45). GIS would pay this airfare regardless of if an employee failed to stay for their full term, or otherwise breached their contractual obligations. (Rec. Doc. 129-16, at 10; Rec. Doc. 221, at 45). So, GIS did not financially pressure Plaintiffs to continue working for GIS.

While Plaintiffs were expected to work for the duration of their contract term, they could still breach that contract and leave GIS, like Plaintiff Decena. (Rec. Doc. 129-5). Defendants did file a complaint to have some employees who breached their contract delisted from the manning agency in accordance with Filipino labor law. *Id.* But, like the plaintiffs in *Signal*, this case still "involves paid workers who in fact could leave their jobs at any time." *Id.* at 21.

Plaintiffs urge this Court to follow *Menocal*, where the court found that an inference of causation would be appropriate for the plaintiffs' forced labor claims. 320 F.R.D. at 267. There, the plaintiffs were immigration detainees, and the defendant had a written sanitation policy that required detainees to clean the facility without

16

pay "under threat of solitary confinement and other punishments." *Id.* at 21. Plaintiffs' situation is vastly different from the immigration detainees because Plaintiffs were paid and could leave the bunkhouse or their employment. These stark differences bolster the notion that a class wide causation inference would not be appropriate here. Thus, Plaintiffs' choice to continue to work for GIS was not so illegitimate that their decision to work was involuntary. Therefore, the Court finds that an individualized inquiry must be conducted to determine whether each Filipino employee was forced to work.

The Court finds that this individualized inquiry would rely on individualized evidence. Like the plaintiffs in *Signal*, the serious harm that Plaintiffs allege compelled them to work is uniquely individual in nature. Plaintiffs allege a uniform class wide policy of not being able to leave the bunkhouse. However, in support of this policy's existence, Plaintiffs primarily rely on conflicting testimony that reveals individual experiences unique to each Plaintiff.[2] While there are some common characteristics of the testimony from the five deposed Plaintiffs, Defendants present twenty-five putative class members who declare that they could leave the bunkhouse of their own free will. (Rec. Doc. 147-8 to Rec. Doc. 147-34). Thus, it could not be said that this anecdotal evidence could be used to infer a uniform policy directed toward the entire class.

---

[2] For example, Plaintiff Decena testified that he could not walk or jog outside the bunkhouse property for safety reasons (Rec. Doc. 129-14, at 16), whereas Plaintiff Hernandez testified that he could have walked to Walmart if he wanted to but that such a journey would be tiresome. (Rec. Doc. 126-9, at 14). Plaintiff Rayos said that at no point during his GIS employment did he ask to leave the bunkhouse and was told he could not leave. (Rec. Doc. 147-39, at 16).

17

Plaintiffs also present certain circumstantial evidence which they argue is sufficient to create a class wide inference of a policy prohibiting employees from leaving the bunkhouse including (1) an email from DNR to Filipino employees warning them not to abandon their employment with GIS (2) a complaint filed by DNR and GIS against Plaintiff Decena for abandoning his employment with GIS, and (3) an email between DNR and GIS wherein GIS confirms that it wants DNR to delist the names of employees who "runaway." (Rec. Doc. 220-3, at 1; Rec. Doc. 129-5, at 4; Rec. Doc. 129-10, at 2–3).

The Court finds that none of this evidence supports the inference of a class wide policy prohibiting employees from leaving the GIS bunkhouse. Instead, this evidence supports that GIS acted against Filipino employees who abandoned their job and breached their employment contract. When the Filipino employees sign their employment contract, they agree to work for GIS for a term, typically three to four months. (Rec. Doc. 26-9, at 1, 8, 22, 29, 36, 43, 50, 57, 64). They also agree to be bound by the POEA Standard Terms and Conditions Governing the Overseas Employment of Filipino Seafarers On-Board Ocean-Going Ships ("Standard Terms"). (Rec. Doc. 26-9; Rec. Doc. 41-8). Section 33 of the Standard Terms provides that employees who desert their assigned vessel, or assist others in deserting their assigned vessel, will be delisted. (Rec. Doc. 26-9, at 7).

By deserting their ships and abandoning their jobs, the Filipinos breach their employment contracts and violate the Standard Terms. By warning employees not to abandon their employment with GIS, DNR is warning the Filipinos not to breach

18

their contracts or violate the Standard Terms. By filing a complaint to delist employees who abandon their employment, GIS is complying with the Standard Terms. Plaintiffs present no written evidence that Defendants acted against Filipino employees who merely left the bunkhouse without permission.

Some Plaintiffs allege that they were verbally threatened with termination or deportation for breaking GIS rules, including leaving the bunkhouse without permission.[3] But of the threats that Plaintiffs allegedly received, none were directed towards the class as a whole. Instead, they were made to individual Plaintiffs by different people at varying times. (Rec. Doc. 147-39, at 17–18; Rec. Doc. 147-41, at 6; Rec. Doc. 147-42, at 6). Further, while some Plaintiffs claimed that certain GIS employees threatened them, other Plaintiffs claim that those same employees were non-problematic or approachable.[4] (Rec. Doc. 147-37, at 9–10; Rec. Doc. 147-38, at 8). And Defendants dispute that these threats ever occurred and substantiate this dispute with sworn declarations from 25 putative class members. (Rec. Doc. 147-8, at 8). This is unlike *Nunag-Tanedo*, where the gravamen of the plaintiffs' TVPA claims involved a "scheme of hidden fees and contracts" that applied uniformly to every class

---

[3] Plaintiff Decena first testified that an individual known as "Big E" would threaten individuals with deportation, but that Big E never threatened him with deportation. (Rec. Doc. 129-14, at 12). However, Decena later changes his story and says that Big E threatened him with deportation. (Rec. Doc. 147-41, at 6).

In his personal statement, Plaintiff Agustin claims that once he left the bunkhouse to walk to a store. (Rec. Doc. 147-43, at 2). Agustin claims that Big E saw him on his way to the store, yelled at him, and told him that if he saw Agustin out again, he would fire all Filipinos. *Id.*

Plaintiff Ortiguerra testified that an individual named Melissa threatened him for being late for a temperature check. (Rec Doc. 147-37, at 9–10). Ortiguerra later testified that Melissa threatened him with deportation for breaking GIS rules but does not specifically mention being threatened for leaving the bunkhouse. (Rec. Doc. 147-42, at 6).

[4] Plaintiff Ortiguerra testified that Melissa threatened him on multiple occasions. (Rec Doc. 147-37, at 9–10; Rec. Doc. 147-42, at 6). However, Plaintiff Hernandez testified that Melissa is approachable. (Rec. Doc. 147-38, at 8). Plaintiffs Decena and Agustin testified that Big E threatened them. (Rec. Doc. 147-41, at 6; Rec. Doc. 147-43). However, Plaintiff Yuzon said that he knew of Big E but that he had no problems with him. (Rec. Doc. 147-36, at 11).

member. *Id.* at \*8. Instead, the factfinder must look to the details surrounding each alleged threat, determine whether that threat actually occurred, and, if so, whether that threat was sufficient to coerce that particular Filipino employee to continue working for GIS. Therefore, the Court finds that individual issues of coercion and consent predominate such that the Court cannot certify Plaintiffs' TVPA forced labor claims. Accordingly, Plaintiffs motion to certify their forced labor claims is **DENIED**.

### ii.    *Trafficking*

The Court will now determine whether Plaintiffs can certify their trafficking claims. In addition to their forced labor claims, Plaintiffs bring trafficking claims under 18 U.S.C. § 1590, which prohibits trafficking with respect to peonage, slavery, involuntary servitude, or forced labor. It provides that "[w]hoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services *in violation of this chapter* shall [face criminal penalties]. 18 U.S.C. § 1590 (West 2000 & Supp. 2008) (emphasis added). Plaintiffs' trafficking claims are based on their forced labor claims. Plaintiffs also bring claims under 18 U.S.C. § 1594(b), which provides that "whoever conspires with another to violate section . . . 1589 . . . shall be punished," and these claims are also premised on Plaintiffs' forced labor claims. 18 U.S.C. § 1594(b) (West 2000 & Supp. 2008, 2015). So, to recover under these statutes, Plaintiffs must first succeed on their forced labor claims.

Because Plaintiffs' trafficking claims are premised on their forced labor claims, the Court finds that Plaintiffs' trafficking claims cannot be tried on a class wide basis. As discussed above, individualized issues will predominate as to whether Defendants

20

truly forced the Filipinos' labor. Accordingly, Plaintiffs' trafficking claims are not amenable to class certification, and the Court must deny the motion as to those claims.

### B. FHA Claims

Plaintiffs also seek certification of their Fair Housing Act claims. Plaintiffs spend the bulk of their motion arguing in favor of certification of their TVPA claims with little discussion of their FHA claims. Still, in their reply to Defendants' opposition, Plaintiffs contend that proving their FHA claims will not require individualized inquiries and can instead rely on common class-wide proof regarding GIS's policy of prohibiting Filipino workers from leaving the bunkhouse and treating Filipinos differently than other GIS workers. (Rec. Doc. 168, at 12).

Defendants unsurprisingly disagree. (Rec. Doc. 147, at 21). Making many of the same arguments against certification of Plaintiffs' TVPA claims, Defendants argue that each of the Plaintiffs' experiences while in the bunkhouse varied, and that Plaintiffs cannot point to a common policy or practice which would indicate that they received the same class wide treatment. *Id.* As such, Defendants contend that resolving Plaintiffs' FHA claims will also require an individualized inquiry. *Id.*

The Court agrees with Defendants. Plaintiffs' FHA claims are premised on the idea that Defendants treated Filipino employees differently than non-Filipino employees, and this theory relies at least in part on whether Defendants had a class wide policy of not allowing Filipinos to leave the bunkhouse. (Rec. Doc. 151-3, at 12). As discussed, evidence supporting the existence of this policy relies on individual

21

experiences unique to each Plaintiff, such that individual issues predominate. Further, evidence of Defendants' alleged discriminatory housing practice and conditions also primarily relies on conflicting and varying anecdotal evidence unique to each Plaintiff, and this evidence is not susceptible to class wide proof.[5] Plaintiffs point to no formal GIS policy treating Filipino employees differently than non-Filipino employees. Tellingly, Plaintiffs also point to no case which certified FHA claims of this nature. The Court thus finds that Plaintiffs fail to carry their burden of proving that individualized liability issues will not predominate their FHA claims. Accordingly, the Court **DENIES** Plaintiffs' motion to certify their FHA claims.

---

[5] For example, one discriminatory practice that Plaintiffs allege is that Filipino workers were refused second helpings of food whereas non-Filipino workers could get seconds. (Rec. Doc. 129-14, at 11). Plaintiffs Decena, Ortiguerra, and Yuzon testified that GIS would not give them second servings of food. (Rec. Doc. 147-35, at 12; Rec. Doc. 147-37, at 13–14; Rec. Doc. 147-36, at 8). However, Plaintiff Hernandez claimed that he could get additional servings. (Rec. Doc. 147-40, at 6). Defendants also offer 25 putative class members who swear that they could get additional servings. (Rec. Doc. 147-8 to Rec. Doc. 147-34).

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' *Motion for Class Certification* **(Rec. Doc. 129)** is **DENIED**.

New Orleans, Louisiana, this 8th day of April 2026.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

23